Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION, ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS *PARENS PATRIAE,*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY; MARK T. ESPER, U.S. SECRETARY OF DEFENSE, IN HIS OFFICIAL CAPACITY; CHAD F. WOLF, ACTING U.S. SECRETARY OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY; AND LIEUTENANT GENERAL TODD T. SEMONITE, COMMANDING GENERAL OF THE U.S. ARMY CORPS OF ENGINEERS, IN HIS OFFICIAL CAPACITY,<br><br>Defendants. | Case No.: 3:20-cv-01552-AJB-MSB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR EMERGENCY TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Hearing on Application for Temporary Restraining Order**<br>**Date:  August 27, 2020**<br>**Time:  2:00 p.m.**<br>**Location:  Courtroom 4A (4th Floor)**<br>**Judge: Anthony J. Battaglia**<br><br>**Motion for Preliminary Injunction Hearing**<br>**Date:  September 17, 2020**<br>**Time: 2:00 p.m.**<br>**Location:  Courtroom 4A (4th Floor)** |

# TABLE OF CONTENTS

STATEMENT OF FACTS ...................................................................................... 1

I.   La Posta and the Land .................................................................................. 1

II.  Impacts of the Border Wall Construction on La Posta's Religious and Cultural Sites and Religious and Spiritual Practices. .................................................. 2

III. Unlawful Border Wall Funding and Construction ........................................ 4

IV. Defendants' Failure to Provide Notice to or Consult with La Posta ............ 6

LEGAL STANDARD ............................................................................................ 7

ARGUMENT ........................................................................................................ 7

I.   La Posta is likely to succeed on the merits. ................................................. 8

   A. Defendants have unlawfully funded and begun construction of the project............. 8

      i.   La Posta has a cause of action both in equity and under the APA. ...................... 8

      ii.  The CAA does not authorize Defendants' transfer of funds to the Drug Interdiction account. ................................................................................. 9

      iii. CAA does not authorize Defendants' use of the $1.375 billion for the Project.. 12

      iv.  Defendants may not use any of the funds because they failed to consult with La Posta. ........................................................................................... 12

      v.   Defendants' construction of the border wall is ultra vires because they failed to consult with La Posta. .................................................................... 14

   B. Defendants' actions violate RFRA ................................................................ 15

      i.   La Posta's treatment of ancestral remains and access to sacred sites is essential to its exercise of religion. ................................................................... 16

      ii.  The Project substantially burdens La Posta's exercise of religion. .................... 16

      iii. The border wall projects are not the least restrictive means to further a compelling government interest. ...................................................................... 18

   C. The Project violates La Posta citizens' Fifth Amendment rights. ................... 19

      i.   La Posta citizens have a constitutionally-protected property right. ................... 19

Memorandum of Points and Authorities in Support of Ex Parte Application for Emergency Temporary Restraining Order and Motion For Preliminary Injunction

i    Case No.: 3:20-cv-01552-AJB-MSB

ii.    Defendants violate La Posta citizens' substantive and procedural due process rights. ................................................................................................. 21

II.   La Posta is suffering irreparable harm and will suffer further harm in the absence of a preliminary injunction. ................................................................... 23

III.  The public interest and balance of the equities weigh in favor of an injunction........ 24

CONCLUSION & REQUEST FOR RELIEF .................................................... 25

Memorandum of Points and Authorities in Support of Ex Parte Application for
Emergency Temporary Restraining Order and Motion For Preliminary Injunction
ii     Case No.: 3:20-cv-01552-AJB-MSB

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................. 7

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ....................................... 8

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ...................................................................... 22

*Armstrong v. United States*, 364 U.S. 40 (1960) ............................................................. 20

*Bennett v. Spear, 520 U.S. 154 (1997)* ........................................................................... 10

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (2015) ................................... 19

*Brenizer v. Ray*, 915 F. Supp. 176 (C.D. Cal. 1996); ..................................................... 21

*California v. Trump*, 963 F.3d 926 (9th Cir. 2020) ..................................................... 9, 12

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ........................................................... 10

*Davis v. Passman*, 442 U.S. 228 (1979) .......................................................................... 19

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073 (9th Cir. 2014) .................................... 24

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ............................................................................ 21

*Harmon v. Brucker*, 355 U.S. 579 (1958) ........................................................................ 8

*In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1125 (S.D. Cal.)..... 14, 15

*In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213 (9th Cir. 2019) .......................... 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).................. 10

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982)..................................................... 19

*Lynch v. United States*, 292 U.S. 571 (1934) .................................................................. 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209
   (2012) ........................................................................................................................ 10

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................... 20, 22

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020) ................................................................. 12

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ....................................................... 24

*Morrissey v. Brewer*, 408 U.S. 471 (1972)...................................................................... 21

Memorandum of Points and Authorities in Support of Ex Parte Application for
Emergency Temporary Restraining Order and Motion For Preliminary Injunction
iii      Case No.: 3:20-cv-01552-AJB-MSB

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ............................ 23

*Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008) ............................ 17

*Nozzi v. Hous. Auth. of City of Los Angeles*, 806 F.3d 1178 (9th Cir. 2015).................... 19

*Reno v. Flores,* 507 U.S. 292 (1993) ............................................................ 21

*San Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005) ...................... 9

*Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) .................................. 7

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) ....................................... 5, 24

*Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020) ................................. 8, 10, 24

*United States v. Gen. Motors Corp.,* 323 U.S. 373 (1945)...................................... 19

*United States v. Salerno*, 481 U.S. 739 (1987)............................................... 19

*United States v. Seeger*, 380 U.S. 163, 174 (1965) .......................................... 16

*United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992).................................. 16

*White v. Univ. of California*, 765 F.3d 1010 (9th Cir. 2014) ................................. 20

*Williams v. Mukasey*, 531 F.3d 1040 (9th Cir. 2008) ......................................... 22

*Witt v. Dep't of Air Force*, 527 F.3d 806 (9th Cir. 2008) ................................... 21

*Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014) .................................... 18

**Statutes**

10 U.S.C. § 284............................................................................... 6

25 U.S.C. §§ 3001–3013.................................................................... 20, 21

42 U.S.C. § 2000......................................................................... 16, 18

5 U.S.C. § 704................................................................................ 9

5 U.S.C. § 706................................................................................ 9

8 U.S.C. § 1103 note.................................................................... passim

Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348 (2018)........ 5

Consolidated Appropriations Act, Pub. L. No. 116-93, § 209, 133 Stat. 2317 (2020)

.................................................................................... passim

U.S. Const. amend. V ....................................................................... 19

Memorandum of Points and Authorities in Support of Ex Parte Application for
Emergency Temporary Restraining Order and Motion For Preliminary Injunction
iv      Case No.: 3:20-cv-01552-AJB-MSB

**Other Authorities**

45 C.F.R. Pt. 10 .................................................................................................. 23

Cardinal Gerhard Ludwig Müller and Archbishop Luis Francisco Ladaria Ferrer,
*Congregation for the Doctrine of Faith, Instruction Ad resurgendum cum Christo
regarding the burial of the deceased and the conservation of the ashes in the case of
cremation,* Aug. 15, 2016 ................................................................................... 2

DHS Tribal Consultation Policy ...................................................................... 13, 14

Executive Order 13175, *Consultation and Coordination with Indian Tribal Governments,*
65 Fed. Reg. 67249 (Nov. 6, 2000) .............................................................. 12, 14

H.R. Rep. No. 93-662, at 16 (1973) .................................................................. 11

United States Attorney General Jeff Sessions, Memorandum for All Executive
Departments and Agencies, "Federal Law Protections for Religious Liberty" (October
6, 2017) ("Sessions Memorandum") ............................................................. 16, 18

Memorandum of Points and Authorities in Support of Ex Parte Application for
Emergency Temporary Restraining Order and Motion For Preliminary Injunction
v    Case No.: 3:20-cv-01552-AJB-MSB

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Since time immemorial, the Kumeyaay people have lived in the area near San Diego and Imperial Counties surrounding what is now the United States-Mexico border. Since the arrival of Europeans in the region, the Kumeyaay territory, culture, religion, and very existence have been under attack to make way for non-Indian settlement. In the most recent episode of Indigenous erasure, the President of the United States and his administration are desecrating Kumeyaay ancestral burial and sacred sites to make way for a wall along the southern border. The La Posta Band of the Diegueño Mission Indians ("La Posta"), in its own capacity and as *parens patriae* on behalf of its citizens, requests a temporary restraining order and preliminary injunction to halt the construction of the border wall—a project being funded and constructed without authorization from Congress and which is violating the constitutional rights of the La Posta citizens.

## STATEMENT OF FACTS

### I.      La Posta and the Land

La Posta is one of twelve bands of Kumeyaay people. Decl. of Gwendolyn Parada ("Chairwoman's Decl.") ¶ 4.  The La Posta Reservation spans 3,556.49 acres and is located in the Laguna Mountains, 56 miles east of San Diego and 46 miles west of El Centro. *Id.* Although the Kumeyaay bands have been restricted to their respective current reservations by United States policy, the Kumeyaay people lived throughout the border area in San Diego and Imperial Counties for over 12,000 years. *Id.* ¶ 8–9; Decl. of Cynthia Parada ("Parada Decl.") ¶ 4; Decl. of Thomas Holm ("Holm Decl.") ¶ 14; Decl. of Stephen Rochester ("Rochester Decl.") ¶ 4.  Many of these village sites are sacred to La Posta citizens and contain human burial sites and other important cultural and archaeological artifacts. *Id.*; Parada Decl. ¶ 13.

Historically, the Kumeyaay moved through their ancestral territory via a system of trails, many of which are still known and used by the Kumeyaay today. *Id.* at ¶ 10.

1  While most of these trails served commercial and social purposes, some trails have

2  religious significance. *Id*. Many of these trails run in proximity to and across the United

3  States-Mexico border in San Diego and Imperial Counties. *Id*.

4      The La Posta tribal citizens practice a religion that is based on oral tradition. Parada

5  Decl. ¶ 8. The Kumeyaay creation story tells of the creation of the universe, similar to

6  Genesis. *Id*. The creation story features many landmarks within the traditional Kumeyaay

7  territory that La Posta citizens hold sacred today, such as Tecate Peak, Jacumba Hot

8  Springs, and Table Mountain, among others. *Id*.; Chairwoman's Decl. ¶ 9; Rochester Decl.

9  ¶ 7.  La Posta citizens hold ceremonies and gatherings at these places, and without access

10 to them, the Kumeyaay people are not able to practice their religion. Parada Decl.  ¶ 10.

11     The Kumeyaay creation story also provides very specific instructions regarding

12 burial practices. *Id*. ¶ 9. The handling and treatment of Kumeyaay remains is a key

13 component of Kumeyaay religion which, like other organized religions, places great

14 emphasis on burial rites. *Id*. ¶ 18; Chairwoman's Decl. ¶ 12; Rochester Decl. ¶ 4. For

15 example, Kumeyaay burial practices call for certain songs to be sung for the dead. Parada

16 Decl. ¶ 9. Similar to mainstream religious dogma,[1] an important Kumeyaay burial rule

17 requires all parts of one's body to remain together after death. Parada Decl. ¶ 9. Kumeyaay

18 religious rites require the proper treatment of Kumeyaay ancestors in the event of

19 exhumation. *Id*. ¶ 13; Chairwoman's Decl. ¶ 12. Such treatment requires a properly trained

20 and certified Kumeyaay person, and the human remains must be treated with respect,

21 including the practice of smudging and singing to ensure proper reburial. *Id*.

22  **II.  Impacts of the Border Wall Construction on La Posta's Religious and**
23     **Cultural Sites and Religious and Spiritual Practices.**

---

24 [1]*See*  Cardinal Gerhard Ludwig Müller and Archbishop Luis Francisco Ladaria Ferrer,
25 *Congregation for the Doctrine of Faith, Instruction Ad resurgendum cum Christo*
26 *regarding the burial of the deceased and the conservation of the ashes in the case of*
27 *cremation,*       Aug.       15,       2016,       available       at
   https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2016/
28 10/25/161025c.html).

Defendants are currently constructing the border wall directly through Kumeyaay burial sites and sacred lands, causing irreversible and easily avoidable damage to Kumeyaay remains, cultural items, history, and religious practices. Chairwoman's Decl. ¶ 9, 12; Decl. of Javier Mercado ("Mercado Decl.") ¶¶ 4-5; Holm Decl. ¶¶ 5-6; Rochester Decl. ¶ 20. For example, Jacumba, known to contain an ancient tribal cemetery, and Tecate, a historical Kumeyaay village site, are located within the path of the border wall project. Chairwoman's Decl. ¶ 11. Prior cultural resources surveys and Kumeyaay historians have noted the existence of human remains, burial sites, and Kumeyaay archaeological sites within the path of construction. *Id.* at ¶ 11; Parada Decl. ¶ 13; Rochester Decl. ¶ 4. In fact, a CBP commissioned study identifies many Kumeyaay cultural sites within the border wall construction area in San Diego. Holm Decl. ¶ 5. However, this study fails to identify many more, and contains erroneous conclusions regarding the need for mitigation. *Id.*

In one disturbing episode, on July 10, 2020, human remains were discovered at a previously unrecorded archaeological site which was under construction for the wall. Holm Decl. ¶¶ 10–13; Mercado Decl. ¶ 8; Rochester Decl. ¶ 16. The appropriate U.S. Customs & Border Protection ("CBP") and U.S. Army Corps of Engineers ("Army Corps") officials were made aware of this discovery. When the discovery was confirmed to be human remains, Defendants did not permit the La Posta to properly exhume the remaining burial site. Mercado Decl. ¶¶ 9–11. Rochester Decl. ¶¶ 21–23. Instead, Defendants continued construction of the border wall over the burial ground. *See* Mercado Decl. ¶ 11; Rochester Decl. ¶¶ 24, 26. This desecration is antithetical to La Posta citizens' religious beliefs and prevents them from exercising their religious obligation to properly treat exhumed remains. Parada Decl. ¶ 17.

In another instance of complete disregard for the rights and beliefs of La Posta citizens, CBP and Army Corps officials ignored the report of an experienced tribal cultural monitor that he had discovered Kumeyaay cultural items that indicated the likely presence of other archaeological material. Mercado Decl. ¶ 12; Parada Decl. ¶ 16. As they did with

Memorandum of Points and Authorities in Support of Ex Parte Application for Emergency Temporary Restraining Order and Motion For Preliminary Injunction

3       Case No.: 3:20-cv-01552-AJB-MSB

the discovery of human remains, Defendants callously continued to build the wall. Mercado Decl. ¶ 12. In yet another episode, Defendants ignored the discovery of soil conditions which indicate the presence of human remains and unceremoniously covered the likely Kumeyaay burial site with fill soil and continued to build the wall. *Id.* at 13.

While Defendants have allowed tribal monitors to observe some construction activity, Defendants have stripped the exercise of value by requiring monitors to agree not to stop construction, even if cultural items are discovered. *Id.* at 15; Parada Decl. ¶ 16; Rochester Decl. ¶ 17. Instead, Defendants force La Posta citizens to choose between ignoring the desecration of their ancestors and the culture they created or to watch powerlessly as construction crews and federal officials ignore their pleas. *Id.*

In addition, the border wall has made, and will continue to make, Kumeyaay burial and sacred sites inaccessible to La Posta citizens. Parada Decl. ¶¶ 12, 17. One of the sacred trails that links several present Kumeyaay reservations with Kumeyaay village sites in what is now Mexico has been cut off by border wall construction. Parada Decl. ¶ 13. Other sacred sites in the path of construction include, significantly, Tecate Peak, Jacumba Hot Springs, and Table Mountain. *Id.* ¶ 5; Parada Decl. ¶ 13; Holm Decl. ¶ 5; Rochester Decl. ¶¶ 4, 19. CBP has even threatened La Posta citizens with trespass charges while engaging in a ritual dance within the border wall construction area. *Id.* ¶ 12. On August 10, 2020, La Posta citizens attempted to visit a site within the border wall area to pray but CBP denied them access and threatened them with arrest and felony charges if they entered the site. Parada Decl. ¶ 18. Defendants will continue to destroy sacred Kumeyaay sites as they next plan to construct the wall through Table Mountain. Rochester Decl. ¶ 19.

## III.   Unlawful Border Wall Funding and Construction

A refrain of President Trump's 2016 election campaign was his promise to build a U.S.-Mexico border wall. Request for Judicial Notice in Support of Temporary Restraining Order and Preliminary Injunction ("RJN"), Ex. 1 (June 16, 2016 Presidential

1  Announcement Speech). Since taking office in 2017, the President repeatedly sought
2  appropriations from Congress for border barrier construction, yet Congress repeatedly
3  denied his requests. *See Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) ("*Sierra*
4  *Club I*").

5  In Fiscal Year ("FY") 2019, the President requested billions in border wall funding,
6  which Congress refused to appropriate. *Id*. at 678. The impasse triggered the nation's
7  longest partial government shutdown, and ultimately, Congress appropriated only $1.375
8  billion of the President's request for $5.7 billion for border wall funding. *Id*. at 678-79. To
9  ensure funding for the wall, the Defendants reprogrammed $1.5 billion of Department of
10  Defense ("DoD") funds toward border wall construction. *Id*. at 682. The Ninth Circuit held
11  that such reprogramming was unlawful and affirmed an injunction preventing the
12  Defendants from using the funds for border wall construction. *Id*.

13  Similar to FY 2019, the FY 2020 budget negotiations were contentious regarding
14  the border wall. President Trump requested $5 billion, and DoD requested $9.2 billion, for
15  construction of the border wall. RJN Ex. 2, 3. Congress rejected both the President's and
16  DoD's FY 2020 budget requests and allocated only $1.375 billion for border wall
17  construction. *See* Consolidated Appropriations Act ("CAA"), Pub. L. No. 116-93, § 209,
18  133 Stat. 2317, 2511–12 (2020). Congress further prohibited the use of any appropriated
19  funds to "increase...funding for a program, project, or activity as proposed in the
20  President's budget request for a fiscal year until such proposed change is subsequently
21  enacted in an appropriation Act..." *Id*., Div. C § 739.

22  Unhappy with the result, Defendants replicated the FY 2019 conduct that the Ninth
23  Circuit found to be illegal. First, after Congress denied Defendants' request for funding for
24  hundreds of miles in wall construction, the Department of Homeland Security ("DHS")
25  initiated a request to DoD for funds for wall construction across "approximately 271
26  miles." RJN Ex. 4. On February 13, 2020, Secretary of Defense Esper announced that DoD
27  would transfer and spend $3.831 billion in funds Congress had appropriated for other

28

1  purposes on border wall construction pursuant to §§ 8005 and 9002 of the CAA. *Id.* Ex. 5.

2  This funding was intended for other purposes but transferred into DoD's Drug Interdiction

3  and Counter-Narcotics Activities ("Drug Interdiction") fund to assist DHS with border wall

4  construction pursuant to 10 U.S.C. § 284 and then subsequently transferred for use by the

5  Army Corps to construct the border wall. *Id.* Ex. 6.

6      These unlawfully reprogrammed funds are funding the construction of

7  approximately fourteen miles of a replacement border wall and seven miles of new border

8  wall (the "Project") in San Diego County and Imperial Counties (the "Project Area"). *Id.*

9  Ex. 7, 9-10 (map of the Project). Acting Secretary of Homeland Security Wolf invoked

10  section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996,

11  as amended, codified at 8 U.S.C. § 1103 note ("IIRIRA"), as authority for construction of

12  the Project. 85 Fed. Reg. 14958-60 ("IIRIRA Waiver"). To avoid having to account for

13  the significant cultural, historical, religious, and environmental impacts of his rash actions,

14  Acting Secretary Wolf waived multiple federal laws designed to protect historical,

15  religious, and cultural resources, the environment, and Indian tribes. *Id.*

16      A recent audit from the Office of the Inspector General ("OIG"), however,

17  concluded that CBP has not adequately justified the need for a physical barrier in the

18  Project Area. RJN Ex. 8 at 3. In fact, the audit concludes "the likelihood that CBP will be

19  able to obtain and maintain complete operational control of the southern border with

20  mission effective, appropriate, and affordable solutions is diminished." *Id.* In particular,

21  the audit found CPB did not adequately justify its decisions to prioritize "certain southern

22  border locations over others for wall construction"—citing the Project as an example of

23  particularly arbitrary decision making. *Id.* at 9. The CBP ignored the results of its own

24  algorithm to expedite Project construction and could offer no rationale when asked by OIG.

25  *Id.* at 9-11.

26  **IV.   Defendants' Failure to Provide Notice to or Consult with La Posta**

27      The Defendants have failed to engage in consultation with La Posta regarding the

28

1  Project. La Posta only learned of Project construction informally during an unrelated

2  meeting with the Bureau of Land Management in March 2020. Rochester Decl.¶ 8. CBP

3  did not offer to consult with La Posta at that time, nor has it since. Rochester Decl. ¶¶ 9–

4  11, 19, 27. CBP representatives engaged in a phone call with tribal representatives in June,

5  a Zoom meeting on July 8, and invited tribal representatives for a site visit on July 10, 2020.

6  Rochester Decl. ¶ 13-14. However, neither engagement by CBP provided sufficient

7  information about the construction plans, a schedule to permit La Posta to evaluate the

8  Projects' impacts on religious and cultural resources, nor has CBP provided a

9  comprehensive evaluation of such impacts. *Id.* ¶ 27-28. CBP also claimed that the Project

10  Area had previously been surveyed, however, tribal representatives pointed out that the

11  2010 survey was outdated and inaccurate. Mercado Decl. ¶ 8; Rochester Decl. ¶ 15.

12       La Posta has requested formal consultation with CBP on numerous occasions both

13  orally and in writing. Rochester Decl. ¶ 10; Mercado Decl. ¶ 6. Additionally, both CBP

14  and Army Corps representatives were informed about the presence of Kumeyaay human

15  remains and burials in the line of construction. Chairwoman's Decl. ¶ 11-12; Mercado Decl.

16  ¶ 9, 11-13. CBP has failed to stop construction to investigate any of the human remains,

17  despite pleas from La Posta. Chairwoman's Decl. ¶ 11. Due to this lack of consultation, La

18  Posta has been unable to secure the location of its relatives' burials. *Id.* ¶ 12.

19                     **LEGAL STANDARD**

20       To obtain a preliminary injunction or temporary restraining order, a plaintiff "must

21  establish that he is likely to succeed on the merits, that he is likely to suffer irreparable

22  harm in the absence of preliminary relief, that the balance of equities tips in his favor, and

23  that an injunction is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137,

24  1142 (9th Cir. 2018). A preliminary injunction may issue where "serious questions going

25  to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor."

26  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

27                        **ARGUMENT**

28

### I.      La Posta is likely to succeed on the merits.

La Posta is likely to succeed on the merits of its claims that the Defendants' acquisition of funds for and construction of the Project is ultra vires, violates various statutory provisions of the CAA, and violates the Constitutional rights of La Posta citizens.

### A. Defendants have unlawfully funded and begun construction of the project.

The Defendants' transfer of $3.81 billion between DoD accounts, use of $1.375 billion for the Project, and commencement of construction are all in direct violation of the statutes allegedly authorizing such actions. La Posta is likely to succeed on these claims.

### i.   La Posta has a cause of action both in equity and under the APA.

Precedent in this circuit recognizes this Court's authority to review the Defendants' transfer of funds for and construction of the border wall and enjoin the actions either as an ultra vires cause of action in equity, or under the Administrative Procedures Act ("APA"). A plaintiff can assert an ultra vires cause of action when "the relief [it] requested ... was traditionally accorded by courts of equity." *Sierra Club v. Trump*, 963 F.3d 874, 890–91 (9th Cir. 2020) ("*Sierra Club II*"). The cause of action thus does not depend on the "availability of a statutory cause of action;" but seeks a "'judge-made remedy' for injuries stemming from unauthorized government conduct, and they rest on the historic availability of equitable review." *Id.* (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)).

The Ninth Circuit has previously recognized that the relief La Posta now seeks "has been traditionally available." *Id.* at 891 (citing *Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958) ("Generally, judicial relief is available to one who has been injured by an act of a government official which is in excess of his express or implied powers."). The Court has authority to review the Defendants' use of funds for, and construction of, the Project as ultra vires and enjoin those actions.

Alternatively, the APA provides a cause of action "for a final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Under the APA, the

1   operative question is whether the agency action is "arbitrary, capricious, an abuse of

2   discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction,

3   authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). The Ninth

4   Circuit has recognized the APA as an alternative cause of action for the types of claims

5   La Posta now brings. *California v. Trump*, 963 F.3d 926, 941 (9th Cir. 2020) (quoting *San*

6   *Carlos Apache Tribe v. United States*, 417 F.3d 1091 (9th Cir. 2005) ("Where a statute

7   imposes obligations on a federal agency but the obligations do not 'give rise to a 'private'

8   right of action against the federal government[,] [a]n aggrieved party may pursue its

9   remedy under the APA'"); *See also In re Border Infrastructure Envtl. Litig.*, 915 F.3d

10  1213, 1222 (9th Cir. 2019).

### ii.  The CAA does not authorize Defendants' transfer of funds to the Drug Interdiction account.

13  The Defendants transferred $3.831 billion appropriated to the DoD from various

14  accounts to the Drug Interdiction account in violation of the CAA. The Secretary of

15  Defense cites CAA §§ 8005 and 9002 as authority for his transfer from various other

16  accounts to the Drug Interdiction account. CAA § 8005 authorizes the Secretary of

17  Defense to transfer funds "between such appropriations or funds or any subdivision

18  thereof, to be merged with and to be available for the same purposes, and for the same

19  time period, as the appropriation or fund to which transferred." Subject to the same terms

20  and conditions as § 8005, CAA § 9002 authorizes the Secretary to transfer additional funds

21  only with the approval of the Office of Management and Budget. CAA § 8005 contains

22  restrictions on the transfer of funds including that the use must be "for higher priority

23  items, based on unforeseen military requirements, than those for which originally

24  appropriated and in no case where the item for which funds are requested has been denied

25  by the Congress."

26  Finally, CAA § 739 contains the following overarching prohibition on use of funds

27  under the Act:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Reading the plain language of the CAA, the Secretary lacked authority thereunder to transfer the $3.81 billion. The Ninth Circuit has held, as a matter of law, "the requirement to build a wall on the southern border" was neither unforeseen nor a military requirement. *California v. Trump*, 963 F.3d 926, 946-48 (9th Cir. 2020). Moreover, now, as in the case of funds transferred pursuant to the 2019 CAA, the funds were included in the President's proposed budget but denied by Congress. Accordingly, the transfer is prohibited by the terms and conditions of CAA §§ 739, 8005, and 9002.

The Ninth Circuit has previously recognized a valid ultra vires and APA cause of action for a transfer in violation of § 8005. *Sierra Club II*, 963 F.3d at 892. To be sure, when reviewing a claim under the APA, the Court must be satisfied that the interest the plaintiff asserts is "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The zone of interest is determined "not by reference to the overall purpose of the Act in question ... but by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear*, 520 U.S. 154, 175 (1997).

The Supreme Court has clarified that the zone of interests test does "not require any 'indication of congressional purpose to benefit the would-be plaintiff.' " *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)). It has repeatedly emphasized that the zone of interests test is "not 'especially demanding[.]'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (quoting *Patchak*, 567 U.S. at 225). Instead a plaintiff can satisfy the test (1) "if it is among those [who] Congress expressly or directly indicated were the intended beneficiaries of a

statute," or (2) "its interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further ... statutory objectives." *California v. Trump*, 963 F.3d at 941–42. "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' " *Patchak*, 567 U.S. at 225, 132 S.Ct. 2199 (quoting *Clarke*, 479 U.S. at 399). "We apply the test in keeping with Congress's 'evident intent' ... 'to make agency action presumptively reviewable[,]' "and note that "the benefit of any doubt goes to the plaintiff." *Id.*

La Posta is within the zone of interests sought to be protected by these sections. With regard to the identical § 8005 in the 2019 CAA, the Ninth Circuit has recognized that "[t]he field of suitable challengers must be construed broadly in this context because, although Section 8005's obligations were intended to protect Congress, restrictions on congressional standing make it difficult for Congress to enforce these obligations itself." *California v. Trump*, 963 at 942. The same broad construction must be applied to §§ 739 and 9002, which were also plainly intended to protect Congress.

La Posta is a suitable challenger because its interests are congruent with those of Congress and are not "inconsistent with the purposes implicit in the statute." *Patchak*, 567 U.S. at 225. As the Ninth Circuit recognized in *California v. Trump*, this challenge actively furthers Congress's intent to "tighten congressional control of the reprogramming process." 963 F.3d at 942 (quoting H.R. Rep. No. 93-662, at 16 (1973)). In particular, this challenge furthers this intent because the congressional committees expressly disapproved of DoD's use of the authority here. *Id.*

Additionally, the Ninth Circuit held that the states of California and New Mexico were within the zone of interest because Section 8005's limitations protect California's and New Mexico's sovereign interests in protecting their environment, "just as they protect Congress's constitutional interests, because they ensure that, ordinarily, Executive

1   action cannot override these interests without congressional approval and funding." *Id.* at

2   943. Similarly, here, La Posta has sovereign interests in protecting its environment,

3   cultural heritage, and the right of its citizens to practice their religion. This action ensures

4   that the executive does not overstep his authority to interfere with tribal sovereign

5   interests. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) ("Legislature wields

6   significant constitutional authority when it comes to tribal relations, possessing even the

7   authority to breach its own promises and treaties. But that power, this Court has cautioned,

8   belongs to Congress alone") (citations omitted).

9       Because §§ 8005, 9002, and 739 do not authorize the transfers at issue here, and La

10  Posta's interest are within the zone of interest intended to be protected by those the

11  provisions, La Posta will succeed on the merits of its claim.

12          **iii. CAA does not authorize Defendants' use of the $1.375 billion for**
13          **the Project.**

14      While Congress explicitly denied the Defendants' request for the billions of dollars

15  that they ultimately transferred into the Drug Interdiction account, Congress duly

16  appropriated $1.375 billion for construction of a border "barrier system." CAA Div. D §

17  209(a)(1). Like the transfers discussed above, however, the Defendants failed to meet the

18  terms and conditions required to perfect the appropriation. CAA Div. D § 210 prevents the

19  use of funds "for the construction of fencing … within historic cemeteries." Construction

20  has already uncovered historic tribal burials in the Project Area and threatens to excavate

21  a tribal historic cemetery in Jacumba. Thus, by using the funding to build a wall directly

22  through La Posta's ancestral, historic burial grounds, Defendants violate the CAA. La Posta

23  is likely to succeed on the merits of its claim that the Defendants' use of the $1.375 billion

24  for border wall construction is unlawful and ultra vires.

25          **iv. Defendants may not use any of the funds because they failed to**
26          **consult with La Posta.**

27      CAA Div. D § 8129 prevents Defendants from using appropriated funds "in

28  contravention of … Executive Order No. 13175." Executive Order 13175 recognizes the

1  unique relationship between Indian tribes and the Federal Government and the trust

2  responsibility the government owes to Indian tribes stemming from that relationship.

3  *Consultation and Coordination with Indian Tribal Governments*, 65 Fed. Reg. 67249 (Nov.

4  6, 2000). As such, the order requires both meaningful consultation and input from Indian

5  tribes when federal agencies implement "policies that have tribal implications." *Id.* at

6  67249.  Agencies are required to engage in consultation <u>prior</u> to implementing such policies

7  and to look to "alternatives that would limit the scope of Federal standards or otherwise

8  preserve the prerogatives and authority of Indian tribes." *Id.* at 67250. Each federal agency

9  implements its own policy in relation to tribes. *Id.*

10       DHS' tribal consultation policy requires that the department affirmatively "[s]olicit

11  input from Tribal Governments of Indian Tribes for which DHS has identified a Tribal

12  Implication," and then "[n]otify appropriate Tribal Governments of DHS's desire to engage

13  in Consultation…"[2] DoD's tribal consultation policy requires that DoD consult with Tribal

14  governments "[w]henever proposing an action that may have the potential to significantly

15  affect protected tribal resources, tribal rights, or Indian lands."[3]

16       Here, Defendants failed to formally consult with La Posta regarding the Project.

17  Defendants have shared limited Project details with La Posta. CBP engaged with tribal

18  representatives via a phone call in early June, a webinar on July 8, and a field visit on July

19  10.  However, to date, CBP has not provided sufficient information about the construction

20  plans and schedule to permit La Posta to evaluate the Projects' impacts on religious and

21  cultural resources, nor has CBP provided a comprehensive evaluation of such impacts.

22       Because the Defendants have not properly consulted with La Posta, their use of

23

24  _____

25  [2] DHS, Tribal Consultation Policy, Section III.A (available at

26  https://www.dhs.gov/sites/default/files/publications/DHS%20Tribal%20Consulation%20
Policy%20Final%20PDF_0.pdf accessed July 27, 2020).

27  [3] DoD Instruction 4710.02 (Sept. 24, 2018) (available at
https://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/471002p.pdf?ver=20

28  18-11-28-143903-320).

1    reprogrammed funds for the border wall is "in contravention of" Executive Order 13175

2    and in violation of the CAA. Defendants' use of the funds is thus ultra vires.

3             **v. Defendants' construction of the border wall is ultra vires because**

4                   **they failed to consult with La Posta.**

5        Defendants lack authority not only to fund the border wall, but to construct it as

6    well. Defendants invoked section 102 of IIRIRA as authority for construction of the

7    Project. 85 FR 14958-60. However, the Defendants violated the prerequisite conditions

8    for exercise of the authority under the statute.

9        IIRIRA Section 102(a) authorizes the Secretary of Homeland Security

10    ("Secretary") to "take such actions as may be necessary to install additional physical

11    barriers and roads . . . in the vicinity of the United States border to deter illegal crossings

12    in areas of high illegal entry into the United States." Section 102(b) authorizes the

13    Secretary to install fencing and "additional physical barriers, roads, lighting, cameras,

14    and sensors to gain operational control of the southwest border" in "priority" areas. *Id*.

15    Section 102(b)(1)(C), however, requires the Secretary to consult with Indian tribes "to

16    minimize the impact on the environment, culture, commerce, and quality of life for the

17    communities and residents located near the sites at which such fencing is to be

18    constructed." *Id*. "[T]he consultation provision applies to any border construction project

19    under section 102." *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092,

20    1125 (S.D. Cal.), *cert. denied sub nom. Animal Legal Def. Fund v. Dep't of Homeland*

21    *Sec.*, 139 S. Ct. 594, 202 L. Ed. 2d 428 (2018), and *aff'd,* 915 F.3d 1213 (9th Cir. 2019).

22        Although Section 102 does not define the term "consultation," DHS' policy on tribal

23    consultation provides a helpful starting point: "'Consultation'" involves the direct, timely,

24    and interactive involvement of Indian Tribes regarding proposed Federal actions on matters

25    that have Tribal Implications."[4] Additionally, because the consultation provision aims to

26

27 _____

28   [4] DHS Tribal Consultation Policy, Section II.B

Memorandum of Points and Authorities in Support of Ex Parte Application for
Emergency Temporary Restraining Order and Motion For Preliminary Injunction
14     Case No.: 3:20-cv-01552-AJB-MSB

minimize impacts in the area where fencing "is *to be* constructed" (emphasis added), timely consultation must occur <u>prior</u> to construction activities.

As explained above, the Defendants have not consulted with La Posta prior to construction to minimize the impact on the environment, culture, commerce, and quality of life for La Posta, which is located near the Project Area.[5] Because the Secretary failed to meet the prerequisite to exercise authority under Section 102(a) and (b), the Defendants' actions to construct the Project were, and are, ultra vires.

While this Court has previously denied a similar argument that the Secretary's waivers were ultra vires for failure to consult, this case demands a different conclusion. In *In re Border Infrastructure Envtl. Litig.*, this Court concluded, "given the lack of a 'clear and mandatory' mandate regarding the timing of consultation," the Defendants did not act "in excess of their delegated powers by approving the waivers or executing construction contracts prior to completing the consultation process." 284 F. Supp. 3d at 1126. While the consultation provision may not be clear with regard to whether consultation must precede *waivers* and *contracts*, the provision is clear that consultation must precede *construction*. To hold otherwise would be inconsistent with the consultation provision's stated purpose: to minimize impacts in the area where fencing "is *to be* constructed." IIRIRA § 102(b)(1)(C)(ii)(1) (emphasis added). Defendants have violated the clear and mandatory prerequisite to the exercise of authority under Sections 102(a) and (b)—consultation—and thus any construction on the Project is ultra vires.

## B. Defendants' actions violate RFRA.

The President's former Attorney General has explained the import of federal law protecting religious liberty: "[T]o the greatest extent practicable and permitted by law, religious observance and practice should be reasonably accommodated in all government

---

[5] *See* section I.A.iv, *supra*.

1  activity."[6] The hallmark of these laws, the Religious Freedom Restoration Act of 1993

2  ("RFRA"), requires the government to demonstrate that any government action that

3  "substantially burdens" a person's "exercise of religion" is in "is in furtherance of a

4  compelling governmental interest" and "is the least restrictive means of furthering that

5  compelling governmental interest." 42 U.S.C. § 2000bb–1.[7] Defendants substantially

6  burden La Posta citizens' exercise of religion by preventing them from accessing their

7  ancestral burial and other sacred sites, and the Project is not the least restrictive means of

8  furthering a compelling governmental interest.

9       **i.  La Posta's treatment of ancestral remains and access to sacred**

10          **sites is essential to its exercise of religion.**

11      "Exercise of religion" means "any exercise of religion, whether or not compelled by,

12  or central to, a system of religious belief." 42 U.S.C. § 2000bb–2(4); 42 U.S.C. § 2000cc–

13  5(7)(A). In determining whether a set of beliefs should be protected as "religious," the

14  Ninth Circuit has analyzed "whether the beliefs professed … are sincerely held and whether

15  they are, in [a claimant's] own scheme of things, religious." *United States v. Ward*, 989

16  F.2d 1015, 1018 (9th Cir. 1992) (quoting *United States v. Seeger*, 380 U.S. 163, 174

17  (1965)).

18      Here, La Posta citizens hold sincere religious beliefs that exhumed burials must be

19  properly handled and reburied. They also hold sincere beliefs that various natural

20  landmarks within the path of the border wall projects are sacred places; and engage in

21  ceremonies and rituals there. Because La Posta's beliefs are sincere and, in its own scheme

22  of things, religious, the practices in question are the "exercise of religion."

23      **ii.  The Project substantially burdens La Posta's exercise of religion.**

24  _____

25  [6] United States Attorney General Jeff Sessions, Memorandum for All Executive

26  Departments and Agencies, "Federal Law Protections for Religious Liberty" (October 6, 2017) ("Sessions Memorandum") at 1 (available at

27  https://www.justice.gov/crt/page/file/1006786/download).

    [7] The IIRIRA Waiver did not waive RFRA.

28

The Project "substantially burdens" La Posta citizens' exercise of their religion by prohibiting such exercise. "Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions. (*Yoder*)." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069–70 (9th Cir. 2008). Defendant's actions constitute a substantial burden under both *Sherbert* and *Yoder*.

First, the Defendants are excavating and desecrating Kumeyaay burials without allowing La Posta access to properly treat the exhumed remains. While the Defendants are now allowing one cultural monitor from La Posta within the 21-mile Project Area, such an arrangement does not permit sufficient coverage to monitor every exhumation. Even when a cultural monitor does observe an exhumation, she is not permitted access to properly treat the remains in a culturally appropriate manner.

Second, the border wall has made and will continue to make Kumeyaay sacred sites that lie within and south of the Project Area inaccessible. La Posta citizens are not and will not be able to access Table Mountain, Jacumba Hot Springs, and Tecate Peak for religious ceremonies. These sites lie within the Project Area and the Defendants' continued construction will prevent access to these sites by La Posta citizens. Additionally, defendants have threatened La Posta citizens with arrest and criminal trespass charges while attempting to access sites to pray and engage in ceremonies within the Project Area.

Preventing access to burial and sacred sites by threat of criminal sanction fits squarely within the Ninth Circuit framework and amounts to a substantial burden. *Navajo Nation*, 535 F.3d at 1070 ("The Plaintiffs are not fined or penalized in any way for practicing their religion on the Peaks or on the Snowbowl"). While preventing access to sites by physical barrier does not fit as nicely into the Ninth Circuit's test, it should require little analysis to determine that the outright prevention of the exercise of religion due to the imposition of a physical barrier is a substantial burden. The Tenth Circuit's simpler

1   recitation of the substantial burden test makes this clear: government conduct amounts to

2   a substantial burden when it "prevents the plaintiff from participating in an activity

3   motivated by a sincerely held religious belief." *Yellowbear v. Lampert*, 741 F.3d 48, 55

4   (10th Cir. 2014); *see also* Sessions Memorandum at 4 ("In general, a government action

5   that bans an aspect of an adherent's religious observance or practice . . . will qualify as a

6   substantial burden on the exercise of religion." Here, the Project bans members of La Posta

7   from properly treating their exhumed relatives and participating in ceremonies at their

8   sacred sites, imposing a substantial burden on La Posta citizens exercise of religion.

9       The Defendants' offers of inadequate cultural monitoring also forces La Posta and

10  its members to choose between two untenable courses of action—either (a) participating

11  in such limited cultural monitoring as CBP may choose to offer (while at the same time the

12  ongoing construction is damaging and destroying La Posta's religious and cultural

13  resources), or (b) refusing to be an active participant in a process that will damage and

14  destroy La Posta's physical, spiritual, and cultural footprint in the Project Area.  Forcing

15  this choice violates RFRA.

16          iii.   **The border wall projects are not the least restrictive means to**
17              **further a compelling government interest.**

18      Because La Posta can demonstrate a substantial burden on their citizens' exercise

19  of religion, "the burden of persuasion shifts to the government to prove that the challenged

20  government action is in furtherance of a 'compelling governmental interest' and is

21  implemented by 'the least restrictive means.'" *Navajo Nation*, 535 F.3d at 1068 (citing 42

22  U.S.C. § 2000bb–1(b)). Defendants cannot meet that burden.

23      La Posta acknowledges Defendants' interest is in border security. *See* Executive

24  Order 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017). However, a physical barrier along the

25  span of the California-Mexico border is not the least restrictive means to further that

26  interest. First, the Defendants can offer no evidence that a construction process and plan

27  that accommodates Kumeyaay religious practice would not equally achieve its interest.

28  Second, the Defendants can offer no evidence that construction of a wall is necessary to

1   achieve its interest in the Project Area. As the OIG reported, CBP did not adequately

2   justify the need for the Project and ignored its own decision-making algorithm to

3   arbitrarily prioritize the specific Project area. In fact, CBP's approach diminishes "the

4   likelihood that CBP will be able to obtain and maintain complete operational control" of

5   the border. Thus, the Project is not the least restrictive (or most effective) way to achieve

6   border security.

7          **C. The Project violates La Posta citizens' Fifth Amendment rights.**

8          "No person shall . . . be deprived of life, liberty, or property without due process of

9   law . . ." U.S. Const. amend. V. The Due Process Clause of the Fifth Amendment authorizes

10  a private cause of action as remedy for violations. *Davis v. Passman*, 442 U.S. 228, 242–

11  44 (1979). The Fifth Amendment guarantees both procedural as well as substantive rights.

12  *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987).

13         **i.  La Posta citizens have a constitutionally-protected property right.**

14         For purposes of the Fifth Amendment, "property" "denote[s] the group of rights

15  inhering in the citizen's relation to the physical thing, as the right to possess, use and

16  dispose of it." *United States v. Gen. Motors Corp.,* 323 U.S. 373, 378 (1945). "[T]he types

17  of interests protected as property are varied and, as often as not, intangible, relating to the

18  whole domain of social and economic fact." *Logan v. Zimmerman Brush Co.*, 455 U.S.

19  422, 430 (1982) (internal quotations omitted). In slightly more concrete terms, "[t]he

20  property interests that due process protects extend beyond tangible property and include

21  anything to which a plaintiff has a 'legitimate claim of entitlement.'" *Nozzi v. Hous. Auth.*

22  *of City of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015), *as amended on denial of reh'g*

23  *and reh'g en banc* (Jan. 29, 2016) (quoting *Board of Regents of State Colleges v. Roth*, 408

24  U.S. 564, 576–77 (2015)). The "dimensions" of such an entitlement "are defined by

25  existing rules or understandings that stem from an independent [of the Constitution] source

26  such as state law—rules or understandings that secure certain benefits and that support

27  claims of entitlement to those benefits." *Id.* Federal statutes, likewise, have been

28

1   recognized as an independent source of law that may create property interests subject to

2   the protection of the Fifth Amendment. *E.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 332

3   (1976) (recognizing Fifth Amendment property interest in social security benefits created

4   by federal statute).

5        La Posta citizens have constitutionally protected property interests in their cultural

6   items and ancestral remains. The Native American Graves Protection and Repatriation Act

7   ("NAGPRA"), 25 U.S.C. §§ 3001–3013, for example, recognizes a tribe's right to

8   "possess, use and dispose" of cultural items that rest on federal lands and to which they

9   have an ancestral or cultural connection. *See Gen. Motors Corp.*, 323 U.S. at 378. In fact,

10  NAGPRA "vests 'ownership and control' over cultural items" in tribes that are culturally

11  affiliated with the remains or in whose aboriginal territory the items were discovered. *White*

12  *v. Univ. of California*, 765 F.3d 1010, 1016 (9th Cir. 2014) (quoting 25 U.S.C. § 3002(a)).

13       The remains that Defendants are desecrating are of the lineal ancestors of current La

14  Posta citizens, and La Posta's aboriginal lands extend into the Project Area, meaning, that

15  even if cultural affiliation cannot be established for certain items, La Posta citizens are

16  entitled to possess and use these items in religious and cultural practices. Thus—based

17  even on the cursory and inadequate monitoring and site-evaluation Defendants have

18  allowed—it is clear La Posta citizens have a right to the "ownership or control" of these

19  cultural items. This interest is more than sufficient to create a property right that the Fifth

20  Amendment protects. *See, generally Armstrong v. United States*, 364 U.S. 40, 44 (1960)

21  (holding materialmen's liens abrogated by action of the United States were property

22  protected by the Fifth Amendment); *Lynch v. United States*, 292 U.S. 571, 579 (1934)

23  (recognizing contract rights as property protected by Fifth Amendment).

24       The IIRIRA Waiver of NAGPRA does not change this result. NAGPRA does not

25  "limit any procedural or substantive right which may otherwise be secured to individuals

26  or Indians tribes . . ." 25 U.S.C. § 3009(4). This means that the waiver of NAGPRA does

27  not preclude La Posta's tribal members from protecting their property interests via means

28

1   other than NAGPRA, such as direct action under the Fifth Amendment. Moreover, the

2   property rights NAGPRA recognizes vest as soon as cultural items are "excavated or

3   discovered." 25 U.S.C. § 3002(a); *White*, 765 F.3d at1016 . Upon excavation or discovery,

4   no "governmental agency retains discretion to grant or deny the benefit" of ownership and

5   control of cultural items to lineal descendants and, in their absence, culturally-associated

6   tribes. *Brenizer v. Ray*, 915 F. Supp. 176, 181 (C.D. Cal. 1996); *see generally* 25 U.S.C.

7   §§ 3001–10. Thus, with respect to the known cultural items that have been found by

8   Kumeyaay people and historical preservation professionals since November 16, 1990, the

9   IIRIRA Waiver is immaterial.

10           **ii.  Defendants violate La Posta citizens' substantive and procedural**
11                  **due process rights.**

12           "When a fundamental right is recognized, substantive due process forbids the

13   infringement of that right 'at all, no matter what process is provided, unless the

14   infringement is narrowly tailored to serve a compelling state interest.'" *Witt v. Dep't of Air*

15   *Force*, 527 F.3d 806, 817 (9th Cir. 2008) (quoting *Reno v. Flores,* 507 U.S. 292, 301–02

16   (1993)). "Procedural due process imposes constraints on governmental decisions which

17   deprive individuals of 'liberty' or 'property' interests within the meaning of the Due

18   Process Clause[.]" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). As explained above, the

19   border wall construction activities implicate La Posta citizens' constitutionally-protected

20   property interests. Because of the nature of these interests, La Posta citizens are entitled to

21   basic notice and the opportunity to be heard regarding the deprivation of these interests.

22   *See, e.g., id.* ("Parties whose rights are to be affected are entitled to be heard; and in order

23   that they may enjoy that right they must first be notified." (internal quotations and citations

24   omitted)). "[D]ue process is flexible and calls for such procedural protections as the

25   particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), and

26   "requires analysis of the governmental and private interests that are affected." *Eldridge*,

27   424 U.S. at 334.

28

1   This analysis requires consideration of "the private interest that will be affected by

2   the official action," "the risk of an erroneous deprivation of such interest through the

3   procedures used, and the probable value, if any, of additional or substitute procedural

4   safeguards", and "the Government's interest, including the function involved and the fiscal

5   and administrative burdens that the additional or substitute procedural requirement would

6   entail." *Id.* at 334–35. Furthermore, "the right to notice and an opportunity to be heard

7   'must be granted at a meaningful time and in a meaningful manner.'" *Id.* (quoting

8   *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

9   Defendants' destruction of Kumeyaay cultural heritage and ancestral remains

10   violates La Posta citizens' substantive due process rights because the actions are not

11   narrowly-tailored to serve that interest, as explained in Section I(B)(iii). Even if narrowly

12   tailored, the actions violate La Posta citizens' procedural due process rights. Defendants

13   gave no formal notice to La Posta regarding the timing, sites, or manner of construction

14   activities for the Project. Instead, Defendants have refused to provide this information or

15   engage in formal consultation despite repeated requests. The lack of any meaningful notice

16   before Defendants began destroying Plaintiffs' property falls far below the constitutional

17   standard. Defendants' non-process carries an enormous risk of the erroneous deprivation

18   of constitutionally-protected property and liberty interests—it already has. Although tribal

19   cultural sites and ancestral cemeteries were identified in prior surveys, and are known to

20   many Kumeyaay people, those sites were not avoided, and no advance opportunity to

21   protect them was afforded.[8] Instead, Plaintiffs are becoming aware of violations of their

22   interest only after it is too late to protect them, such as when human remains were found

23

24

25
_____

26   [8]The general notices of certain of Defendants' actions related to this matter published in
     the Federal Register cannot be sufficient given the more than "purely speculative" interest
27   of Plaintiffs in known Kumeyaay historical, spiritual, and archeological sites. *See Williams*
28   *v. Mukasey*, 531 F.3d 1040, 1042 (9th Cir. 2008).

on July 10, 2020 and the CBP *did nothing* to protect them from the path of heavy construction equipment.

Native American human remains have been destroyed, and possibly even pulverized by heavy equipment and made into the cement that is used to anchor the metal barrier in place. No process was afforded before this occurred. The tragedy is deepened by how easily avoidable episodes like this are. When human remains were found, however, the CPB did nothing. Defendants' begrudging agreement to allow tribal monitors without authority to stop work months after commencing construction and destroying unknown numbers of burial sites and cultural items falls far short. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950) ("Process which is a mere gesture is not due process.").

The standard for the process due when government actions threaten to destroy tribal cultural property is embodied by NAGPRA and its implementing regulations, 45 C.F.R. Pt. 10. Plaintiffs, however, are willing to consult with Defendants to find a mutually-agreeable procedure which affords the basic protections outlined at the conclusion of this memorandum. While these safeguards would impose administrative and financial burdens on Defendants, temporarily ceasing the Project would, according to the CBP's own algorithm, actually allow CBP to use its resources more effectively in other areas. Moreover, pausing construction activities to afford time to take the steps necessary to give due process to foundational rights is what the Constitution requires.

## II.     La Posta is suffering irreparable harm and will suffer further harm in the absence of a preliminary injunction.

La Posta citizens are deeply connected to their religion and cultural heritage. Construction of the Project has permanently destroyed and blocked access to numerous and irreplaceable sacred sites and cultural remains. Such actions have seriously harmed La Posta citizens by destroying their ability to practice their culture and religion. Many more sacred sites and cultural artifacts lie in the path of construction. Defendants have also unlawfully desecrated human remains belonging to La Posta ancestors. These remains can never be salvaged once destroyed. Without a preliminary injunction, Defendants will

1    continue with these actions leaving the La Posta to continue to face serious harm.

2          The Defendants' actions do not only harm La Posta's unique interests in their culture

3    and religion but deprive their citizens of constitutionally protected rights. It is well

4    established in the Ninth Circuit that the deprivation of constitutional rights "unquestionably

5    constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

6          **III.    The public interest and balance of the equities weigh in favor of an**

7          **injunction.**

8          When the government is a party to a case in which a preliminary injunction is sought,

9    the balance of the equities and public interest factors merge. *Drakes Bay Oyster Co. v.*

10   *Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). By denying the Defendants' request for

11   funding the Project, "Congress presumably decided such construction at this time was not

12   in the public interest." *Sierra Club I*, 929 F.3d at 707. And while the public surely has an

13   interest in border security, the public also has an interest in ensuring that "statutes enacted

14   by [their] representatives are not imperiled by executive fiat." *Sierra Club II*, 963 F.3d at

15   895 (quotations and citations omitted). The Ninth Circuit has forcefully recognized the

16   Defendants' relative lack of interest in this context:

17         Defendants cannot suffer harm from an injunction that merely ends an unlawful
18         practice. . .. Defendants' position essentially boils down to an argument that the
           Court should not enjoin conduct found to be unlawful because the ends justify the
19         means. No matter how great the collateral benefits of building a border wall may be,
           the transfer of funds for construction remains unlawful. The equitable maxim 'he
20         who comes in equity must come with clean hands' would be turned on its head if
           unlawful conduct by one party precluded a court from granting equitable relief to
21         the opposing party.
22

23   *Id.* at 895–96 (internal citations and quotations omitted).

24         The harm to La Posta, on the other hand, is not speculative, and will be irreparable

25   in the absence of an injunction. Accordingly, this factor favors La Posta, and counsels in

26   favor of a preliminary injunction, to preserve the status quo and La Posta's invaluable

27   cultural resources until the merits of the case can be promptly resolved.

28

Memorandum of Points and Authorities in Support of Ex Parte Application for
Emergency Temporary Restraining Order and Motion For Preliminary Injunction
24       Case No.: 3:20-cv-01552-AJB-MSB

**CONCLUSION & REQUEST FOR RELIEF**

For the foregoing reasons, La Posta is likely to succeed on the merits, will continue to suffer irreparable harm in the absence of a preliminary injunction, and the public interest and balance of equities favors an injunction. Accordingly, La Posta respectfully request this court enter a temporary restraining order and preliminary injunction that requires the Defendants to immediately cease all construction activity on the Project until the Defendants (i) adequately consult with La Posta regarding cultural items, sacred sites, and historical sites which may be adversely impacted by the Project; (ii) take appropriate, respectful measures to mitigate the adverse impacts, including (a) tribal monitoring (with authority to stop work), (b) modification of proposed border security measures, (c) catalogue and repatriation of cultural items within the Project Area, and (d) a cultural survey of the Project Area that allows for registration of all sites eligible for listing on an appropriate registry; and iii) permit access to Kumeyaay sacred sites, as identified by La Posta.

Respectfully submitted.

August 14, 2020

*Michelle LaPena*

Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

Memorandum of Points and Authorities in Support of Ex Parte Application for
Emergency Temporary Restraining Order and Motion For Preliminary Injunction
25      Case No.: 3:20-cv-01552-AJB-MSB