Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS *PARENS PATRIAE,*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY; MARK T. ESPER, U.S. SECRETARY OF DEFENSE, IN HIS OFFICIAL CAPACITY; CHAD F. WOLF, ACTING U.S. SECRETARY OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY; AND LIEUTENANT GENERAL TODD T. SEMONITE, COMMANDING GENERAL OF THE U.S. ARMY CORPS OF ENGINEERS, IN HIS OFFICIAL CAPACITY,<br>Defendants. | Case No.: 3:20-cv-01552-AJB-MSB<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>**Hearing on Application for Temporary Restraining Order**<br>**Date:  August 27, 2020**<br>**Time:  2:00 p.m.**<br>**Location:  Courtroom 4A (4th Floor)**<br>**Judge: Hon. Anthony J. Battaglia**<br><br>**Hearing on Motion for Preliminary Injunction**<br>**Date:  September 17, 2020**<br>**Time:  2:00 p.m.**<br>**Location:  Courtroom 4A (4th Floor)**<br>**Judge: Hon. Anthony J. Battaglia** |

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs hereby respectfully request, pursuant to Federal Rule of Evidence 201, that this Court take judicial notice of the following documents.

1.     Attached hereto as Exhibit 1 is a true and correct copy of an excerpt of the transcript of a speech President Trump delivered when he announced his candidacy for president on June 16, 2015.

2.     Attached hereto as Exhibit 2 is a true and correct copy of an excerpt of The WALL Act of 2018, S. 3713, 115th Cong. (2018). No action was taken on the bill after referral to the Senate Committee on Finance. As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/s3713/BILLS-115s3713is.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-congress/senate-bill/3713/all-actions.

3.     Attached hereto as Exhibit 3 is a true and correct copy of an excerpt of the 50 Votes for the Wall Act, H.R. 7073, 115th Cong. (2018). No action was taken on the bill after referral to the House Subcommittee on Border and Maritime Security. As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr7073/BILLS-115hr7073ih.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-c actions congress/house-bill/7073/all-actions.

4.     Attached hereto as Exhibit 4 is a true and correct copy of an excerpt of the Build the Wall, Enforce the Law Act of 2018, H.R. 7059, 115th Cong. (2018). No action was taken on the bill after referral to the House Subcommittee on Trade. As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr7059/BILLS-115hr7059ih.pdf; and the history of the bill is posted on Congress's official website at, https://www.congress.gov/bill/115th-congress/house-bill/7059/all-actions.

5.      Attached hereto as Exhibit 5 is a true and correct copy of an excerpt of the Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. (2018). No action was taken on the bill after referral to the House Subcommittee on Immigration and Border Security. As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr6657/BILLS-115hr6657ih.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-congress/house-bill/6657/all-actions.

6.      Attached hereto as Exhibit 6 is a true and correct copy of an excerpt of the American Border Act, H.R. 6415, 115th Cong. (2018). No action was taken on the bill after referral to the House Subcommittee on Immigration and Border Security. As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr6415/BILLS-115hr6415ih.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-congress/house-bill/6415/all-actions.

7.      Attached hereto as Exhibit 7 is a true and correct copy of an excerpt of the Border Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018). On June 27, 2018, this bill failed in the House of Representatives by a recorded vote of 121 – 301. As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr6136/BILLS-115hr6136ih.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-congress/house-bill/6136/all-actions.

8.      Attached hereto as Exhibit 8 is a true and correct copy of an excerpt of the Securing America's Future Act of 2018, H.R. 4760, 115th Cong. (2018). On June 21, 2018, this bill failed in the House of Representatives by a recorded vote of 193 – 231. As of April 4, 2019, the complete text of the bill is posted on the United States Congress's official website, at https://www.congress.gov/115/bills/hr4760/BILLS-115hr4760ih.pdf; and the history of the bill is posted on Congress's official website, at https://www.congress.gov/bill/115th-congress/house-bill/4760/all-actions.

AMENDED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

9.      Attached hereto as Exhibit 9 is a true and correct copy of an excerpt from the Fiscal Year 2020 White House Budget Request, dated Mar. 11, 2019, available on the official White House website at https://www.whitehouse.gov/wp-content/uploads/2019/03/budget-fy2020.pdf.

10.     Attached hereto as Exhibit 10 is a true and correct copy of an excerpt from the Department of Defense Fiscal Year 2020 budget request, dated March 2019, available at the official Department of Defense website at https://comptroller.defense.gov/Portals/45/Documents/defbudget/fy2020/fy2020_Budget_Request_Overview_Book.pdf.

11.     Attached hereto as Exhibit 11 is a true and correct copy of an excerpt from a memorandum from Julian Blackwell, Acting Executive Secretary of the Department of Homeland Security, to Capt. Oliver Lewis, USN, Executive Secretary of Department of Defense, dated January 14, 2020, available at *Sierra Club v. Trump*, No. 4:20-cv-01494-HSG (N.D. Cal., filed March 9, 2020), ECF No. 19-1.

12.     Attached hereto as Exhibit 12 is a true and correct copy of an excerpt from a MEMORANDUM FOR ACTING UNDER SECRETARY OF DEFENSE (COMPTROLLER)/CHIEF FINANCIAL OFFICER, regarding Funding Construction in Support of the Department of Homeland Security Pursuant to 10 U.S.C. § 284 by Secretary of Defense, available at *Sierra Club v. Trump*, No. 4:20-cv-01494-HSG (N.D. Cal., filed March 9, 2020), ECF No. 19-1 at 13.

13.     Attached hereto as Exhibit 13 is a true and correct copy of Notice Regarding Authorization of Additional Border Barrier Projects Pursuant to 10 U.S.C. § 284, available at *California v Trump*, No. 4:19-cv-00872-HSG (N.D. Cal., filed Feb. 13, 2020), ECF No. 271.

14.     Attached hereto as Exhibit 14 is a true and correct copy of the list of border projects approved by the Secretary of Defense on February 13, 2020, available at *California v Trump*, No. 4:19-cv-00872-HSG (N.D. Cal., filed Feb. 13, 2020), ECF No. 271-1 Ex. B.

AMENDED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

15.     Attached hereto as Exhibit 15 is a true and correct copy of the Office of Inspector General's report 20-52, available at

https://www.oig.dhs.gov/sites/default/files/assets/2020-07/OIG-20-52-Jul20.pdf.

16.     Attached hereto as Exhibit 16 is a true and correct copy of a map depicting the border wall construction area in San Diego County, available at *Sierra Club v. Trump*, No. 4:20-cv-01494-HSG (N.D. Cal., filed March 9, 2020), ECF No. 30-1 at 45

17.     Attached hereto as Exhibit 17 is a true and correct copy of a map depicting the border all construction area in Imperial County, available at available at *Sierra Club v. Trump*, No. 4:20-cv-01494-HSG (N.D. Cal., filed March 9, 2020), ECF No. 30-1 at 50.

DATED: August 14, 2020

Respectfully submitted.

Michelle LaPena

Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085

AMENDED REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

| Exhibit No. | Description | Page No. |
| --- | --- | --- |
| 1. | Excerpt of the transcript of a speech President Trump delivered when he announced his candidacy for president on June 16, 2015 | 1 |
| 2. | True and correct copy of an excerpt from the Fiscal Year 2020 White House Budget Request, dated Mar. 11, 2019 | 4 |
| 3. | True and correct copy of an excerpt from the Department of Defense Fiscal Year 2020 budget request, dated March 2019 | 8 |
| 4. | True and correct copy of an excerpt from a memorandum from Julian Blackwell, Acting Executive Secretary of the Department of Homeland Security, to Capt. Oliver Lewis, USN, Executive Secretary of Department of Defense, dated January 14, 2020 | 12 |
| 5. | True and correct copy of an excerpt from a MEMORANDUM FOR ACTING UNDER SECRETARY OF DEFENSE (COMPTROLLER)/CHIEF FINANCIAL OFFICER, regarding Funding Construction in Support of the Department of Homeland Security Pursuant to 10 U.S.C. § 284 by Secretary of Defense. | 13 |
| 6. | True and correct copy of Notice Regarding Authorization of Additional Border Barrier Projects Pursuant to 10 U.S.C. § 284. | 14 |
| 7. | True and correct copy of the list of border projects approved by the Secretary of Defense on February 13, 2020 | 18 |
| 8. | True and correct copy of an excerpt of the Office of Inspector General's report 20-52. | 19 |
| 9. | True and correct copy of a map depicting the areas with the San Diego Project area where DHS and DOD will be constructing barrier. | 59 |
| 10. | true and correct copy of a map depicting the areas with the El Centro Project area where DHS and DOD will be constructing barrier. | 60 |

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Case 3:20-cv-01552-AJB-MSB   Document 11-8   Filed 08/14/20   PageID.340   Page 7 of 66

# TIME

# Here's Donald Trump's Presidential Announcement Speech

**IDEAS**   BY **TIME STAFF** JUNE 16, 2015 2:32 PM EDT

Wow. Whoa. That is some group of people. Thousands.

So nice, thank you very much. That's really nice. Thank you. It's great to be at Trump Tower. It's great to be in a wonderful city, New York. And it's an honor to have everybody here. This is beyond anybody's expectations. There's been no crowd like this.

And, I can tell, some of the candidates, they went in. They didn't know the air-conditioner didn't work. They sweated like dogs.

They didn't know the room was too big, because they didn't have anybody there. How are they going to beat ISIS? I don't think it's gonna happen.

Our country is in serious trouble. We don't have victories anymore. We used to have victories, but we don't have them. When was the last time anybody saw us beating, let's say, China in a trade deal? They kill us. I beat China all the time. All the time.

When did we beat Japan at anything? They send their cars over by the millions, and what do we do? When was the last time you saw a Chevrolet in Tokyo? It doesn't exist, folks. They beat us all the time.

When do we beat Mexico at the border? They're laughing at us, at our stupidity. And now they are beating us economically. They are not our friend, believe me. But they're killing us economically.

Case 3:20-cv-01552-AJB-MSB   Document 11-8   Filed 08/14/20   PageID.341   Page 8 of 66

to as the Trump building right opposite the New York— many other places all over the world.

So the total is $8,737,540,00.

Now I'm not doing that...

I'm not doing that to brag, because you know what? I don't have to brag. I don't have to, believe it or not.

I'm doing that to say that that's the kind of thinking our country needs. We need that thinking. We have the opposite thinking.

We have losers. We have losers. We have people that don't have it. We have people that are morally corrupt. We have people that are selling this country down the drain.

So I put together this statement, and the only reason I'm telling you about it today is because we really do have to get going, because if we have another three or four years— you know, we're at $8 trillion now. We're soon going to be at $20 trillion.

According to the economists— who I'm not big believers in, but, nevertheless, this is what they're saying— that $24 trillion— we're very close— that's the point of no return. $24 trillion. We will be there soon. That's when we become Greece. That's when we become a country that's unsalvageable. And we're gonna be there very soon. We're gonna be there very soon.

So, just to sum up, I would do various things very quickly. I would repeal and replace the big lie, Obamacare.

I would build a great wall, and nobody builds walls better than me, believe me, and I'll build them very inexpensively, I will build a great, great wall on our southern border. And I will have Mexico pay for that wall.

Mark my words.

save it by making the United States, by making us rich again, by taking back all of the money that's being lost.

Renegotiate our foreign trade deals.

Reduce our $18 trillion in debt, because, believe me, we're in a bubble. We have artificially low interest rates. We have a stock market that, frankly, has been good to me, but I still hate to see what's happening. We have a stock market that is so bloated.

Be careful of a bubble because what you've seen in the past might be small potatoes compared to what happens. So be very, very careful.

And strengthen our military and take care of our vets. So, so important.

Sadly, the American dream is dead.

But if I get elected president I will bring it back bigger and better and stronger than ever before, and we will make America great again.

Thank you. Thank you very much.

*Read next:* *How Donald Trump Stole Jeb Bush's Moment*

*Listen to the most important stories of the day.*

---

## MOST POPULAR ON TIME

**1** What the Freemasons Taught the World About Secrecy

**2** Trump Blocks Postal Funding to Thwart Mail Voting

**3** Why the U.S. Is Losing the War On COVID-19

---

**CONTACT US AT** EDITORS@TIME.COM.

# A BUDGET FOR A

# Better America

## PROMISES KEPT. TAXPAYERS FIRST.

**FISCAL YEAR 2020**
**BUDGET OF THE U.S. GOVERNMENT**

# THE BUDGET DOCUMENTS

***Budget of the United States Government, Fiscal Year 2020*** contains the Budget Message of the President, information on the President's priorities, and summary tables.

***Analytical Perspectives, Budget of the United States Government, Fiscal Year 2020*** contains analyses that are designed to highlight specified subject areas or provide other significant presentations of budget data that place the budget in perspective. This volume includes economic and accounting analyses; information on Federal receipts and collections; analyses of Federal spending; information on Federal borrowing and debt; baseline or current services estimates; and other technical presentations.

Supplemental tables and other materials that are part of the *Analytical Perspectives* volume are available at *https://www.whitehouse.gov/omb/ analytical-perspectives/*.

***Appendix, Budget of the United States Government, Fiscal Year 2020*** contains detailed information on the various appropriations and funds that constitute the budget and is designed primarily for the use of the Appropriations Committees. The *Appendix* contains more detailed financial information on individual programs and appropriation accounts than any of the other budget documents. It includes for each agency: the proposed text of appropriations language; budget schedules for each account; legislative proposals; narrative explanations of each budget account; and proposed general provisions applicable to the appropriations of entire agencies or group of agencies. Information is also provided on certain activities whose transactions are not part of the budget totals.

***Major Savings and Reforms, Fiscal Year 2020,*** which accompanies the President's Budget, contains detailed information on major savings and reform proposals. The volume describes both major discretionary program eliminations and reductions and mandatory savings proposals.

### BUDGET INFORMATION AVAILABLE ONLINE

The President's Budget and supporting materials are available online at *https://www.whitehouse. gov/omb/budget/*. This link includes electronic versions of all the budget volumes, supplemental materials that are part of the *Analytical Perspectives* volume, spreadsheets of many of the budget tables, and a public use budget database. This link also includes *Historical Tables* that provide data on budget receipts, outlays, surpluses or deficits, Federal debt, and Federal employment over an extended time period, generally from 1940 or earlier to 2020 or 2024. Also available are links to documents and materials from budgets of prior years.

The budget documents and other supplemental materials included at this link were previously included on the Budget CD-ROM, which is no longer made available.

For more information on access to electronic versions of the budget documents, call (202) 512-1530 in the D.C. area or toll-free (888) 293-6498. To purchase the printed documents call (202) 512-1800.

---

### GENERAL NOTES

1. All years referenced for budget data are fiscal years unless otherwise noted. All years referenced for economic data are calendar years unless otherwise noted.

2. At the time the Budget was prepared, five of the annual appropriations bills for 2019 had been enacted (the Energy and Water Development and Related Agencies Appropriations Act, 2019; the Legislative Branch Appropriations Act, 2019; the Military Construction, Veterans Affairs, and Related Agencies Appropriations Act, 2019; the Department of Defense Appropriations Act, 2019; and the Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2019). The programs and activities provided for in the seven remaining 2019 annual appropriations bills were operating under a continuing resolution (Public Law 115-245, as amended). For these programs, references to 2019 spending in the text and tables reflect the levels provided by the continuing resolution (except for the *Major Savings and Reforms* (MSV) volume which was written following enactment of all appropriations and reflects 2019 enacted for all programs).

3. Detail in this document may not add to the totals due to rounding.

---

### U.S. GOVERNMENT PUBLISHING OFFICE, WASHINGTON 2019

For sale by the Superintendent of Documents, U.S. Government Publishing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512-1800;   DC area (202) 512-1800
Fax: (202) 512-2104 Mail: Stop IDCC, Washington, DC 20402-0001

ISBN 978-0-16-095071-1

> *"Our policy at DHS in the face of growing dangers will not be 'strategic patience.' Instead, we are reasserting U.S. leadership. And we are building the toughest homeland security enterprise America has ever seen."*
>
> Kirstjen M. Nielsen
> Secretary
> September 5, 2018

**Secures the Borders of the United States.** Each day, DHS works to protect the American people and economy by preventing the illegal movement of people and contraband across U.S. borders while facilitating legitimate trade and travel to advance American prosperity. As depicted in the chart below, the number of people determined to be inadmissible at a port of entry or apprehended for illegally crossing the border grew by over 25 percent from 2017 to 2018, with illegitimate border crossers travelling as a family increasing by 53 percent.

Border security remains a top Administration priority, and the Budget continues to implement the President's direction to secure the U.S. Southwest border. The Budget requests $5 billion to construct approximately 200 miles of border wall along the U.S. Southwest border; provides $192 million to hire 750 Border Patrol agents, 171 CBP Officers, and support staff; and invests $367 million in CBP aircraft, vessels, surveillance technology, and equipment. In addition, the Budget includes $1.2 billion to continue to modernize U.S. Coast Guard vessels and aircraft that patrol and provide life-saving rescue missions across the Nation's coastal borders. The men and women of CBP work to keep the Nation safe from those seeking to smuggle people and contraband across America's borders. The Administration is pursuing innovative and effective solutions to hire and retain these valuable Government employees.



**Increased Illegitimate Cross-Border Activity On the Southwest Border**

Source: Department of Homeland Security, 2018.

**Enforces the Nation's Immigration Laws and Strengthens Border Security.** The Budget provides discretionary and mandatory funding to promote the Administration's immigration and border security priorities and ensure the safety and security of American communities. While the Budget provides discretionary funding and investments to support a robust level of immigration and border security activities, these resources are insufficient to close existing loopholes in U.S. immigration laws and provide the full range of programs, activities, and staffing necessary. To bridge this gap, the Budget proposes the creation of a new Border Security and Immigration Enforcement Fund to be financed from mandatory receipts.

**Provides Discretionary Funding to Support Enhanced Immigration and Border Security.** The Budget provides $314 million to hire an additional 1,000 ICE law enforcement officers, 128 immigration court prosecuting attorneys, and 538 additional critical support staff to carry out this vital national security mission. Funding of $2.7 billion is provided for 54,000 detention beds to ensure ICE has the ability to detain criminal aliens and those apprehended at the border—including aliens with meritless asylum claims—so they can be safely removed. The Budget also makes additional investments in the Alternatives to Detention program for active monitoring of a total alien population of approximately 120,000. Moreover, the Budget increases funding for the Transportation and Removal

Timothy F. Soltis
Amanda R.K. Sousane
Rebecca L. Spavins
Raquel A. Spencer
Valeria Spinner
Sarah Whittle Spooner
Travis C. Stalcup
Scott R. Stambaugh
Nora Stein
Lamar R. Stewart
Ryan Stoffers
Gary R. Stofko
Terry W. Stratton
Thomas J. Suarez
Alec J. Sugarman
Kevin J. Sullivan
Jessica L. Sun
Yasaman S. Sutton
Christina Swoope
Katherine M. Sydor

### T

Jamie R. Taber
John Tambornino
Naomi S. Taransky
Jay Teitelbaum
Emma K. Tessier
Matthew A. Tetteh
Rich Theroux

Amanda L. Thomas
Payton A. Thomas
Will Thomas
Philip Tizzani
Thomas Tobasko
Gia Tonic
Gil M. Tran
Alyssa Trinidad
Kim Marie V.
   Tuminaro
Austin Turner

### U

Nicholas J. Ufier
Shraddha A.
   Upadhyaya
Darrell J. Upshaw
Taylor J. Urbanski
Euler V. Uy

### V

Matthew J. Vaeth
Cynthia Vallina
Sarita Vanka
Areletha L. Venson
Alexandra Ventura
Russ Vought

### W

Dana Wade
James A. Wade
Brett Waite
Nicole Waldeck
Heather V. Walsh
Kan Wang
Tim Wang
Peter Warren
Gary Waxman
Bess M. Weaver
Jacqueline K. Webb
Margaret Weichert
Jeffrey A. Weinberg
David Weisshaar
Philip R. Wenger
Max W. West
Steve Wetzel
Arnette C. White
Ashley M. White
Catherine E. White
Curtis C. White
Kim S. White
Sherron R. White
Chad S. Whiteman
Brian Widuch
Mary Ellen Wiggins
Rayna Wilkins

### W (cont.)

Debra (Debbie) L.
   Williams
Michael B. Williams
Rebecca Williams
Ken D. Willis
Jamie S. Wilson
Paul A. Winters
Minzy Won
Raymond J.M. Wong
Jacob Wood
Rachel P. Wood
Sophia M. Wright
Bert Wyman

### Y

Jason Yaworske
Melany N. Yeung
Sin Yeung
David Y. Yi
Katey Yoast
Rita Young
Robert A. Yu

### Z

Eliana M. Zavala
Jen Q. Zhu
Erica H. Zielewski

# OFFICE OF THE UNDER SECRETARY OF DEFENSE (COMPTROLLER)/CHIEF FINANCIAL OFFICER
## MARCH 2019



# Defense Budget Overview

## UNITED STATES DEPARTMENT OF DEFENSE
## FISCAL YEAR 2020 BUDGET REQUEST



## Preface

The Overview Book has been published as part of the President's Annual Defense Budget for the past few years.  From FY 1969 to FY 2005, OSD published the "Annual Defense Report" (ADR) to meet 10 USC section 113 requirements.  Subsequently, the Overview began to fill this role.

The Overview is one part of an extensive set of materials that constitute the presentation and justification of the President's Budget for FY 2020.  This document and all other publications for this and previous DoD budgets are available from the public web site of the Under Secretary of Defense (Comptroller):  http://comptroller.defense.gov.

The Press Release and Budget Briefing, often referred to as the "Budget Rollout," and the Program Acquisition Costs by Weapons System book, which includes summary details on major DoD acquisition programs (i.e., aircraft, ground forces programs, shipbuilding, space systems, etc.) are especially relevant.

The website for Performance Improvement tables and charts is http://dcmo.defense.gov/Publications/AnnualPerformancePlanandPerformanceReport.aspx.

Other background information can be accessed at www.defense.gov.

The estimated cost of this report or study for the Department of Defense is approximately $27,000 for the 2019 Fiscal Year.  This includes $13,000 in expenses and $14,000 in DoD labor.  Generated on 2019Mar05 RefID: E-DE33FD3

Ex. 3

## EMERGENCY REQUIREMENTS

***Emergency Requirements ($9.2 billion):*** The FY 2020 budget request includes $9.2 billion of emergency funding for unspecified military construction to build border barriers, backfill funding reallocated in FY 2019 to build border barriers and rebuild facilities damaged by Hurricanes Florence and Michael.  This funding and the required transfer authority would be provided through a general provision.



Subject: Request for Assistance Pursuant to 10 U.S.C. § 284
Page 15

The specific Project Areas are as follows:

*Del Rio Project A:*
- o The project includes approximately 2 miles of primary pedestrian replacement fencing beginning approximately 1 mile north of the Eagle Pass Port of Entry continuing south in Maverick County.
  - Start Coordinate: (28.702032, -100.504759);
  - End Coordinate: (28.71969, -100.504983)

*Del Rio Project B:*
- o The project includes approximately 2 miles of primary pedestrian replacement fencing beginning approximately 2 miles northwest of the Del Rio Port of Entry continuing southeast in Val Verde County.
  - Start coordinate: (29.345863, -100.945134);
  - Stop coordinate: (29.33107, -100.913086)

## III. Technical Specifications

As set forth above, DHS requires road construction, installation of lighting, and the construction of new or replacement of existing vehicle barrier or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas. DHS will provide DoD with more precise technical specifications as contract and project planning moves forward.

Given DHS's experience and technical expertise, DHS plans to coordinate closely with DoD throughout project planning and execution, to include review and approval of design specifications, fencing alignment and location, and other aspects of project planning and execution.

## IV. Sequencing

The DHS request for assistance includes approximately 271 miles in which DHS requires road construction, the installation of lighting, and the construction of new pedestrian fencing or the replacement of existing vehicle barrier or dilapidated pedestrian fencing with new pedestrian fencing within the Project Areas. DHS requests that DoD's support under 10 U.S.C. § 284 address the requirements in order of priority as DoD resources allow. The DHS order of priority is as follows:

1. El Centro Project A
2. El Paso Project A
3. El Paso Project B
4. Del Rio Project A
5. Yuma Project A
6. Tucson Project A
7. Tucson Project B
8. El Paso Project C
9. Del Rio Project B

██████████████████████████



**SECRETARY OF DEFENSE**
**1000 DEFENSE PENTAGON**
**WASHINGTON, DC 20301-1000**

FEB 1 3 2020

MEMORANDUM FOR ACTING UNDER SECRETARY OF DEFENSE (COMPTROLLER)/
CHIEF FINANCIAL OFFICER

SUBJECT:  Funding Construction in Support of the Department of Homeland Security Pursuant
to 10 U.S.C. § 284

On January 14, 2020, the Secretary of Homeland Security requested that the Department
of Defense provide support to the efforts of the Department of Homeland Security (DHS) to
secure the southern border by blocking up to 13 drug-smuggling corridors along the border
through the construction of roads and fences and the installation of lighting.  I have determined
that the requirements of 10 U.S.C. § 284(b)(7) have been satisfied.  Accordingly, I have
approved the construction of 30-foot bollard-style fencing to block drug-smuggling corridors
along the southern border for 31 of the 38 projects and segments in the DHS request, as specified
in attachment 1.

The approved fencing includes the field elements of the linear ground detection system
(i.e., the fiber optic cables and the laser interrogator), but no further electronic components (i.e.,
the server and the command and control display).  Furthermore, DoD will be undertaking road
construction and refurbishment and installation of lighting (support by grid power and including
embedded cameras).

I have also decided that the Department will transfer funds to provide the support
described above.  This support will be funded through a transfer of up to $3.831B from the
accounts identified in attachment 2 into the "Drug Interdiction and Counter-Drug Activities,
Defense" appropriation.  I am advised that the amounts are excess or early to current
programmatic needs.  You should undertake a reprogramming action to effectuate such transfer,
as authorized by law.

The reprogramming action that I am directing satisfies the statutory requirements.  I have
determined that a transfer of funds and authorizations of appropriations for the construction of
fences and roads and the installation of lighting to block drug-smuggling corridors is in the
national interest.  In an April 4, 2018 memorandum, "Securing the Southern Border of the United
States," the President directed DoD to assist DHS in stopping the flow of illegal drugs into the
United States.  The reprogramming action is necessary to advance that goal.  I have also
determined that the other requirements of §§ 8005 and 9002 of the Department of Defense
Appropriations Act, 2020, and §§ 1001 and 1520A of the National Defense Authorization Act
for Fiscal Year 2020 are met as set forth below:

- The items to be funded in attachment 1 are a higher priority than the item from which
funds and authority are transferred because these projects are necessary in the
national interest to prevent the flow of drugs into the United States, and the items
from which funds and authorizations are transferred are excess or early to current
programmatic needs.



OSD000609-20/CMD001604-20

DAVID M. MORRELL
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN (IN #23840-49)
Senior Trial Counsel
KATHRYN C. DAVIS
MICHAEL J. GERARDI
LESLIE COOPER VIGEN
RACHAEL WESTMORELAND
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:      (202) 616-5084
Fax:      (202) 616-8470
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*, | |
| Plaintiffs, | No. 4:19-cv-00872-HSG |
| v. | No. 4:19-cv-00892-HSG |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | **NOTICE REGARDING AUTHORIZATION OF ADDITIONAL BORDER BARRIER PROJECTS PURSUANT TO 10 U.S.C. § 284** |
| SIERRA CLUB, *et al.*, | |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG –Notice re § 284 Projects
*Sierra Club et. al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG – Notice re § 284 Projects
Ex. 6
14

Defendants hereby notify the Court and parties in the above-captioned cases that the Department of Defense (DoD) has authorized the funding and construction of additional border barrier projects pursuant to 10 U.S.C. § 284.

On January 15, 2020, the Department of Homeland Security (DHS) submitted a request to DoD for assistance in constructing 13 border barrier projects located in drug-smuggling corridors along the southern border. *See* Seventh Declaration of Kenneth Rapuano, Assistant Secretary of Defense for Homeland Defense and Global Security ¶ 3 (Exhibit 1). The request sought construction of new fencing as well as the replacement of existing vehicle barriers and dilapidated fencing, the construction of new and improvement of existing patrol roads, and the installation of lighting, all of which would be on Federal land. *Id.* The 13 requested projects consist of 38 discrete construction segments. *See id.*, Ex. A.

On February 13, 2020, the Secretary of Defense approved construction and funding for 31 segments within the 13 project areas. *See* Seventh Rapuano Decl. ¶ 4 & Ex. B. The approved projects are summarized below:

1. **San Diego A:** 3 miles of new primary pedestrian fencing and 14 miles of replacement pedestrian fencing in San Diego County, CA (Segments 1–3);

2. **El Centro A:** 10 miles of new pedestrian fencing in Imperial County, CA (Segment 1);

3. **Yuma A:** 7 miles of vehicle barriers replaced with new pedestrian fencing and 9 miles of replacement secondary pedestrian fencing in Yuma County, AZ (Segments 1–2);

4. **Yuma B:** 0.5 miles of replacement primary pedestrian fencing and 0.5 miles of new secondary pedestrian fencing located in Imperial County, CA on the Quechan Reservation (Segments 1–2);

5. **Tucson A:** 24 miles of replacement primary pedestrian fencing, 1 mile of replacement secondary pedestrian fencing, and 4.5 miles of new primary pedestrian fencing in Cochise County, AZ (Segments 1–5);

6. **Tucson B:** 2 miles of replacement primary pedestrian fencing and 27.5 miles of new pedestrian fencing in Santa Cruz and Cochise Counties, AZ (Segments 1, 3–6);

7. **Tucson C:** 7 miles of replacement primary pedestrian fencing and 9 miles of new primary pedestrian fencing in Santa Cruz and Pima Counties, AZ (Segments 1, 3–4);

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG –Notice re § 284 Projects
*Sierra Club et. al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG – Notice re § 284 Projects
Ex. 6  1
15

8. **El Paso A:**  20 miles of replacement primary pedestrian fencing in El Paso County, TX (Segment 1);

9. **El Paso B:**  2 miles of new pedestrian fencing in Luna County, NM (Segment 6);

10. **El Paso C:**  10 miles of replacement pedestrian fencing in Dõna Ana and Luna Counties, NM (Segments 1–2);

11. **El Paso D:**  3 miles of replacement secondary pedestrian fencing and 18 miles of replacement primary pedestrian fencing in El Paso County, TX, and 0.5 miles of new primary pedestrian fencing in Dõna Ana County, NM (Segments 1–4);

12. **Del Rio A:**  2 miles of replacement pedestrian fencing in Maverick County, TX (Segment 1);

13. **Del Rio B:**  2 miles of replacement pedestrian fencing in Val Verde County, TX (Segment 1).

To fund these projects, the Secretary of Defense authorized the transfer of $3.831 billion to the counter narcotics support line of the Drug Interdiction and Counter-Drug Activities, Defense, account.  *See* Seventh Rapuano Decl. ¶ 5.  The Secretary directed the transfer of funds pursuant to DoD's general transfer authority under § 8005 of the DoD Appropriations Act for Fiscal Year 2020, *see* Pub. L. No. 116-93, 133 Stat 2317, Div. A, Title VIII, and § 1001 of the National Defense Authorization Act for Fiscal Year 2020 (NDAA), *see* Pub. L. No. 116-92, 133 Stat. 1198, Title X, and DoD's special transfer authority under § 9002 of the FY20 DoD Appropriations Act and § 1520A of the FY20 NDAA.  *Id.*  The source accounts for the transferred funds are described in Exhibit C to the Seventh Rapuano Declaration.  *Id.*

The U.S. Army Corps of Engineers anticipates that it will award contracts and fully obligate the necessary funds for the new § 284 projects no earlier than March 15, 2020.  *See* Second Declaration of Jill Stiglich, Director of Contracting for the U.S. Army Corps of Engineers ¶ 4 (Exhibit 2).  Several of the new § 284 projects are in close proximity to the prior § 284 projects approved in fiscal 2019, and the U.S. Army Corps of Engineers intends modify the existing § 284 contracts to add the new project work.  *Id.* ¶ 5.a.  Because the contractors working on the prior § 284 projects are already mobilized in close proximity to the new project areas, ground-disturbing activities and substantial construction may begin as soon as the contract modifications are executed, that is, no earlier than March 15, 2020.  *Id.*  The U.S. Army Corps of Engineers is working to determine which, if any, of the additional § 284 projects to undertake using this contract modification process.  *Id.*

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG –Notice re § 284 Projects
*Sierra Club et. al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG – Notice re § 284 Projects
Ex. 6   2
16

1    For the remaining § 284 projects that are not executed through the contract modification
2    process described above, the U.S. Army Corps of Engineers intends to undertake a competitive
3    contract award process and award task orders to qualified contractors holding a multiple award task
4    order contract. *See* Stiglich Decl. ¶ 5.b. The U.S. Army Corps of Engineers anticipates that it will
5    award the first of these task orders and fully obligate the necessary funds for these additional § 284
6    projects no earlier than April 7, 2020. *Id.* For these projects, the U.S. Army Corps of Engineers will
7    be prepared to begin ground-disturbing activities as early as five days after task order award and
8    substantial construction as early as ten days after task order award. *Id.*

11   DATE: February 13, 2020                        Respectfully submitted,

12                                                  DAVID M. MORRELL
                                                    Deputy Assistant Attorney General
13

14                                                  ALEXANDER K. HAAS
                                                    Director, Federal Programs Branch
15

16                                                  ANTHONY J. COPPOLINO
                                                    Deputy Director, Federal Programs Branch
17
                                                    */s/ Andrew I. Warden*
18                                                  ANDREW I. WARDEN
                                                    Senior Trial Counsel (IN Bar No. 23840-49)
19

20                                                  RACHAEL L. WESTMORELAND
                                                    KATHRYN C. DAVIS
21                                                  MICHAEL J. GERARDI
                                                    LESLIE COOPER VIGEN
22                                                  Trial Attorneys
                                                    U.S. Department of Justice
23                                                  Civil Division, Federal Programs Branch
                                                    1100 L Street, NW
24                                                  Washington, D.C. 20530
                                                    Tel.:    (202) 616-5084
25                                                  Fax:     (202) 616-8470
                                                    E-Mail: Andrew.Warden@usdoj.gov
26

27

28                                                  *Counsel for Defendants*

*State of California, et al. v. Donald J. Trump, et al.*, 4:19-cv-00872-HSG –Notice re § 284 Projects
*Sierra Club et. al. v. Donald J. Trump, et al.*, 4:19-cv-00892-HSG – Notice re § 284 Projects
Ex. 6   3
17

| Project Name | Segment Miles (approx.) | Est. Project Cost ($M) |
|---|---|---|
| Yuma A (segment 1) | 7 | $140 |
| Yuma A (segment 2) | 9 | $180 |
| El Centro A | 10.2 | $204 |
| Tucson A (segment 1) | 9 | $180 |
| Tucson A (segment 2) | 14 | $280 |
| Tucson A (segment 3) | 1 | $20 |
| Tucson A (segment 4) | 1 | $20 |
| Tucson A (segment 5) | 4.5 | $90 |
| Tucson B (segment 5) | 4.1 | $82 |
| Tucson B (segment 6) | 2.1 | $42 |
| El Paso A | 20 | $400 |
| El Paso B (segment 6) | 2.4 | $48 |
| El Paso C (segment 1) | 3 | $60 |
| El Paso C (segment 2) | 7 | $140 |
| Tucson C (segment 1) | 7 | $140 |
| Tucson C (segment 3) | 2.6 | $52 |
| Tucson C (segment 4) | 5.7 | $114 |
| Tucson B (segment 1) | 2.1 | $42 |
| Tucson B (segment 3) | 21 | $420 |
| Tucson B (segment 4) | 0.2 | $4 |
| Yuma B (segment 1) | 0.3 | $6 |
| Yuma B (segment 2) | 0.3 | $6 |
| San Diego A (segment 1) | 13.7 | $274 |
| San Diego A (segment 2) | 2 | $40 |
| San Diego A (segment 3) | 2 | $40 |
| Del Rio A | 2 | $40 |
| Del Rio  B | 2 | $40 |
| El Paso D (segment 1) | 3 | $60 |
| El Paso D (segment 2) | 1 | $20 |
| El Paso D (segment 3) | 17 | $340 |
| El Paso D (segment 4) | 0.6 | $12 |

OFFICE OF INSPECTOR GENERAL

# CBP Has Not Demonstrated Acquisition Capabilities Needed to Secure the Southern Border


Homeland Security

**July 14, 2020**

**OIG-20-52**



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

July 14, 2020

MEMORANDUM FOR:    Randolph D. Alles
                   Senior Official Performing the Duties of the
                   Under Secretary for Management

                   Scott Glabe
                   Senior Official Performing the Duties of the
                   Under Secretary for Office of Strategy, Policy,
                   and Plans

                   Mark A. Morgan
                   Acting Commissioner
                   U.S. Customs and Border Protection

FROM:              Joseph V. Cuffari, Ph.D.
                   Inspector General

SUBJECT:           *CBP Has Not Demonstrated Acquisition Capabilities
                   Needed to Secure the Southern Border*

For your action is our final report, *CBP Has Not Demonstrated Acquisition
Capabilities Needed to Secure the Southern Border.* We incorporated the
formal comments provided by your office.

The report contains three recommendations aimed at improving U.S.
Customs and Border Protection's ongoing acquisition to obtain operational
control of the southern border. Your office concurred with one of the three
recommendations. Based on information provided in your response to the
draft report, we consider all recommendations open and unresolved. As
prescribed by the Department of Homeland Security Directive 077-01,
*Follow-Up and Resolutions for the Office of Inspector General Report
Recommendations,* within 90 days of the date of this memorandum, please
provide our office with a written response that includes your (1) agreement or
disagreement, (2) corrective action plan, and (3) target completion date for
each recommendation. Also, please include responsible parties and any
other supporting documentation necessary to inform us about the current
status of the recommendations. Until your response is received and
evaluated, the recommendations will be considered open and unresolved.

*www.oig.dhs.gov*

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Please send your response or closure request to
OIGAuditsFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security. We will post the report on our website for public dissemination.

Please call me with any questions, or your staff may contact Sondra McCauley, Assistant Inspector General for Audits, at (202) 981-6000.

Attachment

cc:    James McCament, Deputy Under Secretary, Office of Strategy, Policy, and Plans

Ex. 8
21

# DHS OIG Highlights

## *CBP Has Not Demonstrated Acquisition Capabilities Needed to Secure the Southern Border*

**July 14, 2020**

## Why We Did This Audit

Executive Order 13767, issued on January 25, 2017, directed the Department of Homeland Security to plan, design, and construct a physical wall along the southern border. We conducted this audit to determine to what extent CBP has executed the Analyze/Select Phase, the second phase of the Acquisition Life Cycle Framework, for the acquisition of the barrier along the southern border.

## What We Recommend

We made three recommendations to improve CBP's ongoing acquisition to obtain operational control of the southern border.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov.

# What We Found

U.S. Customs and Border Protection (CBP) has not demonstrated the acquisition capabilities needed to execute the Analyze/Select Phase of the Wall Acquisition Program effectively. Specifically, CBP:

- did not conduct an Analysis of Alternatives to assess and select the most effective, appropriate, and affordable solutions to obtain operational control of the southern border as directed, but instead relied on prior outdated border solutions to identify materiel alternatives for meeting its mission requirement; and
- did not use a sound, well-documented methodology to identify and prioritize investments in areas along the border that would best benefit from physical barriers.

The Department also did not complete the required plan to execute the strategy to obtain and maintain control of the southern border, as required by its *Comprehensive Southern Border Security Study and Strategy*. Without an Analysis of Alternatives, a documented and reliable prioritization process, or a plan, the likelihood that CBP will be able to obtain and maintain complete operational control of the southern border with mission effective, appropriate, and affordable solutions is diminished.

# DHS Response

DHS concurred with recommendation 2 but did not concur with recommendations 1 and 3. Appendix D contains DHS management comments in their entirety. We consider all recommendations unresolved and open.

Ex. 8
22



## OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## Table of Contents

Background ................................................................................................ 1

Results of Audit ....................................................................................... 6

CBP Did Not Conduct an Analysis of Alternatives to Assess All
Possible Alternatives to Secure the Southern Border ............................ 7

Methodology for Identifying and Prioritizing Investments along
the Southern Border Was Not Comprehensive ....................................... 8

Inadequate Planning for Operational Control of the Southern
Border ....................................................................................... 12

Conclusion.................................................................................................. 13

Recommendations...................................................................................... 14

Management Comments and OIG Analysis ................................................ 14

## Appendixes

Appendix A: Objective, Scope, and Methodology  ................................. 21
Appendix B: CBP Funding for Procurement, Construction, and
                      Improvements along the Southern Border  ...................... 24
Appendix C: Status of Border Wall Construction as of July 2019 ......... 25
Appendix D: CBP Comments to the Draft Report................................. 26
Appendix E: Report Distribution........................................................ 34

## Abbreviations

| | |
|---|---|
| ADE | Acquisition Decision Event |
| ALF | Acquisition Lifecycle Framework |
| AoA | Analysis of Alternatives |
| CBP | U.S. Customs and Border Protection |
| DOD | Department of Defense |
| IPLAN | DHS Executive Order Implementation Plan |
| OIG | Office of Inspector General |
| U.S.C. | United States Code |



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

# Background

Within the Department of Homeland Security, U.S. Customs and Border Protection (CBP), U.S. Border Patrol is responsible for preventing terrorists, terrorist weapons, transnational crime, and illegal immigrants from entering the United States between the land ports of entry. Border Patrol also disrupts and degrades transnational criminal organizations by targeting enforcement efforts against the highest priority threats, smuggling, and crimes associated with smuggling. In total, nine Border Patrol Sectors are responsible for guarding the nearly 2,000-mile U.S. border shared with Mexico.[1]

CBP invests in and deploys essential personnel, technology, and infrastructure to gain and maintain operational control of the southern border.[2] According to the 2017 *U.S. Border Patrol Impedance and Denial Prioritization Strategy* (2017 Impedance and Denial Strategy), four capability needs have consistently been identified as required for operational control.

- impedance and denial – the ability to slow or stop illicit cross border activity;
- domain awareness – the ability to continuously detect, identify, classify, and track border incursions for the purpose of planning and executing a response;
- access and mobility – the ability to access areas of responsibility and, under all conditions, effect mobility for the purpose of responding to illicit cross-border activity; and
- mission readiness – the ability to develop, construct, deploy and maintain a proper logistics chain for the purpose of securing infrastructure and equipping agents.

CBP's infrastructure investments for impedance and denial needs have resulted in construction of 654 miles of fencing along the southern border — comprising 354 miles of pedestrian fence and 300 miles of vehicle fence. These structures span Federal, private, and tribal areas. Table 1 depicts the pedestrian and vehicle fencing in place along the southern border, as of January 2017.

---

[1] Border Patrol divides responsibility for border security operations geographically among nine sectors along the southwest border – San Diego, California; El Centro, California; Yuma, Arizona; Tucson, Arizona; El Paso, Texas; Big Bend, Texas; Del Rio, Texas; Laredo, Texas; and Rio Grande Valley, Texas. Each sector is further divided into stations, with agents assigned to patrol defined geographic areas, or zones, within each station.

[2] To achieve its mission, Border Patrol has identified 12 needed Master Capabilities: (1) impedance and denial, (2) domain awareness, (3) access and mobility, (4) mission readiness, (5) command and control, (6) security and partnerships, (7) human capital management, (8) doctrine and policy, (9) intelligence and counter-intelligence, (10) planning and analysis, (11) communications, and (12) information management.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

### Table 1: Southern Border Fencing Miles, as of January 2017

| Land Type | Primary Pedestrian Fence Miles | Primary Vehicle Fence Miles |
|-----------|-------------------------------|----------------------------|
| Federal | 294 | 298 |
| Private | 60 | 0 |
| Tribal | 0 | 2 |
| Total | 354 | 300 |

*Source*: CBP Facilities Management and Engineering Division

CBP has used various designs and materials to construct this existing border fencing. Figure 1 illustrates each type of structure.

### Figure 1: Examples of Existing Barriers along the Southern Border

| Levee Wall | Steel Bollard | Vehicle Fence | Landing Mat Fence topped with Concertina Wire | Steel Mesh Fence topped with Concertina Wire |
|------------|---------------|---------------|-----------------------------------------------|-----------------------------------------------|

*Source:* Photos taken by DHS Office of Inspector General (OIG)

On January 25, 2017, the President issued Executive Order No.13767, *Border Security and Immigration Enforcement Improvements* (Executive Order). The Executive Order directed the Secretary of Homeland Security to take all appropriate steps to immediately plan, design, and construct a physical wall along the southern border, using appropriate materials and technology to most effectively achieve complete operational control of the southern border.[3]

In response, then-Secretary John F. Kelly issued a memorandum instructing CBP to immediately begin planning, designing, constructing, and maintaining a wall along the land border with Mexico in the most appropriate locations. He also established the Executive Order Task Force (Task Force) to outline for DHS the action items needed to implement the Executive Order. CBP received funding to support accomplishment of the objectives of the Executive Order and its operational requirements.

---

[3] Executive Order 13767 defines operational control as the prevention of all unlawful entries into the United States, including entries by terrorists and other unlawful aliens, and instruments of terrorism, narcotics, and other contraband.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## CBP Wall Acquisition Program Establishment

In March 2017, CBP's Wall Acquisition Program was established as a DHS "Level 1" major acquisition program and was added to the DHS Major Acquisition Oversight List.[4]  As a major acquisition, the Wall Acquisition Program must follow government-wide acquisition regulations implemented through the DHS Acquisition Lifecycle Framework (ALF).[5]  The ALF is a four-phase review process DHS uses to determine whether to proceed with an acquisition.  The four phases are:

1. Need Phase – Define the problem;
2. Analyze/Select Phase – Identify alternatives and resource requirements;
3. Obtain Phase – Develop and evaluate capabilities; and
4. Produce/Deploy/Support/Dispose Phase – Produce and maintain capabilities.

Each phase in the ALF leads to an Acquisition Decision Event (ADE).  An ADE is a predetermined point in the phase at which, before commencing the next phase, the acquisition undergoes a review.[6]  The review ensures that needs are aligned with DHS' strategic direction and that upcoming phases are adequately planned.  The border wall was to be constructed in segments, with each segment requiring approval of the necessary acquisition documents prior to the acquisition proceeding to the Obtain Phase.

At the start of our review, CBP had entered the second phase of the ALF — the Analyze/Select Phase.  The purpose of the Analyze/Select Phase is to determine the most effective and affordable way to fill the capability gap identified by the program in its "Mission Needs Statement," which documented the functional capabilities CBP must have to effectively obtain operational control of the southern border.  On May 3, 2019, CBP was granted permission to move to the Obtain Phase where it develops and evaluates capabilities for just the Rio Grande Valley sector wall project.  Figure 2 depicts each lifecycle phase and acquisition event.

---

[4] The DHS Major Acquisition Oversight List identifies acquisition programs designated as Level 1 or Level 2 acquisitions in accordance with the Acquisition Management Directive 102-01. Special interest programs or programs with lifecycle cost estimates exceeding $1 billion or services programs with an annual expenditure level exceeding $1 billion are designated as Level 1 programs.
[5] *DHS Instruction 102-01-001, Rev 01.1, Acquisition Management Instruction*, May 3, 2019
[6] The DHS Acquisition Review Board reviews Level 1 and 2 investments for proper management, oversight, accountability, and alignment to strategic functions of the Department.  The Acquisition Review Board reviews investments before granting approval to proceed to the next phase of an acquisition.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Figure 2: Four-Phase Acquisition Lifecycle Framework**



*Source: DHS Instruction 102-01, Rev 01.1, Acquisition Management Instruction*, May 3, 2019

## CBP's Wall Acquisition Program Results through July 2019

Since May 2017, CBP has received over $12 billion to support procurement, construction, and improvements along the southern border through a combination of appropriations, the Treasury Forfeiture Fund and in reprogrammed funds from the Department of Defense (DOD).[7] [8]  For summary of yearly appropriations, see appendix B.

As of July 2019, CBP had expended $268 million of the $341 million appropriated in fiscal year 2017.  According to CBP, the majority of work along the southern border was accomplished using FY 2017 funds.  Specifically:

- CBP obligated $292 million for a total of 40 miles of replacement wall in San Diego, El Centro, and El Paso Sectors.  At the time of our review, CBP completed 39.5 of the 40 miles of new border wall in place of pedestrian fence and vehicle barrier in those sectors.
- CBP also obligated $49 million to construct 35 border wall gates in the Rio Grande Valley Sector, which were under construction.

Using FY 2018 funds, CBP completed 7.2 miles of approximately 80 miles of planned new and replacement border wall.  Construction started in February

---

[7] 10 United States Code (U.S.C.) § 284(b)(7) authorizes DOD to support the counterdrug activities of other Federal agencies, including DHS, with the construction of roads, fences, and lighting to block drug smuggling corridors across international boundaries.
[8] 10 U.S.C. § 2808 authorizes the Secretary of Defense to determine whether border barriers are necessary to support the use of the armed forces and to re-direct unobligated DOD Military Construction funding to construct border barriers if required.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

2019 for about 14 miles of secondary wall replacement in San Diego Sector, and in April 2019 for 37 miles of primary wall replacement in San Diego and Calexico, California, and Yuma, Arizona. Anticipated construction completion for these projects is late 2020. Additionally, about 25 miles of new border wall and levee wall was planned for the Rio Grande Valley Sector with FY 2018 funding. Construction activities started for about 13 miles of the new levee wall system in Rio Grande Valley Sector's Hidalgo County with estimated completion dependent on availability of real estate. CBP expected to award a construction contract for the remaining 12 miles of new border wall system in Rio Grande Valley Sector's Starr County by December 31, 2019. As of July 2019, CBP had expended $36.7 million of the $1.375 billion appropriated in FY 2018 for border wall construction.

CBP also planned to supplement $1.375 billion in FY 2019 appropriations with $601 million from the Treasury Forfeiture Fund to construct 11 miles of new primary levee wall system and 74 miles of new border wall system in Rio Grande Valley Sector. On May 2019, CBP awarded a $42.9 million contract to construct approximately three miles of new border wall system Rio Grande Valley Sector that was scheduled to begin in August 2019. See appendix C for the status of CBP's use of appropriated funds for construction of new and replacement border wall along the southern border as of July 2019.

Table 2 shows CBP's planned construction of new and replacement border wall along the southern border using funds received through FY 2019.

**Table 2: CBP Planned Border Wall Construction through FY 2019**

| New Primary Wall | New Primary Levee Wall | Primary Wall Replacement (in place of dilapidated designs) | Primary Wall Replacement (in place of vehicle barrier) | Secondary Wall Replacement (in place of dilapidated designs) | Total |
|---|---|---|---|---|---|
| 86 miles* | 24 miles | 62–66 miles | 144 miles | 14 miles | 330–334 miles |

*Source:* CBP
*Miles are approximate and as of June 14, 2019

According to CBP, DOD plans to fund up to $2.5 billion pursuant to 10 U.S.C. § 284(b)(7) in support of CBP requirements to construct up to 129 miles of new replacement wall in place of dilapidated or outdated designs and vehicle barrier, within Yuma, El Paso, El Centro, and Tucson Sectors. In March 2019, DOD authorized the U.S. Army Corps of Engineers to begin planning and executing up to $1 billion to build 57 miles of pedestrian fencing, construct and improve roads, and install lighting within the Yuma and El Paso Sectors. However, these projects were subject to a permanent injunction on June 28,



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

2019.[9]  On appeal, the Ninth Circuit affirmed the district court's permanent injunction and held that Section 8005 of the Department of Defense Appropriations Act of 2019, Pub. L. No. 115-245, 132 Stat. 2981 did not provide transfer authority for projects funded under 10 U.S.C. § 284.[10] Although work on these projects had continued because the Supreme Court previously granted the government's application for stay of the district court injunction pending appeal in the Ninth Circuit,[11] funding for these projects is now barred until the government petitions for a writ of certiorari, at which time the stay will continue until the Court enters judgement, or declines certiorari.

This is our second report on CBP's efforts to secure the southern border physically.[12]  We conducted this audit to determine to what extent CBP has executed the Analyze/Select Phase, the second phase of the Acquisition Lifecycle Framework, for the acquisition of the barrier along the southern border.

## Results of Audit

CBP has not demonstrated the acquisition capabilities needed to execute the Analyze/Select Phase of the Wall Acquisition Program effectively.  Specifically, CBP:

- did not conduct an Analysis of Alternatives (AoA) to assess and select the most effective, appropriate, and affordable solutions to obtain operational control of the southern border as directed, but instead relied on prior outdated border solutions to identify materiel alternatives for meeting its mission requirement; and
- did not use a sound, well-documented methodology to identify and prioritize investments in areas along the border that would best benefit from physical barriers.

The Department also did not complete its plan to execute the strategy to obtain and maintain control of the southern border, as required by its *Comprehensive Southern Border Security Study and Strategy*.[13]  Without an AoA, a documented and reliable prioritization process, or a plan, the likelihood that CBP will be able to obtain and maintain complete operational control of the southern

---

[9] *Sierra Club v. Trump*, No. 19-cv-00892-HSG, 2019 WL 2715422 (N.D. Cal. Jun. 28, 2019)
[10] *Sierra Club v. Trump*, No. 19-16102 19-16300, 2020 WL 3478900, at *11 (9th Cir. Jun. 26, 2020)
[11] *Trump v. Sierra Club*, 140 S.Ct. 1 (2019)
[12] *Special Report: Lessons Learned from Prior Reports on CBP's SBI and Acquisitions Related to Securing our Border*, OIG -17-70-SR, June 12, 2017
[13] *U.S. Department of Homeland Security Comprehensive Southern Border Security Study and Strategy,* November 2017



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

border with mission effective, appropriate, and affordable solutions is
diminished.

## CBP Did Not Conduct an Analysis of Alternatives to Assess All Possible Alternatives to Secure the Southern Border

Although directed to do so by Congress and the Department, CBP did not
conduct an AoA to assess and select the most effective, appropriate, and
affordable solutions to obtain operational control of the southern border.
Specifically, the *Consolidated Appropriations Act* of 2017 (Public Law 115-31) as
well as subsequent appropriations, required the Department submit to the
Committees on Appropriations of the Senate and the House of Representatives
a risk-based plan for improving security along the borders of the United States,
including the use of personnel, fencing, other forms of tactical infrastructure,
and technology.  The plan was to include a description of the methodology and
analyses used to select specific resources for deployment to particular locations
that included among other things an AoA, and comparative costs and benefit
analysis.[14]  Additionally, DHS acquisition guidance requires programs to
identify alternatives and resource requirements during this phase.[15]  As
previously stated, this phase, called the Analyze/Select Phase, aims to
determine the most effective and affordable way to obtain operational control of
the southern border.

### Analysis of Alternatives Was Outdated

An AoA is a fundamental step necessary to determine the optimal way to meet
the requirement.  This analysis aims to fully evaluate the cost, effectiveness,
and risk of potential materiel alternatives to meet a mission requirement.
According to CBP's Component Acquisition Executive, in 2008 CBP completed
85 AoAs for all segments along the southern border.  Based on the 2008 AoA
results, CBP recommended a border wall as the most cost-effective option to
fulfill its operational requirements at that time.  However, we requested copies
during our audit 10 years later, but CBP could not locate 59 of the 85 (69
percent) AoAs.  The remaining 26 AoAs CBP provided were limited in their
usefulness because they did not reference the locations prioritized by Border
Patrol for border wall investment.

After reviewing the 26 AoAs, we concluded that the cost per mile to construct a
border wall in 2008 was outdated.  In the AoAs, CBP estimated that about 60

---

[14] *Consolidated Appropriations Act, 2017*, Public Law 115-31, May 5, 2017;
*Consolidated Appropriations Act, 2018*, Public Law 115-141, March 23, 2018; and
*Consolidated Appropriations Act, 2019*, Public Law 116-6, February 15, 2019
[15] *DHS Instruction 102-01-001, Rev 01, Acquisition Management Instruction*, March 9, 2016



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

miles of new border wall would cost approximately $466 million, or $8 million per mile. However, in the 2017 Impedance and Denial Strategy, which includes Border Patrol's priorities for deploying barriers and other assets along the southern border, Border Patrol estimated that completing construction in its 17 priority groups would result in about 722 additional miles of new border wall at a cost of approximately $18 billion, or $25 million per mile.[16]

Furthermore, according to the 26 AoAs, a border wall was less costly in the long run than additional agents. However, the outdated AoAs did not account for the hiring of 5,000 additional Border Patrol agents, as required by the President's 2017 Executive Order. Additional Border Patrol agents can have a significant effect on border security as evidenced in a recent OIG report.[17] For example, our report disclosed that moving agents out of mission support roles and returning them to their primary border enforcement duties resulted in an increase in apprehensions along the southern border. In response to the Executive Order, Border Patrol has taken steps to recruit additional agents. This constitutes a change that would be important to consider in completing updated AoAs.

Instead of conducting a new AoA, CBP conducted an Alternatives Analysis to identify a type of physical barrier for each location prioritized in the 2017 Impedance and Denial Strategy. However, this type of analysis is more limited than an AoA because it will only evaluate a specific solution, rather than a broader range of solutions, such as technologies or additional personnel.

Fulfilling the direction to secure the southern border constitutes a significant investment. Without full and up-to-date AoAs, CBP cannot accurately identify the cost, effectiveness, and risk of potential materiel alternatives to meeting its mission requirement.

## Methodology for Identifying and Prioritizing Investments along the Southern Border Was Not Comprehensive

Congress required the Department submit a risk-based plan for improving security along the U.S. border that identifies the planned locations, quantities, and types of resources. The plan must also include a description of the methodology and analyses used to select specific resources for deployment to particular locations. In its 2017 Impedance and Denial Strategy, Border Patrol documented its process for identifying and prioritizing impedance and denial

---

[16] Border Patrol divided the 9 southern border sectors into 197 segments, which it then organized into 33 groups. Each group consists of one or more segments.
[17] *Border Patrol Needs a Staffing Model to Better Plan for Hiring More Agents*, OIG-19-23, February 28, 2019



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

investments along the southern border.  Border Patrol intended for its process to lead to informed investments that achieve the greatest possible operational impact, are feasible in terms of constructability, and are scalable to available budgetary resources.  However, Border Patrol did not use a sound methodology to identify and prioritize these investments.  Border Patrol did not document its justification for re-ordered priority rankings for border wall construction, or how evaluation criteria were weighted.  It also used only a single fiscal year of border activity data as a basis for prioritizing construction locations.  Without a comprehensive, well-documented approach, Border Patrol cannot be certain it is making fully informed investment decisions and investing in border locations that could best benefit from physical barriers.

**Inadequate Justification for Prioritizing Locations for Wall Construction**

Border Patrol did not adequately justify its decisions to prioritize certain southern border locations over others for wall construction.  To help evaluate and prioritize locations for investment, Border Patrol developed a decision support tool in a spreadsheet.  Data in this tool comes from two existing sources — the Capability Gap Analysis Process, and the 2017 *Southwest Capability Roadmap* (Roadmap).  Specifically*:*

- In the Capability Gap Analysis Process, Border Patrol collected and managed capability and operational requirements by identifying resources (personnel, training, equipment, technology, and infrastructure) in each southern border sector that fell short of meeting required needs.
- In the Roadmap, Border Patrol surveyed stations with border zones in their area of responsibility and identified the most important capabilities each station and sector needed.  The Roadmap also identified areas of the border that might benefit from improved impedance and denial, domain awareness, and access and mobility.

Using information from both of these processes, the decision support tool scored groups and ranked them 1 through 33 in priority for border wall construction.[18]  CBP's Operational Review Board, comprised of CBP and Border Patrol subject matter experts, then considered the decision support tool rankings, along with broader operational concerns and intelligence reports, to establish a list of priority locations for border wall construction.  However, the Board adjusted the rankings without documenting its rationale for prioritizing certain lower scoring southern border locations over those that the decision

---

[18] Border Patrol used this decision support tool to establish and score 197 segments of varying distances, across the 9 southern border sectors.  Border Patrol organized these 197 segments into 33 groups for evaluation and prioritization.  Each group consists of one or more segments that collectively promote greater operational control along the border.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

support tool had scored higher for investment in impedance and denial.  For example, the Operational Review Board elevated San Diego Group D — a location that already has a dual-layer border wall system and had already received funding for primary wall replacement — to a higher priority.  Specifically, the decision support tool ranked San Diego Group D as 12 of 33, although the Operational Review Board moved the group up to 4 of 33.

Upon further analysis, we determined that border wall construction in San Diego Group D is not supported by CBP's previous analyses or scheduled plans.  First, neither the Roadmap, which cited the San Diego Sector as among the lowest priorities on the southern border for impedance and denial investment, nor the decision support tool's evaluation of the sector supports wall construction.  Second, border wall construction in the San Diego Sector is not supported by the Department's 2017 *Comprehensive Southern Border Security Study and Strategy* to obtain and maintain operational control of the southern border, in which DHS assessed and categorized the sector's risk level as low.  Finally, under the *Consolidated Appropriations Act, 2017*, CBP had already scheduled about 14 miles of fence removal and replacement in San Diego Group D.  Conversely, the decision support tool ranked El Centro Group X as the top priority for border wall construction, but the Operational Review Board moved El Centro Group X to 5 of 33.  Figure 3 shows the Operational Review Board's rankings compared to those of the decision support tool.

### Figure 3: Comparison of Sector Group Rankings

| Sector    Group | Decision Support Tool Ranking Overall Score (100%) | Operational Review Board Ranking | Decision Support Tool Ranking | Change | |
|---|---|---|---|---|---|
| Rio Grande Valley    Group C | 79.71 | 1 | 4 | ▲ | 3 |
| Rio Grande Valley    Group B | 78.71 | 2 | 5 | ▲ | 3 |
| Rio Grande Valley    Group A | 77.81 | 3 | 9 | ▲ | 6 |
| San Diego    Group D | 75.01 | 4 | 12 | ▲ | 8 |
| El Centro    Group X | 81.25 | 5 | 1 | ▼ | -4 |
| Yuma -    Group X | 80.85 | 6 | 2 | ▼ | -4 |
| Laredo    Group A | 79.78 | 7 | 3 | ▼ | -4 |
| El Paso    Group X | 78.22 | 8 | 6 | ▼ | -2 |
| El Centro    Group A | 78.05 | 9 | 7 | ▼ | -2 |
| Yuma -    Group B | 77.85 | 10 | 8 | ▼ | -2 |
| San Diego    Group A | 77.65 | 11 | 10 | ▼ | -1 |
| Laredo    Group C | 75.98 | 12 | 11 | ▼ | -1 |
| El Paso    Group B | 74.90 | 13 | 13 | ▬ | 0 |
| El Paso    Group C | 73.68 | 14 | 14 | ▬ | 0 |
| El Centro    Group B | 73.58 | 15 | 15 | ▬ | 0 |
| Del Rio    Group D | 72.96 | 16 | 16 | ▬ | 0 |
| Tucson -    Group E | 71.51 | 17 | 17 | ▬ | 0 |

*Source:* DHS OIG analysis of the decision support tool and Border Patrol's *Impedance and Denial Prioritization Strategy*

We asked Border Patrol to explain why the lower scoring southern border locations were prioritized over those that its decision support tool scored higher



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

for investment in impedance and denial.  In response, Border Patrol officials provided us a presentation that included the same justifications for investing in all 33 groups along the southern border as in the 2017 Impedance and Denial Strategy.  But, they offered no further rationale for prioritizing for example San Diego Group D over the other groups.  Documenting revisions to priority justification would help ensure that Border Patrol made sound decisions and selected and prioritized the most appropriate locations for border wall construction.

**Weighting of Decision Support Tool Criteria Was Not Explained**

Border Patrol did not provide rationale for how it weighted the criteria in its decision support tool for prioritizing wall construction locations.  Federal Government standards call for management to clearly document internal controls, all transactions, and other significant events to allow documentation to be readily available for examination.[19]  Border Patrol's 2017 Impedance and Denial Strategy outlined the evaluation criteria used in the decision support tool to score and prioritize impedance and denial investments along the southern border and the corresponding weights per the following:

- ability to achieve strategic objectives (40 percent),
- analysis of border census data (40 percent), and
- operational and engineering feasibility considerations (20 percent).

Using Border Patrol's scoring process, weighting of the criteria greatly influenced the score of each border location.  As such, Border Patrol should establish and document a clear rationale for the weights to provide more informative, transparent, and defensible investment decisions.  For example, if the operational and engineering feasibility considerations criteria had been weighted more heavily than 20 percent, certain areas in the Rio Grande Valley Sector may not have scored as highly because these areas present unique feasibility challenges related to land acquisition and environmental requirements.  Such challenges could inhibit construction and increase costs beyond available funding.  Border Patrol officials said they weighted operational and engineering feasibility considerations lower than achieving strategic objectives and analysis of border census data because the tool focused on where the need is regardless of implementation.  However, Border Patrol's process for identifying and prioritizing investments along the southern border is supposed to result in fully informed investments that achieve the greatest possible operational impact, but are also feasible to implement.

---

[19] *Standards for Internal Control in the Federal Government*, GAO-14-704G, September 2014



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

These issues are magnified by CBP's plans to rely solely on an analysis of types of physical barriers for all segments prioritized for improved impedance and denial, rather than completing an AoA, which might identify alternative solutions. Constructing a border wall may be a viable option for some locations, but in other locations non-construction alternatives may be more feasible, and may best help CBP achieve operational control of the southern border.

**Multi-year Border Activity Data Was Not Used to Support Investment Decisions**

Although Border Patrol recognizes that the threat along the southern border is dynamic, it used only the most recent complete year (FY 2016) of border activity data, such as drug seizures, apprehensions, and assaults on Border Patrol agents, to determine the locations with the greatest need for impedance and denial investment. According to Border Patrol officials, they considered using multi-year data but decided instead to use the most recent complete year of data in the decision support tool. However, they also said they would consider using multi-year data in their future assessments as they see the value in multi-year data and trends.

Using multiyear data may help Border Patrol maximize the decision support tool's utility in addressing its mission needs by providing insights about trends and context not available from single year data. For example, if segment X experienced more illicit activity in FY 2016 than segment Y, the decision support tool would score segment X higher based on information from just that single year. However, using data from multiple years might show illicit activity trending upward in segment Y and downward in segment X, providing more insight and fuller context to better inform Border Patrol's prioritization and investment decisions.

# Inadequate Planning for Operational Control of the Southern Border

A lack of detailed planning to help guide acquisition management efforts may be a contributor to the deficiencies we identified in the Analyze/Select Phase of the Wall Acquisition Program. Specifically, the Department has not conducted adequate planning for ensuring southern border security. Executive Order 13767 required the Department to conduct a comprehensive study of the southern border's security, including a strategy to obtain and maintain complete operational control. This study was due 180 days from the issuance of the Executive Order, or on July 24, 2017.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

In response to these requirements, the Department submitted the *Comprehensive Southern Border Study and Strategy* 4 months after the 180-day deadline. The study included information on all geophysical and topographical aspects of the southern border, the availability of Federal and state resources necessary to achieve complete operational control of the southern border, and a strategy to obtain and maintain complete operational control of the southern border. The strategy included three general goals and objectives:

- securing the southern border and approaches;
- dismantling transnational criminal organizations; and
- deterring flow of illegal entries through consequence delivery, benefit adjudication, interior enforcement, and partner engagement.

To achieve these goals and objectives, the Department reported it planned to deploy physical barriers and personnel to high-risk areas; position security and response assets to prevent, detect, and defeat threats as far forward of the physical border as possible; and improve domain awareness using state-of-the-art technology and operational assets, such as radar towers, cameras, aircraft, ships, and vehicles.

However, the study was not accompanied by an implementation plan, as required. To execute the strategy described in the study, the DHS Office of Strategy, Policy, and Plans was to complete, with components including CBP and the Under Secretary for Management, a joint implementation plan. As of September 2019, the Department had neither finalized nor submitted an implementation plan. According to officials in the Office of Strategy, Policy, and Plans, they have not been involved or tasked to help with this action. Without an implementation plan, the Department cannot ensure it will fulfill its mission requirements with effective, appropriate, and affordable solutions.

## Conclusion

CBP has not fully demonstrated that it possesses the capability to potentially spend billions of dollars to execute a large-scale acquisition to secure the southern border. The majority of work along the southern border so far has been accomplished using FY 2017 appropriations. As of July 2019, CBP had expended $268 million of the $341 million appropriated in FY 2017 to replace 39.5 miles of fencing. CBP also had expended $36.7 million of $1.375 billion appropriated to install or replace 7.2 of approximately 80 miles of border wall in FY 2018. In FY 2019, $6.7 billion of DOD funds were reprogrammed for border construction.

Given the challenges we identified through our lessons learned review, CBP's inability to effectively guide this large-scale effort poses significant risk of



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

exponentially increased costs.[20]  Until it takes corrective action to improve its acquisition planning and management, CBP will remain challenged as in the past; any future initiative may take longer than planned, cost more than expected, and deliver less capability than envisioned to secure the southern border.

## Recommendations

**Recommendation 1:** We recommend the Under Secretary for Management of DHS require CBP to conduct an up-to-date independent Analysis of Alternatives to identify the most appropriate and effective solutions to obtain complete operational control of the southern border.

**Recommendation 2:** We recommend Border Patrol revise its methodology for prioritizing southern border investments to include:

- a comprehensive justification for the Operational Review Board's final group rankings for southern border investment;
- a rationale for the weights assigned to the decision support tool's evaluation criteria;
- multi-year border activity data in the decision support tool; and
- documenting any deviation from the decision support tool results.

**Recommendation 3:** We recommend the Office of Strategy, Policy, and Plans for DHS determine the need for an implementation plan for obtaining and maintaining complete operational control of the southern border, as instructed by the *Comprehensive Southern Border Security Study and Strategy*.

## Management Comments and OIG Analysis

The Department provided formal written comments in response to a draft of this report.  We have included a copy of the Department's response in its entirety in appendix D.  The Department concurred with one recommendation, but did not concur with the remaining two.  Additionally, the Department raised concerns about conclusions and assertions within our report.

First, the Department claimed that we overlook CBP's role as an agency under the executive branch of the government.  The Department claimed we "seem to chastise" CBP and DHS for not undertaking actions to explicitly violate language in the Executive Order — namely, actions other than *immediately* constructing a border wall.  Although we recognize our report is critical of

---

[20] *Special Report: Lessons Learned from Prior Reports on CBP's SBI and Acquisitions Related to Securing our Border*, OIG -17-70-SR, June 12, 2017



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

CBP's and the Department's implementation of the Executive Order, our criticism is appropriate considering the cost and scope of a project as large as the construction of the southern border wall. We recognize the Department's explicit, required role in the construction of the border wall in accordance with the Executive Order. However, DHS' lead in implementing the construction of the border wall does not exempt the Department from following congressional requirements and established acquisition practices to safeguard taxpayers dollars from fraud, waste, and abuse. The Department can fully and successfully comply with the Executive Order while also adhering to these acquisition controls.

Second, DHS claimed the purpose or objective of our audit is misaligned with the conclusions and recommendations contained within the report. Specifically, the Department stated that our report "pivots" from the original purpose of determining the extent to which CBP executed the Analyze/Select phase of the acquisition lifecycle framework for the acquisition of the barrier for the southern border to focus on CBP's efforts to gain operational control of the southern border. DHS argued that the physical barrier constitutes an element of impedance and denial, which is only one of three aspects that comprise operational control.

We recognize that implementing impedance and denial solutions are only a part of gaining operational control of the southern border. However, border wall construction was to be in the most appropriate locations to effectively achieve operational control of the border. This is significant because our review of Border Patrol's Capability Gap Analysis Process for stations that have border zones within their areas of responsibility did not always identify impedance and denial as a need for securing the southern border. Specifically, three stations prioritized for border wall construction did not identify impedance and denial as a capability need. In fact, the capability needs most often identified for operational control of the southern border were domain awareness, followed by human capital management, mission readiness, and security partnerships.

Third, the Department took issue with our analysis and discussion of CBP's use of an AoA versus an Alternatives Analysis. Specifically, CBP claims that it did not conduct an AoA to select the most effective, appropriate, and affordable solution to obtain operational control of the southern border because it would have been inappropriate to do so. According to CBP, it conducted an extensive review on how best to provide impedance and denial when it previously built several hundred miles of barrier. This past analysis conclusively showed that the only cost-effective approach to impedance and denial was through the use of a physical barrier.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

As discussed in our report, CBP completed an AoA in 2008 for all segments along the southern border and recommended a border wall as the most cost-effective option to fulfill its operational requirements at that time.  However, we found those AoA to be outdated.  We also concluded that CBP's decision to use prior AoAs was not responsive to the DHS Executive Order Implementation Plan (IPLAN) and to congressional appropriations requirements for an AoA. Contrary to the Department's assertion, conducting an AoA would not violate the Executive Order.  An AoA would support the solutions most appropriate for prioritized locations along the southern border while also being responsive to congressional appropriation requirements.

Lastly, the Department emphasized that this audit took 34 months to complete.  Although we recognize the length of the audit timeline, the purpose of the OIG remains, as established in the *Inspector General Act of 1978* as amended.  Our purpose, in part, is to conduct and supervise audits related to agency programs and operations; to recommend policies for activities designed to promote economy, efficiency, and effectiveness; and to prevent and detect fraud and abuse.  Our work keeps the Department and the Congress fully and currently informed about problems and deficiencies related to the administration of such programs and operations as well as the necessity for, and progress of, corrective action.  Border wall construction remains a significant, high-cost work in progress in need of oversight.  As such, we believe our report provides value to the Department, Congress, and the public.

We also received technical comments from the Department and made revisions to the report where appropriate.  We consider the three recommendations unresolved and open.  A summary of the Department's responses and our analysis follows.

**DHS Response to Recommendation 1:** Non-concur.  According to the Department, the CBP Wall Acquisition Program appropriately conducted an Alternatives Analysis in accordance with DHS Acquisition Management Directive 102-01, its implementing instruction, and other related guidance. The Alternatives Analysis examined performance characteristics of alternative ways to implement the material solution of creating a physical barrier in accordance with Executive Order 13767.  The Department added that the CBP Wall Acquisition Program addressed impedance and denial capabilities as stated in the Mission Need Statement, not operational control.

DHS indicated conducting an AoA of solutions to obtain complete operational control of the southern border was neither appropriate nor necessary. Alternatives for operational control of the southern border are not generally considered through an AoA, nor under the authority of the DHS Under Secretary for Management.  Instead, reviews of these types of alternatives are



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

conducted through strategic and operational evaluations, such as the Border Security Improvement Plan, which was required pursuant to language set forth in the *DHS Appropriations Act of 2018*. The alternatives considered through this strategic and operational review process were considered in a complementary fashion via CBP's layered enforcement strategy and through the Requirements, Acquisition, and Planning, Programming, Budgeting, Execution processes. Additionally, DHS' Chief Acquisition Officer required that CBP further document the rationale for its integrated system architecture. This deliverable will further portray the complementary nature of the integrated systems planned to support operational control of the southern border. Estimated Completion Date: January 31, 2021.

**OIG Analysis:** We do not agree with the Department's conclusion that the CBP Wall Acquisition Program properly followed instruction and other related guidance. We also disagree with the Department's assertion that conducting an AoA of solutions is neither appropriate nor necessary to obtain complete operational control of the southern border. The IPLAN identified and instructed lead components responsible for executing tasks to implement the executive orders. It also established responsibilities for activities the Department must perform for this broad unity of effort and strategy to succeed. Specifically, the IPLAN tasked CBP with ensuring compliance with DHS Management Directive 102, including completing an AoA to include an analysis of costs, benefits, and effectiveness of existing fencing.

Additionally, the *Consolidated Appropriations Act* of 2017 (Public Law 115-31) as well as subsequent appropriations, required the Department to submit to the Committees on Appropriations of the Senate and the House of Representatives a risk-based plan for improving security along the borders of the United States, including the use of personnel, fencing, other forms of tactical infrastructure, and technology. The plan was to include a description of the methodology and analyses used to select specific resources for deployment to particular locations that included, among other things, an AoA and comparative costs and benefits. The Department's Border Security Improvement Plan was developed pursuant to language set forth in the Appropriations Act. However, an AoA was not completed.

We consider this recommendation unresolved. It will remain open until CBP provides an estimated completion date along with a corrective action plan to conduct an AoA identifying appropriate and effective solutions to obtain complete operational control of the southern border or provides evidence that it has satisfied its congressional requirement.

**DHS Response to Recommendation 2:** Concur. The Department stated that the Chief of Border Patrol addressed the recommended enhancements as a



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

result of a U.S. Government Accountability Office audit report,[21] and an independent verification and validation analysis. Enhancements to the process included improving the documentation associated with quantitative and qualitative data input into the decision support tool, weighting, and calculations to assess the most operationally effective location for the border wall. Border Patrol removed feasibility to avoid skewing operational prioritization with nonoperational data. Feasibility, however, remains an important aspect, which was addressed after the prioritization, as a part of DHS Acquisition Management Directive 102-01.

Border Patrol assessed 198 segments of border wall requirements that were not funded as of June 30, 2019, scoring segments individually according to the updated decision support tool methodology. These segments were then combined into 31 groups that collectively promoted operational control. Border Patrol convened an Operational Review Board on May 8, 2019. The Operational Review Board, comprised of executive leadership, reviewed and validated the decision support tool's results, making some minor adjustments to the prioritization and applying and documenting a border-wide perspective. On June 21, 2019, the Chief of Border Patrol was briefed on the outcomes and approved the Operational Review Board's priority list.

The Department, however, clarified that Border Patrol will not be using multi-year operational data given the dynamic and changing environment in which it operates. Instead, Border Patrol needs to utilize the most recent information and threat data to adequately assess requirements needs. DHS requested the recommendation be closed as implemented upon issuance of the final report.

**OIG Analysis:** Although the Department concurred with the recommendation, we find Border Patrol's actions do not meet the intent of the recommendation. Border Patrol has taken steps to enhance the selection process for prioritizing southern border investments. Enhancements to the decision support tool, which is used to prioritize locations for investment though a scoring process, included improving the documentation associated with the quantitative and qualitative data input, weighting, and calculations to assess the most operationally effective locations for the border wall. However, these stated enhancements do not include the Operational Review Board's documented justification for deviating from the decision support tool's results.

Additionally, we disagree with Border Patrol's decision not to use multi-year border activity data. As presented in our report and confirmed in the Department's formal written comments, activity along the southern border is dynamic and constantly changing. Using multiyear data helps Border Patrol

---

[21] *Southwest Border Security: CBP Is Evaluating Designs and Locations for Border Barriers but Is Proceeding Without Key Information*, GAO-18-614, July 30, 2018



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

maximize the decision support tool's utility to obtain operational control by providing insights about trends and context not available from single year data. Using multi-year data would provide additional insight and fuller context to inform Border Patrol's prioritization and investment decisions, while also minimizing the likelihood of the Operational Review Board making significant adjustments to the decision support tool's priority rankings.  Refining the prioritization methodology to include multi-year data in the decision support tool would also account for changes in illegal entry traffic patterns as CBP constructs new border wall.

We consider this recommendation unresolved.  It will remain open until Border Patrol provides an estimated completion date along with updates and documentary evidence that these enhancements were completed and implemented.

**DHS Response to Recommendation 3:** Non-concur.  The Department disagrees with our conclusion that "[w]ithout an implementation plan the Department cannot ensure it will fulfill its mission requirements with effective, appropriate, and affordable solutions."  According to DHS, the DHS Executive Order Implementation Plan (IPLAN), dated March 1, 2018, is exactly the implementation plan the Secretary directed to be created in order to unify the disparate and broad requirements and tasks embodied within multiple related national security Executive Orders and supplemental guidance.  The IPLAN established responsibilities for the remaining activities that the Department must perform for this broad unity of effort and strategy to succeed.

The Department also stated that the Border Security Improvement Plan provided more detail to guide wall acquisition than the IPLAN could have.  Of necessity, a Department implementation plan such as the IPLAN is a high-level guidance document that does not provide the details to influence an AoA or revision to Border Patrol's methodology for prioritizing southern border investments.  The Department concluded that it made very little sense as a matter of appropriate resource management or logic for the Office of Strategy, Policy, and Plans in 2020 to retrospectively determine the need for an implementation plan for efforts successfully ongoing since January 2017.  The Department requested the recommendation be closed as implemented upon issuance of the final report.

**OIG Analysis:** During the course of our audit we had numerous written exchanges with the Strategy and Analysis team within the Office of Strategy, Policy, and Plans.  Through these exchanges, we confirmed that the Department never produced an implementation plan for its *Comprehensive Southern Border Study and Strategy.*  The Strategy and Analysis team's misrepresentation of the IPLAN as exactly the implementation plan required by



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the *Comprehensive Southern Border Study and Strategy* highlights the Department's ongoing struggle with providing appropriate documentation, which reduces program auditability and extends audit timelines. The inability to prepare and provide appropriate documentation also inhibits the ability to determine and assign accountability by Department decision makers. The IPLAN assigned lead and support components responsible for executing tasks to implement the Executive Orders. Among the tasks articulated in the IPLAN was ensuring that DHS Headquarters produce a final draft of the *Comprehensive Southern Border Security Study and Strategy*. However, the Department now claims that the IPLAN is an implementation plan of that same *Comprehensive Southern Border Security Study and Strategy*.

The Department also indicated in its response that the Border Security Improvement Plan provides more detail to guide wall acquisition than the IPLAN could. The Border Security Improvement Plan was developed in accordance with the *Consolidated Appropriations Act* of 2017 (Public Law 115-31). However, the Department did not explain how the Border Security Improvement Plan satisfies the requirement for an implementation plan called for in the *Comprehensive Southern Border Security Study and Strategy*. To state otherwise in our opinion, is misleading.

We disagree with the Department's conclusion that it makes very little sense as a matter of appropriate resource management or logic to retrospectively determine the need for an implementation plan to execute the approach identified in the *Comprehensive Southern Border Study and Strategy*. The *Comprehensive Strategy's* was to include baselines to monitor implementation and progress as well as an impact analysis for DHS to adjust its approach to ensure that resources were optimally applied to securing the border. Although the Department referenced other documents that it created to meet the requirements of Executive Order 13767, the *Comprehensive Strategy's* implementation plan was to ensure the right capability was deployed to secure the southern border. We consider this recommendation unresolved. It will remain open pending further review and clarification of the Department's next steps to determine the need for an implementation plan to execute the *Comprehensive Southern Border Security Study and Strategy*.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix A
## Objective, Scope, and Methodology

Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Public Law 107−296) by amendment to the *Inspector General Act of 1978*.

We conducted this audit to determine to what extent CBP has executed the Analyze/Select Phase, the second phase of the ALF, for the acquisition of the barrier along the southern border.  Specifically, we (1) determined to what extent CBP identified the alternatives to select the most appropriate solution and locations to effectively and efficiently achieve operational control, (2) determined to what extent CBP and Border Patrol supported its decision making, and (3) assessed to what extent the Department developed and implemented a strategy to obtain complete operational control of the southern border.

To accomplish our objective, we obtained and reviewed pertinent Federal, DHS, CBP, and Border Patrol specific regulations, policies, procedures, and guidance relevant to the Analyze/Select Phase of the Wall Acquisition Program.  We reviewed prior DHS OIG and GAO reports, the Department's *Comprehensive Southern Border Security Study and Strategy*, and the Department's *Border Security Improvement Plan*.  We reviewed acquisition documents produced during the Need Phase, such as the Mission Need Statement and the Capability Development Plan.  We interviewed representatives of DHS' Joint Requirements Council and CBP's Component Acquisition Executive.  We also met with Border Patrol officials and staff responsible for management and oversight of the Wall Acquisition Program as well as the Border Patrol's Enforcement Systems Division.

To determine relevant executive and departmental guidance, we reviewed the requirements set forth in Executive Order 13767 and then-DHS Secretary John F. Kelly's implementation memo.  To assess whether CBP followed the appropriate acquisition steps, we compiled pertinent Federal and departmental regulations, policies, procedures, and guidance relevant to DHS acquisitions.  To verify compliance with DHS acquisitions policy, we reviewed acquisition documents, including the Requirements Decision and Action Memorandum, Acquisition Decision Memorandum, the Concept of Operations for Impedance and Denial, Preliminary Operational Requirements Document for Impedance and Denial, the Border Wall System Program Cost Estimating Baseline Document, and the Acquisition Plan produced during the Analyze/Select Phase of the Wall Acquisition Program.  We interviewed DHS, CBP, and Border Patrol officials responsible for recommending a solution to fulfill the capability gap in the southern border and analyzed the requirements set forth in Public Law



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

115–31 and the DHS *Executive Order Implementation Plan.* We obtained and analyzed the letter from the U.S. Senate Committee on Appropriations requesting that the Department complete an AoA. We obtained and assessed 26 of the 85 AoAs that CBP developed during the Secure Border Initiative Network (SBI*net*) to determine whether the estimated cost included in the analysis was comparable to the estimated cost in the Wall Acquisition Program and assessed the cost estimate's accuracy.

To verify Border Patrol's capability development need, we reviewed FY 2016 Capability Gap Analysis Process (CGAP) reports from four of the nine Sectors along the southern border. We judgmentally selected San Diego, El Centro, Yuma, and Rio Grande Valley Sectors because (1) the decision support tool ranked El Centro and Yuma highest, (2) CBP prioritized San Diego and Rio Grande Valley for FY 2018 border wall funding, and (3) the Operational Review Board ranked these four sectors highest. We selected FY 2016 CGAP reports because they were current during the creation of the Roadmap, the decision support tool, and CBP's FY 2018 Budget Request (the 2017 CGAP was not completed until September 2017). We obtained the CGAP reports directly from Border Patrol's Webtool, which is the system of record for Border Patrol's sector and station CGAP reports. We also examined Capabilities, Objective Measures, Resources, Evaluative Methods cards submitted by stations located in El Centro, Rio Grande Valley, San Diego, and Yuma Border Sectors. Specifically, we reviewed 190 - FY 2016 cards from 13 of the 16 stations that have border zones within their area of responsibility located in the four judgmentally selected sectors.

We conducted site visits to the four judgmentally selected sectors and interviewed Sector Chiefs, station patrol agents-in-charge, and the Sector Strategic Planning Teams, who were involved in the CGAP process. We assessed the reliability of the CGAP data by contacting the Strategic Planning Officers in El Centro, Rio Grande Valley, and San Diego to verify the completeness of CGAP reports. We also compared the sector to station Capabilities, Objective Measures, Resources, Evaluative Methods cards to confirm that the capability gaps identified matched between the sector and stations. We determined the CGAP reports were sufficiently reliable for the purposes of this report. We also toured the southern border, observed the prototypes in San Diego, and examined the various types of barriers to determine how terrain influences barrier types appropriate to each location.

To assess the Roadmap, we analyzed the instructions provided to the 9 Border Patrol sectors and 47 Border Patrol stations along the southern border. We then met with Border Patrol's Operational Requirements Management Division to understand the methodology for the statistical information contained in the document. We compared relevant data included in the Roadmap to Border



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Patrol's prioritized locations for border wall and found variances.  However, we considered them immaterial for the purposes of our report.

To understand the decision support tool, we met with Operational Requirements Management Division and contractor staff.  We also analyzed the decision support tool's evaluation criteria, the segments scoring and ranking, and the qualitative and quantitative details.  To determine whether the decision support tool was consistent with standards for internal control requirements, we compared the supporting documentation of the evaluation criteria and its weights and sub-weights to the standards.  We also reviewed source documents used to populate the decision support tool from three southern border Sectors to determine whether the decision support tool considered the impact of scheduled work funded from prior year appropriations on the southern border.  In their submissions, Border Patrol sectors identified whether scheduled work will be ongoing in their area of responsibility.

To assess the reliability of the decision support tool, we performed comparative analyses of the quantitative and qualitative data.  We compared the decision support tools quantitative data to data in the Border Patrol Enterprise Reporting Tool and to data obtained directly from Border Patrol stations.  Although we found slight variances, we determined the decision support tool data was sufficiently reliable for the purposes of this report.  We also compared the qualitative data to the results of the CGAP reports.  Specifically, we identified locations with capability gaps that related to "impedance and denial," and we reviewed the scores for these locations in the decision support tool that related to the ability to impede and deny.

We conducted this performance audit between June 2017 and September 2019 pursuant to the *Inspector General Act of 1978*, as amended, and according to generally accepted government auditing standards (GAGAS).  GAGAS standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based upon our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based upon our audit objectives.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix B
## CBP Funding for Procurement, Construction, and Improvements along the Southern Border

| Fiscal Year | Appropriated Amount | |
|---|---|---|
| 2017[22] | $497.4 Million* | • $341.2 million to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border, and to add gates to existing barriers;<br>• $78.8 million for acquisition and deployment of border security technology; and<br>• $77.4 million for new border road construction. |
| 2018[23] | $1.5 Billion | • $251 million for approximately 14 miles of secondary fencing along the southwest border in the San Diego Sector;<br>• $445 million for 25 miles of primary pedestrian levee fencing along the southwest border in the Rio Grande Valley Sector;<br>• $196 million for primary pedestrian fencing along the southwest border in the Rio Grande Valley Sector;<br>• $445 million for replacement of existing primary pedestrian fencing along the southwest border;<br>• $38 million for border barrier planning and design; and<br>• $196 million for acquisition and deployment of border security technology. |
| 2019[24] | $2.3 Billion | • $1.375 billion for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector;<br>• $725 million for the acquisition and deployment of border security technologies and trade and travel assets and infrastructure; and<br>• $270.2 million for construction and facility improvements and humanitarian needs. |
| | $6.7 Billion** | • about $601 million from the Treasury Forfeiture Fund;<br>• up to $2.5 billion under DOD funds transferred for support for counterdrug activities (10 U.S.C. 284); and<br>• up to $3.6 billion reallocated from DOD military construction projects under the President's declaration of a national emergency (10 U.S.C. 2808). |
| 2020[25] | $1.9 Billion | • $1.375 billion for the construction of barrier system along the southern border;<br>• $221.9 million for the acquisition and deployment of border security technologies and trade and travel assets and infrastructure;<br>• $62.3 million for facility construction and improvements;<br>• $199.5 million for integrated operations assets and infrastructure; and<br>• $45.6 million for mission support and infrastructure. |

*Source*: DHS OIG analysis of 2017, 2018, 2019, and 2020 *Consolidated Appropriations Act*
*Amount does not include appropriations for border security assets and infrastructure
**Upon signing the FY 2019 appropriations bill into law in February 2019, the President identified about $6.7 billion in funds that could be re-programmed, primarily from DOD.

---

[22] *Consolidated Appropriations Act*, 2017, Public Law 115-31, May 5, 2017
[23] *Consolidated Appropriations Act*, 2018, Public Law 115-141, March 23, 2018
[24] *Consolidated Appropriations Act*, 2019, Public Law 116-6, February 15, 2019
[25] *Consolidated Appropriations Act*, 2020, Public Law 116-93, December 20, 2019



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Appendix C
## Status of Border Wall Construction as of July 2019

| Type of Barrier and Location | Amount Appropriated | Funded work |
|---|---|---|
| **FY 2017 Appropriations:** | | |
| Replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southern border | $341 million | • 40 miles of new wall replacement in San Diego, El Centro, and El Paso Sectors.<br><br>• Construction underway for 35 border wall gates in the Rio Grande Valley Sector. |
| **FY 2018 Appropriations:** | | |
| 14 miles of secondary wall replacement in San Diego Sector | $251 million | • Construction started in February 2019. |
| 25 miles of new border wall and levee wall in Rio Grande Valley Sector | $445 million | • Construction activities have started for approximately 13 miles of new levee wall system in Hidalgo County.  Estimated completion will depend on availability of real estate.<br>• An additional 12 miles of new border wall system located in Starr County is set for award by December 31, 2019. |
| Primary pedestrian fencing in Rio Grande Valley Sector | $196 million | • No work to date. |
| Replacement of existing primary pedestrian fencing along the southern border | $445 million | • Construction started in April 2019 for approximately 37 miles of new border wall in place of dilapidated and outdated designs in San Diego and Calexico, California, and Yuma, Arizona. |
| **FY 2019 Appropriations:** | | |
| Construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector | $1.375 billion* | • Contract awarded May 2019 to construct approximately three miles of new bollard wall system within Rio Grande Valley Sector's Rio Grande City Border Patrol Station area of responsibility.  Construction is anticipated to begin in 2019. |

*Source:* DHS OIG analysis of 2017, 2018, and 2019 *Consolidated Appropriations Act* and CBP's status update of border wall construction.

* Amount does not include funds from the Treasury Forfeiture Fund or 10 U.S.C. § 284(b)(7)



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## Appendix D
## DHS Comments to the Draft Report

U.S. Department of Homeland Security
Washington, DC 20528



April 24, 2020

MEMORANDUM FOR:     Joseph V. Cuffari, Ph.D.
                    Inspector General

FROM:               Jim H. Crumpacker, CIA, CFE     JIM H     Digitally signed by
                    Director                        CRUMPACKER  JIM H CRUMPACKER
                    Departmental GAO-OIG Liaison Office          Date: 2020.04.24
                                                                 15:58:33 -04'00'

SUBJECT:            Management Response to Draft Report: "CBP Has Not
                    Demonstrated Acquisition Capabilities Needed to Secure the
                    Southern Border" (Project No. 17-087-AUD-CBP)

Thank you for the opportunity to comment on this draft report. The U.S. Department of
Homeland Security (DHS or the Department) appreciates the Office of Inspector
General's (OIG) work in planning and conducting its review and issuing this report.

The Department, however, is seriously concerned that OIG's draft report contains a series
of significantly flawed and inaccurate factual representations—despite numerous
meetings with program officials, subject matter experts, and others—and the continual
sharing of extensive supporting documentation since OIG announced this audit 34
months ago on June 5, 2017. The OIG's apparent misunderstanding of the facts during
the past nearly three years has resulted in three recommendations, two with which the
Department must non-concur, and one with which it concurs.

**Overarching Concerns with the Report's Misalignment of Purpose and Product**

The Department's concerns with the draft report fall into three major categories, specifically,
the OIG's evident and puzzling: (1) misperception of the established role of an Executive
Branch agency in carrying forward executive direction, (2) lack of clarity when discussing its
analysis of "operational control" (OPCON) versus "impedance and denial" (I&D), and (3)
improper use of an Analysis of Alternatives (AoA) versus an Alternatives Analysis (AA).

### 1. Regarding the Role of an Executive Branch Agency

The mission of the U.S. Customs and Border Protection (CBP) is to safeguard
America's borders, thereby protecting the public from dangerous people and materials
while enhancing the Nation's global economic competitiveness by enabling legitimate



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

trade and travel.  As the lead federal agency charged with detecting and preventing the illegal entry of aliens into the United States, CBP, together with other law enforcement partners, protects our Nation's physical and economic security by facilitating the flow of legal immigration and goods while preventing the illegal trafficking of people and contraband.

As background, in 2017, CBP revisited its methods for gaining OPCON of the border pursuant to the President's Executive Order (EO) 13767, "Border Security and Immigration Enforcement Improvements," dated January 25, 2017.  This EO established the policy of the Chief Executive to obtain "complete operational control" of the southern border (i.e., preventing all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband).  Within CBP, the President's EO required additional improvements to the existing border OPCON framework which the U.S. Border Patrol (USBP) had been undertaking to refine and advance for many years.

As relates to OIG's review, the President's EO specifically directed the "*immediate* construction of a physical **wall** on the southern border" (emphasis added), which it unambiguously defined as "a contiguous, physical wall or other similarly secure, contiguous, and impassable physical barrier."  Accordingly, CBP, as an executive agency within the executive cabinet-level Department of Homeland Security, began to implement the EO requirement to build a wall.

The OIG's draft report, however, seems to chastise CPB, and DHS, for not undertaking actions to violate the explicit language of the EO and pursue courses of action other than *immediately* building a wall.  This is puzzlingly evident in the report language.  For example, the report states on page 9 that, "Without a comprehensive, well-documented approach, Border Patrol cannot be certain it is making fully informed investment decisions and investing in border *locations that could best benefit* from physical barriers." (emphasis added.)  This particular assessment includes the OIG suggesting it would be appropriate for CBP not to build a wall at all (e.g., on page 12 of the report, OIG states: "Constructing a border wall may be a viable option for *some locations*, but in other locations *non-construction alternatives* may be more feasible, and may best help CBP achieve operational control of the southern border." (emphasis added)).  These opinions do not correspond with, and indeed stand in direct contravention of, the plain directive language of the EO to CBP and DHS.

Accordingly, this analysis by the OIG seems to overlook repeatedly that DHS, again as part of the Executive Branch, operates under the direction of the President setting forth Executive Branch policies as the *fons et origo* (i.e., source or origin) of executive power.  DHS and CBP, as members of the Executive Branch, are to seek to proceed immediately to implement such order of the Chief Executive in keeping with

2



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the parameters of their mission. This is particularly so in this instance where USBP has been undertaking specific OPCON improvements for many years.

**2. Conflation and Confusion of "Operational Control" and "Impedance and Denial"**

Gaining OPCON, according to both the "DHS-U.S. Customs and Border Protection Strategy 2020 – 2025" and "2020 DHS-U.S. Border Patrol Strategy," requires attaining three interrelated, operational elements: I&D, situational awareness, and execution of a law enforcement response. The ability to achieve these operational elements is dependent on mission readiness, which is a supporting capability focusing on agent training, equipment readiness, and agent availability. I&D represents USBP's ability to stop or slow down the adversary at the immediate border. USBP accomplishes this I&D by using tactical infrastructure with emphasis on a physical barrier (e.g., wall).

The draft report states that OIG's audit was specifically conducted "to determine to what extent CBP has executed the Analyze/Select Phase, the second phase of the Acquisition Life Cycle Framework, for the acquisition of the barrier along the southern border." There is a significant pivot, however, in direction from the purpose to the resultant report in that the conclusions and recommendations in the draft report focus on CBP efforts "to obtain operational control of the southern border." Although these efforts are complementary, they are obviously not the same. The steps taken to analyze, select, and build an "impassable physical barrier" are different from the steps taken to attain "complete operational control" of the southern border. As a result, the purpose (i.e., overall objective) of the OIG's audit is misaligned with the conclusions and recommendations documented in the draft report.

CBP specifically conducts analyses to determine the most cost-effective approach to each one of three interrelated operational elements. "Operational control" or OPCON requires a mix of systems to cover the three operational elements of I&D, situational awareness, and execution of a law enforcement response. For example, things that impede generally do not provide effective situational awareness, and things that provide situational awareness generally do not effectively impede. Some individuals are apparently of the opinion that surveillance systems, such as cameras and radars, could become a "virtual wall," but cameras and radars do not impede progress or deny access. Surveillance systems let us know that people are moving—they do not impede that movement. Accordingly, it is incorrect to confuse I&D with OPCON, as OIG unfortunately does.

OIG further states on page 3 of the draft report that the purpose of the Analyze/Select Phase "is to determine the most effective and affordable way to fill the capability gap identified by the program in its "Mission Needs Statement" (MNS), which

3



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

documented the functional capabilities that CBP must have in order to effectively obtain *operational control* of the southern border" (emphasis added). However, this statement is in error given that the MNS specifically highlights that the key capability gaps it addresses are for *impedance and denial only*, not the full suite of capabilities (e.g., mission readiness) necessary for operational control (emphasis added).

In addition, OIG states on page 1 of the draft report, "According to Border Patrol, four capability needs have consistently been identified as required for operational control: (1) I&D […]; (2) domain awareness […]; (3) access and mobility […]; and (4) mission readiness […]." However, in several places, the MNS highlights that the key capability gaps it addresses are for I&D only and not the other three capability needs necessary for OPCON. Again, OIG's draft report appears to confuse I&D with OPCON.

### 3. Proper Use of an Analysis of Alternatives versus an Alternatives Analysis

As previously noted, the OIG's stated audit purpose (i.e., overall objective) was "to determine to what extent CBP has executed the Analyze/Select Phase, the second phase of the Acquisition Life Cycle Framework, for the acquisition of the barrier along the southern border," and the OIG notes in its Highlights summary, as well as on pages 6 and 7 of the draft report, that "CBP did not conduct an Analysis of Alternatives to assess and select the most effective, appropriate, and affordable solutions to obtain operational control of the southern border as directed, but instead relied on prior outdated border solutions to identify materiel alternatives for meeting its mission requirement … ."

CBP did not conduct an AoA because doing so would have been inappropriate. During the past nearly three years of this audit, CBP program officials and subject matter experts have repeatedly explained to OIG staff that CBP conducted an *extensive* review of how best to provide I&D when it previously built several hundred miles of barrier. That review confirmed that options such as surveillance systems could not, by their very definition, perform I&D functions. The only options that provide actual I&D are physical barriers or, of course, USBP personnel lined side by side on the border. The latter would not only be prohibitively expensive but would prevent enforcement personnel from responding and executing law enforcement functions. In short, past analysis *conclusively* showed that the only cost-effective approach to I&D was through use of a physical barrier. The only remaining question, then, was about the specific type of physical barrier needed.

CBP's Wall Acquisition Program was established to address I&D needs identified by USBP in its MNS and to comply with EO 13767 to *immediately* plan, design, and construct a physical **wall** on the southern border. The Department's Acquisition Management Directive (MD) 102-01, its implementing instructions, and other related

4



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

guidance supports an AA rather than an AoA when the preferred solution is already narrowed down to a specific material solution. In accordance with this guidance, the CBP Wall Acquisition Program conducted an AA to examine performance characteristics of alternative ways to implement the material solution (i.e., a physical barrier, as called for in the EO).

The OIG further states in the draft report on page 7, "[a]dditionally, DHS acquisition guidance requires programs to identify alternatives and resource requirements during this phase. As previously stated, this phase, called the Analyze/Select Phase, is meant to determine the most effective and affordable way to obtain OPCON of the southern border." The OIG's statement is inaccurate because the Analyze/Select phase as applied to the Wall Acquisition Program, and as traced to the MNS, is, of course, for I&D. This once again misaligns the purpose (i.e., overall objective) of OIG's audit with the conclusions and recommendations documented in the draft report in that I&D is a component of, but not equivalent to, OPCON.

**DHS Response to Recommendations**

The draft report contained three recommendations. DHS concurs with one (Recommendation 2) and non-concurs with two (Recommendations 1 and 3). Attached find our detailed response to each recommendation. DHS previously submitted technical comments under a separate cover for OIG's consideration.

<p style="text-align:center">*     *     *</p>

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions.

Attachment

5



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Attachment:  Management Response to the Recommendations
Contained in Project No. 17-087-AUD-CBP**

**Recommendation 1**:  The Under Secretary for Management of DHS require CBP to conduct an up-to-date independent Analysis of Alternatives to identify the most appropriate and effective solutions to obtain complete operational control of the southern border.

**Response**:  Non-concur.  As identified in the USBP MNS, the CBP Wall Acquisition Program addressed I&D capabilities, not OPCON.  The Program appropriately conducted an AA, in accordance with DHS's Acquisition MD 102-01, its implementing instruction, and other related guidance, to examine performance characteristics of alternative ways to implement the material solution of creating a physical barrier (i.e., wall) in accordance with EO 13767.

Conducting an AoA of solutions to obtain complete OPCON of the southern border is neither appropriate nor necessary.  Alternatives for OPCON of the southern border are not generally considered through an AoA, nor under the authority of the DHS Under Secretary for Management.  Instead, reviews of these types of alternatives are conducted through strategic and operational evaluations, such as the Border Security Improvement Plan (BSIP), which was required pursuant to language set forth in the DHS Appropriations Act of 2018.  The alternatives considered through this strategic and operational review process are considered in a complementary fashion via CBP's layered enforcement strategy and through the Requirements, Acquisition, and Planning, Programming, Budgeting, Execution processes.

It is also important to note that DHS's Chief Acquisition Officer has required that CBP further document the rationale for its integrated system architecture.  This deliverable will further portray the complementary nature of the integrated systems planned to support OPCON of the southern border.  Estimated Completion Date (ECD): January 31, 2021.

**Recommendation 2**:  Border Patrol revise its methodology for prioritizing southern border investments to include:
- a comprehensive justification for the Operational Review Board's final group rankings for southern border investment;
- a rationale for the weights assigned to the decision support tool's evaluation criteria;
- multi-year border activity data in the decision support tool; and
- documenting any deviation from the decision support tool results.

**Response**:  Concur.  The Chief of the USBP has already addressed the recommended enhancements (with the exception of using multi-year operational data), which were the result of a U.S. Government Accountability Office audit report GAO-18-614,

6



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

"SOUTHWEST BORDER SECURITY:  CBP Is Evaluating Designs and Locations for Border Barriers but Is Proceeding Without Key Information," published on July 30, 2018, and publicly released on August 6, 2018, and an Independent Verification and Validation (IV&V) analysis for the second iteration of the Decision Support Tool (DST 2) to improve the methodology for collection, prioritization, and documentation of I&D solutions.  These enhancements to the process included improving the documentation associated with the quantitative and qualitative data input, weighting, and calculations to assess the most operationally effective location for the border wall.  USBP removed feasibility from the model to avoid skewing operational prioritization with non-operational data.  Feasibility, however, remains an important aspect, which is addressed after the prioritization, as a part of DHS MD 102-01, Revision 03.

USBP had assessed 198 segments of border wall requirements that had not been funded, as of June 30, 2019, scoring segments individually according to the updated DST 2 methodology.  These segments were then combined into 31 groups that collectively promote OPCON.

The USBP convened an Operational Review Board (ORB) on May 8, 2019.  The board, comprised of executive leadership, reviewed and validated the DST results making some minor adjustments to the prioritization, and applying and documenting a border-wide perspective.  On June 21, 2019, the Chief of Border Patrol was briefed on the outcomes and approved the priority from the ORB.

USBP will not be using multi-year operational data given the dynamic and changing environment in which it operates.  Instead, USBP needs to utilize the most recent information and threat data to adequately assess requirements needs.

We request that the OIG consider this recommendation resolved and closed as implemented.

**Recommendation 3**:  The Office of Strategy, Policy, and Plans for DHS determine the need for an implementation plan for obtaining and maintaining complete operational control of the southern border, as instructed by the Comprehensive Southern Border Security Study and Strategy.

**Response**:  Non-concur.  Unfortunately, it is our understanding that the OIG did not deem it necessary to consult with leadership of the Office of Strategy, Policy, and Plans (PLCY) during the course of this years-long audit or in making this recommendation.  And so OIG's *ipse dixit* (i.e., unproven statement) that "[w]ithout an implementation plan [from PLCY] the Department **cannot** ensure it will fulfill its mission requirements with effective, appropriate, and affordable solutions" is misplaced (see page 13 of the draft report) (emphasis added).  OIG does not seem to recognize that the DHS Executive Order Implementation Plan (IPLAN), dated March 1, 2018, is *exactly* the implementation plan

7



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

the Secretary expressly "directed" be created to "unify the disparate and broad requirements and tasks embodied" within multiple related national security EOs and supplemental guidance, and was "the result of the analytical and operational planning process derived from this requirement." (see page 3 of the IPLAN.) The IPLAN by its very terms "establishes responsibilities for the remaining activities that the Department must perform for this broad unity of effort and strategy to succeed." (*Id.*) And the IPLAN explains that this cross-component effort was administered by the Deputy's Management Action Group, and that PLCY was one of two leads for "coordinating EO implementation activities." (*Id.* at page 8.) The IPLAN even contains an Annex called "Implementation" to *inter alia* list discrete requirements and track progress over time. (*Id.* at page 21.) OIG somehow omits all of this in its draft report.

In addition, the BSIP provides *more* detail to guide wall acquisition than the IPLAN could have. Of necessity, a Department implementation plan such as the IPLAN is a high-level guidance document that does not provide the details to influence an AoA or revision to USBP's methodology for prioritizing southern border investments. Moreover, it makes very little sense as a matter of appropriate resource management or logic for PLCY in 2020 to retrospectively "determine the need for an implementation plan" for efforts successfully ongoing since January 2017 pursuant in substantial part to an implementation plan as to which PLCY was a co-lead (which, again, OIG entirely ignores). (See, e.g., CBP, "Border Wall System," https://www.cbp.gov/border-security/along-us-borders/border-wall-system.)

We request that the OIG consider this recommendation resolved and closed as implemented.

8



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix E**
**Report Distribution**

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary, Office of Strategy, Policy, and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs
CBP Audit Liaison

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at:
www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General
Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click
on the red "Hotline" tab. If you cannot access our website, call our hotline at
(800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

> Department of Homeland Security
> Office of Inspector General, Mail Stop 0305
> Attention: Hotline
> 245 Murray Drive, SW
> Washington, DC 20528-0305



Exhibit C San Diego Projects

LEGEND

Existing Vehicle Barrier

Proposed Projects

Primary Pedestrian Barrier

Primary Pedestrian Barrier Replacement

San Diego A-1

San Diego A-2

San Diego A-3

UNITED STATES
MEXICO

*If sheet measures less than 11x17 it is a reduced print. Reduce scale accordingly.*

1 in = 2.14 mi          1:135,500

Los Angeles

San Diego

Tijuana

AREA ENLARGED

WARNING: This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 600v10.1                                                    April 16, 2020



# Exhibit E El Centro Projects

*If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1 in = 1.97 mi 1:124,678

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 600v10.1

April 16, 2020

Ex. 10