UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION, ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS PARENS PATRIAE,<br>                                   Plaintiffs,<br>v.<br>DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY, et al.,<br>                                   Defendants. | Case No.:  3:20-cv-01552-AJB-MSB<br><br>**ORDER DENYING WITHOUT PREJUDICE LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION'S EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**(Doc. Nos. 13–14.)** |

This case presents difficult and sensitive issues concerning Native American rights and the construction of the United States-Mexico border wall. The matter came before the Court on Plaintiff's The La Posta Band of the Diegueño Mission Indians' ("La Posta") *ex parte* motion for a temporary restraining order ("TRO") and motion for preliminary injunction. (Doc. Nos. 13, 14.) Defendants Donald J. Trump, Mark T. Esper, Chad F. Wolf, and Todd T. Semonite ("Defendants" or "the Government") opposed both motions. (Doc.

1

Nos. 20, 21.) La Posta filed a reply. (Doc. No. 22.) The Court held a hearing on both La Posta's *ex parte* motion for TRO and preliminary injunction on August 27, 2020. (Doc. No. 24.)

The burden at this juncture lies with La Posta. La Posta's burden is a demanding one, and the extraordinary remedy of a TRO and preliminary injunction is inappropriate in the absence of a clear showing of entitlement. At this early point of the litigation, Defendants have yet to answer, and discovery has yet to be conducted. However, with the current evidence before the Court, and the concerning factual disputes yet to be resolved (and which could not be resolved at the August 27, 2020 hearing), the issuance of a TRO or preliminary injunction at this initial stage would not be proper. Additionally, driving this Court's determination today is the fundamental legal principle that obligates lower courts to follow the orders of higher courts when making a ruling on a similar case with similar issues. Here, in issuing this Order, the Court cannot simply ignore the clear statements from our highest court. Thus, the Court **DENIES** La Posta's *ex parte* motion for TRO and preliminary injunction **WITHOUT PREJUDICE**. (Doc. Nos. 13–14.)

I.   **BACKGROUND**

A.   **La Posta and Their Religious Practices**

This matter involves questions about the ability of private parties to enforce Congress' appropriations power, in addition to constitutional questions regarding a Native American tribe's rights to ancestral remains and cultural items. La Posta—a federally recognized Native American tribe—brings this action on behalf of itself as a sovereign tribal nation, and on behalf of its members. (Complaint ("Compl."), Doc. No. 1, ¶ 5.) La Posta seeks injunctive relief to halt the construction of the United States-Mexico border wall "until the Defendants can guarantee adequate consultation and protection of La Posta religious practices and cultural heritage." (*Id.* ¶ 1.)

La Posta is one of twelve bands of Kumeyaay people. (*Id.* ¶ 10.) The La Posta Reservation spans 3,556.49 acres and is in the Laguna Mountains, 56 miles east of San Diego and 46 miles west of El Centro. (*Id.*) According to La Posta, the Kumeyaay people

2

lived throughout the border area in the San Diego and Imperial Counties for over 12,000 years. (*Id.*) Many parts of these border areas contain village sites sacred to La Posta citizens and contain human burial grounds and other important cultural and archaeological artifacts. (*Id.*) Historically and presently, the Kumeyaay people move through their ancestral territory via a system of trails. (*Id.* ¶ 11.) Many of these trails run in proximity to and across the United States-Mexico border in the San Diego and Imperial Counties. (*Id.*)

The La Posta tribal citizens practice a religion based on oral tradition. (*Id.* ¶ 12.) The creation story of the Kumeyaay people features many landmarks within the Kumeyaay territory that La Posta citizens hold sacred, including "Tecate Peak, Jacumba Hot Springs, and Table Mountain, among others." (*Id.*) Thus, La Posta tribal citizens practice their religion by holding ceremonies and gatherings at these sacred places. (*Id.*) Kumeyaay values and heritage are additionally passed on to future generations through participation in traditional cultural and religious ceremonies at these locations. (*Id.* ¶ 14.) Additionally, the religion of the Kumeyaay provides for specific burial practices. For example, Kumeyaay burial practices call for (1) certain songs to be sung for the dead, (2) all parts of a body to remain together after death, and (3) the proper treatment of Kumeyaay ancestors in the event of exhumation, including the practice of smudging and singing to ensure proper reburial by a properly trained and certified Kumeyaay person. (*Id.* ¶ 13.)

La Posta states that several of their sacred landmarks containing ancient tribal cemeteries and village sites are located within the path of construction of the United States-Mexico border wall. (*Id.* ¶ 16.) A study commissioned by the U.S. Customs and Border Protection ("CBP") identifies many Kumeyaay cultural sites within the border wall construction area in San Diego. (Declaration of Thomas Holm ("Holm Decl."), Doc. No. 13-8, ¶ 5.) However, La Posta claims this study is incomplete and fails to include many sacred sites. (*Id.*) For example, on July 10, 2020, human remains were allegedly discovered at a previously unrecorded archaeological site which was under construction for the wall. (*Id.* ¶¶ 10–13; Declaration of Javier Mercado ("Mercado Decl."), Doc. No. 13-5, ¶ 8; Declaration of Stephen Rochester ("Rochester Decl."), Doc. No. 13-7, ¶ 16.) CBP and

U.S. Army Corps of Engineers ("Army Corps") officials were made aware of this discovery but Defendants allegedly did not permit La Posta to properly exhume the remaining burial site. (Mercado Decl. ¶¶ 9–11; Rochester Decl. ¶¶ 21–23.) Instead, Defendants continued construction of the border wall over the burial ground. (*See* Mercado Decl. ¶ 11; Rochester Decl. ¶¶ 24, 26.) La Posta details other instances of CBP and Army Corps officials allegedly ignoring indications of cultural items and the presence of human remains. (*See* Mercado Decl. ¶ 13.)

La Posta further asserts that the border wall construction obstructs burial and sacred site access. (Declaration of Cynthia Parada ("C. Parada Decl.), Doc. No. 13-4, ¶¶ 12, 17.) Specifically, La Posta alleges CBP has threatened La Posta citizens with trespass charges while engaging in a ritual dance within the border wall construction area. (*Id.* ¶ 18.) On August 10, 2020, La Posta citizens attempted to visit a site within the border wall area to pray but CBP denied them access and threatened them with arrest and felony charges if they entered the site. (*Id.*)

La Posta states that "CBP representatives engaged in a phone call with tribal representatives in June, a Zoom meeting on July 8, and invited tribal representatives for a site visit on July 10, 2020." (Compl. ¶ 24.) However, according to La Posta, neither engagement by CBP provided sufficient information about the construction plans, a schedule to permit La Posta to evaluate the Projects' impacts on religious and cultural resources, nor has CBP provided a comprehensive evaluation of such impacts. (*Id.*)

**B.    The United States-Mexico Border Wall Funding and Construction Projects**

Since the beginning of his term, the President of the United States, Donald J. Trump has been a strong supporter of the construction of a United States-Mexico border wall. *See California v. Trump*, 963 F.3d 926, 932 (9th Cir. 2020). On January 25, 2017, President Trump issued an Executive Order directing federal agencies "to deploy all lawful means to secure the Nation's southern border." Exec. Order No. 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017). The Executive Order instructed agencies to "take all appropriate steps to

4

immediately plan, design and construct a physical wall along the southern border," including to "[i]dentify and, to the extent permitted by law, allocate all sources of Federal funds" to that effort. *Id.* at 8794.

On April 4, 2018, President Trump issued a memorandum titled, "Securing the Southern Border of the United States." Presidential Memorandum, 2018 WL 1633761 (Apr. 4, 2018). The President stated "[t]he security of the United States is imperiled by a drastic surge of illegal activity on the southern border" and pointed to "the combination of illegal drugs, dangerous gang activity, and extensive illegal immigration." *Id.* at *1. The President determined the situation at the border had "reached a point of crisis" that "once again calls for the National Guard to help secure our border and protect our homeland." *Id.* Therefore, the President directed the Department of Defense ("DoD") to support the Department of Homeland Security ("DHS") in "securing the southern border and taking other necessary actions to stop the flow of deadly drugs and other contraband, gang members and other criminals, and illegal aliens into this country." *Id.* at *2.

In furtherance of his plans to build a border wall, President Trump repeatedly sought appropriations from Congress for border wall construction. *See Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) ("*Sierra Club I*"). In Fiscal Year 2019, during negotiations to pass an appropriations bill, President Trump announced he would not sign any legislation that did not allocate substantial funds to the border wall project. *See California*, 963 F.3d at 932. On January 6, 2019, the Trump Administration requested $5.7 billion to fund the construction of the border barrier. *Id.* These negotiations concerning border wall funding reached a stalemate and resulted in the "longest partial government shutdown in United States history." *Id.*

Then on February 14, 2019, Congress passed the Consolidated Appropriations Act of 2019 ("FY19 CAA"), which included the Department of Homeland Security Appropriations Act for Fiscal Year 2019. *See* Pub. L. No. 116-6, div. A, 133 Stat. 13 (2019). The FY19 CAA allocated $1.375 billion for border wall construction, specifying that the funding was for "the construction of primary pedestrian fencing . . . in the Rio

5

Grande Valley Sector." *Id.* § 230(a)(1). The FY19 CAA was signed into law the next day.

Likewise, in Fiscal Year 2020, President Trump requested $5 billion, and DoD requested $9.2 billion, for construction of the border wall. (Doc. No. 13-3[1] Exs. 2, 3.) Both requests were rejected, and Congress instead allocated $1.375 billion for border wall construction "along the southwest border" in the Consolidated Appropriations Act of 2020 ("FY20 CAA"). *See* Pub. L. No. 116-93, § 209(a)(1), 133 Stat. 2317, 2511–12 (2020). On December 20, 2019, President Trump signed the FY20 CAA into law.

On January 14, 2020, pursuant to its authority under 10 U.S.C. § 284, DHS requested DoD's assistance to construct 38 discrete border barrier project segments along the southern border. (*See* Administrative Record ("AR"), Declaration of Kathryn Davis ("Davis Decl."), Doc. No. 20-1, Ex. 2 at 12).) Section 284 authorizes DoD to "provide support for the counterdrug activities . . . of any other department or agency," if "such support is requested." 10 U.S.C. § 284(a). This support includes the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." *Id.* § 284(b)(7). Accordingly, DHS requested support for: (1) the construction of new fencing, (2) the replacement of existing vehicle barriers and fencing, (3) the construction of new, and the improvement of, existing patrol roads, and (4) the installation of lighting. (AR at 28–29.) La Posta challenges the construction of two projects (both on federal land), consisting of four discrete segments, in the San Diego and Imperial Counties ("the Projects").

One project, "San Diego A" comprises of three segments totaling three miles of new

---

[1] La Posta requests judicial notice of seventeen documents filed in connection with its *ex parte* motion for TRO and motion for preliminary injunction. (Doc. No. 13-3.) Under Federal Rule of Evidence 201, the Court can judicially notice "[o]fficial acts of the legislative, executive, and judicial departments of the United States," and "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." Fed. R. Evid. 201. Upon thorough review of these documents, the Court concludes they are appropriate subjects for judicial notice as they are either government documents, public records, or documents that can be easily verified. Thus, La Posta's requests for judicial notice are **GRANTED**.

primary pedestrian fencing and 14 miles of replacement pedestrian fencing in San Diego County. (*See* Doc. No. 20 at 11.) The other project, "El Centro A" seeks to construct three miles of new pedestrian fencing in Imperial County. (Declaration of Paul Enriquez ("Enriquez Decl."), Doc. No. 20-2, ¶ 16.) According to Defendants, DHS identified both project locations as a "drug smuggling corridor" within the meaning of 10 U.S.C. § 284(b)(7). (Doc. No. 20 at 11.) Defendants state the construction of new fencing in these areas is required to add barriers in locations where none exist. (*See* AR at 30–31.) Further, Defendants seek replacement of the existing pedestrian fencing because the older designs are easily breached and have been severely damaged. (*See id.*)

On February 13, 2020, Secretary of Defense Mark Esper announced DoD would transfer $3.831 billion in funds Congress had appropriated for other purposes to the Drug Interdiction and Counter-Narcotics Activities fund ("Drug Interdiction fund") for border wall construction. It is this transfer at issue in this litigation. (Doc. No. 13-3, Ex. 5.) Secretary Esper directed the transfer pursuant to DoD's general transfer authority under Section 8005 of the DoD Appropriations Act, 2020 (a component of the FY20 CAA) ("hereinafter Section 8005 of the FY20 CAA" or "Section 8005"), Section 1001 of the National Defense Authorization Act for Fiscal Year 2020 ("NDAA"), Section 9002 of the FY20 DoD Appropriations Act, and Section 1520A of the FY20 NDAA ("hereinafter Section 9002").[2] (*See* AR at 1–7, 13–14.) These provisions collectively authorize DoD to transfer up to $6 billion in Fiscal Year 2020, but Section 8005 provided "[t]hat the authority to transfer may not be used unless for higher priority items, based on unforeseen military requirements than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." FY20 CAA, Div. A, § 8005. The Secretary concluded the transfer met these requirements. (*See* AR at 6, 13–

---

[2] As all of these reprogramming provisions are subject to Section 8005's requirements, the Court will refer to all these requirements collectively by reference as "Section 8005." *See Sierra Club v. Trump*, 929 F.3d 670, 682 n.7 (9th Cir. 2019).

14.)

Then on March 16, 2020, Acting Secretary of Homeland Security Chad Wolf invoked Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 8 U.S.C. § 1103 ("IIRIRA"), as authority for construction of the Projects. Under IIRIRA, the Secretary of Homeland Security has the authority "take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). Moreover, the Secretary of Homeland Security has the "the authority to waive all legal requirements" that, in the "Secretary's sole discretion," are "necessary to ensure expeditious construction" of those barriers and roads. *Id.* § 102(c)(1). Acting Secretary Wolf accordingly waived the application of various federal and state laws, "in their entirety," for the construction of the Projects. Of importance to this litigation, Defendants waived the Native American Grave Protection and Repatriation Act (25 U.S.C. § 3001 et seq.) ("NAGPRA").

## II.   PROCEDURAL HISTORY

On August 11, 2020, La Posta filed their Complaint in this Court, alleging the following causes of action:

1. *Ultra Vires*—the CAA does not authorize Defendants' transfer of funds to the to the Drug Interdiction account;

2. *Ultra Vires*—the CAA does not authorize Defendants' use of the $1.375 billion for the Projects;

3. *Ultra Vires*—the CAA requires consultation with La Posta;

4. *Ultra Vires*—Defendants' construction of the Project pursuant to IIRIRA Section 102 is *ultra vires* because they failed to consult with La Posta;

5. Violation of the Appropriations Clause, Article I, Section 9, Clause 7;

6. Violation of the Presentment Clause, Article I, Section 7, Clause 2;

7. Violations of the Administrative Procedures Act;

8. Violation of First Amendment of the U.S. Constitution;

8

9.  Violation of the Religious Freedom Restoration Act of 1993;

10. Violation of Fifth Amendment Procedural Due Process Rights; and

11. Violation of Fifth Amendment Substantive Due Process Rights.

(Compl. at 8–17.)

On August 17, 2020, La Posta filed an *ex parte* motion for TRO, in addition to a separately noticed motion for preliminary injunction. (Doc. Nos. 13–14.) On August 21, 2020, Defendants filed an opposition to both the *ex parte* motion for TRO and motion for preliminary injunction. (Doc. Nos. 20–21.) On August 25, 2020, La Posta replied. (Doc. No. 22.) The Court held a hearing on both motions on August 27, 2020. This order follows.

## III.   LEGAL STANDARDS

The standard for issuing a TRO is the same as that for the issuance of a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347 n.2 (1977). Thus, much like a preliminary injunction, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Whether to grant or deny a TRO or preliminary injunction is a matter within the Court's discretion. *See Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1132–33 (9th Cir. 1979).

To obtain a TRO or preliminary injunction, "the moving party 'must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.'" *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (quoting *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014)). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This articulation represents "one alternative on a continuum" under the "'sliding scale' approach to preliminary injunctions employed" by the Ninth

9

Circuit. *Id.* at 1131–32. But "[t]he critical element in determining the test to be applied is the relative hardship to the parties." *Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978). "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.*

## IV.  DISCUSSION

As a preliminary matter, on August 17, 2020, La Posta filed substantively identical motions for their *ex parte* motion for TRO and separately noticed motion for preliminary injunction. (Doc. Nos. 13–14.) Because of the similarity of the two motions, Defendants opposed both motions with the same opposition. (Doc. Nos. 20–21.) Finding no reason to address the motions separately and considering that the standard for the issuance of a TRO is the same as that for a preliminary injunction, the Court will address both motions together below.[3]

### A.  Likelihood of Success on the Merits

In deciding whether to grant preliminary injunctive relief, the Court must first make an initial assessment as to the likelihood of success of La Posta's claims based on the current law and evidence. Unlike in a motion to dismiss context, a plaintiff's allegations are not presumed to be true for a motion for preliminary injunctive relief. *See Smith v. Ditech Fin. LLC*, No. EDCV181411JGBSHKX, 2018 WL 6431404, at *3 (C.D. Cal. Aug. 29, 2018). Instead, a plaintiff bears the burden of proving that they are likely to succeed on the merits of their claims. To establish a substantial likelihood of success on the merits, La Posta must show "a fair chance of success." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (en banc). Alternatively, La Posta can demonstrate "serious questions going to the merits." *Cottrell*, 632 F.3d at 1135. La Posta first argues they are likely to succeed on the merits of their claims that Defendants' acquisition of funds

---

[3] For the sake of brevity, the Court will cite to La Posta's *ex parte* motion for temporary restraining order in this Order when addressing both motions. (Doc. No. 13-2.)

10

for and construction of the Project is *ultra vires*, violates various statutory provisions of the CAA, and violates the constitutional rights of La Posta citizens. (Doc. No. 13-2 at 14.) The Court will closely examine each claim in turn.

### 1. Whether La Posta Has A Cause of Action Under Section 8005 of the CAA

La Posta starts by maintaining they have two mechanisms to assert their claims for relief under the CAA. The first is an *ultra vires* cause of action in equity, and the second is a claim under the Administrative Procedure Act ("APA"). (*Id.*) Defendants disagree, arguing La Posta lacks a cause of action to challenge DoD's internal transfer of funds as already determined by the Supreme Court of the United States. (Doc. No. 20 at 13.) The Court addresses both grounds below.

### a) Whether La Posta Has An *Ultra Vires* Cause of Action Under Section 8005 of the CAA

#### (1) *Sierra Club v. Trump*

To determine whether La Posta has an *ultra vires* cause of action, it is necessary to address recent Ninth Circuit and Supreme Court authority relevant to this litigation. On February 19, 2019, Sierra Club and the Southern Border Communities Coalition ("SBCC") challenged DoD's budgetary transfers to fund construction of the border wall in California, New Mexico, and Arizona. Sierra Club and the SBCC filed suit in the United States District Court for the Northern District of California, asserting violations of the 2019 CAA, the constitutional separation of powers, the Appropriations Clause, the Presentment Clause, the National Environmental Policy Act, and an *ultra vires* action arising out of border wall construction. *See Sierra Club v. Trump ("Sierra Club II")*, 963 F.3d 874, 882 (9th Cir. 2020), *petition for cert. filed* (U.S. Aug. 07, 2020) (No. 20-138).

The district court ultimately issued a permanent injunction, enjoining the transfer of funds to construct a border wall in Arizona's Yuma and Tucson Sectors, California's El Centro Sector, and New Mexico's El Paso Sector. *Id.* The Government appealed to the Ninth Circuit, and sought an emergency stay of the permanent injunction, which the Ninth

Circuit denied. *See Sierra Club I*, 929 F.3d at 677. While the appeal to the Ninth Circuit was pending, the Government filed an application for a stay of the injunction pending appeal with the Supreme Court. The Supreme Court granted the application to stay, explaining that "[a]mong the reasons are that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Trump v. Sierra Club*, 140 S. Ct. 1 (2019).

After the Supreme Court issued the stay of the district court's permanent injunction, the Ninth Circuit went on to address the Government's appeal. Specifically, the Ninth Circuit considered whether Sections 8005 and 9002 of the DoD Appropriations Act of 2019 (a part of the FY19 CAA) authorized the budgetary transfers for border wall construction for the Fiscal Year 2019. *See Sierra Club II*, 963 F.3d at 879–80. Section 8005 authorized the Secretary of Defense to transfer funds "between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred." However, Section 8005 contained restrictions on the transfer of funds including that the use must be "for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress." Subject to the same terms and conditions as Section 8005, Section 9002 authorized the Secretary of Defense to transfer additional funds only with the approval of the Office of Management and Budget.

The Ninth Circuit affirmed the district court and held that Section 8005 did not authorize the transfer of funds because "the border wall was not an unforeseen military requirement," and "funding for the wall had been denied by Congress." *See California v. Trump*, 963 F.3d 926, 944 (9th Cir. 2020), *petition for cert. filed* (U.S. Aug. 07, 2020) (NO. 20-138). Pertinent to the instant matter, the Ninth Circuit addressed whether Sierra Club had a cause of action to obtain review of the Acting Secretary's compliance with Section 8005. *See Sierra Club II*, 963 F.3d at 887. Acknowledging that the Supreme Court's order

12

"suggests that Sierra Club may not be a proper challenger here[,]" the Ninth Circuit went on to "heed the words of the Court, and carefully analyze Sierra Club's arguments." *Id.* In doing so, the Ninth Circuit concluded "Sierra Club has both a constitutional and an ultra vires cause of action." *Id.*

First, as to the constitutional cause of action, the Ninth Circuit noted that certain structural constitutional provisions give rise to private causes of action. *Id.* at 888. In particular, Ninth Circuit authority explained that as long as a litigant satisfies the Article III standing requirements, he or she can "challenge Appropriations Clause violations," *id.* at 889, because "[o]nce Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for . . . the courts to enforce them when enforcement is sought." *McIntosh*, 833 F.3d at 1172 (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978)). With this authority, the Ninth Circuit concluded that "Congress decided the order of priorities for border security" and "chose to allocate $1.375 billion to fund the construction of pedestrian fencing in Texas. It declined to provide additional funding for projects in other areas, and it declined to provide the full $5.7 billion sought by the President: it is for the courts to enforce Congress's priorities, and we do so here." *Sierra Club II*, 963 F.3d at 889 (internal citations omitted).

On the *ultra vires* cause of action, the Ninth Circuit focused on the equitable relief traditionally available to the courts to review illegal executive action. *Id.* at 891. The Ninth Circuit pointed out that the Supreme Court never questioned that it had authority to issue its decision in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). In that case, Congress had passed various statutes authorizing the President to take personal and real property under specific conditions. *See Youngstown*, 343 U.S. at 585–86. However, President Truman during the Korean War signed an Executive Order seizing most of the nation's steel mills, even though the conditions of the statutes had not been met. *Id.* at 582, 586. The Supreme Court was tasked to determine whether the President had constitutional authority to seize the steel mills—it held he did not. *Id.* at 588–89. So too here, the Ninth Circuit reasoned, would courts have the authority to review whether an executive agency

13

(DoD) exceeds its delegation of authority in reprogramming funds for border wall construction. *Id.* Based on the foregoing, the Ninth Circuit ultimately affirmed the district court's issuance of the permanent injunction.

Since the Supreme Court's stay of the district court's permanent injunction, and the Ninth Circuit's decision in *Sierra Club II*, Sierra Club filed a motion to lift the stay on June 21, 2020. On July 31, 2020, the Supreme Court, without analysis, summarily declared, "[t]he motion to lift stay is denied." *Trump v. Sierra Club*, No. 19A60, 2020 WL 4381616 (U.S. July 31, 2020). Defendants here now argue "when the Supreme Court stayed the injunction, it necessarily concluded that the Government was likely to succeed on the merits of the claim that the Sierra Club plaintiffs 'have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." (Doc. No. 20 at 13 (quoting *Sierra Club*, 140 S. Ct. at 1).)

### (2)    The Effect of the Supreme Court's Stay Order

Now, the question this Court is called upon to answer is what effect the Supreme Court's stay order has on La Posta's ability to assert a Section 8005 claim. Under Rule 23 of the United States Supreme Court and the All Writs Act, 28 U.S.C. 1651, a single Justice or the Supreme Court may stay a district-court order pending appeal to a court of appeals. *See, e.g., Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2083 (2017) (per curiam); *West Virginia v. EPA*, 136 S. Ct. 1000, 1000 (2016). For the Supreme Court to issue an emergency stay, the petitioner must establish: (1) a reasonable probability that the Supreme Court will grant certiorari, (2) a fair prospect that the Court will then reverse the decision below, and (3) a likelihood that irreparable harm will result from the denial of a stay. *See Maryland v. King*, 567 U.S. 1301 (2012).

The complete Supreme Court stay order stated as follows:

The application for stay presented to Justice KAGAN and by her referred to the Court is granted. ***Among the reasons is that the Government has made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005***. The District Court's June 28, 2019 order granting a permanent injunction is stayed

14

pending disposition of the Government's appeal in the United States Court of Appeals for the Ninth Circuit and disposition of the Government's petition for a writ of certiorari, if such writ is timely sought. Should the petition for a writ of certiorari be denied, this stay shall terminate automatically. In the event the petition for a writ of certiorari is granted, the stay shall terminate when the Court enters its judgment.

*Trump v. Sierra Club*, 140 S. Ct. 1 (2019) (emphasis added).

The Supreme Court's issuance of its stay order, and statement regarding Section 8005 presents a significant obstacle for La Posta. Although the *Sierra Club II* plaintiffs and La Posta are different plaintiffs, there does not appear to be any practical difference in both plaintiffs' assertions of *ultra vires* actions. Indeed, both the *Sierra Club II* plaintiffs and La Posta allege that the Government's budgetary transfers pursuant to Section 8005 of the CAA are *ultra vires* acts in excess of the Government's authority. Indeed, similar to the *Sierra Club II* plaintiffs' contentions, La Posta alleges Defendants transferred $3.831 billion appropriated to DoD to the Drug Interdiction account in violation of Section 8005. (Doc. No. 13-2 at 15.) Both sets of plaintiffs argue that the construction of the border wall was a result of an *ultra vires* action stemming from the improper transfer. While La Posta challenges the Government's actions under Section 8005 of the FY20 CAA, and *Sierra Club II* addressed Section 8005 of the FY19 CAA, the text of Section 8005 is the same for both fiscal years. And, like Fiscal Year 2019, the Secretary of Defense cites Sections 8005 and 9002 as authority for this transfer in Fiscal Year 2020. *Id.* Nothing else about La Posta's case distinguishes it from Sierra Club's case from the standpoint of whether plaintiffs may challenge the Government's compliance with Section 8005. As La Posta itself admits, "La Posta is within the zone of interests that § 8005 seeks to protect for the same reasons that the Ninth Circuit held the Sierra Club and California to be in [*Sierra Club II* and *California v. Trump*]." (Doc. No. 22 at 1.) But in the face of an unequivocal statement from the Supreme Court that the plaintiffs likely "have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005," La Posta appears likely precluded from bringing suit based on Section 8005 as well.

In reply, La Posta argues that because the Ninth Circuit has issued a published decision, "courts within this circuit may not 'ignore this binding precedent because the Supreme Court stayed the Ninth Circuit's decision.'" (Doc. No. 22 at 2 (quoting *Doe v. Trump*, 284 F. Supp. 3d 1182, 1185 (W.D. Wash. 2018)).) La Posta also argues that "the default rule (at least in the Ninth Circuit) is that 'once a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority.'" (Doc. No. 22 at 2 (quoting *Durham v. Prudential Ins. Co. of Am.*, 236 F. Supp. 3d 1140, 1147 (C.D. Cal. 2017)).) But in both cases cited by La Posta—*Doe v. Trump* and *Durham*—the Supreme Court gave no reason whatsoever for its stay orders. *See Trump v. Hawaii*, 138 S. Ct. 49, (Mem)–50, 198 L. Ed. 2d 777 (2017) ("Application for stay of mandate presented to Justice KENNEDY and by him referred to the Court granted, and the issuance of the mandate of the United States Court of Appeals for the Ninth Circuit in case No. 17–16426 is stayed with respect to refugees covered by a formal assurance, pending further order of this Court."); *Dignity Health v. Rollins*, 137 S. Ct. 28, 29, 195 L. Ed. 2d 901 (2016) (same). By contrast, here, the Supreme Court issued a stay order specifically explaining that the Government had shown the *Sierra Club II* plaintiffs had no cause of action to seek review of the Acting Secretary's compliance with Section 8005.

Other federal courts have also addressed similar issues related to the CAA and the Supreme Court's stay. As one example, on October 11, 2019, in a case brought by El Paso County and a community organization in the Western District of Texas, the District Court for the Western District of Texas found that the Government's efforts to spend billions of military dollars on wall construction violates Congress' decision to limit the scope and location of wall construction in enacting the CAA. *See El Paso County v. Trump*, 408 F. Supp. 3d 840, 857 (W.D. Tex. 2019). But due to the Supreme Court's stay order, the district court found claims regarding Section 8005 and Section 284 "unviable" and limited its

16

holding to the Military Construction Act, 10 U.S.C. § 2808.[4] *Id.* at 846. The district court issued an injunction based on 10 U.S.C. § 2808. On January 8, 2020, a panel of the Fifth Circuit granted the Trump Administration's request to stay the 10 U.S.C. § 2808 injunction pending resolution of the appeal and denied the plaintiffs' request to expedite the appeal. *See El Paso County v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020).

All in all, when the Supreme Court issues a stay of an injunction, it necessarily concludes that there is a likelihood of success on the merits of the appeal, and accordingly, a likelihood of reversal of the injunction. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Here, the Supreme Court expressly declared that the Government had sufficiently shown there is no cause of action to obtain review of the Acting Secretary's compliance with Section 8005. As La Posta has not indicated any different circumstances to distinguish it from Sierra Club, La Posta's Section 8005 arguments are likely barred by the Supreme Court's ruling as well. *See CASA de Md., Inc. v. Trump*, 2020 WL 4664820, at *1 (4th Cir. Aug. 5, 2020) (declining "to take the aggressive step of ruling that the plaintiffs here are in fact likely to succeed on the merits right upon the heels of the Supreme Court's stay order necessarily concluding that they were unlikely to do so.").

Returning to the relevant standard on a motion for preliminary injunctive relief, the question to focus on is whether La Posta has demonstrated a likelihood of success on its Section 8005 claim. The Court concludes that based on the current law, they have not. In light of the Supreme Court's stay order, La Posta has not established a likelihood of success on its Section 8005 *ultra vires* claim at this time.

### 2.   Whether La Posta's Has An Alternative APA Cause of Action

In the alternative, La Posta argues that it has a cause of action under the APA. (Doc. No. 13-2 at 14.) The APA provides for judicial review of "final agency action for which

---

[4] Section 2808, while not at issue in this cause, provides that the Secretary of Defense may authorize military construction projects if three criteria are met: (1) the President has declared a national emergency that (2) requires use of the armed forces and (3) the authorized projects will support the armed forces. *See* 10 U.S.C. § 2808(a).

17

there is no other adequate remedy in a court." 5 U.S.C. § 704. Where a statute imposes obligations on a federal agency but the obligations do not "give rise to a 'private' right of action against the federal government[,] [a]n aggrieved party may pursue its remedy under the APA." *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1099 (9th Cir. 2005). Under the APA, La Posta must establish that they fall within the "zone of interests" of a relevant statute to bring an APA claim. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224, (2012) ("This Court has long held that a person suing under the APA must satisfy not only Article III's standing requirements, but an additional test: The interest he asserts must be 'arguably within the zone of interests to be protected or regulated by the statute' that he says was violated.") (quotations omitted).

In *California v. Trump*—a companion case to *Sierra Club II*—the Ninth Circuit found that the States of California and New Mexico stated a Section 8005 claim under the APA and satisfied the "zone of interests" requirement because "their interests are congruent with those of Congress and are not 'inconsistent with the purposes implicit in the statute.'" *California*, 963 F.3d at 942 (quoting *Patchak*, 567 U.S. at 225). Specifically, the Ninth Circuit reasoned California and New Mexico's challenge furthered Congress' intent to tighten congressional control of the reprogramming process. *Id.* And second, the Ninth Circuit explained California and New Mexico's challenge of Section 8005 reinforces the same structural constitutional principle Congress sought to protect through Section 8005: congressional power over appropriations. *Id.*

Here, La Posta argues it has an APA claim based on Section 8005 because they are within the zone of interests of Section 8005 just like California and New Mexico in *California v. Trump*. (Doc. No. 13-2 at 17.) Namely, La Posta posits their interests are congruent with Congress' interest in tightening control of the reprogramming process, and Congress' interest in serving as a check on the Executive Branch's power. (*Id.* at 17–18.) Again, the question here is whether in light of the Supreme Court's stay order, La Posta would have success on the merits on its alternative APA claim. On the one hand, the Supreme Court's stay order applied to the district court's permanent injunction in *Sierra*

18

*Club. See Sierra Club v. Trump*, No. 19-CV-00892-HSG, 2019 WL 2715422 (N.D. Cal. June 28, 2019). The district court did not directly address the APA in its permanent injunction order, and the Ninth Circuit only briefly addressed the APA in passing. But on the other hand, the Supreme was clear, as explained above, in stating that the *Sierra Club* plaintiffs have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005. At this time, the Court can only speculate as to whether the Supreme Court would similarly bar APA claims based on Section 8005. Therefore, with this unclarity, the Court concludes there are serious questions going to the merits of whether La Posta would be able to assert an APA claim based on Section 8005.

### 3.     Whether Defendants Violated CAA Div. D § 210

Next, the Court turns to La Posta's CAA Div. D § 210 claim. Through the FY20 CAA, Congress appropriated $1.375 billion for construction of a border barrier system. *See* CAA Div. D § 209(a)(1). La Posta argues that not only was the transfer of additional funds above this 1.375 billion *ultra vires*, but Defendants' use of the properly appropriated funds is *ultra vires* as well. (Doc. No. 13-2 at 18.) Specifically, La Posta claims CAA Div. D § 210 prevents the use of funds "for the construction of fencing . . . within historic cemeteries." According to La Posta, construction has already uncovered historic tribal burials in the Project area and threatens to excavate a tribal historic cemetery in Jacumba. (*Id.*) In opposition, Defendants defend by asserting that the Projects are not being built within "historic cemeteries" as that term is commonly understood. (Doc. No. 20 at 17.) The term "cemetery," Defendants explain, generally refers to a defined area set apart for interring the dead. (*Id.*) Defendants contend that the Project is not being constructed within any defined historic cemetery space necessary for a Section 210 violation. (*Id.*)

The Court concludes that La Posta has not demonstrated a likelihood of success based on this claim. "When a term goes undefined in a statute, [courts] give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The term at issue, "historic cemetery," is not defined in the CAA. However, the common understanding of cemetery is "a defined place or area set apart . . . for the purpose of

19

[interring] the dead." *See, e.g.*, 14 Am. Jur. 2d Cemeteries § 1. This definition of a cemetery as a defined area is consistent with the character of the other places Congress exempted from construction in Section 210. A review of these other areas exempted by Section 210 demonstrate that they are all defined locations. *See, e.g.*, FY20 CAA § 210(1) ("within the Santa Ana Wildlife Refuge"); FY20 CAA § 210(2) ("within the Bentsen-Rio Grande Valley State Park"); FY20 CAA § 210(3) ("within La Lomita Historical park"); FY20 CAA § 210(4) ("within the National Butterfly Center").

But here, the Projects are being constructed on a 60-foot strip of expansive land owned by the federal government, with no evidence of a defined historic cemetery nearby. Defendants point out that the construction area contains "largely rural, undeveloped desert and mountains" and "CBP's surveys and record searches . . . do not indicate the presence of any known burial sites or historical villages" within the Project areas. (Enriquez Decl. ¶¶ 14, 17, 47, 51 & Exs. B, D.)  In reply, La Posta responds that "[t]he Project Area has not been previously comprehensively surveyed for human remains," (Declaration of Richard Carrico ("Carrico Decl.") ¶ 27), which explains why CBP's surveys do not reveal human remains. (Doc. No. 22 at 3.) The factual dispute here is one of many in this case, suggesting that La Posta has not demonstrated clear entitlement to preliminary injunctive relief. The Court finds that this lack of evidence of a "historic cemetery,"—including where it is, what it looks like, what markers would provide notice of its presence—precludes a finding of likely success on the merits on La Posta's CAA Div. D § 210 claim.

### 4.    Whether Defendants Violated CAA Div. D § 8129 and Executive Order 13175

La Posta next asserts Defendants' use of the reprogrammed funds constitutes an *ultra vires* act in violation of the CAA Div. D § 8129 and in contravention of Executive Order 13175. (Doc. No. 13-2 at 18–20.) Section 8129 of the FY20 DoD Appropriations Act prohibits "funds made available by th[e] Act" from being "used in contravention of—(1) Executive Order No. 13175 (65 Fed. Reg. 67249; relating to consultation and coordination with Indian Tribal governments)." Pub. L. No. 116-93, 133 Stat. 2367. Executive Order

20

No. 13175, in turn, directs federal agencies to consult and coordinate with Native American tribal governments as they develop policy on issues that impact tribal communities. *See* Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000).

La Posta contends "Defendants failed to formally consult with La Posta regarding the Project" and "CBP has not provided sufficient information about the construction plans and schedule to permit La Posta to evaluate the Projects' impacts on religious and cultural resources . . . ." (Doc. No. 13-2 at 19.) La Posta points out the Executive Order states, "[w]hen undertaking to formulate and implement policies that have tribal implications, agencies shall . . . in determining whether to establish Federal standards, consult with tribal officials as to the need for Federal standards and any alternatives that would limit the scope of Federal standards or otherwise preserve the prerogatives and authority of Indian tribes." *See* Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000). Defendants claim La Posta "do not identify a single part of Executive Order 13175 that Defendants have allegedly contravened, nor could they because the challenged actions do not directly implicate the guidance and requirements." (Doc. No. 20 at 19.)

Setting aside the issue that the Executive Order itself does not provide for a private cause of action,[5] La Posta does not adequately and clearly explain how the construction of a border wall on federal land "establish Federal standards," prompting the requirement of consultation with tribal officials under the Executive Order. And, in any event, there appears to be some evidence of consultation with La Posta concerning the border wall (although the Court does not express judgment on whether the consultation was sufficient). For example, La Posta states "CBP engaged with tribal representatives via a phone call in early June, a webinar on July 8, and a field visit on July 10." (*See* Doc. No. 13-2 at 19.) Even more, La Posta concedes that currently four cultural monitors are permitted to

---

[5] *See* Exec. Order No. 13175, 65 Fed. Reg. 67249 ("This order is intended only to improve the internal management of the executive branch, and is not intended to create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person.").

observe construction for the past several weeks, suggesting some sort of consultation had taken place. (Doc. No. 22 at 7.)

Of course, the Government is reminded that it should always strive to "strengthen the United States government-to-government relationships with Indian tribes" as contemplated by the Executive Order. *See* Exec. Order No. 13175, 65 Fed. Reg. 67249 (Nov. 6, 2000). But based on the evidence before the Court and the factual disputes, La Posta has not met its burden of establishing a likelihood of success on the merits on its CAA Div. D § 8129 claim.

### 5.    Whether Defendants Violated Sections 102(a) and (b) of the IIRIRA

Next, La Posta claims that not only was the transfers of funds into the Drug Interdiction account *ultra vires*, but Defendants' construction of the border wall itself is *ultra vires* because Defendants have not complied with Sections 102(a) and (b) of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). (Doc. No. 13-2 at 20.) La Posta argues that Section 102 of the IIRARA requires consultation with Indian tribes before the commencement of construction, something which La Posta contends Defendants did not do.

In 1996, Congress enacted the IIRIRA which, pursuant to Section 102(a), required the United States Attorney General to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104–208, Div. C., Title I, § 102(a), 110 Stat. 3009, 3009–554 (1996). Section 102(b) authorizes the Secretary of Homeland Security to install fencing and "additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border" in "priority" areas. *Id.* Section 102(b)(1)(C), however, requires the Secretary to consult with Indian tribes "to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." *Id.* "[T]he

22

consultation provision applies to any border construction project under section 102." *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1125 (S.D. Cal.), *cert. denied sub nom. Animal Legal Def. Fund v. Dep't of Homeland Sec.*, 139 S. Ct. 594 (2018), and *aff'd*, 915 F.3d 1213 (9th Cir. 2019).

Section 102(c) grants the Secretary of Homeland Security the discretion to waive "all legal requirements" he or she "determines necessary to ensure expeditious construction of the barriers and roads" and limits judicial review of the Secretary's waiver decision to solely constitutional violations. *See* 8 U.S.C. § 1103. However, the United States Supreme Court has recognized a narrow exception to a statutory bar on judicial review, whereas here, there is a claim that an agency acted beyond its statutory authority. *See Leedom v. Kyne*, 358 U.S. 184 (1958); *Bd. of Governors of Fed. Reserve Sys. v. MCorp. Fin., Inc.*, 502 U.S. 32 (1991). Courts have held that for this exception to apply, the plaintiff must establish: (1) that the agency acted "in excess of its delegated powers" contrary to "clear and mandatory statutory language," and (2) "the party seeking review must be 'wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights." *Pac. Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1208 (9th Cir. 2016) (citations omitted).

Here, La Posta argues that Defendants' failure to consult with La Posta *prior* to the construction constitutes an *ultra vires* act in excess of the Government's authority as demonstrated by the plain language of Section 102(b)(1)(C). In *In re Border Infrastructure Environmental Litigation*, Judge Curiel addressed the mandatory consultation provision that is at dispute today. *See In re Border Infrastructure Envt'l. Litig.*, 284 F. Supp. 3d at 1102. In that case, environmental organizations and the State of California challenged the determinations of the Department of Homeland Security in waiving the legal requirements of the National Environmental Policy Act, the Endangered Species Act, the Coastal Zone Management Act, and more than 30 additional laws under the IIRIRA. The plaintiffs there alleged the waivers were *ultra vires* acts because the Secretary had not consulted with the parties identified in section 102(b)(1)(C) prior to the waiver determinations. *Id.* at 1122. The defendants opposed, contending that the waiver provision does not expressly or

implicitly depend on the completion of the consultation requirement. *Id.* The critical issue thus was whether the Government's failure to consult with the parties before any waiver determination of legal requirements was *ultra vires.* Judge Curiel concluded it was not. Of note, Judge Curiel recognized, "Plaintiffs' argument that the consultation should occur prior to any waiver determinations so that the Secretary is fully informed when the determination is made is logical." *Id.* at 1125. But the court focused on the question of "whether such timing is mandatory" and concluded "Section 102 does not provide any specific limitation or guidance concerning when or how consultation is to occur except expressly stating who shall be consulted." *Id.* at 1126.

Here, La Posta differentiates between *In re Border Infrastructure Environmental Litigation* and this case because while the "consultation provision may not be clear with regard to whether consultation must precede waivers and contracts, the provision is clear that consultation ***must precede construction***." (Doc. No. 13-2 at 21 (emphasis added).) La Posta draws attention to the words "to be constructed" in Section 102(b): "In carrying out this section, the Secretary of Homeland Security shall consult with . . . Indian tribes . . . to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing ***is to be constructed***." The phrase "to be constructed," La Posta posits, suggests consultation with Indian tribes must occur ***prior*** to construction to minimize the impact of construction.

Returning to the pertinent question of whether the DHS acted "in excess of its delegated powers" contrary to "clear and mandatory statutory language," the issue appears to be a close call, suggesting that Section 102(b) does not evince a "clear and mandatory" requirement that consultation occur before construction. Indeed, it would be sensible and certainly better practice for the Government to consult with impacted communities before construction to mitigate any adverse effects from construction. But unfortunately, Congress did not make this requirement of consultation before any construction "clear and mandatory." While La Posta's interpretation is not outright unreasonable, Section 102(b)

does not appear to specifically set forth any no equivocal requirement that demands consultation occur before a certain event.

Even assuming that Section 102(b) mandates consultation prior to construction, there appears to be some serious factual disputes as to whether there was consultation before construction. While La Posta maintains no consultation occurred, (Doc. No. 13-2 at 21), the CBP official overseeing environmental planning and compliance, states that "CBP has engaged in extensive stakeholder consultation with respect to San Diego A and El Centro A beginning in March 2020, months in advance of construction." (Enriquez Decl. ¶¶ 14, 17, 22, 28.) Defendants point out the Government "has shared with Plaintiffs (among numerous other tribes) information about the barrier design and location, surveys for biological and cultural resources within the project areas, and its Best Management Practices" and "has investigated and implemented mitigation measures requested by tribal authorities. . . ." (*See, e.g.*, *id.* ¶¶ 34–45.) Therefore, in light of these serious factual disputes, the Court cannot find that there is a substantial likelihood of success on the merits on this claim.

Based on this conclusion, the Court need not reach the second prong in the analysis. *See In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d at 1128 ("[T]he Court concludes that Plaintiffs have not established a plain violation of an unambiguous and mandatory provision of section 102, and, therefore, the Court lacks jurisdiction to hear non-constitutional claims under section 102(c)(2)(A).").

### 6. Whether Defendants Violated the RFRA

Next, La Posta argues they are likely to succeed on the merits of their Religious Freedom Restoration Act of 1993 ("RFRA") claim. (Doc. No. 13-2 at 21–25.) Specifically, La Posta alleges Defendants substantially burden La Posta citizens' religion by preventing them from accessing burial and other sacred sites, and the Project is not the least restrictive means of furthering a compelling governmental interest. (*Id.* at 22.)

The RFRA provides that "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" except

where the government demonstrates that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000bb–1(a), 2000bb–1(b). The Ninth Circuit has held that a "substantial burden" under the RFRA "is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1070 (9th Cir. 2008) (internal references omitted). "Any burden imposed on the exercise of religion short of that . . . is not a 'substantial burden' within the meaning of RFRA." *Id.* at 1070. Thus, an alleged impairment of "subjective, emotional religious experience" or "the diminishment of spiritual fulfillment—serious though it may be—is not a 'substantial burden' on the free exercise of religion [under RFRA]." *Id.* at 1070; *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1214–15 (9th Cir. 2008).

In determining whether La Posta is likely to succeed on their RFRA claim, it is useful to review the current state of the law pertaining to the RFRA. In a seminal case, *Sherbert v. Verner*, 374 U.S. 398 (1963), the Court held that an individual's religion is substantially burdened when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit. The plaintiff was fired from her job because she refused to work on the Sabbath. *See id.* at 399. The state unemployment compensation commission denied her application for unemployment benefits, finding that she failed to accept suitable work without good cause. *Id.* at 400–01. The Supreme Court held that the state unemployment commission could not, under the Free Exercise clause, condition the plaintiff's eligibility for unemployment benefits on accepting Sabbath-day work because doing so would unconstitutionally force her to choose between observing her religious precepts or obtaining a generally-available government benefit. *Id.* at 404. *Sherbert* thus presented the first "substantial burden" scenario where the government compels an individual to choose between obtaining a generally-available government benefit or following her religious principles.

Then in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court held a substantial burden is established when individuals are coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions. In *Yoder*, three Amish defendants refused to send their 14- and 15-year-old kids to school, believing it to be against Amish religion. *See id.* at 209. As a result, they were charged and convicted under a Wisconsin law requiring school attendance up to age 16. *Id.* at 207–08. The Supreme Court reversed their convictions, holding that, as applied to the defendants, the compulsory-attendance law violated the Free Exercise clause by requiring them, "under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id.* at 218. *Yoder* demonstrates the second "substantial burden" scenario—where the Government compels a person to act against his or her religion by threat of sanction.

In *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), the plaintiffs challenged the United States Forest Service's decision to construct a logging road through federal lands that the plaintiffs considered sacred. *Id.* at 442–43. The Supreme Court assumed that the road would "interfere significantly" with the plaintiffs' ability to practice their religion, even to the point of "virtually destroy[ing]" their ability to do so. *Id.* at 451. Nonetheless, the Court concluded that the decision to build the road did not trigger heightened Free Exercise scrutiny because it neither coerced the plaintiffs to violate their religion, nor "penalize[d] religious activity by denying [the plaintiffs] an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* at 449. "Whatever rights the [plaintiffs] may have to the use of the area," the Court concluded, "those rights do not divest the Government of its right to use what is, after all, its land." *Id.* at 453 (emphasis in original).

In *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008), the tribal plaintiffs challenged the United States Forest Service's decision to allow artificial snowmaking in a mountain range that the plaintiffs considered sacred. *Id.* at 1062–65. The plaintiffs alleged the artificial snow, which contained .0001% human waste, would desecrate the entire mountain, deprecate their religious ceremonies, and decrease spiritual

fulfillment. *Id.* at 1062–63, 1070. The Ninth Circuit focused on the question of whether, under RFRA, the government's decision to allow artificial, recycled snow imposed a "substantial burden" on the plaintiffs' religious exercise. *Id.* at 1068. The court concluded "[u]nder RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Id.* at 1069–70. With those rules, the Ninth Circuit concluded that the plaintiffs could not establish a "substantial burden" because using recycled wastewater to make artificial snow on the Peaks neither (a) forced the plaintiffs to choose between following their religion or obtaining a government benefit, nor (b) coerced them to act contrary to their religion under the threat of sanction. *Id.* at 1070.

The Ninth Circuit re-affirmed this principle in *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207 (9th Cir. 2008), holding that a governmental decision to re-license a hydroelectric dam did not impose a "substantial burden" under RFRA even though it "interfere[d] with the ability of tribal members to practice religion." *Id.* at 1214. In that case, tribal plaintiffs argued that the Government's decision to re-license a hydroelectric dam violated RFRA by preventing the plaintiffs from accessing a waterfall for vision quests, eliminating the mist required for religious experiences, and altering sacred water cycles. *Id.* at 1213. Relying principally on *Navajo Nation*, the Ninth Circuit rejected that argument. *Id.* at 1214–15. As the Ninth Circuit explained: "The Tribe's arguments that the dam interferes with the ability of tribal members to practice religion are irrelevant to whether the hydroelectric project either forces them to choose between practicing their religion and receiving a government benefit or coerces them into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction." *Id.* at 1214. Thus, the court concluded, "the Tribe's argument that [the government] violated RFRA fails [under *Navajo Nation*]."

//

//

28

### a) Whether Construction of the Border Wall Constitutes A Substantial Burden On La Posta's Religion

Circling back to the relevant RFRA elements, the first question is whether Defendants' construction of the border wall substantially burdens members of the La Posta tribe's exercise of religion. To answer this question, the Court looks at whether La Posta members are: (1) forced to choose between following their religion or obtaining a governmental benefit (*Sherbert*), or (2) coerced into abandoning their religious precepts by threat of sanction (*Yoder*). To support their claim of a substantial burden, La Posta first argues "Defendants are excavating and desecrating Kumeyaay burials without allowing La Posta access to properly treat the exhumed remains." (Compl.¶ 1, 15.) To date, Defendants have allowed four cultural monitors to observe construction, but La Posta explains that monitors have no ability to stop construction and provide for repatriation of any remains that are discovered. (Doc. No. 13-2 at 23; Compl. ¶ 63.) Second, La Posta asserts that the border wall has "made and will continue to make Kumeyaay sacred sites that lie within and south of the Project Area inaccessible." (Doc. No. 13-2 at 23.) They contend La Posta citizens are not and will not be able to access Table Mountain, Jacumba Hot Springs, and Tecate Peak for religious ceremonies. (*Id.*) Lastly, La Posta alleges Defendants have threatened La Posta citizens with arrest and criminal trespass charges while attempting to access sites to pray and engage in ceremonies within the Project Area. (Doc. No. 13-2 at 23.)

The *Sherbert* line of cases—holding that a "substantial burden" exists where the government compels an individual to choose between obtaining a government benefit or following religious principles—does not apply to La Posta's theory for various reasons. First, La Posta argues Defendants' offers of inadequate cultural monitoring forces its members to choose between two untenable courses of action—either (a) participating in such limited cultural monitoring as CBP may choose to offer, or (b) refusing to be an active participant in a process that will damage and destroy La Posta's physical, spiritual, and cultural footprint in the Project Area. (Doc. No. 13-2 at 24.) But with regard to the cultural

29

monitoring as a public benefit, La Posta is not compelled in a situation where its members are denied an equal share of the rights, benefits, or privileges enjoyed by other citizens. The provision of cultural monitors does not necessarily require La Posta to choose between practicing or abandoning their religion. Instead, the tribal cultural monitors—a benefit not generally available to the public—serve to further La Posta's religious freedoms. Lastly, to the extent La Posta argues they are being denied a government benefit in access to sacred land and burial grounds, that argument is unavailing as well. Denial of a government benefit implicates RFRA only if a governmental benefit were "conditioned . . . upon conduct that would violate the Plaintiffs' religious beliefs." *Navajo Nation*, 535 F.3d at 1063. Here, access to federal land is not conditioned on acts that would defy La Posta religious principles. Thus, "[a]lleging that the Project impedes Plaintiff's access to a religious site is simply not enough to suggest that the Plaintiffs are deprived of the kind of benefit protected by RFRA." *La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*, 2012 WL 2884992, *7 (C.D. Cal. July 13, 2012).

Whether under *Yoder*, La Posta "is coerced into abandoning their religious precepts by threat of sanction" presents a closer question. In *Navajo Nation*, the Ninth Circuit noted the "Plaintiffs are not fined or penalized in any way for practicing their religion on the Peaks or on the Snowbowl. Quite the contrary: the Forest Service 'has guaranteed that religious practitioners would still have access to the Snowbowl' and the rest of the Peaks for religious purposes." *Navajo Nation*, 535 F.3d at 1070 (citations omitted). But here, La Posta alleges, "Defendants have threatened La Posta citizens with arrest and criminal trespass charges while attempting to access sites to pray and engage in religious ceremonies within the Project Area." However, like many other aspects of this case, there appears to be yet another factual dispute. Defendants argue that "USBP has not threatened to arrest Plaintiffs' members praying at the construction site and has accommodated Plaintiffs' access to the project areas for First Amendment activities to the maximum extent possible while also ensuring border security and public safety." (Doc. No. 20 at 27 (citing Declaration of Kevin J. Mason ¶¶ 8, 11–12, 14–20).) Therefore, uncertainty remains as to

30

whether La Posta is coerced into acting contrary to their religion.

Setting aside the factual dispute concerning criminal sanctions, there are still questions about whether La Posta's RFRA claims would fail under Ninth Circuit and Supreme Court authority. Factually, this case is similar to *Lyng*, wherein the Supreme Court rejected the plaintiffs' challenge to the United States Forest Service's construction of a logging road through federal lands that the plaintiffs considered sacred. 485 U.S. at 442–43. Additionally, the Ninth Circuit likewise rejected similar contentions in *Snoqualmie* where the plaintiffs claimed that a decision to relicense a hydroelectric dam prevented the plaintiffs from accessing a waterfall for vision quests, eliminating the mist required for religious experiences, and altering sacred water cycles. *See* 545 F.3d at 1213. Furthermore, under *Navajo Nation*, denial of access to land, without a showing of coercion to act contrary to religious belief, does not give rise to a RFRA claim, regardless of how that denial of access is accomplished. 535 F.3d at 1063. Although La Posta may have some rights to use sacred sites, "those rights do not divest the Government of its right to use what is, after all, its land." *Lyng*, 485 U.S. at 453. The option to use those parts of the Project area is simply not available to La Posta or any other citizen.

Because La Posta has not demonstrated they are (1) forced to choose between following their religion or obtaining a governmental benefit, or (2) coerced into abandoning their religious precepts by threat of sanction, La Posta has not established a "substantial burden" within the meaning of the RFRA. This ends the analysis for La Posta's RFRA claim.

### 7. Whether Defendants Have Violated the Fifth Amendment

Lastly, La Posta asserts a Fifth Amendment violation of their substantive and procedural due process rights. Under the Fifth Amendment, "[n]o person shall . . . be deprived of life, liberty, or property without due process of law . . ." U.S. Const. amend. V. The Due Process Clause of the Fifth Amendment authorizes a private cause of action as remedy for violations. *See Davis v. Passman*, 442 U.S. 228, 242–44 (1979). The Fifth

Amendment guarantees both procedural as well as substantive rights. *See, e.g., United States v. Salerno*, 481 U.S. 739, 746 (1987).

### a)     Procedural Due Process

As a threshold matter, La Posta must first establish a property interest to assert a procedural due process claim. *See Krainski v. Nevada ex rel. Bd. of Regents of Nevada Sys. of Higher Educ.*, 616 F.3d 963, 970 (9th Cir. 2010). La Posta argues its citizens have constitutionally protected property interests in their cultural items and ancestral remains. (Doc. No. 13-2 at 26.) La Posta cites the Native American Graves Protection and Repatriation Act ("NAGPRA"), which recognizes a tribe's right to "possess, use and dispose" of cultural items that rest on federal lands and to which they have an ancestral or cultural connection. Cultural items under NAGPRA include, "associated funerary objects," "unassociated funerary objects," "sacred objects," and "cultural patrimony." 25 U.S.C. § 3001.

Sadly for La Posta, the Government has waived the application of NAGPRA to the construction of the border wall. As mentioned above, section 102(c) of IIRIRA grants the Secretary of Homeland Security the discretion to waive "all legal requirements" he or she "determines necessary to ensure expeditious construction of the barriers and roads." Apparently, the Secretary of Homeland Security has waived NAGPRA as it pertains to border barriers and road construction. (Doc. No. 13-2 at 26; Doc. No. 20 at 29.) Thus, in light of the waiver of NAGPRA, Defendants contend La Posta "has no property interest in a particular benefit where a governmental agency retains discretion to grant or deny the benefit." *Brenizer v. Ray*, 915 F. Supp. 176, 181 (C.D. Cal. 1996). But La Posta counters that NAGPRA does not "limit any procedural or substantive right which may otherwise be secured to individuals or Indians tribes . . ." 25 U.S.C. § 3009(4). Using this, La Posta explains "[t]his means that the waiver of NAGPRA does not preclude La Posta's tribal members from protecting their property interests via means other than NAGPRA, such as direct action under the Fifth Amendment." (Doc. No. 13-2 at 26–27.)

Therefore, the next inquiry is whether La Posta has property interests independent

32

of the property interests granted (and waived) under NAGPRA. It appears La Posta is claiming ownership in two categories of items—cultural items and ancestral remains. As for ancestral remains, Defendants are correct that there is no property right in ancestral remains. *See* 22A Am. Jur. 2d Dead Bodies, § 3 ("At common law, there is no property right in the body of a deceased person."); 75 Fed. Reg. 12378, 12398 ("American common law generally recognizes that human remains cannot be owned."). But as to other items that may take the form of personal property, the Supreme Court has recognized "[t]he Fifth Amendment applies to personal property as well as real property." *Horne v. Dep't of Agric.*, 576 U.S. 350, 357 (2015). The problem, however, is that there are factual disputes as to what personal property exists in the Project areas, including the nature of the objects, in addition to where they are in the path of construction. (Mason Decl. ¶¶ 55–57.)

Assuming La Posta can establish a property interest, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause[.]" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Furthermore, "the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

La Posta alleges, "Defendants gave no formal notice to La Posta regarding the timing, sites, or manner of construction activities for the Project. Instead, Defendants have refused to provide this information or engage in formal consultation despite repeated requests." (Doc. No. 13-2 at 28.) Additionally, La Posta asserts "[a]lthough tribal cultural sites and ancestral cemeteries were identified in prior surveys, and are known to many Kumeyaay people, those sites were not avoided [in construction], and no advance opportunity to protect them was afforded." (*Id.*) Factual disputes again exist as to consultation and due process. Defendants maintain that contrary to La Posta's claims, the "Government did not prevent Plaintiffs from retrieving" alleged remains and cultural items

33

and in fact "consulted with Plaintiffs on how best to respond." (Doc. No. 20 at 32.) Defendants add "CBP is finalizing a formal cultural resource plan to memorialize procedures for responding to any future discovery of historical or cultural artifacts in the project areas, including stopping construction and repatriating items to the appropriate tribes." (Enriquez Decl. ¶ 45.) Again, these factual disputes concerning the consultation and procedures offered preclude a finding of inadequate procedural due process.

In light of these disagreements, La Posta, at best, has only demonstrated "serious questions" as to whether they may succeed on a procedural due process claim.

### b) Substantive Due Process

Finally, substantive due process prohibits "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). Substantive due process protection is usually reserved for the vindication of fundamental rights, such as matters relating to marriage, family, procreation, and bodily integrity. *Albright v. Oliver*, 510 U.S. 266, 271–72 (1994). The Supreme Court urges courts to use caution and restraint in applying substantive due process. *See, e.g., Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 225–26 (1985). In addition, because of the highly destructive potential of overextending substantive due process protection, *see, e.g., Washington v. Glucksberg*, 521 U.S. 702, 720 (1997), and because the doctrine's boundaries are not clear, the Supreme Court has repeatedly cautioned that the concept of substantive due process has no place when a provision of the Constitution directly addresses the type of illegal governmental conduct alleged by the plaintiff. *See, e.g., Graham v. Connor*, 490 U.S. 386, 394–95 (1989).

La Posta argues, "Defendants' destruction of Kumeyaay cultural heritage and ancestral remains violates La Posta citizens' substantive due process rights because the actions are not narrowly-tailored to serve that interest." (Doc. No. 13-2 at 28.) However, La Posta has not identified any authority suggesting that this sort of a property deprivation constitutes a substantive due process violation. Additionally, La Posta's grievances appear

34

to be more appropriately addressed through other portions of the Constitution with regard to procedural due process and religious freedom. Therefore, whether these challenges have merit are unclear at best.

### B.     Irreparable Injury

La Posta "must establish that irreparable harm is likely, not just possible, in order to obtain a [TRO]." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) (citation omitted). This factor focuses on "whether the harm to Plaintiffs [i]s irreparable," rather than "the severity of the harm." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm. . . ." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quoting *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981–82 (9th Cir. 2011)).

La Posta explains they have already suffered irreparable injury, and will continue to suffer irreparable harm, as the construction of the border wall has destroyed and blocked access to La Posta's sacred sites and cultural remains. (Doc. No. 13-2 at 29.) Defendants, however, state that although recent surveys have indicated the presence of archaeological resources, they "do not indicate the presence of any known burial sites or historical villages within the 284 Project Areas," and "[n]o such sites have been revealed during construction or discovered by the tribal cultural monitors." (Doc. No. 20 at 31.) Defendants explain "CBP is finalizing a formal cultural resources plan to memorialize procedures for responding to any future discovery of historical or cultural artifacts in the project areas, including stopping construction and repatriating items to the appropriate tribes." (Doc. No. 20 at 32.)

In no way does the Court seek to minimize the seriousness of La Posta's allegations of harm. However, as noted, many questions exist as to the likelihood of this injury, especially in the face of the alleged mitigation efforts by Defendants. It should also be noted that the construction of the Projects themselves will occur on federal land, most of

35

which has already been previously disturbed with barrier wall construction. (*See* Enriquez Decl. ¶¶ 11, 14, 17.) Therefore, at this point, it is unclear whether this factor weighs in favor of La Posta.

### C. Balance of the Equities and the Public Interest

The Court turns to the final two factors. "When the government is a party, these last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). La Posta contends that by "denying the Defendants' request for funding the Project, 'Congress presumably decided such construction at this time was not in the public interest.'" (Doc. No. 13-2 at 30 (quoting *Sierra Club I*, 929 F.3d at 707).) And while the public surely has an interest in border security, La Posta argues "the public also has an interest in ensuring that 'statutes enacted by [their] representatives are not imperiled by executive fiat.'" (Doc. No. 13-2 at 30 (quoting *Sierra Club II*, 963 F.3d at 895 (quotations and citations omitted)).)

However, the Supreme Court has recognized a "compelling interests in safety and in the integrity of our borders," *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 672 (1989), and an injunction would prohibit the Government from taking necessary steps to prevent the continuing surge of illegal drugs from entering the country. *See United States v. Guzman-Padilla*, 573 F.3d 865, 889 (9th Cir. 2009) (acknowledging the government's "strong interest[]" in "interdicting the flow of drugs"). In addition, Defendants persuasively point out that "an injunction stopping ongoing construction would force DoD to incur potentially millions of dollars of unrecoverable fees and penalties to its contractors for each day that work is suspended—costs that DoD would not have to pay but for an injunction." (Doc. No. 20 at 30.) According to estimations by Defendants, suspension costs for projects would be approximately $29 million per month. (*See* Declaration of Antionette Gant ¶ 15.)

Additionally, in staying the permanent injunction in *Sierra Club II*, the Supreme Court has already balanced the harm to the Government from an injunction prohibiting border barrier construction against the irreparable environmental interests of the Sierra

Club. *See Trump*, 140 S. Ct. at 1. In this analysis, the Supreme Court necessarily had to have concluded that harm to the Government from an injunction prohibiting border barrier construction outweighs the harm to the *Sierra Club* plaintiffs. Though La Posta is a different plaintiff, with different interests, their interests are not so dissimilar from Sierra Club's that the Supreme Court's stay order would have no value today's analysis. *See Maryland*, 567 U.S. 1301 (stating that for the Supreme Court to issue an emergency stay, the petitioner must establish . . . a likelihood that irreparable harm will result from the denial of a stay). Based on the foregoing, with irreparable harms on both sides, it is not clear that the balance of equities tips in La Posta's favor.

## V.  CONCLUSION

Nothing in this Order should be interpreted as an authorization to entirely disregard the cultural and religious practices of La Posta. Although the Government may possess rights to use its own land, the Government should of course always strive to strengthen the relations with Native American tribes, accommodate sacred practices when possible, and maintain meaningful channels of communication with its citizens. Nevertheless, based on the current law and evidence, the Court ultimately concludes La Posta has not met its burden in demonstrating entitlement to the extraordinary remedy of preliminary injunctive relief as this time. Accordingly, in light of the many factual disputes and the current state of the law, the Court **DENIES** La Posta's requests for a TRO and preliminary injunction **WITHOUT PREJUDICE**.

Dated:  September 9, 2020

Hon. Anthony J. Battaglia
United States District Judge