Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION , ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS *PARENS PATRIAE,* <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY; CHRISTOPHER MILLER, U.S. SECRETARY OF DEFENSE, IN HIS OFFICIAL CAPACITY; CHAD F. WOLF, ACTING U.S. SECRETARY OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY; AND LIEUTENANT GENERAL TODD T. SEMONITE, COMMANDING GENERAL OF THE U.S. ARMY CORPS OF ENGINEERS, IN HIS OFFICIAL CAPACITY , <br> Defendants. | Case No.: <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 1

## I.     INTRODUCTION

1.   Since time immemorial, the Kumeyaay people have lived in the area near San Diego and Imperial Counties surrounding what is now the United States-Mexico border. Since the arrival of Europeans in the region, the Kumeyaay territory, culture, religion, and very existence have been under attack to make way for non-Indian settlement. In the most recent episode of Indigenous erasure, the President of the United States and his administration are desecrating Kumeyaay land, ancestral burial sites, and other sacred sites to make way for a wall along the United States' southern border. The La Posta Band of the Diegueño Mission Indians ("La Posta"), in its own capacity and as parens patriae on behalf of its citizens, bring this complaint to halt unlawful construction of the border wall and demand the removal of wall components that are already in place.

## II.    JURISDICTION AND VENUE

2.    This case arises under the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA"), Article I (Appropriations and Presentment Clauses) and the First (Free Exercise Clause) and Fifth (Due Process Clause) Amendments of the U.S. Constitution, the Consolidated Appropriations Act of 2020, Pub. Law No. 116-93, 8 U.S.C. § 1103 ("CAA"), and other acts of Congress.

3.    This court has subject matter jurisdiction under 28 U.S.C. § 1362 (district courts shall have original jurisdiction of all civil actions, brought by any Indian Tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States"); § 1331 (general federal question jurisdiction); § 1346(a)(2) (civil action against the United States); and § 2202 (injunctive relief).

4.    Venue in this district is appropriate under 28 U.S.C. § 1391(e) because it is the district in which "a substantial part of the events or omissions giving rise to the

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 2

claim occurred," the property that is the subject of the action is situated here, and La Posta resides here.

## III.    PARTIES

5.    La Posta is a federally recognized Indian tribe. 84 FR 1200, 1202. La Posta brings this action on behalf of itself, as a sovereign tribal nation, and on behalf of its members.

6.    Defendant DONALD J. TRUMP is the President of the United States and is sued in his official capacity.

7.    Defendant CHRISTOPHER MILLER, Secretary of Defense, is sued in his official capacity.  Secretary Miller's role is to ensure that Department of Defense actions are in compliance with applicable laws.  Secretary Miller is responsible for carrying out the diversion of military construction funds for the construction of the border wall under President Trump's national emergency declaration.

8.    Defendant CHAD F. WOLF, purported Acting Secretary of Homeland Security is sued in his official capacity.  Mr. Wolf is unlawfully serving in the capacity of Acting Secretary. The Acting Secretary's role is to ensure that Department of Homeland Security actions are in compliance with applicable laws. The Acting Secretary is responsible for carrying out the construction of the border wall and otherwise implementing President Trump's national emergency declaration.

9.    Defendant LIEUTENANT GENERAL TODD T. SEMONITE, Commanding General of the Army Corps of Engineers is sued in his official capacity.  Lieutenant General Semonite is responsible for carrying out the construction of the border wall and otherwise implementing President Trump's declaration of a national emergency.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 3

IV.   **FACTUAL ALLEGATIONS**

    I.   **La Posta and the Land**

10.   La Posta is one of twelve bands of Kumeyaay people. The La Posta Reservation spans 3,556.49 acres and is located in the Laguna Mountains, 56 miles east of San Diego and 46 miles west of El Centro. Kumeyaay people lived throughout the border area in San Diego and Imperial Counties for over 12,000 years. Many of these village sites are sacred to La Posta citizens and contain human burial grounds and other important cultural and archaeological artifacts.

11.   Historically, the Kumeyaay moved through their ancestral territory via a system of trails, many of which are still known and used by the Kumeyaay today. While most of these trails served commercial and social purposes, some trails have religious significance. Many of these trails run in proximity to and across the United States-Mexico border in San Diego and Imperial Counties.

12.   The La Posta tribal citizens practice a religion that is based on oral tradition. The Kumeyaay creation story tells of the creation of the universe, similar to Genesis. The creation story features many landmarks within the traditional Kumeyaay territory that La Posta citizens hold sacred today, such as Tecate Peak, Jacumba Hot Springs, and Table Mountain, among others.  La Posta citizens hold ceremonies and gatherings at these places, and without access to them, the Kumeyaay people are not able to practice their religion.

13.   The Kumeyaay creation story also provides very specific instructions regarding burial practices. The handling and treatment of Kumeyaay remains is a key component of Kumeyaay religion which, like other organized religions, places great emphasis on burial rites. For example, Kumeyaay burial practices call for certain songs to be sung for the dead. Similar to mainstream religious dogma, an important Kumeyaay burial rule requires all parts of one's body to remain together

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 4

after death. Kumeyaay religious rites require the proper treatment of Kumeyaay ancestors in the event of exhumation. Such treatment requires a properly trained and certified Kumeyaay person, and the human remains must be treated with respect, including the practice of smudging and singing to ensure proper reburial.

14.   Like the land, the sky is also critically important to the Kumeyaay culture, religion, and worldview. Since time immemorial, Kumeyaay people have studied the night sky. In the Kumeyaay language, the sky itself is known as *Emay* or *Umi*. The word for moon is *Hellya* but the full moon is *Halya*, and the new moon is *Halyaxai*. There are different words for star, including *Mesap* and *Kwenmessap*. Kumeyaay people have their own index of constellations, such as *Emuu*, meaning Mountain Sheep, which describes what is commonly known as Orion.

15.   For Kumeyaay people, stars are in the heavens and in the sky above but sometimes they can come to earth or be brought to earth. In one Kumeyaay creation stories, two brothers *Cuyahomarr* reach into the sky and pull stars from it to cover their bodies so that they would look like shining stars or a shiny fish. This allowed them to fly above and past some people they feared and go unmolested in search of their wives-to-be. Kumeyaay people also use the stars to predict the yearly cycles of weather and plant ripening.

16.   Tribal citizens practice stargazing as a religious and cultural exercise. They look to the sky as a cultural calendar and for deeper meaning. They engage in this activity throughout the Project Area depending on the season, but one particularly important place is Boundary Mountain, which lies only a few hundred feet from the border wall. The addition of lighting to the border wall in San Diego and Imperial counties will cause light pollution and disturb their ability to engage in these important rites.

17.   In addition to a complex oral tradition, Kumeyaay values and heritage are

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 5

transmitted through participation in traditional cultural and religious ceremonies. Kumeyaay people typically begin learning about these ceremonies and traditions at a young age. Because of the close connection between traditional Kumeyaay cultural and religious practices and the land itself, sacred sites and trails play an essential role. When contemporary Kumeyaay people hold ceremonies and gatherings at traditional sacred places, they typically do not remove cultural items or remains from these sites when they visit, though they are aware of their presence.

18. If these sacred places are allowed to be desecrated, Kumeyaay children will never be able to learn about these places, and thus would be deprived the opportunity to fully understand their cultural and religious heritage.

19. Defendants are currently constructing the border wall directly through Kumeyaay burial sites and sacred lands, causing irreversible and easily avoidable damage to Kumeyaay remains, cultural items, history, and religious practices. For example, Jacumba, known to contain an ancient tribal cemetery, and Tecate, a historical Kumeyaay village site, are located within the path of the border wall project. Prior cultural resources surveys and Kumeyaay historians have noted the existence of human remains, burial sites, and Kumeyaay archaeological sites within the path of construction.

20. Burial sites and cultural sites are sacred ground to the Tribe. Disturbance of a burial or cultural site is a deeply offensive injury to the Tribe's ancestors that echoes through the generations and causes harm to those living relatives who bear witness. While the Tribe wishes that ancestral and archeological remains that are disturbed are properly cared for and repatriated, those measures cannot mitigate the injury already done by disturbing the sites.

21. The Tribe's aboriginal territory is sacred to the Tribe. The land is as much a part of the Tribe's history and identity as are the Tribe's stories, songs, and their

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 6

ancestors who are buried throughout the Project Area. Construction activity, whether it is constructing a wall, grading roads, or disturbing the soil through the operation of heavy machinery, desecrates the land and directly injures Kumeyaay people. The border wall itself is a scar across the land and causes the Kumeyaay people immeasurable pain.

22.    Tribal citizens regularly walk sacred trails and engage in other religious ceremonies throughout the Project Area. The construction of the border wall and associated infrastructure is not only an eye sore in an otherwise undisturbed environment, but also interferes with the Tribe's ability to engage spiritually with the land.

23.    Kumeyaay archaeological sites, including cultural sites and burial sites, have been uncovered during construction of the project. Circular features in Davies and Skull Valley have been bisected by the border wall. Human bone fragments have been discovered in Davies Valley and Tierra Del Sol within the Project Area. Numerous fire features indicating possible cremation sites have been uncovered in Davies Valley, only feet from the border wall.

24.    Customs and Border Patrol itself has discovered burial sites in the Project Area during its surveys.

## II.    Unlawful Border Wall Funding and Construction

25.    A refrain of President Trump's 2016 election campaign was his promise to build a U.S.-Mexico border wall. Since taking office in 2017, the President repeatedly sought appropriations from Congress for border barrier construction, yet Congress repeatedly denied his requests.

26.    In Fiscal Year ("FY") 2019, the President again requested billions in border wall funding, which Congress refused to appropriate. The impasse triggered the nation's longest partial government shutdown, and ultimately, Congress

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 7

appropriated only $1.375 billion of the President's request for $5.7 billion for border wall funding. To ensure funding for the wall, the Defendants reprogrammed $1.5 billion of Department of Defense ("DoD") funds toward border wall construction. The Ninth Circuit held that such reprogramming was unlawful and affirmed an injunction preventing the Defendants from using the funds for border wall construction. *Sierra Club v. Trump*, 929 F.3d 670, 678 (9th Cir. 2019).

27. Similar to FY 2019, the FY 2020 budget negotiations were contentious regarding the border wall. President Trump requested $5 billion, and DoD requested $9.2 billion, for construction of the border wall. Congress rejected both the President's and DoD's FY 2020 budget requests and allocated only $1.375 billion for border wall construction. Congress further prohibited the use of any appropriated funds to "increase…funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act…" CAA Div. C § 739.

28. Unhappy with the result, Defendants replicated the FY 2019 conduct that the Ninth Circuit found to be illegal. First, after Congress denied Defendants' request for funding for hundreds of miles in wall construction, the Department of Homeland Security ("DHS") initiated a request to DoD for funds for wall construction across "approximately 271 miles." On February 13, 2020, Secretary of Defense Esper announced that DoD would transfer and spend $3.831 billion in funds Congress had appropriated for other purposes on border wall construction pursuant to §§ 8005 and 9002 of the CAA. This funding was intended for other purposes but transferred into DoD's Drug Interdiction and Counter-Narcotics Activities ("Drug Interdiction") fund to assist DHS with border wall construction pursuant to 10 U.S.C. § 284 and then subsequently transferred for use by the Army Corps to construct the border wall.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 8

29.   These unlawfully reprogrammed funds are funding the construction of approximately fourteen miles of a replacement border wall and seven miles of new border wall (the "Project") in San Diego and Imperial Counties (the "Project Area").

30.   Acting Secretary of Homeland Security Wolf invoked section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, codified at 8 U.S.C. § 1103 note, ("IIRIRA") as authority for construction of the Project. 85 FR 14958-60 ("IIRIRA Waiver").   To avoid having to account for the significant cultural, historical, religious, and environmental impacts of his rash actions, Acting Secretary Wolf waived multiple federal laws designed to protect historical, religious, and cultural resources, the environment, and the rights of Indian tribes and their members.

31.   A recent audit from the Office of the Inspector General ("OIG"), however, concluded that CBP has not adequately justified the need for a physical barrier in the Project Area. OIG Report 20-52.[1] In fact, the audit concludes "the likelihood that CBP will be able to obtain and maintain complete operational control of the southern border with mission effective, appropriate, and affordable solutions is diminished." *Id*. at 6-7. In particular, the audit found CPB did not adequately justify its decisions to prioritize "certain southern border locations over others for wall construction"— citing the Project as an example of particularly arbitrary decision making. *Id*. at 9. The CBP ignored the results of its own algorithm to expedite Project construction and could offer no rationale when asked by OIG.

///

///

---

[1] Available at https://www.oig.dhs.gov/sites/default/files/assets/2020-07/OIG-20-52-Jul20.pdf.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 9

### III.   Defendants' Failure to Provide Notice to or Consult with La Posta

32. The Defendants have failed to engage in consultation with La Posta regarding the Project. La Posta only learned of Project construction informally during an unrelated meeting with the Bureau of Land Management in March 2020. CBP did not offer to consult with La Posta at that time, nor has it since. CBP representatives engaged in a phone call with tribal representatives in June, a Zoom meeting on July 8, and invited tribal representatives for a site visit on July 10, 2020. However, neither engagement by CBP provided sufficient information about the construction plans, a schedule to permit La Posta to evaluate the Projects' impacts on religious and cultural resources, nor has CBP provided a comprehensive evaluation of such impacts. CBP also claimed that the Project Area had previously been surveyed, however, tribal representatives pointed out that the 2010 survey was outdated and inaccurate.

33. La Posta has requested formal consultation with CBP on numerous occasions both orally and in writing. Additionally, both CBP and Army Corps representatives were informed about the presence of Kumeyaay human remains and burials in the line of construction. CBP has failed to stop construction to investigate any of the human remains, despite pleas from La Posta.  Due to this lack of consultation, La Posta has been unable to secure the location of its relatives' burial grounds.

### IV.   Chad Wolf's Unlawful Tenure

34.   The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, requires the President to obtain the advice and consent of the Senate before appointing any principal officer of the United States—such as the head of a department, like the Secretary of Homeland Security—which is "among the significant structural safeguards of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651,

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 10

659 (1997). These positions are known as Presidentially Appointed Senate-confirmed positions ("PAS"). To protect against situations where disagreement between the President and the Senate results in a prolonged PAS vacancy, Congress has long "authoriz[ed] the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929 (2017)

35.    The Federal Vacancies Reform Act of 1998 ("FVRA") provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS office]." 5 U.S.C. § 3347(a). If a PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office ... the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." 5 U.S.C. § 3345(a). The terms of the FVRA apply unless (1) an express statutory provision either "(A) authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or (B) designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity;" or (2) the President fills a vacancy with a recess appointment. *Id.*

36.    Congress enacted such a statutory provision contemplated in exception (1) when it gave the Secretary of Homeland Security the power to designate a further order of succession for Acting Secretaries beyond the two statutory "first assistants." Specifically, the Homeland Security Act ("HSA"), as amended in 2016, provides that "the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary," 6 U.S.C.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 11

§ 113(g)(1), and "[n]otwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary," id. § 113(g)(2). Since this amendment to the HSA, DHS has relied on the HSA's procedures to define the order of succession to the office of Secretary of Homeland Security. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903(a), 130 Stat. 2001 (Dec. 23, 2016).

37.    Chad Wolf claims his title through a succession order signed by Kevin McAleenan, who claimed the title of Acting Secretary prior to his resignation. Because Mr. McAleenan was unlawfully serving as Acting Secretary, however, his succession order was invalid and Mr. Wolf cannot claim his succession through it.

38.    Secretary Kristjen Nielsen exercised her power under 6 U.S.C. § 113(g)(2) by designating an order of succession for Acting Secretary in February, 2019 ("February Delegation"). The February Delegation set two separate tracks for delegating authority to an Acting Secretary in the event that the office of the Secretary became vacant, depending on the circumstances that led to the vacancy. The first track was for vacancies caused by the Secretary's death, resignation, or inability to perform the functions of the office. In that case, succession was set by Executive Order 13753 ("E.O. 13753") as follows: (1) the Deputy Secretary; (2) the Under Secretary for Management; (3) the Administrator of the Federal Emergency Management Agency ("FEMA"); and (4) the Director of the Cybersecurity and Infrastructure Security Agency ("CISA"). The second track applied when the Secretary was unavailable to act during a disaster or catastrophic emergency. (*Id.*) In that case, succession was governed by "Annex A." (*Id.*). Annex A provided an identical order of succession as E.O. 13753, meaning that for succession purposes there was no practical difference, as of February 2019, in what manner a vacancy occurred. (*Id.*).

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 12

39.     Secretary Nielsen resigned her position, effective April 7, 2019, in a letter to President Trump. At the time, the office of Deputy Secretary was vacant. Claire Grady was serving as the Under Secretary for Management and would have been next in the line of succession. However, on April 7 at 6:02 pm, President Trump announced via a tweet that Kevin McAleenan, who was serving as the Commissioner of U.S. Customs and Border Patrol ("CBP"), would become Acting Secretary. At 10:36 pm, Secretary Nielsen tweeted that she would remain as Secretary until April 10, 2019.

40.     On April 9, Ms. Nielsen signed a Memorandum from John Mitnick, DHS's General Counsel, titled "Designation of an Order of Succession to the Secretary," explicitly approving the document attached (the "April Delegation"). The April Delegation amended Annex A, such that the order of succession under it was, as relevant: (1) the Deputy Secretary; (2) the Under Secretary for Management; (3) CBP Commissioner; (4) FEMA Administrator; and (5) Director of the Cybersecurity and Infrastructure Security Agency. Immediately thereafter, Ms. Grady announced that she would resign as Under Secretary. Mr. McAleenan began to perform the duties of Acting Secretary.

41.     Mr. McAleenan's assumption of the office violated the controlling order of succession on two different theories. First, because Ms. Nielsen's attempt to revoke or extend her resignation via twitter lacked any legal effect, she lacked authority to sign the April Delegation. Thus, the Purported April Delegation was invalid and the February Delegation controls. Under the February delegation, Mr. McAleenan could not have assumed the office of Acting Secretary, and thus could not later have designated an order of succession that would allow Mr. Wolf to assume the office.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 13

42.     Second, even if the April Delegation controls, Mr. McAleenan was not entitled to take office under it. The April Delegation did not change when Annex A, rather than E.O. 13753, governed. Annex A was, by its terms, only applicable in the event of the Secretary's unavailability during a disaster or catastrophic emergency. Under E.O. 13753, Christopher Krebs, Director of CISA, would have been the Acting Secretary because the office of the FEMA Administrator was also vacant. Accordingly, even if Ms. Nielsen resigned after the April Delegation, Mr. McAleenan could not have revised the order of succession to allow Mr. Wolf to assume office.

## V.     Defendants Have Not Complied with Their Responsibility to Evaluate the Effects of Border Fence Construction Under NEPA, the NHPA, the ESA, NAGPRA, and AIRFA.

43.   In his March 16, 2020 waivers, the Defendant Wolf purported to waive the application of the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), the Endangered Species Act ("ESA"), the Native American Graves Protection and Repatriation Act ("NAGPRA"), and the American Indian Religious Freedom Act ("AIRFA") to the construction of the border fence in eastern San Diego County and western Imperial County. Because his waivers were ineffective, void, and ultra vires, these statutes still apply.

44.   NEPA is implemented by regulations promulgated by the Council on Environmental Quality. See 40 C.F.R. pts. 1500-1508. The regulations in place when this Project was initiated, and that therefore apply to it under NEPA, provide that NEPA governs proposed "major federal actions" such as a federal construction project. See 40 C.F.R. §§ 1508.18, 1508.18(b)(4) ("major federal actions" to which NEPA applies include major actions "which are potentially subject to [f]ederal control," such as "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area"). The construction of

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 14

the border fence in eastern San Diego County is a "major federal action." The construction of the border fence in western Imperial County is a "major federal action."

45.   Before approving such actions, federal officials must take a "hard look" at the proposed environmental impacts of the proposed action and proposed alternatives to the proposed action and provide a full and fair discussion of significant environmental impacts of the project. 42 U.S.C. § 4332(C)(i)-(iii); 40 C.F.R. §§ 1502.1, 1508.8, 1508.11. Additionally, when a proposed federal action would have a primary impact on the natural environment, then the agency may consider secondary socio-economic effects from the project. See *Coal. of Concerned Citizens v. FTA*, 843 F.3d 886, 905 (10th Cir. 2016) (citing *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1235 n.10 (10th Cir. 2016)); see also *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 761 (2004).

46.   When a project could affect Indian tribes, a "hard look" includes reviewing a project in light of principles of environmental justice, under which an agency should address the "disproportionately high and adverse human health or environmental effects" its actions have "on minority populations and low-income populations," including Indian tribes. Exec. Order No. 12,898, § 1-101, 59 Fed. Reg. 7629 (Feb. 16, 1994). Environmental justice recognizes that human activities often have disproportionately negative effects on the resources, health, and welfare of historically disadvantaged populations. *Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004); *see Latin Ams. for Soc. & Econ. Dev. v. Adm'r of FHA*, 756 F.3d 447, 465 (6th Cir. 2014); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006)). Under principles of environmental justice, mitigation measures "should reflect the needs and preferences of . . . Indian tribes to the extent practicable." Council on Envtl. Quality, Exec. Office of President,

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 15

1   *Environmental Justice: Guidance Under the National Environmental Policy Act* 16
2   (1997).

3      47.   To comply with NEPA and evaluate potential impacts, a responsible agency
4   "shall integrate the NEPA process with other planning at the earliest possible
5   time . . . ." 40 C.F.R. § 1501.2. The agency first prepares an environmental
6   assessment of the proposed project, determining whether there will be no significant
7   impacts from the project, or whether further environmental study is required in an
8   environmental impact statement. Id. § 1501.3 (incorporating id. § 1508.9).

9      48.   If the agency determines that it is proper to prepare an environmental impact
10   statement, the agency must engage in a scoping process to determine the
11   environmental impacts to be reviewed, *id.* §§ 1501.4(d), 1501.7, in which it must
12   invite the participation of any affected Indian tribe, *id.* § 1501.7(a)(1). It must then
13   prepare an environmental impact statement, *id.* pt. 1502, which should, *inter alia*,
14   describe the purpose and need of the proposed action and alternatives, *id.* § 1502.13,
15   "[r]igorously explore and objectively evaluate all reasonable alternatives" to the
16   proposed project, *id.* § 1502.14(a), "[i]nclude the alternative of no action," *id.* §
17   1502.14(d), "[i]nclude appropriate mitigation measures not already included in the
18   proposed action or alternatives," *id.* § 1502.14(f), and "describe the environment of
19   the area(s) to be affected," *id.* § 1502.15. It must then describe, *inter alia*, the
20   environmental consequences of the project, including direct and indirect effects, *id.*
21   § 1502.16(a)-(b) (incorporating *id.* § 1508.8), the environmental effects of
22   alternatives, *id.* § 1502.16(d), and "historic and cultural resources," *id.* § 1502.16(g).

23      49.   Defendants have not complied with any of these requirements of NEPA in
24   their planning or construction of the border fence in eastern San Diego County and
25   western Imperial County.

26

27

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**- 16

50.   The NHPA protects "historic properties," which means "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register [of Historic Places], including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308. The National Register of Historic Places is a registry of "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture" maintained by the Secretary of the Interior. Id. § 302101 (incorporated by reference by id. § 300311). A historic site is eligible for listing on the Register when it

"possess[es] integrity of location, design, setting, materials, workmanship, feeling, and association and
(a) that are associated with events that have made a significant contribution to the broad patterns of our history; or
(b) that are associated with the lives of persons significant in our past; or
(c) that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
(d) that have yielded, or may be likely to yield, information important in prehistory or history."
36 F.R. § 60.4.

51.   The NHPA requires that the head of each federal agency "assume responsibility for the preservation of historic property that is owned or controlled by the agency," 54 U.S.C. § 306101(a)(1), and ensure "the preservation of property not under the jurisdiction or control of the agency but potentially affected by agency actions is given full consideration in planning," id. § 306102(b)(3). Additionally,

[t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 17

agency shall afford the [Advisory] Council [on Historic Preservation ("ACHP")] a reasonable opportunity to comment with regard to the undertaking.

54 U.S.C. § 306108; see 36 C.F.R. § 800.1(a). This process of taking such effects into account is known as the "Section 106 Process."

52.    An "undertaking" for NHPA purposes is "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency." 36 C.F.R. § 800.16(y). Construction of the border fence in eastern San Diego County is a federal undertaking. Construction of the border fence in western Imperial County is a federal undertaking.

53.    Agencies "must complete the section 106 process 'prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license,'" *id.* § 800.1(c) (citing 54 U.S.C. § 306108) (emphasis added), and must ensure "that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking," *id.*

54.    Additionally, under NHPA, the agency must "consult with any Indian tribe . . . that attaches religious and cultural significance to historic properties that may be affected by an undertaking." *Id.* § 800.2(c)(2)(ii); *see id.* § 800.6(a).

55.    The agency must determine whether or not historic properties would be affected by a federal undertaking and support that determination with "sufficient documentation to enable any reviewing parties to understand its basis." *Id.* § 800.11(a). If an agency determines historic properties will not be affected, the documentation the agency must provide includes:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, drawings, as necessary;

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 18

(2) A description of the steps taken to identify historic properties . . . ; and

(3) The basis for determining that no historic properties are present or affected.

*Id.* § 800.11(d). If the agency determines historic properties will be affected, the documentation the agency must provide includes:

(1) A description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, and drawings, as necessary;

(2) A description of the steps taken to identify historic properties;

(3) A description of the affected historic properties, including information on the characteristics that qualify them for the National Register;

(4) A description of the undertaking's effects on historic properties;

(5) An explanation of why the criteria of adverse effect were found applicable or inapplicable, including any conditions or future actions to avoid, minimize or mitigate adverse effects; and

(6) Copies or summaries of any views provided by consulting parties and the public.

*Id*. § 800.11(e).

56.    The agency must then consult with tribal and state historic preservation officers, as well as other consulting parties that the agency may have invited to participate, and develop a memorandum of agreement with those parties to describe how adverse effects to historic properties will be resolved, *id*. § 800.6(b), and that will "govern the undertaking and all of its parts," *id*. § 800.6(c).

57.    When the potential effects on historic properties cannot be fully determined prior to the approval of a federal undertaking, the agency may negotiate a programmatic agreement to "govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 19

undertakings." *Id*. § 800.14(b), (b)(1)(ii). As with memorandums of agreement, programmatic agreements must be agreed to by the agency, appropriate state and tribal historic preservation officers. *Id*. § 800.14(b)(2)(iii). Development of the programmatic agreement must include consultation with affected Indian tribes, *id*. § 800.14(f), and the responsible agency must provide summaries of the affected tribes' views to the ACHP, *id*. § 800.14(f)(2).

58.    Defendants have not complied with any of these requirements of the NHPA in their planning and actions to construct the border fence in eastern San Diego County and western Imperial County.

59.    The ESA prohibits anyone under the jurisdiction of the United States from taking an "endangered species" of fish or wildlife within the United States, or violating any regulation pertaining to an endangered or species listed as "threatened." 16 U.S.C. § 1538(a)(1)(B), (G).

60.    "Endangered species" are "any species which is in danger of extinction throughout all or a significant portion of its range . . . ." 16 U.S.C. § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). The Secretary of the Interior determines whether species are endangered or threatened, *see id.* § 1533(a)(1); 50 C.F.R. § 424.11, and maintains a list of those species, 50 C.F.R. § 17.11(h). The ESA also protects species that are proposed in the Federal Register to be listed as either threatened or endangered, *see id.* § 402.02.

61.    To "take" an endangered species means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

62.    The ESA and its implementing regulations also protect "critical habitats," which are specific areas within the geographical area occupied by a listed species

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 20

that are essential for the conservation of the species or that may require special management considerations or protection, or other specific areas essential for the conservation of the species. 16 U.S.C. § 1532(5)(A). *See* USFWS Threatened & Endangered Species Active Critical Habitat Report, U.S. Fish & Wildlife Serv., https://ecos.fws.gov/ecp/report/table/critical-habitat.html (last visited Sept. 19, 2020). The ESA also protects areas that are proposed in the Federal Register to be critical habitats. *See* 50 C.F.R. § 402.02.

63.    Federal agencies must engage in consultation with the U.S. Fish and Wildlife Service ("FWS") to determine how to "reduce the likelihood of conflicts between listed species or critical habitat and proposed actions," 50 C.F.R. § 402.11(a), where "actions" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States," *id.* § 402.02. The construction of the border fence in eastern San Diego County and western Imperial County is an "action."

64.    The federal agency responsible for the action must develop a biological assessment to evaluate the potential effects of the action on listed and proposed species and designated and proposed critical habitat, and determine whether such species or habitat are likely to be adversely affected by the action. *Id.* § 402.12(a). A biological assessment must be completed before "any contract for construction is entered into and before construction is begun." *Id.* § 402.12(b)(2). This requires obtaining a statement from the Director of the FWS of any listed or proposed species or designated or proposed critical habitat. *Id.* § 402.12(c)-(d). If a listed species or critical habitat may be present, the agency must complete a biological assessment. *Id.* § 402.12(d)(2).

65.    After the biological assessment is completed, the agency must submit it to the Director of the FWS, *id.* § 402.12(j), and if the Director concurs in the biological

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 21

assessment, then the agency must determine whether to consult with the FWS on how to avoid, minimize, or offset the effects of the action, *id.* §§ 402.12(k), 402.14(a)-(g), and then develop with FWS a biological opinion on whether the proposed action will jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, *id.* §§ 402.14(h), 402.02.

66.     Defendants have not complied with any of the requirements of the ESA in their planning and construction of the border fence in eastern San Diego County or in their planning and construction of the border fence in western Imperial County.

67.     NAGPRA, 25 U.S.C. §§ 3001-3013, governs the federal government's treatment and possession of Native American cultural items, which include human remains, funerary objects used as part of a death rite or ceremony, sacred objects used in the practice of traditional Native American religion, and "cultural patrimony," which are objects "having ongoing historical, traditional, or cultural importance central to the Native American group or culture itself, rather than property owned by an individual Native American, and which, therefore, cannot be alienated, appropriated, or conveyed by any individual . . . ." 25 U.S.C. § 3001(3).

68.     NAGPRA provides that, if any person knows or has reason to know they have discovered Native American cultural items on Federal lands after November 16, 1990, then they must notify the head of the department or agency having management authority over the lands, must cease the activity that resulted in the discovery of the cultural items in the area of the discovery, and must make a reasonable effort to protect the items before resuming the activity. *Id.* § 3002(d)(1). Any activity may not resume until 30 days after the head of the agency or department certifies that notice has been received. *Id.* If the cultural items uncovered are human remains or funerary objects associated with human remains, then those cultural items belong to the lineal descendants of the dead person. *Id.* § 3002(a)(1). If the cultural

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 22

items are funerary objects that are not associated with human remains, sacred objects, or cultural patrimony, then they belong to the Indian tribe with the closest cultural affiliation with the items. *Id.* § 3002(a)(2)(B).

69.    NAGPRA applies to the project sites of the border barrier construction, and Defendants have not complied with the requirements of NAGPRA in the construction of the border fence.

70.    AIRFA provides that:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

42 U.S.C. § 1996.

71.    Defendants have not complied with the policy articulated in AIRFA in the construction of the border fence.

72.    AIRFA and NAGPRA specifically protect the free exercise of religion and the religious practices and beliefs of Indians and Indian tribes under the Free Exercise Clause of the First Amendment, which provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . . " U.S. Const. amend. I.

## DECLARATORY AND INJUNCTIVE RELIEF

La Posta will suffer irreparable injury if Defendants continue construction on the Project and La Posta have no adequate remedy at law.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Ultra Vires) (The CAA does not authorize Defendants' transfer of funds to the to the Drug Interdiction account)**

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF- 23

1.    All the foregoing allegations are repeated and realleged as if fully set forth herein.

2.    CAA § 8005 authorizes the Secretary of Defense to transfer funds "between such appropriations or funds or any subdivision thereof, to be merged with and to be available for the same purposes, and for the same time period, as the appropriation or fund to which transferred."

3.    Subject to the same terms and conditions as § 8005, CAA § 9002 authorizes the Secretary to transfer additional funds only with the approval of the Office of Management and Budget.

4.    CAA § 8005 contains restrictions on the transfer of funds including that the use must be "for higher priority items, based on unforeseen military requirements, than those for which originally appropriated and in no case where the item for which funds are requested has been denied by the Congress."

5.    Finally, CAA § 739 contains the following overarching prohibition on use of funds under the Act:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

6.    The requirement to build the Project was neither unforeseen nor a military requirement; and the funds were included in the President's proposed budget but denied by Congress.

7.    Defendants have thus acted ultra vires by reprogramming funds to the Drug Interdiction account.

## **SECOND CAUSE OF ACTION**

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 24

**(Ultra Vires) (CAA does not authorize Defendants' use of the $1.375 billion for the Project)**

8.   All the foregoing allegations are repeated and realleged as if fully set forth herein.

9.   Defendants failed to meet the terms and conditions required to perfect Congress' appropriation of $1.375 billion for a border barrier system.

10.   CAA Div. D § 210 prevents the use of funds "for the construction of fencing … within historic cemeteries."

11.   Construction has already uncovered historic tribal burials in the Project Area and threatens to excavate a tribal historic cemetery in Jacumba.

12.   By using the funding to build a wall directly through La Posta's ancestral, historic burial grounds, Defendants violate the CAA and thus lack authority to use those funds.

## THIRD CAUSE OF ACTION
**(Ultra Vires) (CAA funds; Failure to consult with La Posta)**

13.   All the foregoing allegations are repeated and realleged as if fully set forth herein.

14.   CAA Div. D § 8129 prevents Defendants from using CAA funds "in contravention of … Executive Order No. 13175."

15.   Executive Order 13175 requires both meaningful consultation and input from Indian tribes when federal agencies implement "policies that have tribal implications." 65 Fed. Reg. 67249. Agencies are required to engage in consultation prior to implementing such policies and to look to "alternatives that would limit the scope of Federal standards or otherwise preserve the prerogatives and authority of Indian tribes." *Id*. At 67250. .

16.   Defendants failed to formally consult with La Posta regarding the Project. Defendants have shared limited Project details with La Posta. CBP engaged with

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 25

tribal representatives via a phone call in early June, a webinar on July 8, and a field visit on July 10.  However, to date, CBP has not provided sufficient information about the construction plans and schedule to permit La Posta to evaluate the Projects' impacts on religious and cultural resources, nor has CBP provided a comprehensive evaluation of such impacts.

17.   Because the Defendants have not adequately consulted with La Posta, their use of reprogrammed funds for the border wall is "in contravention of" Executive Order 13175 and ultra vires.

### FOURTH CAUSE OF ACTION
**(Ultra Vires) (Defendants' construction of the Project pursuant to IIRIRA Section 102 is ultra vires because they failed to consult with La Posta)**

18.   All the foregoing allegations are repeated and realleged as if fully set forth herein.

19.   Defendants invoked section 102 of IIRIRA as authority for construction of the Project. However, the Defendants violated the prerequisite conditions for exercise of the authority under the statute.

20.   IIRIRA Section 102(b)(1)(C) requires the Secretary of Homeland Security to consult with Indian tribes "to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed."

21.   Defendants have not consulted with La Posta prior to construction to minimize the impact on the environment, culture, commerce, and quality of life for La Posta, which is located near the Project Area. Because the Secretary failed to meet the prerequisite to exercise authority under Section 102(a) and (b), the Defendants' actions to construct the Project were, and are, ultra vires.

22.   Defendants have not consulted with La Posta prior to construction to minimize the impact on the environment, culture, commerce, and quality of life for

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 26

La Posta, which is located near the Project Area. Because the Secretary failed to meet the prerequisite to exercise authority under Section 102(a) and (b), the Defendants' actions to construct the Project were, and are, ultra vires.

## FIFTH CAUSE OF ACTION
### (Ultra Vires) (DHS's waiver of environmental laws violated clear and mandatory statutory language that the waiver come from the Secretary of Homeland Security)

23.    All the foregoing allegations are repeated and realleged as if fully set forth herein.

24.    IIRIRA authorizes the Secretary of Homeland Security to waive applicable laws.

25.    Chad Wolf purported to waiver environmental laws. 85 Fed. Reg. 14958, 85 Fed. Reg. 14960.

26.    At the time of the waiver, Mr. Wolf was not lawfully serving as Acting Secretary of Homeland Security.

27.    The waiver was ultra vires and of no force and effect.


## SIXTH CAUSE OF ACTION
### (Appropriations Clause, Article I, Section 9, Clause 7 of the Constitution)

28.  All the foregoing allegations are repeated and realleged as if fully set forth herein.

29.  Article I, Section 9, Clause 7, known as the Appropriations Clause, states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." Only Congress has the authority to appropriate funds out of the Treasury.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 27

30. Defendants transferred $3.831 billion from various other accounts to the Drug Interdiction account and used $1.375 billion for border wall construction without authorization. Such unauthorized withdrawals by the executive violate the Appropriations Clause of the Constitution.

## SIXTH CAUSE OF ACTION
### (Presentment Clause, Article I, Section 7, Clause 2)

31. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

32. The Presentment Clause of the Constitution provides the President the option to sign a bill or send it back to Congress with objections once it is received for his signature.

33. When President Trump received the CAA, he chose to sign the act into law, despite his previously voiced objections.  He then attempted to circumvent the act he had just signed by reprogramming funds for the construction of the border wall.

34. This executive action violates the Presentment Clause as an attempt to modify or repeal the CAA and bypass the restrictions Congress set in place therein.

///

///

## SEVENTH CAUSE OF ACTION
### (Violations of the Administrative Procedures Act) (Unlawful Funding)

35. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

36. Under the Administrative Procedure Act ("APA"), a court may enjoin a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 28

limitations, or short of statutory right." 5 U.S.C. §§ 704, 706(2)(A), (C).5 U.S.C. § 706(2)(A), (C).

37.   Defendants transferred $3.831 billion from various other accounts to the Drug Interdiction account and used $1.375 billion for border wall construction in violation of, and without authorization from, the CAA.

38.   Defendants are constructing the Project in violation of IIRIRA Section 102(b)(1)(C) and in excess of the authority granted therein.

## EIGHTH CAUSE OF ACTION
### (Violation of the Administrative Procedures Act) (Unlawful Authorization of Project Construction)

39.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

40.   Under the APA, a court may enjoin a final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 704, 706(2)(A), (C).5 U.S.C. § 706(2)(A), (C).

41.   Chad Wolf authorized Project Construction pursuant to Section 102(a) of IIRIRA. That section requires action by the Secretary of Homeland Security. Chad Wolf was not lawfully serving in that role, so his authorization of the Project was not in accordance with law.

## NINTH CAUSE OF ACTION
### (Violation of the Administrative Procedures Act) (Failure to comply with environmental laws)

42.   The Defendants' actions to approve construction of the border wall constitute final agency actions under 5 U.S.C. § 704.

43.   Defendants have not complied with their obligations under NEPA, the NHPA, the ESA, and NAGPRA. These obligations are non-discretionary and imposed by federal law and regulations.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 29

44.    The Defendants' failure to comply with these authorities without a valid IIRIRA waiver is arbitrary, capricious, not in accordance with law, and without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (D).

## TENTH CAUSE OF ACTION
**(Violation of First Amendment of the U.S. Constitution)**

45.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

46.    "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…" U.S. Const. amend. I.

47.    La Posta citizens hold sincere religious beliefs that exhumed burials must be properly handled and reburied. They also hold sincere beliefs that various natural landmarks within the path of the border wall projects are sacred places; and engage in ceremonies and rituals there.

48.    The Defendants are excavating and desecrating Kumeyaay burials without allowing La Posta access to properly treat the exhumed remains. While the Defendants are now allowing one cultural monitor from La Posta within the 21-mile Project Area, such an arrangement does not permit sufficient coverage to monitor every exhumation. Even when a cultural monitor does observe an exhumation, she is not permitted access to properly treat the remains in a culturally appropriate manner.

49.    The border wall has made and will continue to make Kumeyaay sacred sites that lie within and south of the Project Area inaccessible. La Posta citizens are not and will not be able to access Table Mountain, Jacumba Hot Springs, and Tecate Peak for religious ceremonies. These sites lie within the Project Area and the Defendants' continued construction will prevent access to these sites by La Posta citizens.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 30

50.   Defendants have threatened La Posta citizens with arrest and criminal trespass charges while attempting to access sites to pray and engage in religious ceremonies within the Project Area.

51.   The Project prohibits members of La Posta from properly treating their exhumed relatives and participating in religious ceremonies at their sacred sites.

52.   The Defendants' offers of inadequate cultural monitoring also forces La Posta and its members to choose between two untenable courses of action—either (a) participating in such limited cultural monitoring as CBP may choose to offer (while at the same time the ongoing construction is damaging and destroying La Posta's religious and cultural resources), or (b) refusing to be an active participant in a process that will damage and destroy La Posta's physical, spiritual, and cultural footprint in the Project Area.

53.   Defendants' actions prohibit La Posta citizens' free exercise of their religion.

## NINTH CAUSE OF ACTION

### (Religious Freedom Restoration Act of 1993)

54.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

55.   RFRA requires the government to demonstrate that any government action that "substantially burdens" a person's "exercise of religion" is in "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."42 U.S.C. § 2000bb

56.   As explained above, Defendant's actions related to the Project prohibit, and therefore substantially burden, La Posta citizens' exercise of religion.

57.   The Project is not the least restrictive means to further the government's interest in border security. The construction process could accommodate La Posta

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 31

citizens' religious practices or forgo construction of a barrier altogether, in favor of increased border patrol presence, for example.

58.   The Project violates La Posta citizens' rights under RFRA.

## TENTH CAUSE OF ACTION
### (Violation of Fifth Amendment Procedural Due Process Rights)

59.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

60.   La Posta citizens have a constitutionally-protected property interest in their ancestral remains, *see* 25 U.S.C. section 3002(a) (recognizing tribal property right in cultural items excavated or discovered on Federal lands after November 16, 1990), a liberty interest in their right to access historical and cultural sites affected by the Project, *see Kent v. Dulles*, 357 U.S. 116, 125 (1958), and a liberty interest in raising their children in the Kumeyaay tradition. *See Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534–35, (1925).

61.   Defendants' construction activities within the Project Area have damaged and destroyed Plaintiffs' property, and, if allowed to continue, further construction activities in the Project Area will continue to irreparably damage and destroy property of Plaintiffs known to rest within the Project Area.

62.   Project activities also prevent La Posta citizens from accessing sacred sites, and raising their children in the Kumeyaay tradition.

63.   Defendants have not provided La Posta citizens due process. Defendants gave no formal notice to Plaintiffs regarding the timing, sites, or manner of construction activities for the Projects. Instead, Defendants have refused to provide this information or engage in formal consultation despite repeated requests. The lack of any meaningful notice before Defendants began destroying Plaintiffs' property

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 32

and violating their significant liberty interests and religious freedom falls far below the constitutional standard for due process.

64. Defendants' non-process carries an enormous risk of the erroneous deprivation of constitutionally-protected property and liberty interests—it already has. Although tribal cultural sites and ancestral cemeteries were identified in prior surveys, and are known to many Kumeyaay people, those sites were not avoided, and no advance opportunity to protect them was afforded. Instead, Plaintiffs are becoming aware of violations of their interest only after it is too late to protect them, such as when CBP knew that human remains were found on July 10, 2020, yet  the CBP *did nothing* to protect them from the path of a heavy construction equipment.

65. The standard for the process due when government actions threaten to destroy Tribal cultural property is embodied by Native American Graves Protection and Repatriation Act ("NAGPRA") and its implementing regulations, 45 C.F.R. Pt. 10. Plaintiffs, however, are willing to consult with Defendants to find a mutually-agreeable procedure which affords the basic protections consistent with Defendant's legal obligations. While these safeguards would impose administrative and financial burden on Defendants, temporarily ceasing the Project would, according to the CBP's own algorithm, actually allow CBP to use its resources more effectively in other areas. Moreover, pausing construction activities to afford time to take the steps necessary would provide due process to foundational rights as the Constitution requires.

## ELEVENTH CAUSE OF ACTION
### (Violation of Fifth Amendment Substantive Due Process Rights)

66. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 33

67.  Border wall construction in the Project Area does not serve a compelling state interest and it is not narrowly-tailored to achieve that interest.

## PRAYER FOR RELIEF

La Posta requests the following relief:

1.  A declaration that:

   A.  The Defendants did not have lawful authority to fund the Project. Their transfer of funds from DoD accounts to DHS accounts violates the Appropriations Act of 2020 and the Appropriations Clause of the United States Constitution.

   B.  The Defendants have and are violating IIRIRA in the construction of the border fence in eastern San Diego County and western Imperial County, because the Secretary of Homeland Security did not authorize the Project.

   C.  The Defendant Wolf's purported exercises of the Secretary of Homeland Security's waiver authority under IIRIRA are invalid, and the purported waivers for eastern San Diego County and western Imperial County are null and void and cannot be ratified;

   D.  The Defendants have failed to comply with NEPA, the NHPA, the ESA, and NAGPRA

2.  An injunction that bars Defendants from continuing any construction of the Project until they:

   A.  Adequately consult with La Posta regarding cultural items, sacred sites, and historical sites which may be adversely impacted by the Project, which would include a series well-scheduled meetings that includes representatives of all Kumeyaay tribal governments to share information about (1) project construction to date; (2)

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 34

impacts to tribal cultural sites and burials; (3) a detailed plan for a new survey of the San Diego and El Centro Sectors with cadaver dogs and knowledgeable tribal leaders to identify undiscovered tribal cultural resources and burials;

B. Adequately survey the Project Area with tribal consultants using soil sampling and cadaver dogs;

C. Take appropriate, respectful measures to mitigate the adverse impacts, including

    i. Entering into contracts with Kumeyaay tribes to allow for monitoring by tribal members who can report to Kumeyaay tribal governments (not monitoring by Cogstone, which is a government contractor), and thereby establishing a formal tribal monitoring program with at least two tribal monitors at every construction site along the project route at any time (with authority to stop work until the cultural item/and or human remains can be properly removed and repatriated).

    ii. Allowing Tribal monitors to be in close enough proximity ground disturbing construction to witness the uncovering of potential cultural materials.

    iii. Modification of proposed border security measures to alleviate impacts to tribal cultural sites and burial sites, which might include pre-construction archaeological testing to fully determine site boundaries and appropriate mitigation measures for each site.

    iv. Where there is reasonable suspicion of cultural materials present, the avoidance of using heavy machinery or

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 35

explosives that precludes the ability for Tribal monitors to view and recover uncovered materials.

    v. Cataloguing and repatriating all recovered cultural items, including human within the Project Area; and

    vi. Developing an Environmental Stewardship Summary and a full Cultural Survey of the Project Area that allows for registration of all sites eligible for listing on an appropriate registry.

    vii. Meaningful consultation on the draft Communication Protocol.  The current draft is wholly inadequate and requires a full revision.

    D. Permit access to Kumeyaay sacred sites, as identified by La Posta.

3. An order requiring Defendants to remove the existing, newly constructed border barrier within the Project Area because it was constructed unlawfully and causes irreparable harm to the Tribe by desecrating sacred tribal land.

4. Award Plaintiffs their reasonable costs of litigation; and

5. Grant such other and further relief as the Court may deem just and proper.

//

//

//

//

//

RESPECTFULLY SUBMITTED this 24th day of November, 2020.


**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 36

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

/s/ *Michelle LaPena*

Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**- 37