Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION, ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS *PARENS PATRIAE,*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY; MARK T. ESPER, U.S. SECRETARY OF DEFENSE, IN HIS OFFICIAL CAPACITY; CHAD F. WOLF, ACTING U.S. SECRETARY OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY; AND LIEUTENANT GENERAL TODD T. SEMONITE, COMMANDING GENERAL OF THE U.S. ARMY CORPS OF ENGINEERS, IN HIS OFFICIAL CAPACITY,<br><br>Defendants. | Case No.: 3:20-cv-01552-AJB-MSB<br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Case No.: 3:20-cv-01552-AJB-MSB

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ......................................................................................................... 4

   I.   The Tribe is likely to succeed on the merits. ........................................... 4

     A.  DHS's authorization of Project construction was unlawful. ................. 4

     B.  Defendants are violating NEPA, NHPA, NAGPRA, and the ESA ................... 11

     C.  Defendants are unlawfully funding the Project. ................................. 13

  II.  La Posta will suffer irreparable harm in the absence of a preliminary injunction.. 14

  III.  The public interest and balance of the equities weigh in favor of an injunction. ... 18

CONCLUSION & REQUEST FOR RELIEF ..................................................... 20

**TABLE OF AUTHORITIES**

Cases

*Aleman Gonzalez v. Barr*, 955 F.3d 762 (9th Cir. 2020) ................................. 14

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............... 4, 13, 17, 18

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ............................. 15, 16

*Batalla Vidal v. Wolf*, No. 16-cv-4756 (NGG) (VMS), 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020)................................................................... 5, 7, 10, 11

*California v. Trump*, 963 F.3d 926 (9th Cir. 2020) ........................................ 13, 14

*Casa de Md., Inc. v. Wolf*, No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020)........................................................................................................... 5

*Competello v. Jones*, 267 F.2d 689 (D.C. Cir. 1959)........................................ 9

Drakes Bay Oyster Co. v. Jewell, 747 F.3d 1073 (9th Cir. 2014) ..................... 18

*Edmond v. United States*, 520 U.S. 651 (1997) ............................................... 6

*Edwards v. United States*, 103 U.S. 471 (1880) .............................................. 9

*Haine v. Googe*, 248 F. Supp. 349 (S.D.N.Y. 1965) ......................................... 9

*Immigr. Legal Res. Ctr. v. Wolf*, No. 20-cv-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020)................................................................................... 5, 19

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

*In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092 (S.D. Cal) .................... 12

*In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213 (9th Cir. 2019) ........................ 12

*La Clinica de la Raza v. Trump*, No. 19-cv-04980-PJH, 2020 WL 4569462 (N.D. Cal.
   Aug. 7, 2020) ............................................................................................................. 5

*Leedom v. Kyne*, 358 U.S. 184 (1958) ................................................................................ 12

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) .............................................................. 14

*N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929 (2017) ............................................................... 6

*Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, No. CV
   19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020) .................................. 5, 11

*Rockingham Cnty. v. Luten Bridge Co.*, 35 F.2d 301 (4th Cir. 1929) .............................. 9

*Sadler v. Jester*, 46 F. Supp. 737 (N.D. Tex. 1942) .......................................................... 9

*Sampson v. Murray*, 415 U.S. 61 (1974) ........................................................................... 20

*Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) ............................................. 4

*See Manzanita Band of Kumeyaay Nation v. Wolf*, No. 1:20-CV-02712 (TNM) (D.D.C.
   Oct. 16, 2020) .......................................................................................................... 12

*Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020) ........................................ 14, 18, 20

*Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978 (8th Cir. 2011) ................. 18

*State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054 (N.D. Cal. 2018) ......................... 18

*Trump v. Sierra Club*, 140 S. Ct. 1 (2019) ........................................................................ 13

*Trump v. Sierra Club*, 140 S. Ct. 2620 (2020) ................................................................. 14

Statutes

16 U.S.C. § 1533 ................................................................................................................. 11

25 U.S.C. §§3001-3013 ............................................................................................. 1, 11, 12

5 U.S.C. § 3345 ..................................................................................................................... 6

5 U.S.C. § 3347 ..................................................................................................................... 6

5 U.S.C. § 3349 ................................................................................................................... 10

5 U.S.C. § 706 ....................................................................................................................... 4

54 U.S.C. §306108 .............................................................................................................. 11

6 U.S.C. § 113 ....................................................................................................................... 7

8 U.S.C. § 1103 .......................................................................................................... 5, 11, 12

Other Authorities

Am. Heritage Coll. Dictionary (3d ed. 2010) ................................................................... 10

E.O. 13753 ............................................................................................................................ 9

*In re Dep't of Homeland Sec.*, B-331650 (Comp. Gen. Aug. 14, 2020) *mot. to rescind
   denied*, B-332451, 2020 WL 4923735 (Aug. 21, 2020) ............................................. 6

Regulations

36 C.F.R. §800.16 ............................................................................................................... 11

50 C.F.R. §402.11 ............................................................................................................... 11

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND
REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION

<u>Constitutional Provisions</u>

U.S. Const. art. II, § 2, cl. 2 ................................................. 6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND
REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION

iv      Case No.: 3:20-cv-01552-AJB-MSB

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

"It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963). The status quo here is that Kumeyaay ancestral burials and cultural sites have remained largely undisturbed for centuries. In May of 2020, the Defendants began construction of a 30-ft tall border barrier through Kumeyaay traditional territory. The La Posta Band of Diegueño Mission Indians ("Tribe") is requesting an injunction to preserve the status quo by allowing for the identification and preservation of Kumeyaay cultural sites while the legality of the Defendant's project is ultimately determined.

The Tribe challenges the legality of the Project in this motion on three grounds. First, the Department of Homeland Security's action to authorize construction in the first place was not in accordance with law. Second, the Project is violating the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), the Native American Graves Protection and Repatriation Act ("NAGPRA"), and the Endangered Species Act ("ESA"). Third, the Project was unlawfully funded.

### STATEMENT OF FACTS

The Tribe incorporates the facts presented in its first request for temporary restraining order and preliminary injunction, Dkt. 13-2 at 1-7. The Tribe adds the following facts.

The Tribe's traditional territory, which encompasses the areas impacted by construction within eastern San Diego and Imperial Counties ("Project Area"), is sacred to the Tribe. Second Decl. of Cynthia Parada ("Parada Decl.") ¶ 11. Construction activity, whether it is constructing a wall, grading roads, or disturbing the soil through the operation of heavy machinery, desecrates the land and burial and cultural sites, and directly injures

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

1    Case No.: 3:20-cv-01552-AJB-MSB

Kumeyaay people. *Id*. The wall itself is a scar across the land and causes the Tribe immeasurable pain. *Id*. Tribal citizens regularly walk Kumeyaay sacred trails and engage in other religious ceremonies throughout the Project Area. *Id*. ¶ 12. The construction of the border wall and associated infrastructure is not only an eye sore in an otherwise undisturbed environment that will frustrate the Tribe's ability to enjoy its traditional territory, but also interferes with Tribal citizens' ability to engage spiritually with the land and their ancestors. *Id*.

In an effort to protect some of these interests, the Tribe has offered to survey the Project Area for Kumeyaay burial and cultural sites at its own expense, but CBP has not permitted the Tribe to do so. *Id*. ¶ 4. As a result of construction proceeding without adequate survey, the director of the Kumeyaay Historic Preservation Council, Thomas Holm, recently discovered that the El Centro section of the border wall cuts directly through a sacred site in Davies Valley. Second Decl. of Thomas Holm ("Holm Decl.") ¶ 4. This site features a circle approximately 120 ft in diameter, marked clearly with a perimeter of stones and containing rock cairns. *Id*. ¶¶ 3-4. The circle is surrounded by smaller circle features and trails. *Id*. The circle would have been easily identified with the naked eye with an adequate archaeological field study, and in fact is easily identified through satellite imagery on Google Earth. *Id*. ¶ 3. Mr. Holm believes the circle is centuries-old, *id*. ¶ 4, and it holds sacred significance to the Kumeyaay people. *Id*; Parada Decl. ¶ 5. On November 10, 2020, a Kumeyaay group attempted to visit and pray at the site but Customs and Border Patrol ("CBP") officers prevented the group from accessing the site. *Id*. ¶ 6. Since this discovery, other similar circle complexes have been identified in the Project Area. Holm Decl. ¶ 6.

On another occasion, Mr. Holm encountered a site about which contains a rock alignment that appears to be a Kumeyaay cultural site. Holm Decl. ¶ 7. The site contains numerous ceramic sherds indicative of cremation vessels within the site. *Id*.

More recently, on November 17, 2020, CBP notified various Kumeyaay-affiliated

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

2     Case No.: 3:20-cv-01552-AJB-MSB

Indian tribes that CBP made an "unanticipated discovery" in the El Centro Project site when a tribal cultural monitor identified a Kumeyaay archaeological site adjacent to the newly constructed border wall in a "laydown yard." Holm Decl. ¶ 8. CBP identified three culturally significant discoveries at this location: two "small fire pits or roasting features" and one "possible cremation site." Second Decl. of Michelle LaPena ("LaPena Decl.") ¶ 5.

Tribal experts later visited the location and identified 18 separate fire features approximately 100m north of the wall and extending south into the road adjacent to the border wall, indicating other features have already been destroyed and obscured by construction. Holm Decl. ¶ 9; Parada Decl. ¶ 8. A forensic anthropologist inspected the site and found two small bone fragments, one 2 millimeters and one 6 millimeters, that could be human neck or face bones. Holm Dec. ¶ 9, Ex. D. The site also contains artifacts, flakes, core stones, scrapers, and hammer stones, and an ancient Kumeyaay trail passes by the site and is cut off by new border barrier construction. Parada Decl. ¶ 8. Tribal citizens regard this Kumeyaay cultural site as sacred. *Id*.

Another way the Project will harm the Tribe and its citizens is the Project's interference with stargazing. Since time immemorial, Kumeyaay people have studied the night sky. *See Id*. ¶ 13. In the Kumeyaay language, the sky itself is known as Emay or Umi. *Id*. The word for moon is Hellya but the full moon is Halya, and the new moon is Halyaxai. *Id*. There are different words for star, including Mesap and Kwenmessap. *Id*. Kumeyaay people have their own index of constellations, such as Emuu, meaning Mountain Sheep, which describes what is commonly known as Orion. *Id*. Stars feature prominently in Kumeyaay creation stories. *Id*. ¶ 14. Kumeyaay people also use the stars to predict the yearly cycles of weather and plant ripening. *Id*. Astronomy is an integral piece of Kumeyaay religion and cultural practice. *Id*. Tribal citizens practice stargazing throughout the Project Area. *Id*. ¶ 15. Installation of lighting on the border wall will cause light pollution that will injure the Tribe's ability to stargaze. *Id*.

Although as of the date of this filing, the Defendants have only approximately one

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

3    Case No.: 3:20-cv-01552-AJB-MSB

mile of bollards left to complete, much ground disturbing activity remains. LaPena Decl. ¶ 5. After expected completion of the bollards on December 21, 2020, Defendants plan to begin construction of the "linear ground detection system" adjacent to the 20 miles of new barrier construction. *Id*. Defendants intend to excavate a 4 ft deep by 3 ft wide trench along the entire length of the Project, including access roads, for installation of electrical equipment. Holm Decl. ¶ 10. Defendants have also yet to install security features, such as lighting and cameras in much of the Project Area. LaPena Decl. ¶ 5. Defendants have, however, already begun installing lighting on the border wall in Skull Valley. Holm Decl. ¶ 11. The lighting resembles stadium lighting, and installation requires excavation of a deep pit to anchor the light posts. *Id*. Border Patrol has stacked large conduit tubing along the border wall prior to installation. *Id*. Stacking this equipment causes ground disturbance. *Id*. Expected completion date for the project is late June, 2021. LaPena Decl. ¶ 6.

## LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Saravia for A.H. v. Sessions*, 905 F.3d 1137, 1142 (9th Cir. 2018). A preliminary injunction may issue where "serious questions going to the merits [are] raised and the balance of hardships tips sharply in [plaintiff's] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

## ARGUMENT

**I.   The Tribe is likely to succeed on the merits.**

**A.   DHS's authorization of Project construction was unlawful.**

The Tribe is likely to succeed on its claim, brought pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 706(2)(a), that DHS's authorization of Project construction is unlawful because the agency action required secretarial approval under the

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which did not happen. Section 102(a) of IIRIRA vests the Secretary of Homeland Security with authority to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104-208, div. C, tit. I, § 102, 110 Stat. 3009, 3009-554 (codified as amended at 8 U.S.C. § 1103 note). While Chad Wolf purported to invoke the authority granted by Section 102(a) for construction of the Project,[1] he did not lawfully hold office of the Secretary when he purported to do so. Accordingly, DHS's action to authorize the Project is not in accordance with law and the Project should be enjoined.

Every court to address whether Mr. Wolf lawfully holds the position of Acting Secretary of the Department of Homeland Security in accordance with the Homeland Security Act (HSA) has concluded that he does not. *Batalla Vidal v. Wolf*, No. 16-cv-4756 (NGG) (VMS), 2020 WL 6695076, at *8-9 (E.D.N.Y. Nov. 14, 2020); *Immigr. Legal Res. Ctr. v. Wolf*, No. 20-cv-05883-JSW, 2020 WL 5798269, at *7-8 (N.D. Cal. Sept. 29, 2020); *Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, No. CV 19-3283 (RDM), 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020); *Casa de Md., Inc. v. Wolf*, No. 8:20-cv-02118-PX, 2020 WL 5500165, at *20-23 (D. Md. Sept. 11, 2020), *appeal filed*, Nov. 12, 2020; *see La Clinica de la Raza v. Trump*, No. 19-cv-04980-PJH, 2020 WL 4569462, at *12-14 (N.D. Cal. Aug. 7, 2020), *reconsideration mot. pending* (*see Immigr. Legal Res. Ctr.*, 2020 WL 5798269, *7 n.9). The Government Accountability Office issued an opinion concluding the same. See *In re Dep't of Homeland Sec.*, B-331650

---

[1] 85 Fed. Reg. 14958 ("Due to the high levels of illegal entry of people and drugs within the San Diego Sector, I must use my authority under section 102 of IIRIRA to install additional physical barriers and roads in the San Diego Sector."); 85 Fed. Reg. 14961 ("Due to the high levels of illegal entry of people and drugs within the El Centro Sector, I must use my authority under section 102 of IIRIRA to install additional physical barriers and roads in the El Centro Sector.")

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

5   Case No.: 3:20-cv-01552-AJB-MSB

(Comp. Gen. Aug. 14, 2020) *mot. to rescind denied*, B-332451, 2020 WL 4923735 (Aug. 21, 2020). To be sure, *La Clinica de la Raza v. Trump*, 2020 WL 4569462, at *12-14 suggests that Mr. Wolf's appointment is lawful under the Federal Vacancy Reform Act ("FVRA"), but it is alone in that conclusion. Every other court has rejected the application of FVRA and concluded Mr. Wolf is invalidly serving as Acting Secretary. This court should do the same.

The Appointments Clause, U.S. Const. art. II, § 2, cl. 2, requires the President to obtain the advice and consent of the Senate before appointing any principal officer of the United States—such as the head of a department, like the Secretary of Homeland Security. The Appointments Clause is thus "among the significant structural safeguards of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651, 659 (1997). Positions requiring the consent of the Senate are commonly known as "PAS" positions. To protect against situations where disagreement between the President and the Senate results in a prolonged PAS vacancy, Congress has long "authoriz[ed] the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929 (2017)

The FVRA, subject to relevant exceptions, provides "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS office]." 5 U.S.C. § 3347(a). If a PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office ... the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." 5 U.S.C. § 3345(a). The terms of the FVRA apply unless (1) an express statutory provision either "(A) authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity; or (B) designates an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity"; or (2) the President fills a vacancy with a recess

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

6     Case No.: 3:20-cv-01552-AJB-MSB

appointment. *Id*.

Congress enacted a statutory provision contemplated in exception (1) when it gave the Secretary of Homeland Security the power to designate a further order of succession for Acting Secretaries beyond the two statutory "first assistants." Specifically, the Homeland Security Act ("HSA"), as amended in 2016, provides that "the Under Secretary for Management shall serve as the Acting Secretary if by reason of absence, disability, or vacancy in office, neither the Secretary nor Deputy Secretary is available to exercise the duties of the Office of the Secretary," and "[n]otwithstanding chapter 33 of Title 5, the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary," 6 U.S.C. § 113(g)(1) & (2). DHS has subsequently relied on the authority granted by this amendment to the HSA to define the order of succession to the office of Secretary of Homeland Security. See National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903(a), 130 Stat. 2001 (Dec. 23, 2016).

In other lawsuits, Chad Wolf has claimed his title through a succession order signed by Kevin McAleenan, who claimed the title of Acting Secretary prior to resigning. See *Batalla Vidal*, 2020 WL 6695076. Because Mr. McAleenan was unlawfully serving as Acting Secretary, however, his succession order was invalid, and Mr. Wolf cannot claim his succession through it.

The story begins with Secretary Kristjen Nielsen, who exercised her power under 6 U.S.C. § 113(g)(2) by designating an order of succession for Acting Secretary in February 2019 ("February Delegation"). *See Batalla Vidal*, 2020 WL 6695076, at *2. The February Delegation set two separate tracks for delegating authority to an Acting Secretary in the event that the office of the Secretary became vacant, depending on the circumstances that led to the vacancy. The first track was for vacancies caused by the Secretary's death, resignation, or inability to perform the functions of the office. *Id*. In that case, succession was set by Executive Order 13753 ("E.O. 13753") as follows: (1) the Deputy Secretary;

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

7    Case No.: 3:20-cv-01552-AJB-MSB

(2) the Under Secretary for Management; (3) the Administrator of the Federal Emergency Management Agency ("FEMA"); and (4) the Director of the Cybersecurity and Infrastructure Security Agency ("CISA"). *Id*. The second track applied when the Secretary was unavailable to act during a disaster or catastrophic emergency. *Id*. In that case, succession was governed by "Annex A." *Id*. Annex A provided an identical order of succession as E.O. 13753, meaning that for succession purposes there was no practical difference, as of February 2019, how a vacancy occurred. *Id*. Secretary Nielsen resigned her position, effective April 7, 2019, in a letter to President Trump. See Letter from Kirstjen M. Nielsen, Sec'y of Homeland Sec., to Donald J. Trump, President of U.S. (Apr. 7, 2019), https://www.dhs.gov/sites/default/files/publications/19_0407_s1_nielsen-resignation-letter.pdf. At the time, the office of Deputy Secretary was vacant. Claire Grady was serving as the Under Secretary for Management and would have been next in the line of succession. However, on April 7 at 6:02 pm, President Trump announced via a tweet that Kevin McAleenan, who was serving as the Commissioner of U.S. Customs and Border Patrol ("CBP"), would become Acting Secretary. @realDonaldTrump, Twitter (Apr. 7, 2019 6:02 PM), https://twitter.com/realDonaldTrump/status/1115011885303312386. At 10:36 pm, despite having already resigned, Secretary Nielsen tweeted that she would remain as Secretary until April 10, 2019. @SecNielsen, Twitter (Apr. 7, 2019 10:36 PM), https://twitter.com/SecNielsen/status/1115080823068332032.

On April 9, Ms. Nielsen signed a Memorandum from John Mitnick, DHS's General Counsel, titled "Designation of an Order of Succession to the Secretary," explicitly approving the document attached (the "April Delegation"). See Request for Judicial Notice ("RJN"), Ex. 1. The April Delegation amended only Annex A, such that the order of succession under it was, as relevant: (1) the Deputy Secretary; (2) the Under Secretary for Management; (3) CBP Commissioner; (4) FEMA Administrator; and (5) Director of the Cybersecurity and Infrastructure Security Agency ("CISA"). *Id*. Immediately thereafter, Ms. Grady announced that she would resign as Under Secretary for Management and Mr.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

8    Case No.: 3:20-cv-01552-AJB-MSB

McAleenan began to perform the duties of Acting Secretary.

Mr. McAleenan assumption of the office violated the controlling order of succession for two reasons. First, because Ms. Nielsen's attempt to revoke or extend her resignation via twitter lacked any legal effect, she lacked authority to sign the April Delegation.[2] Thus, the Purported April Delegation was invalid and the February Delegation controls. Under the February delegation, Mr. McAleenan could not have assumed the office of Acting Secretary, and thus could not later have designated an order of succession that would allow Mr. Wolf to assume the office.

Second, even if the April Delegation controls, Mr. McAleenan was not entitled to take office under it. The April Delegation modified only the order of succession during a disaster or catastrophic emergency in Annex A, and did not purport to affect cases where the Secretary merely resigns, which continued to be governed by E.O. 13753. Under E.O. 13753, at the time of Secretary Nielsen's resignation Christopher Krebs,[3] Director of CISA, would have been the Acting Secretary because the office of the FEMA Administrator was also vacant. Accordingly, even if Ms. Nielsen had the authority to make the April Delegation, Mr. McAleenan could not have revised the order of succession to allow Mr.

---

[2] No statute governs the method of a Cabinet official's resignation, and so the effective date and time of Secretary Nielsen's resignation is governed by the common law rules that "a resignation must be accepted before it can be regarded as complete," *Edwards v. United States*, 103 U.S. 471, 475 (1880), that upon acceptance it becomes complete, *see Rockingham Cnty. v. Luten Bridge Co.*, 35 F.2d 301, 306 (4th Cir. 1929); *Sadler v. Jester*, 46 F. Supp. 737, 740 (N.D. Tex. 1942), and that once complete, the resignation cannot be rescinded, *see Competello v. Jones*, 267 F.2d 689, 690 (D.C. Cir. 1959) (per curiam); *Haine v. Googe*, 248 F. Supp. 349, 351 (S.D.N.Y. 1965). Secretary Nielsen submitted her resignation to the President on April 7, 2019, and he accepted the resignation by public announcement at 6:02 PM. See @realDonaldTrump, Twitter (Apr. 7, 2019 6:02 PM), https://twitter.com/realDonaldTrump/status/1115011884154064896.

[3] President Trump fired Christopher Krebs on November 17, 2020. @realDonaldTrump, Twitter (Nov. 17, 2020 4:07 PM), https://twitter.com/realDonaldTrump/status/1328852354049957888.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Wolf to assume office.

The Defendants have argued elsewhere that when Peter Gaynor was subsequently appointed as FEMA Administrator, he "exercised 'any authority' he might have as Acting Secretary and designated an order of succession for the office under [HSA] Section 113(g)(2)," under which Mr. Wolf, instead of Mr. Krebs, would have succeed to Acting Secretary. *See Batalla Vidal*, 2020 WL 6695076, at *4. Mr. Wolf then proceeded to ratify his previous actions taken under color of the authority of Acting Secretary. *Id*. These events, however, do not validate Mr. Wolf's office.

No authority allows a government official to take administrative action in the alternative. As one district court explained:

"DHS is a large and complex organization with significant law enforcement and national security responsibilities. Congress and DHS, via the FVRA and HSA, have provided detailed contingency plans to ensure that somebody is accountable for the Department's mission. That purpose would be significantly undermined if DHS allowed two different people—Mr. Wolf and Administrator Gaynor—to simultaneously exercise the Secretary's power."

*Id*. at *9.

Moreover, DHS has not submitted any notice to Congress that Administrator Gaynor is or was currently serving as Acting Secretary of Homeland Security, which is required under 5 U.S.C. § 3349(a). DHS has submitted FVRA notifications (as incorporated by the HSA) in the past for its Acting Secretaries who have purported to assume the office via the authority of the Secretary under 6 U.S.C. § 113(g)(2). *See Batalla Vidal*, 2020 WL 6695076, at *9. Finally, Administrator Gaynor never resigned, so his order of succession, even if valid, has not yet been employed. Section 113(g)(2) only allows the Secretary to "designate" officers in an "order of succession to serve as Acting Secretary"—it does not authorize the Secretary to simply appoint someone else in his or her place. To "designate" is to "select and set aside for an office," *Am. Heritage Coll. Dictionary* 376 (3d ed. 2010),

and a "succession" is "[t]he sequence in which one person after another succeeds to a title." *Id*. at 1355. Thus, the Secretary may select the sequence in which officers will become Acting Secretary. Such a designation does not divest the current Acting Secretary of authority, and no law gives an Acting Secretary the power to simply "abdicat[e] his authority" to another government official. *See Batalla Vidal*, 2020 WL 6695076, at *9; Rights Project, 2020 WL 5995206, at *18-23.

Because he is not and was never Acting Secretary, Mr. Wolf did not (and does not) possess the power to authorize the Project under Section 102(a) of IIRIRA. Accordingly, the Tribe is likely to succeed on its claim that DHS's actions authorizing the Project were not in accordance with law.

### B. Defendants are violating NEPA, NHPA, NAGPRA, and the ESA.

The construction of the border fence triggers various federal laws that require agencies to engage in environmental analysis and consultation with appropriate stakeholders before undertaking such efforts. Under NEPA, federal agencies must take a "hard look" at the possible environmental impacts before approving a major project and provide a written discussion of such impacts. *See* 42 U.S.C. §4332(C)(i)-(iii). Under the NHPA, federal agencies must "take into account the effect of [a federal] undertaking on any historic property" protected by the NHPA. 54 U.S.C. §306108; *see* 36 C.F.R. §800.16 (l). NAGPRA, 25 U.S.C. §§3001-3013, governs the federal government's treatment of Indian human remains and cultural items and vests possession and control of such remains and cultural items in Native Americans. *Id.* at § 3001(3). And, under the ESA, federal agencies must consult with the Fish and Wildlife Service to "reduce the likelihood of conflicts between listed species or critical habitat and proposed actions." 50 C.F.R. §402.11(a); *see generally* 16 U.S.C. § 1533. The Defendants have not attempted or purported to comply with these statutes.

While Chad Wolf purported to waive these laws, 85 Fed. Reg. 14958, 85 Fed. Reg. 14960, the waivers are invalid. IIRIRA's waiver provision authorizes the "Secretary of

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND
REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION

11    Case No.: 3:20-cv-01552-AJB-MSB

Homeland Security . . . to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." § 102(c)(1). Because Mr. Wolf was not lawfully serving as the Acting Secretary of Homeland Security, he lacked authority under this provision. Thus, NEPA, NHPA, NAGPRA, and the ESA apply to Defendants' border wall construction activities. Because Defendants' have not even attempted to comply with these statutes, the Tribe is likely to succeed on its claims under these statutes. *See* 85 Fed. Reg. 14959 (March 16, 2020) (purporting to waive requirements of NEPA, NHPA, NAGPRA, and ESA).

The Defendants have argued elsewhere that IIRIRA explicitly bars a claim that assumes the invalidity of the waivers. *See Manzanita Band of Kumeyaay Nation v. Wolf*, No. 1:20-CV-02712 (TNM) (D.D.C. Oct. 16, 2020) *see* Dkt. 16 at 16. But the Ninth Circuit has recognized an ultra vires cause of action. *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 n.7 (9th Cir. 2019). IIRIRA limits "claims or cause of actions arising from" waivers under § 102(c)(1) to constitutional claims, which must be brought within 60 days after the issuance of the waiver. § 102(c)(2). However, "[t]he United States Supreme Court has identified a narrow exception to an express statutory bar on judicial review when there is a claim that an agency acted beyond its statutory authority." *In re Border Infrastructure Envtl. Litig.*, 284 F. Supp. 3d 1092, 1111 (S.D. Cal.), *cert. denied sub nom. Animal Legal Def. Fund v. Dep't of Homeland Sec.*, 139 S. Ct. 594, 202 L. Ed. 2d 428 (2018), *and aff'd,* 915 F.3d 1213 (9th Cir. 2019) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958). The Ninth Circuit recognized that the *Leedom* exception would apply in this context if a plaintiff could show the waivers violated "'clear and mandatory' statutory language." *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 n.7 (9th Cir. 2019).

The purported waivers violated "clear and mandatory statutory language." IIRIRA § 102(c)(1) requires the "Secretary of Homeland Security" to issue the waivers. It does not authorize the Under Secretary of Homeland Security for Strategy, Policy, and Plans or any

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

12      Case No.: 3:20-cv-01552-AJB-MSB

other official to issue the waivers. Because Mr. Wolf was not lawfully serving as the Acting Secretary of Homeland Security, his waivers violated the clear and mandatory requirement that the waivers come from that office.

Because the waivers are invalid, the environmental laws apply, and the Tribe is likely to succeed on its claim that the Defendants have violated them.

## C. Defendants are unlawfully funding the Project.

The Ninth Circuit, in *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020) ("*Sierra Club II*") and *California v. Trump*, 963 F.3d 926, 941 (9th Cir. 2020), held that the Defendants lacked authority to transfer funds appropriated in 2019 to DoD for border barrier construction. The Defendants have conceded that transfer of 2020 funds was legally and substantively identical to the 2019 transfer that the Ninth Circuit held to be unlawful.[4]

Finding it unlikely that the Tribe had an ultra vires had a cause of action to address this unlawful transfer, this Court previously recognized that there are, at least, "serious questions going to the merits of whether La Posta would be able to assert an APA claim based on Section 8005." Dkt. 26 at 19. This is enough for a preliminary injunction under this Circuit's sliding scale approach. *See, e.g.*, *Cottrell*, 632 F.3d at 1134–35. In fact, there are more than serious questions: the law in this Circuit is clear that the Tribe has a cause of action under the APA and as an *ultra vires* claim. The Tribe is thus certain to succeed on its claim that the transfer was unlawful.

The cause for this Court's pause on the cause of action question was the Supreme Court's stay order in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019), and denial of a subsequent

---

[4] During oral argument on the Tribe's appeal of this court's denial of the Tribe's first motion for a preliminary injunction, Judge Murguia asked the government's counsel, "is it your position, or the government's position, that the fiscal year 2020 fund transfers at issue here were substantively different from the fiscal year 2019 funding transfers that the Sierra II panel held violated Section 8005?" The government's counsel responded, "No, your honor." Oral argument recording at 43:52 (https://youtu.be/2l-XOfDfqjc?t=2632).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Case No.: 3:20-cv-01552-AJB-MSB

motion to lift that stay, *Trump v. Sierra Club*, 140 S. Ct. 2620 (2020). But this Court need not attempt to predict how the Supreme Court would rule because the Ninth Circuit has already done that in *Sierra Club II*, *California v. Trump*, and most recently *Sierra Club v. Trump*, 977 F.3d 853, 876 (9th Cir. 2020) (*Sierra Club III*). This Court is bound by the Ninth Circuit's analysis. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (holding that district courts are "bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis'").

A district court can replace Ninth Circuit law with its own analysis "when, but only when, the earlier decision is clearly irreconcilable with the holding or reasoning of intervening authority from our court sitting en banc or the Supreme Court." *Aleman Gonzalez v. Barr*, 955 F.3d 762, 765 (9th Cir. 2020) (emphasis added). The exception does not apply here because the Supreme Court's stay order is not "intervening authority"— *Sierra Club II* and *California* came <u>after</u> the Supreme Court's stay. And, the Ninth Circuit recognized the States' and Sierra Club's cause of action to challenge a funding violation after the Supreme Court refused to lift the stay in *Sierra Club III*.

Unless and until the Supreme Court overturns *Sierra Club II*, *III*, and *California*, this Court is bound to follow the Ninth Circuit's analysis and conclusions with regard to the cause of action question.

## II. La Posta will suffer irreparable harm in the absence of a preliminary injunction.

Without a preliminary injunction pausing construction, the Defendants will complete construction of the Project while this case in pending and, in so doing, continue to destroy tribal cultural and burial sites and injure Tribal citizens' ability to enjoy their ancestral territory.

Continued excavation and use of heavy equipment is likely to unearth and displace tribal cultural items and disinter tribal burial sites. The Tribe cannot provide precise locations of burials and cultural artifacts in the project area because it has not been

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

14     Case No.: 3:20-cv-01552-AJB-MSB

permitted to conduct a comprehensive survey, even at its own expense. Parada Decl. ¶ 4. However, Tribal leaders and elders have knowledge, based on the Tribe's oral history and intensive occupation of the Project Area for millennia, that there are Kumeyaay burial sites and other Kumeyaay archaeological resources scattered throughout the Project Area. *See* Dkt. 13-4 ¶ 13; Dkt. 13-5 ¶¶ 2, 4; Dkt. 13-6 ¶¶ 8, 9, 11. Archaeological and anthropological research in the surrounding areas that have been comprehensively surveyed supports the Tribe's traditional knowledge. *See* Dkt. 22-1 ¶¶ 30-31; Dkt. 13-7 ¶ 4. Significantly, CBP's own alleged survey of the Project Area discovered burial sites[5] and other "isolated" archaeological resources[6]. Dkt. 20-2 ¶¶ 44, 47, 50.

Discoveries of archaeological resources during construction further corroborate the Tribe's knowledge. For example, the Tribe's declarants discovered two different human bones and midden sites. *See* Dkt. 13-4 ¶ 16; Dkt. 13-5 ¶¶ 9-12; Dkt. 13-8 ¶¶ 9-10, 13; Dkt. 22-1 ¶ 32. In earlier proceedings, CBP did not refute that the second discovery was human bone, only that it could not investigate because it was found ten feet south of the border. Dkt. 20-2 ¶ 56. In fact, the only statement CBP makes on the discovery of archaeological resources during construction is that "there has been no instance where the discovery of a significant cultural site or burial ground has required that construction be stopped to preserve or protect such sites." *Id*. ¶ 50. Whether or not CBP thought cultural sites or burial

---

[5] CBP's Paul Enriquez states that CBP's surveys "do not indicate the presence of any *known* burial sites." Dkt. 20-2 ¶¶ 47, 50 (emphasis added). The Tribe takes this to mean that, although CBP did not discover previously recorded burials sites (because there have been no prior comprehensive surveys in the Project Area), CBD *did* discover previously *unrecorded* burial sites. If the Tribe misinterprets Mr. Enriquez, it welcomes clarification on this point.

[6] While CBP explains that these findings "do not appear to be significant," Dkt. 20-2 ¶ 44, the question of irreparable harm does not turn on the defendant's characterization of the significance of the harm, rather, as this Court has explained, the analysis "focuses on 'whether the harm to Plaintiffs [i]s irreparable,' rather than 'the severity of the harm.'" Dkt. 26 (citing *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014)).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

15     Case No.: 3:20-cv-01552-AJB-MSB

grounds that they unearthed were significant is not the test here. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Two recent discoveries resolve any remaining doubt as to whether there are in fact burial grounds and cultural sites in the project area that CBP's surveys failed to identify. Mr. Holm recently discovered that the El Centro section of border wall cuts directly through a sacred site in Davies Valley. Holm Decl. ¶ 4. The 120-foot-diameter circle would have been easily identified with an adequate archaeological field study, and in fact is easily identified through satellite imagery on Google Earth. *Id*. The circle is believed to be centuries-old, *id*. ¶ 5, and holds sacred significance to the Kumeyaay people. Parada Decl. ¶ 5. Recently, a Kumeyaay group attempted to visit and pray at the site but CBP prevented their access. *Id*. ¶ 6. Since this discovery, other similar circle complexes have been identified in the Project Area. Holm Decl. ¶ 6.

More recently, on November 17, 2020, CBP notified various Kumeyaay-affiliated tribes that CBP made an "unanticipated discovery" in the El Centro Project site when a tribal cultural monitor identified a potential tribal archaeological site adjacent to the newly constructed border wall in a "laydown yard." Holm Decl. ¶ 8. CBP later identified three sites: two "small fire pits or roasting features" and one "possible cremation site." LaPena Decl. ¶ 5. Tribal experts later visited the location and identified 18 separate fire features approximately 100m north of the wall and extending south into the road adjacent to the border wall, indicating other features have already been destroyed and obscured by construction. Holm Decl. ¶ 9; Parada Decl. ¶ 8. A forensic anthropologist inspected the site and found two small bone fragments, one 2 millimeters and one 6 millimeters, that could be human neck or face bones. Holm Decl. ¶ 9, Ex. D. The site also contains artifacts, flakes, core stones, scrapers, and hammer stones, and an ancient Kumeyaay trail passes by the site and is cut off by new border barrier construction. Parada Decl. ¶ 8. Tribal citizens regard this Kumeyaay cultural site as sacred. *Id*. Had CBP conducted an adequate survey of the Project Area, it would have identified these sites.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

16      Case No.: 3:20-cv-01552-AJB-MSB

In light of CBP's "unanticipated discoveries" during construction, it is not just likely but inevitable that more tribal cultural and burial sites will be "discovered." Unfortunately, CBP did not want to find any tribal cultural sites in its cursory surveys, so they focused on construction and refused to implement the pre-construction cultural item identification methods that the Kumeyaay tribal leaders requested, including surveys that included knowledgeable tribal people and cadaver dogs which would have found burials and cremations in the path of construction and within other areas subject to disturbance for other infrastructure, including the "laydown sites" and staging areas. Unearthing tribal artifacts or disinterring tribal remains through construction activity will cause irreparable harm regardless of the measures that CBP takes afterward to notify the tribes and repatriate the remains. Parada Decl. ¶ 9.

In addition to desecrating cultural and burial sites, the continued construction of the Project is likely to injure Tribal citizens' ability to enjoy and practice their religion in their traditional territory. "An organization can demonstrate irreparable harm by showing that the challenged action will injure its members' enjoyment of public lands." *Sierra Club II*, 963 F.3d at 895 (9th Cir. 2020) (citing *Cottrell*, 632 F.3d at 1135) (finding irreparable harm when the Forest Service's proposed project would harm the Alliance's members' ability to "view, experience, and utilize" national forest areas in an undisturbed state)).

The Tribe's traditional territory, which encompasses the Project Area, is sacred to the Tribe. Parada Decl. ¶ 11. Construction activity, whether it is constructing a wall, grading roads, or disturbing the soil through the operation of heavy machinery, desecrates the land, which is a direct injury to Kumeyaay people. *Id*. The wall itself is a scar across the land and causes the Tribe and its citizens immeasurable pain. *Id*. Tribal citizens regularly walk Kumeyaay sacred trails and engage in other religious ceremonies throughout the Project Area. *Id*. ¶ 12. The construction of the border wall and associated infrastructure is not only an eye sore in an otherwise undisturbed environment that will frustrate the Tribe's ability to aesthetically enjoy its traditional territory, but it also

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

17     Case No.: 3:20-cv-01552-AJB-MSB

interferes with Tribal citizens' ability to engage spiritually with the land. *Id.*

Installation of lighting will have a particularly negative impact on Tribal citizens' ability to enjoy their land and practice their culture. Astronomy is an integral piece of Kumeyaay religion and cultural practice. Parada Decl. ¶¶ 13-14. Tribal citizens continue to practice stargazing throughout the Project Area. *Id.* ¶ 15. Installation of lighting on the border wall will cause light pollution that will injure the Tribe's ability to stargaze. *Id.* Other courts have recognized light pollution as evidence of irreparable environmental harm. *See Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 995 (8th Cir. 2011) (holding that "light and noise pollution caused by plant construction" was irreparable environmental harm); *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1073 (N.D. Cal. 2018) ("finding irreparable harm where the Plaintiff environmental injury such as noise and light pollution"). Similarly, here, light pollution will irreparably injure Tribal citizens ability to engage in cultural practices.

The Ninth Circuit has recognized that an injunction must issue where a government project interferes with a plaintiff's ability to "view, experience, and utilize" a national forest. *Cottrell*, 632 F.3d at 1135. The Tribe has easily demonstrated the same type of harm here, with the additional showing of specific harm to tribal cultural items. The Tribe satisfies this factor.

## III. The public interest and balance of the equities weigh in favor of an injunction.

When the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). By denying the Defendants' request for funding the Project, "Congress presumably decided such construction at this time was not in the public interest." *Sierra Club I*, 929 F.3d at 707; *See also Sierra Club III*, 977 F.3d at 889 ("Congress determined that the interests of the entire country did not favor funding more expansive border wall construction"). And, while the public surely has an interest in

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

18    Case No.: 3:20-cv-01552-AJB-MSB

border security, the public also has an interest in ensuring that "statutes enacted by [their] representatives are not imperiled by executive fiat." *Sierra Club II*, 963 F.3d at 895 (quotations and citations omitted); *see also Immigrant Legal Res. Ctr.*, 2020 WL 5798269, at *18 ("[I]n light of the issues raised regarding the validity of Mr. McAleenan's and Mr. Wolf's appointments, the Court concludes the public has an interest in avoiding overreach of Executive power with respect to appointments that require the informed consent of the Legislative branch[.]").

On the Tribe's first request for an injunction, this Court examined three factors: 1) the government's interest in stopping drug trafficking, 2) the government's interest in avoiding contract fees from work suspension, and 3) that "the Supreme Court necessarily had to have concluded that harm to the Government from an injunction prohibiting border barrier construction outweighs the harm to the *Sierra Club* plaintiffs." Dkt. 26 at 36-37. All three of the factors have changed since the Court last addressed them.

First, construction of the border barrier is substantially complete. The injunction would only stall installation of the underground linear detection system and lighting. Because the government never analyzed the effectiveness of the proposed border barrier, it cannot say with any certainty what degree of drug trafficking prevention these technological features add. *See* Dkt. 13-3, Ex. 8 at 22 (Office of Inspect General Report concluding that CBP "did not conduct an Analysis of Alternatives to assess and select the most effective, appropriate, and affordable solutions to obtain operational control of the southern border"). It is doubtful that a pause on installation of this technology will significantly hamper the government's ability to stop drug trafficking, certainly not to a degree that justifies the risk posed to the Tribe's invaluable and irreplaceable cultural heritage. And, as the Ninth Circuit has recognized, most illegal drugs cross at ports of entry, not along the open border. *Sierra Club II*, 963 F.3d at 897 n. 16.

Second, the costs resulting suspension of work must be reassessed. Like the drug trafficking concerns, contract suspension fees should not factor into the analysis when the

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

19    Case No.: 3:20-cv-01552-AJB-MSB

Tribe has made such a strong showing that the contracts are unlawful. *See Sierra Club II*, 963 F.3d at 895-6. Additionally, in its request for funding from the DoD, DHS cautioned that prior decisions to grant the funding are the subject of ongoing litigation and that "[a]dditional litigation is expected if you decide to undertake additional construction[.]" Dkt. 20-1, Ex. 2 at 16. Defendants were aware at the time of contracting that construction may be suspended and cannot now complain that the expectation has become a reality. This is ever truer now, when the Defendants have had more than three months since the Tribe filed its complaint to protect Tribal cultural sites and conform its conduct with the law. And, of course, monetary harm is never irreparable, *Sampson v. Murray*, 415 U.S. 61, 90, 94 (1974), so the fear of contract penalties cannot outweigh the irreparable harm facing the tribe.

Third, and finally, the Ninth Circuit has made clear the Supreme Court's stay order in *Sierra Club* "does not address the appropriateness of injunctive relief." *Sierra Club III*, 977 F.3d at 888. "If anything, the order alludes only to the merits of Sierra Club's cause of action arguments; it contains nowhere a suggestion that the district court abused its discretion in balancing the equities and weighing the public interest." *Id.* Thus, this Court's reading of the Supreme Court stay has been overruled by the Ninth Circuit and cannot be used as a basis for denying an injunction. The equities weigh sharply in favor of an injunction.

## CONCLUSION & REQUEST FOR RELIEF

For the foregoing reasons, La Posta is likely to succeed on the merits, will continue to suffer irreparable harm in the absence of a preliminary injunction, and the public interest and balance of equities favors an injunction. Accordingly, La Posta respectfully requests this court enter a preliminary injunction that requires the Defendants to immediately cease all construction activity on the Project until the Defendants (i) adequately consult with Kumeyaay tribes regarding cultural items, sacred sites, and historical sites which may be adversely impacted by the Project (which would include a series well-scheduled meetings

that includes representatives of all Kumeyaay tribal governments to share information about (1) project construction to date; (2) impacts to tribal cultural sites and burials; (3) a detailed plan for a new survey of the San Diego and El Centro Sectors with cadaver dogs and knowledgeable tribal leaders to identify unrecorded tribal cultural resources and burials); (ii) perform a survey informed by tribal consultation that includes soil sampling and cadaver dogs; (iii) contract with Kumeyaay tribes to allow for monitoring by tribal members who can report to Kumeyaay tribal governments (not monitoring by Cogstone, which is a government contractor) of all construction activities (with authority to stop work), (iv) modify of proposed border security measures to avoid impacts to Kumeyaay cultural sites where necessary, (c) catalogue and repatriation of cultural items within the Project Area (including discussion about mitigation to such resources); (v) permit access to Kumeyaay sacred sites, as identified by the Tribe; and (vi) provide meaningful consultation on the draft Communication Protocol, which is wholly inadequate and requires a full revision.

Respectfully submitted.

November 24, 2020

*/s/ Michelle LaPena*

Michelle LaPena (SBN 201018)
Robert A. Rosette (SBN 224437)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT Of SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

21     Case No.: 3:20-cv-01552-AJB-MSB