JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
ROBERT S. BREWER, JR.
United States Attorney
JOHN V. COGHLAN
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch
ANDREW I. WARDEN
Senior Trial Counsel
BRIAN ROSEN-SHAUD
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20530
Tel.:    (202) 616-5084
Fax:    (202) 616-8470
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUENO MISSION INDIANS OF THE LA POSTA RESERVATION, ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS *PARENS PATRIAE* | Case No. 3:20-cv-01552-AJB-MSB |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' SECOND MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | Date: January 14, 2020<br>Time: 2:00 pm<br>Courtroom: 4A<br>Hon. Anthony J. Battaglia |
| DONALD J. TRUMP, *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.  The Ninth Circuit's Decision Affirming the Court's PI Order and
          Recent Decisions in Related Border Barrier Cases .................................. 2

    B.  Current Construction Status of San Diego A and El Centro A ................... 3

LEGAL STANDARD ............................................................................................ 4

ARGUMENT ....................................................................................................... 4

    I.  Plaintiffs Have Not Established An Irreparable Injury ................................ 4

    II.  Plaintiffs Are Not Likely to Succeed on the Merits .................................. 13

        A.  DHS has Statutory Authority to Construct Border Barriers and
             Waive Laws that Impede Expeditious Construction .......................... 13

        B.  Acting Secretary Wolf is Properly Serving as the Acting
             Secretary of Homeland Security ...................................................... 15

            1.  Former Secretary Kirstjen Nielsen Had the Authority
                 to Issue the April 9, 2019 Succession Order ......................... 15

            2.  Acting Secretary Kevin McAleenan Lawfully Succeeded
                 Secretary Kirstjen Nielsen ....................................................... 16

            3.  Alternatively, Acting Secretary Wolf's Ratification of His
                 Prior Orders Cures the Alleged Service-Related Defects
                 in the Authorization and Waivers .......................................... 20

        C.  Plaintiffs are Unlikely to Succeed on the Merits of Their
             Challenge to the Funding of the Border Barrier Projects. .................. 23

    III.  The Balance of Equities and Public Interest Favor Denial of an
          Injunction ............................................................................................ 24

CONCLUSION .................................................................................................. 25

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

i

*3:20-cv-01552-AJB-MSB*

<u>Cases</u>

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ............................................................. 4

*Batalla Vidal v. Wolf,*
    No. 16-cv-4756 (NGG)(VMS), 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020) ......... 21

*Benisek v. Lamone,*
    138 S. Ct. 1942 (2018) ............................................................. 24

*California v. Trump,*
    963 F.3d 926 (9th Cir. 2020) ............................................................. 23

*CFPB v. Gordon,*
    819 F.3d 1179 (9th Cir. 2016) ............................................................. 23

*Colorado River Indian Tribes v. Dep't of Interior,*
    2015 WL 12661945 (C.D. Cal. June 11, 2015) ............................................ 10

*Ctr. for Biological Diversity v. Hays,*
    2015 WL 5916739 (E.D. Cal. Oct. 8, 2015) ............................................. 12

*Edwards v. United States,*
    103 U.S. 471 (1880) ............................................................. 16

*English v. Trump,*
    279 F. Supp. 3d 307 (D.D.C. 2018) ............................................................. 18

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., (TOC),*
    528 U.S. 167 (2000) ............................................................. 12

*Guedes v. ATF,*
    920 F.3d 1 (9th Cir. 2019) ............................................................. 23

*Harmon v. Dep't of Defense,*
    50 M.S.P.R. 218 (1991) ............................................................. 16

*La Posta Band of Diegueno Mission Indians of La Posta Reservation v. Trump, No.*
    20-55941, 2020 WL 6482173 (9th Cir. Nov. 4, 2020) ............................................. 2, 3, 13

*Lopez v. Brewer,*
    680 F.3d 1068 (9th Cir. 2012) ............................................................. 4

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

ii

3:20-cv-01552-AJB-MSB

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ................................................................................ 13

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) ........................................................................... 12, 13

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
   485 U.S. 439 (1988) ........................................................................... 10, 11

*Manzanita Band of Kumeyaay Nation v. Wolf,* No. 1:20-CV-02712
   (TNM), 2020 WL 6118182 (D.D.C. Oct. 16, 2020) .................. 3, 7, 8, 9, 10, 11

*Navajo Nation v. U.S. Forest Service,*
   535 F.3d 1058 (9th Cir. 2008) (en banc) ...................................................... 11

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................ 25

*Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.,*
   No. CV 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020) .......................... 21

*Pac. Mar. Ass'n v. NLRB,*
   827 F.3d 1203 (9th Cir. 2016) ................................................................... 14

*Quechan Tribe of the Ft. Yuma Indian Reservation v. U.S. Dep't of the Interior,*
   No. 12-CV-1167-WQH-MDD, 2012 WL 1857853, (S.D. Cal. May 22, 2012) ............. 7

*S. Fork Band v. U.S. Dep't of Interior,*
   643 F. Supp. 2d 1192 (D. Nev. 2009), *aff'd in part, rev'd in part on other grounds* 588 F.3d
   718 (9th Cir. 2009) ................................................................................ 11

*Sampson v. Murray,*
   415 U.S. 61 (1974) ................................................................................ 25

*Sierra Club v. Trump,*
   963 F.3d 874 (9th Cir. 2020) ............................................................. 11-12, 23

*Sierra Club v. Trump,*
   977 F.3d 853 (9th Cir. 2020) ............................................................. 12, 25

*Stand Up for California! v. DOI,*
   298 F. Supp. 3d 136 (D.D.C. 2018) ............................................................ 19

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   239 F. Supp. 3d 77 (D.D.C. 2017) ............................................................. 11

*Trump v. Sierra Club,*
    140 S. Ct. 1 (2019) ................................................................. 23

*Trump v. Sierra Club,*
    140 S. Ct. 2620 (2020) ........................................................... 24

*Westfall v. Mortg. Elec. Registration Sys., Inc., No. 15-CV-1403-AJB-AGS,*
    2019 WL 498513 (S.D. Cal. Feb. 8, 2019) ............................. 13

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................... 4, 25

## Statutes

5 U.S.C. § 551 ........................................................................ 14

5 U.S.C. § 3345 ........................................................... 17, 18, 22

5 U.S.C. § 3346 ...................................................................... 20

5 U.S.C. § 3349 ........................................................... 16, 17, 23

6 U.S.C. § 112 ................................................................... 18, 19

6 U.S.C. § 113 ................................................... 15, 18, 19, 21, 22

10 U.S.C. § 284 ................................................................... 3, 14

10 U.S.C. § 2808 .................................................................... 25

16 U.S.C. § 1531 .................................................................... 14

25 U.S.C. § 3001 .................................................................... 14

42 U.S.C. § 4321 .................................................................... 14

54 U.S.C. § 300101 ................................................................. 14

Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA),
codified as amended at 8 U.S.C. § 1103 note ........................... 2, 13, 14

Consolidated Appropriations Act, 2020
    Pub L. No. 116-93, Div. A, § 8005 ......................................... 23

National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114- 328,
  § 1903 (Dec. 23, 2016) ................................................................................. 18

Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002) . 18

**Legislative Materials**

S. Rep. No. 105-250 (1998) ............................................................................. 20

**Executive Orders:**

Exec. Order No. 13753, 81 Fed. Reg. 90667 (Dec. 9, 2016) ........................... 17, 18, 20, 21

Determinations Pursuant to Section 102 of IIRIRA, as Amended,
85 Fed. Reg. 14958–61 (March 20, 2020) ................................................................. 14

# **INTRODUCTION**

The Court should deny Plaintiffs' second motion for a temporary restraining order and preliminary injunction because Plaintiffs have failed to carry their burden of establishing irreparable harm from the ongoing construction of two border barrier projects in San Diego and Imperial Counties. The Ninth Circuit recently affirmed the Court's decision denying Plaintiffs' first motion on the grounds that Plaintiffs had not made a sufficient showing of irreparable harm to warrant emergency injunctive relief. That same flaw requires denial of Plaintiffs' latest motion, as their new allegations once again fall short of the mark.

Plaintiffs base their motion primarily on recent discoveries of purported cultural items in Imperial County, but many of these items are located outside the construction area or otherwise bear no indicia of having cultural significance. For the small number of other items, this was the first time, after nearly 6 months of construction over approximately 18 miles, that any arguable Kumeyaay Tribal burial resources had been found within the project areas, and the response from the U.S. Customs and Border Protection (CBP) confirms that it has in place—and follows—highly effective avoidance and mitigation measures to prevent harm from occurring. Indeed, CBP immediately stopped work adjacent to the items and agreed to implement the protective measures suggested by Plaintiffs to avoid any damage. In light of the robust protections in place to prevent harm to cultural items and natural resources during construction, Plaintiffs cannot establish a likelihood of irreparable harm.

Plaintiffs' remaining allegations regarding the impacts of construction on the narrow strip of federal land near the border are otherwise too speculative to warrant an injunction or simply reassert arguments the Court previously rejected. At a minimum, there are serious factual disputes about Plaintiffs' latest allegations that negate the clear showing required for the extraordinary remedy of a preliminary injunction.

Although the Court can and should deny Plaintiffs' motion based on the insufficient showing of irreparable harm, the other preliminary injunction factors also favor denial of the motion. Plaintiffs do not offer any persuasive reason for the Court to alter its previous conclusion that Plaintiffs failed to show that the balance of equities and the public interest

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

1

3:20-cv-01552-AJB-MSB

favored an injunction. As to the likelihood of success on the merits, Plaintiffs merely reassert the same arguments about the funding of the projects that the Court previously rejected. Further, Plaintiffs' challenge to Acting Secretary of Homeland Security Chad Wolf's appointment misinterprets both the relevant statutory provisions governing succession and the Department of Homeland Security's (DHS) own internal documents. Acting Secretary Wolf took office pursuant to a valid order of succession and was lawfully serving in that position when DHS requested support from the Department of Defense (DoD) to construct the projects at issue and when he waived application of various laws to expedite construction pursuant to the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). In any event, any doubt about Mr. Wolf's status has been removed because of recent DHS actions that permit Mr. Wolf's lawful service as Acting Secretary even under Plaintiffs' theory of succession. Out of an abundance of caution, Acting Secretary Wolf has ratified his prior delegable actions, thus removing any question about their legality.

For these reasons, as explained further below, Plaintiffs' motion should be denied.

## BACKGROUND

The Court previously summarized the relevant factual background of this case in its Order denying Plaintiffs' first motion for a temporary restraining order and preliminary injunction. *See* Order Denying Without Prejudice La Posta Band of the Diegueño Mission Indians of the La Posta Reservation's Ex Parte Motion for Temporary Restraining Order and Motion for Preliminary Injunction at 2–8 (ECF No. 26) (Sept. 9, 2020) (hereinafter "PI Order"). Defendants focus here on developments since the Court's Order.

### A. The Ninth Circuit's Decision Affirming the Court's PI Order and Recent Decisions in Related Border Barrier Cases

On November 4, 2020, a unanimous panel of the Ninth Circuit affirmed this Court's denial of Plaintiffs' first motion for a preliminary injunction. *See La Posta Band of Diegueno Mission Indians of La Posta Reservation v. Trump*, No. 20-55941, 2020 WL 6482173 (9th Cir. Nov. 4, 2020). The Ninth Circuit concluded that this Court did not abuse its discretion in denying Plaintiffs' motion because "La Posta had not made a sufficient showing of irreparable harm."

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

2

3:20-cv-01552-AJB-MSB

*Id.* at 3. The Ninth Circuit further stated that the Court "acted within its discretion in concluding that factual disputes undermined La Posta's showing of [its] asserted harms." *Id.*

In addition to this case, there is also similar litigation now proceeding in the D.C. Circuit brought by a separate group of Tribes of the Kumeyaay Nation that seeks to stop construction of the same projects at issue in this case. On October 16, 2020, the D.C. district court denied the plaintiffs' motion for an expedited preliminary injunction, concluding that plaintiffs had not demonstrated a likelihood of irreparable injury. *See Manzanita Band of Kumeyaay Nation v. Wolf*, No. 1:20-CV-02712 (TNM), 2020 WL 6118182, at *1 (D.D.C. Oct. 16, 2020). As summarized by the district court: "The Kumeyaay raise three theories of irreparable harm: destruction of Kumeyaay culture and religion, lack of access to the Projects, and injury to their procedural rights. None holds water." *Id.* at *3. On November 23, 2020, a divided D.C. Circuit panel (2-1) denied the plaintiffs' motion for an injunction pending appeal. *See Manzanita Band of Kumeyaay Nation v. Wolf*, No. 20-5333 (D.C. Cir).

On October 19, 2020, in another related case, the Supreme Court granted Defendants' petition for a writ of *certiorari* in *Trump v. Sierra Club*, No. 20-138. As discussed at length in the parties' prior briefs and the Court's Order, the two questions presented in *Sierra Club* are also at issue here, namely, (1) whether plaintiffs have a cause of action to obtain review of DoD's compliance with § 8005 of the Consolidated Appropriations Act; and (2) whether DoD exceeded its authority under § 8005 in transferring funds for border barrier construction pursuant to 10 U.S.C. § 284.

## B. Current Construction Status of San Diego A and El Centro A

Construction of the projects in San Diego (San Diego A) and Imperial Counties (El Centro A) has continued since the Court denied Plaintiffs' motion. The bollards are completely installed for the El Centro A project (approximately 3.17 total miles) and approximately 14.3 of 15 miles are installed for the San Diego A project. *See* Second Declaration of Antoinette Gant ¶ 8. The addition of supplemental attributes will begin in December 2020, including installation of lighting, cameras, a Linear Ground Detection System, and construction of patrol roads. *Id.*

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

3

3:20-cv-01552-AJB-MSB

**LEGAL STANDARD**

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). A plaintiff must show that (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Alternatively, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**ARGUMENT**

**I.  Plaintiffs Have Not Established An Irreparable Injury.**

The Court should deny Plaintiffs' motion because Plaintiffs cannot establish that an irreparable injury is likely in the absence of an injunction. As the Supreme Court emphasized in *Winter*, a preliminary injunction cannot issue on the basis of speculation or possibility. The Supreme Court rejected the then-controlling law in the Ninth Circuit, which allowed for a preliminary injunction to issue "based only on a possibility of irreparable harm." 555 U.S. at 22. The Supreme Court concluded that standard was "too lenient" and emphasized that a preliminary injunction should issue only upon a showing that irreparable harm is "*likely* in the absence of an injunction." *Id.* at 22 (emphasis in original). Plaintiffs fail to satisfy this demanding standard.

Plaintiffs assert several new allegations of harm associated with recent discoveries of purported cultural items in the El Centro A project area, but none of their claims stand up to scrutiny. First, Plaintiffs contend that barrier construction will cut through a "centuries-old" sacred rock circle. Pls.' Mem. at 2, 16; Holm Decl. ¶¶ 3–5. But the circular feature is a modern construct. *See* Third Declaration of Paul Enriquez ¶ 78. Indeed, satellite imagery of the area shows no evidence of the circular feature before 2016. *Id.* Further, when Plaintiffs

and other representatives of the Kumeyaay Tribes examined the site in November, they stated it was not a cultural site and suggested it was possibly the result of "new agers" or "ATV enthusiasts." *Id.* ¶ 79. Plaintiffs' declarant—Mr. Holm—was present for this discussion and agreed that the feature is a modern construct. *Id.* ¶ 79.

Second, Plaintiffs allege that there is evidence of other circular rock formations, *see* Pls.' Mem. at 2, 16; Holm Decl. ¶¶ 6–7, but these features will not be impacted by construction in the El Centro A project area. Third Enriquez Decl. ¶¶ 81–84. The alleged trail intersection marked by a rock cairn described in Mr. Holm's declaration is located *outside* the El Centro A project area. Third Enriquez Decl. ¶ 81; *see* Holm Decl. ¶ 6. Additionally, the rock alignment near the Skull Valley access road was identified by CBP during the surveys before construction began and the road alignment for the Skull Valley access road was shifted west to avoid the rock alignment. Third Enriquez Decl. ¶ 83. Regarding Plaintiffs' allegation that ceramic sherds found at the site might be evidence of cremation vessels, *see* Holm ¶ 7, CBP is in the process of conducting additional soil sampling and laboratory testing, but the current assessment is that the sherds are indicative of water collection given the site's location in a wash area. *See* Third Enriquez Decl. ¶ 84.

Third, Plaintiffs assert that "18 separate fire features" and two small bone fragments were found by a tribal cultural monitor near the El Centro project area. *See* Pls.' Mem. at 2–3, 16; Holm Decl. ¶¶ 8–9. Plaintiffs, however, significantly overstate the number of features that are actually inside the project area. Three cultural features, not 18, were discovered within 20 meters of each other in the El Centro project area during the week of November 16, 2020. *See* Third Enriquez Decl. ¶¶ 60-65. The on-site archaeologist initially identified two of the features as a small fire pit or roasting feature, and the third feature as a possible cremation site. *Id.* ¶¶ 63, 65. The remaining features are located outside the project area on a federal-designated wilderness area and will not be impacted by construction. *Id.* ¶ 60.

As to the three features within the El Centro project area, Plaintiffs provide no evidence to support how the mere discovery of these items will irreparably harm their cultural or religious interests. Nor could they. Defendants stopped construction in the area

and immediately instituted mitigation measures to avoid any damage to the items, arranged for Plaintiffs to examine the features, and are working with Plaintiffs to implement a mutually-agreeable treatment plan. *See* Third Enriquez Decl. ¶¶ 61–76.

After a tribal cultural monitor discovered the items, CBP immediately created a 100-meter buffer zone around all three features and ceased all construction activity and vehicular traffic within that area. *Id.* ¶ 65. CBP then arranged for Plaintiffs and other representatives from the Kumeyaay Tribes to conduct a site inspection of the area on November 19, 2020. *Id.* ¶ 66–76. During that visit, one of the tribal representatives suggested that the fragments initially thought to be bone near the third feature might be caliche (a deposit of gravel and sand), and also stated that the location of the feature was not consistent with other cremation sites, which are usually located at higher elevations. *Id.* ¶ 68. In light of that uncertainty, CBP accommodated the Tribes' request to conduct another site visit on November 23, to include an inspection by the Tribes' medical examiner. *Id.*

The November 23 examination identified two bone fragments less than 6mm in diameter. *Id.* ¶ 73. The remaining items in the area were identified as caliche. *Id.* It is impossible, however, to determine whether the fragments are human or animal absent laboratory testing, which would likely destroy the fragments given their small size. *Id.* Although the Tribes' medical examiner assessed the bones as more likely to be human, CBP's archeologist concluded that the bones are more likely to belong to an animal because it is more common to find animal remains in a thermal feature or roasting pit. *Id.* ¶ 74.

Despite the uncertainty about the origin of the bone fragments, CBP has agreed to treat the feature as a cremation site out of respect for the Kumeyaay Tribes and is working with the Tribes to develop an appropriate protection plan for the area. *Id.* ¶ 76. Based on the preferences expressed by the Kumeyaay Tribes, CBP circulated a draft plan in early December that calls for capping—a means of protecting cultural resources in place—the cremation site and performing additional testing on the other two features. *Id.* Pending implementation of that plan, CBP and the Kumeyaay Tribes agreed that temporary concrete barriers would be placed around the features and no construction traffic or activity would

be allowed within that buffer zone. *Id.*

Defendants' significant efforts to protect the recently-discovered features confirm that Plaintiffs have failed to show a likelihood of irreparable harm. Plaintiffs argue that Defendants should have conducted better pre-construction surveys and found the items sooner. *See* Pls.' Mem. at 16. But Plaintiffs offer no evidence to explain how they are irreparably injured by the timing of the discovery. Nor do Plaintiffs explain how their alleged injury turns on whether the items were discovered during a pre-construction survey or by a tribal cultural monitor after construction began. What matters is how the items were treated when they were discovered. The record here establishes that Defendants immediately notified Plaintiffs about the discovered items, instituted proactive measures to create a buffer zone around the area to stop nearby construction, and agreed to Plaintiffs' recommended protection measures. These actions demonstrate that Plaintiffs have not been irreparably injured by the discovery of cultural items in the El Centro A project area, and are unlikely to suffer harm even if additional items are discovered.

Plaintiffs speculate that additional cultural items are likely to be discovered, but they provide no evidentiary support for that claim. *See* Pls.' Mem. at 21; *see Manzanita Band of Kumeyaay Nation*, 2020 WL 6118182, at *4 (rejecting similar speculative argument that prior discovery of cultural items establishes irreparable injury because additional items are likely to be discovered). As the Ninth Circuit has emphasized, "speculative injury cannot be the basis for a finding of irreparable harm." *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007). Moreover, the factual record here undercuts Plaintiff's speculation because after 6 months of construction over nearly 18 miles involving the presence of tribal cultural monitors and CBP's own archeological monitors, no previously recorded or unrecorded burial sites have been revealed, other than the three features discussed above. *See* Third Enriquez Decl. ¶ 58.

In any event, Defendants mitigation measures negate Plaintiffs' asserted irreparable harm. *See Quechan Tribe of the Ft. Yuma Indian Reservation v. U.S. Dep't of the Interior*, No. 12-CV-1167-WQH-MDD, 2012 WL 1857853, at *7 (S.D. Cal. May 22, 2012) (finding no

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

7

3:20-cv-01552-AJB-MSB

likelihood of irreparable harm related to destruction of tribal artifacts where plaintiff failed to show that mitigation procedures were "not adequate to guard against irreparable injury to items discovered on public land"). Defendants have instituted robust procedures and protocols to identify and protect cultural resources within the project areas. Contrary to Plaintiffs' claim that CBP had no interest in locating tribal resources, *see* Pls.' Mem. at 17, CBP reviewed prior survey data, conducted record searches, and performed new surveys of the project areas. *See* First Declaration of Paul Enriquez Decl. ¶ 20 (ECF No. 20-2). Additionally, CBP re-surveyed areas specifically identified by Plaintiffs as having a high likelihood of cultural artifacts with the tribal cultural monitors present. Third Enriquez Decl. ¶¶ 34, 40–43.[1]

There is also no basis for Plaintiffs' claim that CBP is not utilizing "knowledgeable tribal people" to identify cultural resources. *See* Pls.' Mem. at 17. Five tribal cultural monitors are currently on site observing construction activities in the project areas, in addition to the monitors CBP itself is providing. *See* Third Enriquez Decl. ¶ 37. CBP also has advised Plaintiffs that they may provide additional tribal cultural monitors at their own cost, but they have chosen not to do so. *Id.* ¶¶ 37, 46; *see Manzanita Band of Kumeyaay Nation*, 2020 WL 6118182, at *8 (stating that the plaintiffs' decision not to provide their own monitors "weakens their claim that they cannot oversee construction activities to mitigate potential damage"). The on-site monitors are notified each day of the locations where construction will be occurring and are free to observe the construction activities of their choice. *Id.* ¶ 38. CBP has thus instituted appropriate measures to identify tribal resources, and Plaintiffs' recycled criticisms of CBP's efforts are insufficient to establish an irreparable

---

[1] CBP has not denied Plaintiffs' request to conduct surveys at the Tribe's expense. *See* Third Enriquez Decl. ¶¶ 85–88. The first and only offer of financial assistance was made during the November 23 site visit discussed above. *Id.* ¶ 88. In response, CBP left open the possibility of relying on the Tribe's financial assistance to perform additional investigations of the features, should those steps be necessary. *Id.*

injury.[2]

CBP also has implemented appropriate mitigation procedures to protect any items of cultural importance that are discovered in the project areas, and the recent discoveries confirm that those procedures are effective. CBP has developed a Cultural Resources Protocol and Communications Plan that sets forth procedures that will be utilized for avoidance, treatment, curation, and repatriation of cultural resources. Third Enriquez Decl. ¶¶ 44, 55. For example, the Protocol Plan calls for avoiding areas where resources are found and striving to leave the resources in place wherever possible. *Id.* ¶ 44. If a resource cannot be avoided, the Protocol Plan requires an immediate halt to construction within 100 feet of the resource until it can be treated appropriately. *Id.* If the resource is one that would be eligible for treatment under the Native American Graves Protection and Repatriation Act, the Protocol Plan requires that no more than 48 hours after the notification of a discovery, the tribes and CBP will consult regarding culturally appropriate treatment. *Id.* The Protocol Plan further provides that the Tribes will be provided access to any discovered cultural items for ceremonies or other cultural practices. *Id.* ¶ 55, Ex. C at 15.[3]

The record here establishes that these procedures ensured that when a potentially significant discovery was made, harm to resources was averted. As discussed above, CBP took immediate action to protect the recently-discovered fire features from any construction

---

[2] For example, Plaintiffs' raise the same criticism presented in their first motion that CBP did not utilize cadaver dogs to identify cultural items, *see* Pls.' Mem. at 17, but CBP considered that option and determined it was both cost prohibitive and likely ineffectual, as the average temperatures within the project areas would hinder the dogs' ability to locate potential remains. *See* Third Enriquez Decl. ¶ 32.

[3] CBP did not deny a Kumeyaay group from visiting a site in Davies Valley on November 10 to engage in a ceremony. *See* Third Enriquez Decl. ¶¶ 89–91; Pls.' Mem. at 2. CBP received no advance notice for access to the site and suggested that Plaintiffs coordinate their request with the Bureau of Land Management (BLM), given that agency's authority over access to federally-designated wilderness areas. *Id.* ¶ 90. BLM offered to work with Plaintiffs to find a suitable area for the ceremony in light of the safety issued posed by ongoing construction. *Id.* ¶ 91.

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

9

3:20-cv-01552-AJB-MSB

activity and agreed to implement Plaintiffs' recommended protection measures. On another occasion, after two archeological sites were identified within the El Centro A project footprint, CBP took steps to ensure that the sites would not be impacted. First Enriquez Decl. ¶ 26. CBP shifted the alignment of an access road to avoid impacts to the first archeological site and required that the construction contractor find a new location for a proposed well site in order to avoid impacts to the second site. *Id.* Additionally, following re-surveys of specific areas requested by Plaintiffs with their cultural monitors present, CBP agreed to various protection measures, including a protective buffer zone around certain isolated resources to ensure they were not disturbed. Third Enriquez Decl. ¶¶ 40–42, 49.

These examples illustrate that the CBP protocol plan works as intended to protect cultural items during the construction process. In light of the protections in place, Plaintiffs cannot establish a likelihood of irreparable harm. *See Manzanita Band of Kumeyaay Nation*, 2020 WL 6118182, at *5 (holding that plaintiffs' "irreparable harm theory is undermined by Government measures in place to avoid and mitigate any harm to their religion and culture"); *Colorado River Indian Tribes v. Dep't of Interior*, 2015 WL 12661945, at *26–28 (C.D. Cal. June 11, 2015) (finding no irreparable injury where mitigation and avoidance measures were in place to protect against unanticipated discoveries of tribal cultural artifacts); *cf. Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 454 (1988) ("It is worth emphasizing . . . that the Government has taken numerous steps in this very case to minimize the impact that construction of the [ ] road will have on the Indians' religious activities.").

Plaintiffs also re-assert the same claim from their first motion that construction of the projects "is likely to injure Tribal citizens' ability to enjoy and practice their religion in their territory." Pls.' Mem. at 17. The flaw in this argument, as the Court found in denying Plaintiffs' first motion, is that the construction is occurring on *federal* land. *See* PI Order at 27–31. As the Court explained, "this case is similar to *Lyng*, wherein the Supreme Court rejected the plaintiffs' challenge to the United States Forest Service's construction of a logging road through federal lands that the plaintiffs considered sacred." *Id.* at 31. In reversing a permanent injunction issued by the Ninth Circuit, the Supreme Court

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

10

3:20-cv-01552-AJB-MSB

acknowledged in *Lyng* that "the logging and road-building projects at issue in this case could have devastating effects on traditional Indian religious practices" and assumed that the projects would "virtually destroy the . . . Indians' ability to practice their religion." 485 U.S. at 451. The Supreme Court nonetheless concluded that construction did not impose a burden "heavy enough" on the exercise of religion to violate the Free Exercise Clause. *Id.* at 442. "Whatever rights the Indians may have to the use of the area, however, those rights do not divest the Government of its right to use what is, after all, *its* land." *Id.* at 453; *see Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058, 1072 (9th Cir. 2008) (en banc).

*Lyng*'s rationale applies here and undermines Plaintiffs' argument that construction of the border barrier projects on a narrow strip of federal land immediately adjacent to the international border irreparably harms Plaintiffs' exercise of religion. Indeed, Plaintiffs do not identify a single case in which an injunction was upheld to prohibit the federal government's construction on its own land based an alleged interference with religious activity. To the contrary, courts have consistently rejected such requests for injunctive relief. *See Manzanita Band of Kumeyaay Nation*, 2020 WL 6118182, at *6–7; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 92–94 (D.D.C. 2017); *S. Fork Band v. U.S. Dep't of Interior*, 643 F. Supp. 2d 1192, 1207–09 (D. Nev. 2009), *aff'd in part, rev'd in part on other grounds*, 588 F.3d 718 (9th Cir. 2009).

Plaintiffs cannot escape the force of *Lyng* and its progeny by attempting to recharacterize their injury in terms of diminished enjoyment of public lands. *See* Pls. Mem. at 17 (arguing that the barriers are an "eye sore" that "will frustrate" the Tribe's aesthetic and spiritual enjoyment of the land). Plaintiffs' claim fails because they are challenging "a government-sanctioned project, conducted on the government's own land, on the basis that the project will diminish their spiritual fulfillment." *Navajo Nation*, 535 F.3d at 1072. Even if the Court were to accept Plaintiffs' recasting of their injury, Plaintiffs offer only a single paragraph of vague and conclusory allegations, *see* Parada Decl. ¶ 12, that are not comparable to the detailed evidence accepted by the Ninth Circuit in the *Sierra Club* litigation to support those plaintiffs' recreational and aesthetic injuries. *Compare Sierra Club v. Trump*, 963 F.3d

874, 883–86 (9th Cir. 2020); *Sierra Club v. Trump*, 977 F.3d 853, 872–76 (9th Cir. 2020). Further, unlike the neighbors and recreationists in *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc., (TOC)*, 528 U.S. 167, 182-84 (2000), who documented evidence of direct effects to recreational and aesthetic interests by the challenged activities, Plaintiffs here do not present "dispositively more than the mere 'general averments' and 'conclusory allegations'" of aesthetic injury that are insufficient to establish an irreparable injury. *Friends of the Earth, Inc.*, 528 U.S. at 184 (internal citation omitted); *see Ctr. for Biological Diversity v. Hays*, 2015 WL 5916739, at *10 (E.D. Cal. Oct. 8, 2015) (concluding that an "aesthetic opinion that post-fire logging is 'ugly' does not establish likely irreparable harm").

The same flaws also undermine Plaintiffs' allegation that installation of lighting near the barriers will injure the Plaintiffs' ability to stargaze. *See* Pls.' Mem. at 18. CBP can take steps to minimize light spillage, including through the installation of light shields that allow the light to spill downward, not upwards or horizontally. *See* Third Enriquez Decl. ¶ 93. With those measures in place, there is unlikely to be any light pollution of the night sky to obscure stargazing unless one is standing close to the light feature itself. *Id.* Plaintiffs provide no evidence to suggest that the narrow strip of land immediately adjacent to the proposed barriers is the only location across the entire southern border where they can view the night stars. Nor do Plaintiffs cite any authority for the proposition that the inability to stargaze in a specific area constitutes irreparable injury, particularly where, as here, the nearby areas are large tracts of undeveloped desert and mountains that are unlikely to be impacted by the lighting. *See* Third Enriquez Decl. ¶ 93.

Rather, Ms. Parada alleges that she stargazes "throughout the Project Area" without any supporting details about where or how frequently she has engaged in that activity in the past. Parada Decl. ¶ 15. The San Diego and El Centro projects collectively cover 18 miles, and it strains credulity to suggest that all lighting at the barrier must be enjoined. Plaintiffs' declaration is far too general and suffers from the same flaw that the Supreme Court identified in *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). The Supreme Court dismissed that case for lack of standing, holding that a plaintiff "assuredly" does not provide enough

"specific facts" when it only states "that one of respondent's members uses unspecified portions of an immense tract of territory." *Id.* at 889. Further, Ms. Parada's generic statement that she "intends to use" Boundary Mountain "in the future" is the type of "'some day' intention[]—without any description of concrete plans, or indeed even any specification of *when* the some day will be" that the Supreme Court has found insufficient "to support a finding of [an] 'actual or imminent' injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (emphasis in original)

***

In sum, Plaintiffs' failure to establish to establish a likelihood of irreparable injury is fatal to their request for preliminary injunctive relief. At a minimum, the significant factual disputes demonstrate that Plaintiffs have not established a clear entitlement to a preliminary injunction. *See* PI Order at 2, 20, 22, 25, 30, 37; *La Posta*, 2020 WL 6482173 at *1. Accordingly, the Court should deny Plaintiffs' motion without consideration of the other preliminary injunction factors. *La Posta Band*, 2020 WL 6482173, at *1; *see Westfall v. Mortg. Elec. Registration Sys., Inc.*, No. 15-CV-1403-AJB-AGS, 2019 WL 498513, at *2 (S.D. Cal. Feb. 8, 2019) ("Because Plaintiff has failed to show 'irreparable harm,' the Court does not consider the remaining three factors.").

## II. Plaintiffs Are Not Likely to Succeed on the Merits.

In the event the Court proceeds to consider the other preliminary injunction factors, Plaintiffs have not demonstrated a likelihood of success on the merits of their three legal claims. *See* Pls.' Mem. at 2. First, the projects are lawfully authorized pursuant to DHS' statutory authority to construct border barriers. Second, the Acting DHS Secretary lawfully waived application of the various statutes that Plaintiffs claim were violated. Third, Plaintiffs reassert the same arguments the Court previously rejected regarding funding of the projects

### A. DHS has Statutory Authority to Construct Border Barriers and Waive Laws that Impede Expeditious Construction.

IIRIRA authorizes the Secretary of Homeland Security "take such actions as may be necessary" to install "physical barriers" on the "United States border to deter illegal crossings

in areas of high illegal entry into the United States." IIRIRA § 102(a) (codified as amended at 8 U.S.C. § 1103 note). That statutory mandate includes a directive requiring DHS to "construct reinforced fencing along not less than 700 miles of the southwest border." *Id.* § 102(b)(1)(A). Acting under § 102 of IIRIRA, DHS requested that DoD assist with constructing the San Diego A and El Centro A projects pursuant to 10 U.S.C. § 284. *See* Administrative Record at 28–43 (ECF No. 20-1).

IIRIRA also seeks to ensure expeditious construction by authorizing the Secretary of Homeland Security to waive a broad array of legal impediments: "Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). On March 16, 2019, the Acting Secretary of Homeland Security, Chad Wolf, issued waivers for the two projects at issue here. *See* Determinations Pursuant to Section 102 of IIRIRA, as Amended, 85 Fed. Reg. 14958–61 (Mar. 16, 2020). The waived laws include all of the statutes that Plaintiffs claim were violated in this case: the Native American Graves Protection and Repatriation Act (25 U.S.C. § 3001 *et seq.*), the National Environmental Policy Act (42 U.S.C. § 4321 *et. seq.*), the National Historic Preservation Act (54 U.S.C. § 300101 *et seq.*), the Endangered Species Act (16 USC § 1531 *et seq.*), and the Administrative Procedure Act (5 U.S.C. § 551 *et. seq.*) (APA). *Id.*

Plaintiffs do not dispute the scope of these authorities or their application to this case. Instead, Plaintiffs contend that the projects and waivers were not lawfully authorized because Chad Wolf has never legally held the position of Acting Secretary of Homeland Security. *See* Pls.' Mem. at 4–12. That claim is subject only to limited *ultra vires* review,[4] and Plaintiffs are unlikely to prevail on the merits.

---

[4] In light of the waiver of the APA, Plaintiffs' only available cause of action is *ultra vires* review, which requires: "(1) that the agency acted 'in excess of its delegated powers' contrary to 'clear and mandatory statutory language,' and (2) 'the party seeking review must be 'wholly deprive[d] . . . of a meaningful and adequate means of vindicating its statutory rights.'" PI Order at 23 (quoting *Pac. Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1208 (9th Cir. 2016)).

**B. Acting Secretary Wolf is Properly Serving as the Acting Secretary of Homeland Security.**

Plaintiffs' argument is unavailing because former DHS Secretary Kirstjen Nielsen had the authority to issue a succession order, and Kevin McAleenan lawfully assumed the role of Acting Secretary under her April 9, 2019 succession order. Mr. McAleenan then issued his own order of succession, and Mr. Wolf, as Senate-confirmed Under Secretary for Strategy, Policy, and Plans, lawfully assumed the role of Acting Secretary under that order. Alternatively, if Plaintiffs are correct about the effect of Secretary Nielsen's April 2019 order, then Mr. Wolf lawfully assumed the role of Acting Secretary by virtue of a November 14, 2020 succession order issued by the Senate-confirmed Director of the Federal Emergency Management Agency (FEMA), Peter Gaynor, who would have been the Acting Secretary under Plaintiffs' succession theory.

**1. Former Secretary Kirstjen Nielsen Had the Authority to Issue the April 9, 2019 Succession Order.**

Under the Homeland Security Act (HSA), the Secretary of Homeland Security has the power to "designate such other officers of the Department in further order of succession to serve as Acting Secretary." 6 U.S.C. § 113(g)(2). On April 9, 2019, then-Secretary Nielsen exercised this power and designated an order of succession for the office of the Secretary. *See* Declaration of Juliana Blackwell ¶ 2, Ex. 1, Designation of an Order of Succession for the Secretary (Apr. 9, 2019) (April 2019 Order); Declaration of Neal Swartz ¶ 3. That order applied to all vacancies in the office, regardless of the reason for the vacancy: "By the authority vested in me as Secretary of Homeland Security, including . . . 6 U.S.C. § 113(g)(2), I hereby designate the order of succession for the Secretary of Homeland Security as follows . . . ." *See* April 2019 Order at 2; Swartz Decl. ¶ 3. Her order then set out in "Annex A" a list of officers that comprised the order of succession. *See* April 2019 Order at 2.

Plaintiffs assert that Ms. Nielsen had no authority to issue the April 9 succession order because she resigned on April 7, meaning all later actions leading to the designation of Mr. Wolf as Acting Secretary were unlawful. *See* Pls.' Mem. at 9 & n.2. They rely on a resignation

*Defs.' Opp'n to Pls.' Second Motion for Temp. Restraining Order & Preliminary Injunction*

*3:20-cv-01552-AJB-MSB*

letter from Ms. Nielsen, which stated that her resignation was effective on April 7. But, Plaintiffs cannot establish when her resignation was accepted. *See Edwards v. United States*, 103 U.S. 471, 473–74 (1880) (explaining the common law rule is that a resignation is not effective until accepted). They point to a tweet by President Trump, in which he announces that "Secretary of Homeland Security Kirstjen Nielsen *will be* leaving her position" and "Kevin McAleenan . . . *will become* Acting Secretary." @realDonaldTrump, Twitter (Apr. 7, 2019 6:02 PM), https://twitter.com/realDonaldTrump/status/1115011884154064896 (emphasis added). Rather than accepting Ms. Nielsen's resignation and announcing that Ms. Nielsen *had left* her position and Mr. McAleenan *has become* Acting Secretary, the President indicated that Ms. Nielsen would be leaving at an undisclosed time in the future. *Id.* Shortly after the President's tweet, Ms. Nielsen herself indicated that she had been asked to stay on until April 10. @SecNielsen, Twitter (April 7, 2019 10:36 PM) https://twitter.com/SecNielsen/status/1115080823068332032; *cf. Harmon v. Dep't of Defense*, 50 M.S.P.R. 218, 220 (1991) (resignations are presumptively effective at the end of the day on which they are to take effect).

All other evidence supports the conclusion that Ms. Nielsen served as Secretary until April 10. Under the Federal Vacancies Reform Act (FVRA), agencies must notify Congress of certain vacancies and the date when the vacancy occurred. 5 U.S.C. § 3349(a). On April 11, DHS notified Congress that a vacancy for the office of Secretary began on April 10 and that an Acting Secretary had been designated. *See* Swartz Decl. ¶ 7, Ex. 1. Additionally, Ms. Nielsen sent a farewell email to DHS staff on April 10 announcing that it was her "final day" at the Department. Email from Kirstjen M. Nielsen, Secretary of Homeland Security (Apr. 10, 2019, 04:35 EST). Thus, despite Ms. Nielsen's April 7 resignation letter, her resignation was not accepted at that time, she remained the Secretary until April 10, and her April 2019 order was lawful. *See* Blackwell Decl. ¶¶ 5, 8.

## 2. Acting Secretary Kevin McAleenan Lawfully Succeeded Secretary Kirstjen Nielsen.

The April 2019 Order controlled the order of succession when Ms. Nielsen resigned on April 10. When she resigned, the first two offices in the succession order were vacant.

*See* Swartz Decl. ¶ 5. As the next official in line, Kevin McAleenan, Commissioner of U.S. Customs and Border Protection, began serving as Acting Secretary of Homeland Security. *See* Swartz Decl. ¶ 7, Ex. 1 (noting that McAleenan began service as Acting Secretary on April 11); April 2019 Order at 2 (CBP Commissioner listed as third position in order of succession).

Plaintiffs concede that the Secretary of Homeland Security has the power under the HSA to designate a further order of succession. *See* Pls.' Mem. at 7. Plaintiffs instead argue that Executive Order (EO) 13753—and not Ms. Nielsen's April 2019 Order—controlled the order of succession when the Secretary resigned. *See id.* at 9–10. And because Mr. McAleenan was not next in line under EO 13753, Plaintiffs claim that he did not in fact become Acting Secretary and thus lacked authority to designate the order of succession under which Mr. Wolf currently serves. *Id.* That argument is incorrect—Ms. Nielsen designated the first-ever § 113(g)(2) order of succession on April 9, and it superseded EO 13753 as a matter of law.

The context of earlier revisions to DHS Delegation 00106, an administrative document that is periodically updated and meant to consolidate and maintain the orders of succession and delegations of authority for many senior DHS positions, helps illuminate the meaning of the April 2019 Order. *See* Swartz Decl. ¶ 4. On December 15, 2016, then-Secretary Jeh Johnson signed Revision 8 to DHS Delegation 00106. *See* Blackwell Decl. ¶ 6, Ex. 5 (Revision 8). This signed revision addressed two different kinds of orders: (1) an order of succession, meaning a list of officials who could become Acting Secretary in the event of a vacancy, and (2) an order for delegating authority, meaning a list of officials who could exercise the Secretary's authority during a disaster or catastrophic emergency. *Id.* at 1, § II.A-B.

Section II.A of Revision 8 explained that, "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office," the order of succession would be governed by EO 13753. Under the HSA that existed at that time, the Secretary had no authority to designate an order of succession. At that time, only the President had the authority (under the FVRA) to designate an order of succession. *See* 5 U.S.C. § 3345(a)(2)-(3) (allowing the President to designate an acting official). Section II.A thus expressly tracked the FVRA: it noted that the President's order of succession in EO 13753 would apply to a

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

3:20-cv-01552-AJB-MSB

vacancy covered by the FVRA. Section II.A even listed the same triggering events as the FVRA. *Compare* 5 U.S.C. § 3345(a), *with* Revision 8 at 1, § II.A.

In § II.B of Revision 8, Mr. Johnson separately exercised his own authority under 6 U.S.C. § 112(b)(1)—authority that the Secretary had possessed since the original enactment of the HSA in 2002 and creation of the Secretary's position, *see* Pub. L. No. 107-296, § 102(b)(1), 116 Stat. 2135, 2142 (Nov. 25, 2002)—and delegated the authorities of his office to a list of officials in the event that he was temporarily "unavailable to act during a disaster or catastrophic emergency." This action was not an order of succession. The circumstances addressed by § II.B are not the kind of vacancy that would trigger the FVRA, and the § II.B delegation would not make someone exercising that authority an Acting Secretary. *Cf. English v. Trump*, 279 F. Supp. 3d 307, 322 (D.D.C. 2018) ("Defendants argue, with some force, that [unavailability to act is] commonly understood to reflect a temporary condition, such as not being reachable due to illness or travel.").

Only *after* Mr. Johnson signed Revision 8 did Congress give the Secretary the power to designate an order of succession that would apply "[n]otwithstanding" the FVRA. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1903, 130 Stat. 2000 (2016) (codified at 6 U.S.C. § 113(g) (Dec. 23, 2016)). Secretary Nielsen's April 2019 Order used this new power to set a "desired order of succession for the Secretary of Homeland Security" under § 113(g)(2). And it is unremarkable that, in exercising this new power for the first time, Secretary Nielsen chose to *harmonize* the relevant lists of priority for both (1) the order of succession in cases of vacancy, resignation, or inability to serve under § 113(g)(2); and (2) the delegation of authority under § 112(b)(1) for cases of catastrophic emergency or disaster. Plaintiffs' reliance on the prior structure of DHS Delegation 00106, before the Secretary first exercised her designation authority under § 113(g)(2), ignores this legislative context, the plain text of the April 2019 Order, and its undisputed purpose.

Plaintiffs rely on various district court decisions to argue that Ms. Nielsen's order merely amended Annex A, and does not govern in cases of resignation. *See* Pls.' Mem. at 5, 9 (citing cases). But by its plain terms the April 2019 Order designated an unqualified order

of *succession*—the order states *five times* that Ms. Nielsen was designating an order of succession for the office of the Secretary, including in the subject line of the memorandum, the title of the order, and throughout the text. *See* April 2019 Order at 1–2. And Ms. Nielsen's designation was unqualified, meaning that it applied to any vacancy, regardless of reason. The decisions that Plaintiffs rely on improperly conflate orders of succession and delegations of authority. As the HSA recognizes, delegations of authority, which simply allow an official to exercise certain powers of the office of the Secretary, are different from orders of succession, which lists officials who may become Acting Secretary in the event of a vacancy. *Compare* 6 U.S.C. § 112(b)(1) (allowing Secretary to delegate authority), *with id.* § 113(g)(2) (allowing Secretary to designate a further order of succession); *see also Stand Up for California! v. DOI*, 298 F. Supp. 3d 136, 141 (D.D.C. 2018) (explaining that certain duties of vacant office "[may] be delegated to other appropriate officers and employees in the agency" even in absence of acting officer).

Section II.B's plain text shows that it is a delegation of authority, not an order of succession. *See* Revision 8.5, § II.B ("I hereby delegate to the officials . . . listed [in Annex A], my authority to exercise the powers and perform the functions and duties of my office, to the extent not otherwise prohibited by law, in the event I am unavailable to act during a disaster or catastrophic emergency."). And DHS Delegation 00106's context reinforces this: as explained, when then-Secretary Johnson executed Revision 8, he had no authority to designate an order of succession. So by holding that Ms. Nielsen's order applied only to § II.B, those courts necessarily concluded that she set an order for delegation of authority, not an order of succession. These decisions have offered no explanation as to why the April 2019 Order repeatedly invoked Ms. Nielsen's authority to designate an "order of succession" under § 113(g)(2) if she was actually only delegating her authority under § 112(b)(1).

The difference between orders of succession and delegations of authority, as well as DHS Delegation 00106's context—namely, that § II.A itself has never designated an order of succession—confirm that Ms. Nielsen's order did two things: (1) it designated the first-ever § 113(g)(2) order of succession, which superseded the President's FVRA designation in EO

Defs.' Opp'n to Pls.' Second Motion for Temp.
Restraining Order & Preliminary Injunction

19

3:20-cv-01552-AJB-MSB

13753 as a matter of law, and (2) it amended the list in Annex A that would control who would exercise the Secretary's delegated authority during an emergency.[5]

In sum, Ms. Nielsen's order controlled when she resigned, and Mr. McAleenan validly served as Acting Secretary. He thus had the authority to designate the order of succession that Mr. Wolf lawfully serves under now, and has been since November 13, 2019.

### 3. Alternatively, Acting Secretary Wolf's Ratification of His Prior Orders Cures the Alleged Service-Related Defects in the Authorization and Waivers.

As explained, Acting Secretary Wolf was serving lawfully under the HSA and the relevant orders of succession. But DHS recognizes that ongoing challenges to his service risk an unnecessary "distraction to the mission of the Department of Homeland Security." Swartz Decl. ¶ 8, Ex. 2, (Gaynor Order). DHS has thus taken steps necessary to cure any potential service-related defect in Mr. Wolf's authority to authorize the projects and issue the waivers.

Under Plaintiffs' theory, EO 13753 (not Ms. Nielsen's April 9 order) and the FVRA would control the current vacancy in the office of the Secretary. *See* Pls.' Mem. at 9. On September 10,[6] the President submitted Mr. Wolf's nomination to serve as Secretary of Homeland Security to the Senate, which, under the FVRA, created a permissible period for acting service even after the expiration of the FVRA's initial 210-day limit on acting. *See* 5 U.S.C. § 3346(a)(2); S. Rep. No. 105-250, at 14 (1998). Under EO 13753, the Senate-confirmed Administrator of the FEMA, Peter T. Gaynor, would have been the officer next in line and thus would have begun serving as Acting Secretary under the FVRA after the

---

[5] To be sure, when Mr. McAleenan amended the order of succession on November 8, 2019, he expressly said that Annex A governs when a Secretary resigns. *See* November 2019 Order. But while this clarified Annex A's role, Mr. McAleenan's order did more than that: it also changed the actual order of succession. Thus, it is not as though the sole purpose of Mr. McAleenan's order was to address when Annex A governs. Nor does this clarifying language change the legal effect of Ms. Nielsen's April 2019 order—Ms. Nielsen's order superseded EO 13753 as a matter of law.

[6] www.congress.gov/nomination/116th-congress/2235.

President submitted Mr. Wolf's nomination.[7]

Thus, after the President submitted Mr. Wolf's nomination, "out of an abundance of caution," on November 14 Mr. Gaynor exercised "any authority" he might possess as Acting Secretary and designated an order of succession for the office under § 113(g)(2), which applies "[n]otwithstanding" the FVRA. Gaynor Order.[8]

Plaintiffs rely on the decision in *Batalla Vidal*, which errantly concluded that Mr. Wolf could not ratify any prior actions because Mr. Gaynor's succession order had "no legal effect" because Mr. Wolf and Mr. Gaynor could not "simultaneously exercise the Secretary's power." *Batalla Vidal v. Wolf*, No. 16-cv-4756(NGG)(VMS), 2020 WL 6695076 at *9 (E.D.N.Y. Nov. 14, 2020). Contrary to that court's conclusion, Defendants have never argued that Mr. Wolf and Mr. Gaynor could simultaneously exercise authority. Rather, Defendants have always argued, and continue to maintain, that Mr. Wolf was properly serving as Acting Secretary under the HSA because Mr. McAleenan was properly serving as Acting Secretary when he amended the order of succession in November 2019. But if Defendants are wrong on that point, then *under Plaintiffs' own theory*, the result would be that Mr. Gaynor (not Mr. Wolf) would have been the proper Acting Secretary under the EO's order of succession when the President submitted Mr. Wolf's nomination and thus would have been authorized under 6

---

[7] The first two positions listed in EO 13753, the Deputy Secretary of Homeland Security and the Under Secretary for Management, were at the time and still are vacant. Plaintiffs appear to suggest that Christopher Krebs, the Director of the Cybersecurity and Infrastructure Security Agency, was the Acting Secretary until he was fired from that position on November 17, 2020. *See* Pls.' Mem. 9–10 & n.3. But, under the FVRA, when Mr. Wolf's nomination was submitted to the Senate on September 10, 2020, "FEMA Administrator Peter Gaynor [ ] would have been Acting Secretary according to the order of succession designated by Executive Order 13753." *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigration Servs.*, No. CV 19-3283 (RDM), 2020 WL 5995206, at *14 (D.D.C. Oct. 8, 2020).

[8] Mr. Gaynor previously issued the succession order on September 10, 2020, but Defendants later became aware that the order may have been signed an hour before Mr. Wolf's nomination was sent to the Senate. Because Defendants could not be certain that the September 10 succession order was signed after the submission of Mr. Wolf's nomination, Mr. Gaynor reissued the succession order on November 14, 2020. *See* Swartz Decl. ¶ 8; Gaynor Order.

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

21

3:20-cv-01552-AJB-MSB

U.S.C. § 113(g)(2) to alter the order of succession. This would also be the result under the conclusion of the court in *Batalla Vidal*—that Mr. McAleenan was did not assume the position of Acting Secretary after Ms. Nielsen's resignation—because only Mr. Gaynor and not Mr. Wolf would have assumed the position of Acting Secretary. And as a result of Mr. Gaynor's November 14 order—through which the FEMA Administrator and the Under Secretary for Strategy, Policy, and Plans would become sixth and fourth in line, respectively—Mr. Wolf began serving as the Acting Secretary, as the most senior official now serving in that line of succession.[9] *See* 6 U.S.C. § 113(g)(2).

Plaintiffs next contend that the Gaynor order, if effective, has not been triggered because Mr. Gaynor has not resigned. Pls.' Mem. 10–11. But the Gaynor Order set a new order of succession that was activated immediately—regardless of Gaynor's continued service—because it applied "[n]otwithstanding" the FVRA. *See* 6 U.S.C. § 113(g)(1)-(2). And Gaynor's order under § 113(g)(2) superseded his own basis for service under the FVRA.[10]

On November 16, 2020, Acting Secretary Wolf ratified "each of [his] delegable prior actions as Acting Secretary" "out of an abundance of caution." Blackwell Decl. ¶ 7; Ex. 6 (Ratification of Actions Taken By The Acting Secretary of Homeland Security). In doing so, he confirmed that he had "full and complete knowledge of the contents and purpose of any and all actions taken by [him] since November 13, 2019." *Id.*[11]

In sum, under Plaintiffs' own theory, Mr. Gaynor's November 14, 2020 order of succession provides an alternate basis for Acting Secretary Wolf's current authority.

---

[9] The first three positions in Mr. Gaynor's order of succession, the Deputy Secretary of Homeland Security, the Under Secretary for Management, and the CBP Commissioner, were at the time and still are vacant.

[10] This interpretation is consistent with the analogous scheme in the FVRA. The default rule under the FVRA is that the first assistant will automatically assume the position of acting officer. 5 U.S.C. § 3345(a)(1). The President can later designate another official to serve as the acting officer, displacing the first assistant without requiring the first assistant to resign. 5 U.S.C. § 3345(a)(2)-(3).

[11] Plaintiffs have waived any argument that the FVRA's limited bar on ratification applies here.

*Defs.' Opp'n to Pls.' Second Motion for Temp.*
*Restraining Order & Preliminary Injunction*

22

3:20-cv-01552-AJB-MSB

Exercising his authority on that basis, Mr. Wolf then ratified the authorization and waivers at issue here, and that ratification cures any alleged service-related defect in the waivers. Plaintiffs' claims fail under this alternative theory. *See Guedes v. ATF*, 920 F.3d 1, 12 (9th Cir. 2019); *CFPB v. Gordon*, 819 F.3d 1179, 1190-92 (9th Cir. 2016).[12]

### C.   Plaintiffs are Unlikely to Succeed on the Merits of Their Challenge to the Funding of the Border Barrier Projects.

The Court also should reject Plaintiffs' argument that DoD lacked authority to fund the projects at issue pursuant to § 8005 of the Consolidated Appropriations Act of 2020, Pub. L. No. 116-93, Div. A. *See* Pls.' Mem. at 13–14. The Court concluded Plaintiffs had not established a likelihood of success on that claim in denying Plaintiffs' first motion, *see* PI Order at 10–19, and Plaintiffs' offer no new reasons to alter that conclusion.

Plaintiffs again argue that the Court should follow the Ninth Circuit's reasoning in *Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020) and *California v. Trump*, 963 F.3d 926 (9th Cir. 2020), but this Court is tasked not with determining whether Plantiffs are likely to succeed on the merits of their claims *in the Ninth Circuit*, but whether Plaintiffs would ultimately likely succeed on the merits at the end of the litigation. In that broader inquiry into ultimate success on the merits, the Court appropriately found it instructive that the Supreme Court had stayed an injunction identical to the one Plaintiffs seek on the basis of § 8005. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019). In staying that injunction, the Supreme Court explained that the *Sierra Club* plaintiffs likely had no cause of action to sue, a conclusion that is equally applicable to Plaintiffs here. *Id.*; *see* PI Order at 17 ("La Posta's Section 8005 arguments are likely barred by the Supreme Court's ruling as well."). The Supreme Court reaffirmed that decision by

---

[12] Plaintiffs' argument that DHS failed to submit a Notice of Vacancy to Congress has no bearing, even if credited, on the question of whether Mr. Gaynor became the Acting Secretary by operation of the FVRA and EO 13753 as a matter of law. As a factual matter, DHS notified Congress of the vacancy created by Secretary Nielsen's resignation. *See* Swartz Decl. ¶ 7, Ex. 1. And it is unremarkable that DHS did not submit any notice to Congress regarding Mr. Gaynor because Defendants at all times have believed that Mr. Wolf has been lawfully serving as Acting Secretary. Even if such notice was required for Mr. Gaynor, nothing in the HSA or FVRA conditions acting service upon such a notification. *See* 5 U.S.C. § 3349(a)(1).

denying a motion to lift the stay, *Trump v. Sierra Club*, 140 S. Ct. 2620 (2020), and recently granted Defendants' petition for a writ of *certiorari*. *See supra* at 3. In light of the multiple stay orders, the grant of *certiorari*, and the possibility of Supreme Court reversal, Plaintiffs cannot establish a clear entitlement to injunctive relief on the basis of § 8005. *See Benisek v. Lamone*, 138 S. Ct. 1942, 943 (2018) (district court did not abuse its discretion when it refrained from "charging ahead" with a preliminary injunction, when the case was before the Supreme Court and "firmer guidance" from that Court "might have been forthcoming.").

## III. The Balance of Equities and Public Interest Favor Denial of an Injunction.

There is no basis for the Court to change its prior conclusion that the balance of harms and the public interest do not weigh in favor of granting a preliminary injunction. *See* PI Order at 36–37. Plaintiffs offer three reasons why the balance has shifted in their favor since the Court's decision, but each of their arguments falls short.

First, there is no evidence to support Plaintiffs' speculation that an injunction against further construction activity would not harm Defendants because the bollard installation is nearly complete and the remaining work is less important. *See* Pls. Mem. at 19. To the contrary, the additional attributes to be installed are critical tools that enhance border security and improve agent safety. Third Enriquez Decl. ¶ 16, 21. The linear ground detection system and embedded cameras alert Border Patrol agents to the presence of individuals near the barrier, allowing agents to operate more efficiently and alerting them to possible dangers in advance of apprehension. *Id.* Similarly, lighting is critical to operations at night, as it allows Border Patrol agents to see potentially dangerous individuals and weapons. *Id.* An injunction prohibiting Defendants from completing installation of these important features would likely harm border security in high drug-smuggling areas and compromise agent safety. *See* Administrative Record at 20–33 (explaining that thousands of pounds of illegal drugs have been seized between ports of entry in the San Diego and El Centro border patrol sectors).

Second, the Court should not ignore the high costs to the government and the public interest of implementing an unanticipated work stoppage. Stopping ongoing construction would force DoD to incur potentially millions of dollars of unrecoverable fees and

penalties—costs that DoD would not have to pay but for an injunction.  *See* Second Gant Decl. ¶¶ 9–22 (estimating suspension costs of approximately $35 million per month, in addition to costs associated with potential termination and reprocuring contracts).  These costs are irreparable because DoD would have to pay them from the funds available for border barrier construction, thus diminishing the money available for construction.  *See id.* ¶¶ 9, 12, 20, 22.  This case is not comparable to a damages action where monetary loss is not deemed irreparable because "adequate compensatory or other corrective relief will be available at a later date."  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Third, the Court's prior order appropriately looked to the Supreme Court's *Sierra Club* stay in balancing the harms and determining the public interest, recognizing that the Supreme Court "has already balanced the harm to the Government from an injunction prohibiting border barrier construction against the irreparable environmental interests of the Sierra Club."  PI Order at 36–37.  Plaintiffs cite the Ninth Circuit's October 2020 decision addressing border barrier construction under a different statute—10 U.S.C. § 2808—where the court stated that "the Supreme Court's stay order does not address the appropriateness of injunctive relief.  *Sierra Club v. Trump*, 977 F.3d 853, 888 (9th Cir. 2020), *petition for cert. pending*, No. 20-685 (filed Nov. 17, 2020.).  But the Court certainly has equitable discretion to take appropriate account of the Supreme Court's stay order given that the same equitable factors that govern the grant of a preliminary injunction apply to a stay.  *See Winter*, 555 U.S. at 22; *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Indeed, this Court's approach is consistent with the way in which the Ninth Circuit has previously considered the impact of the Supreme Court's stay when considering a request to lift a stay of an injunction.  *See* Order, *Sierra Club v. Trump*, No. 19-17501 (9th Cir. Dec. 30, 2019) (denying motion to lift stay of injunction because the stay order "appears to reflect the conclusion of a majority of that Court that the challenged construction should be permitted to proceed pending resolution of the merits").

## **CONCLUSION**

For these reasons, the Court should deny Plaintiffs' second motion for a temporary restraining order and preliminary injunction.

Dated: December 4, 2020                    Respectfully submitted,


                                           JEFFREY BOSSERT CLARK
                                           Acting Assistant Attorney General

                                           ROBERT S. BREWER, JR.
                                           United States Attorney

                                           JOHN V. COGHLAN
                                           Deputy Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Director, Federal Programs Branch

                                           ANTHONY J. COPPOLINO
                                           Deputy Director, Federal Programs Branch

                                           */S/ Andrew I. Warden*
                                           ANDREW I. WARDEN (IN Bar No. 23840-49)
                                           Senior Trial Counsel
                                           BRIAN ROSEN-SHAUD (ME Bar No. 006018)
                                           Trial Attorney
                                           U.S. Department of Justice
                                           Civil Division, Federal Programs Branch
                                           1100 L Street, NW
                                           Washington, D.C. 20530
                                           Tel.:   (202) 616-5084
                                           Fax:    (202) 616-8470