Michelle LaPena (SBN 201018)
Simon W. Gertler (SBN 326613)
ROSETTE, LLP
1415 L Street, Suite 450
Sacramento, CA 95814
Telephone: (916) 353-1084
Facsimile: (916) 353-1085
borderwalllitigation@rosettelaw.com

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION, ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS *PARENS PATRIAE,*<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY; MARK T. ESPER, U.S. SECRETARY OF DEFENSE, IN HIS OFFICIAL CAPACITY; CHAD F. WOLF, ACTING U.S. SECRETARY OF HOMELAND SECURITY, IN HIS OFFICIAL CAPACITY; AND LIEUTENANT GENERAL TODD T. SEMONITE, COMMANDING GENERAL OF THE U.S. ARMY CORPS OF ENGINEERS, IN HIS OFFICIAL CAPACITY,<br><br>Defendants. | Case No.: 3:20-cv-01552-AJB-MSB<br><br>**REPLY IN SUPPORT OF SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# ARGUMENT

When the Court issued its order from the bench on the Tribe's first preliminary injunction, it explained, "obviously, as circumstances develop, any order denying the PI would be without prejudice to other circumstances." Hearing Transcript at 59. Since then, legal and factual developments have occurred that warrant an injunction. Six[1] district courts and the Government Accountability Office ("GAO") have concluded that Chad Wolf is serving unlawfully as the Acting Secretary of Homeland Security; the Ninth Circuit has clarified its position on the availability of a cause of action for the Defendants funding violations as well as the balance of the equities (*Sierra Club III*); and the Tribe has identified multiple cultural sites disturbed by construction, illustrating the inevitability of further harm in the absence of an injunction.

## I. Recent case law illustrates the Tribe's inevitable success on the merits.

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). The Tribe has satisfied the most important factor by demonstrating that Defendants' construction of the Project is unlawful.

### A. Chad Wolf has never lawfully held the position of Acting Secretary.

As in other cases invalidating actions taken by Chad Wolf, the Government does not contest that if Mr. Wolf was in fact serving unlawfully, DHS's authorization of the Project and waivers are invalid. *See Casa de Maryland, Inc. v. Wolf*, No. 8:20-CV-02118-PX, 2020 WL 5500165, at *20 (D. Md. Sept. 11, 2020) ("The Government does not contest that if the Court credits Plaintiffs' argument, the rules were promulgated without authority and must be set aside."). Instead, the Defendants offer arguments that all of the federal district courts to hear them, and the GAO, have rejected.

---

[1] The Tribe previously cited five district courts. Dkt. 40-1 at 5. In addition, during the hearing on the plaintiff's motion for a preliminary injunction, the D.C. district court in *Manzanita Band of the Kumeyaay Nation v. Wolf* said, "I mean, I will tell you, it looks to me like [Secretary Kirstjen Nielsen] messed up." *See* Third Request for Judicial Notice, Ex. 1 at 3.

### i. Secretary Nielsen's April Order did not change the order of succession.

The Defendants paraphrase the Tribe's argument to say that "Executive Order (EO) 13753—and not Ms. Nielsen's April 2019 Order—controlled the order of succession when the Secretary resigned." Opposition at 17. Ms. Nielsen's April 2019 Order controls, but the Order does not say what the Defendants want it to say. Defendants offer the same strained interpretation that has failed elsewhere. This Court should reject it as well.

"Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 878 (9th Cir. 2001). The language of Ms. Nielsen's April Order is plain: "Annex A of...Delegation No. 00106, is hereby amended by striking the text of such Annex in its entirety and inserting the following in lieu thereof." Dkt. 47-4 at 6. Annex A listed the people who could exercise secretarial authority in the event the secretary is "unavailable to act during a disaster or catastrophic emergency." Dkt. 47-4 at 7. Replacing that list did not amend section II.A. of Delegation No. 00106, which refers to the order of succession in EO 13753. *Id.*

The government points out that the Mitnick memorandum and attachment refer to designating an order of succession "five times," suggesting that Ms. Nielsen's order actually intended to amend section II.A. of Delegation No. 00106. The district courts and GAO were unconvinced. *See La Clinica De La Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 7053313, at *5 (N.D. Cal. Nov. 25, 2020)[2] ("As the district court in *Casa de Maryland* recognized, the memo prepared by the DHS general counsel constitutes such a prefatory clause or preamble and the memo does not detract from the operative language that altered only Annex A."); *Batalla Vidal v. Wolf*, No. 16CV4756NGGVMS, 2020 WL 6695076, at *9 (E.D.N.Y. Nov. 14, 2020) ("The Government's reading of the documents

---

[2] The Northern District granted a motion for reconsideration of its prior order, reversing its conclusion that DHS's botched succession could be lawful under FVRA considering that "defendants have repeatedly represented that McAleenan was appointed pursuant to the HSA and not the FVRA." 2020 WL 7053313, at *7.

is tortured. On the plain text, Secretary Nielsen amended the order of officials in Annex A but did nothing to change when Annex A applied."); GAO, B–331650, August 14, 2020 at 9 ("the plain language of the delegation controls, and it speaks for itself. . . [Secretary Nielsen] did not change the ground for which Annex A would apply.")

The circumstantial evidence also weighs against the Defendants' argument. DHS released Revision 8.5 to Delegation No. 00106 the day after Secretary Nielsen's order, which only shows an amendment to Annex A. Dkt 47-4 at 7. This "is persuasive contemporaneous evidence that the replacement of Annex A was the only such change effectuated by the order." *La Clinica De La Raza*, 2020 WL 7053313 at *6. Further, "the fact that on November 8, 2019, McAleenan purported to revise Delegation No. 00106 by amending Section II.A to explicitly reference Annex A in cases of resignation, instead of Executive Order 13753, confirms that Nielsen's revision did not do so." *Id*. (citing *Casa de Md.*, 2020 WL 5500165, at *21). Ms. Nielsen's April 2019 Order achieved no more than it purported, and as a result, McAleenan was not entitled to succeed her.

### ii. Wolf's ratification does not cure the problem.

Defendants' attempts to cure Ms. Nielsen's error do not vest in Mr. Wolf authority he did not have. The three courts that have heard Defendants' ratification arguments have rejected them. *Batalla Vidal*, 2020 WL 6695076, at *9; *Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, No. CV 19-3283 (RDM), 2020 WL 5995206, at *16 (D.D.C. Oct. 8, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-CV-05883-JSW, 2020 WL 5798269, at *9 (N.D. Cal. Sept. 29, 2020).

The Tribe previously explained *Batalla Vidal*'s rejection of the ratification argument. Dkt. 40-1 at 10. That court has since enjoined the DHS action at issue in that case. *Batalla Vidal*, 2020 WL 7121849, at *2 (E.D.N.Y. Dec. 4, 2020). In response to Mr. Wolf's latest attempt to ratify his actions, the court reiterated its disapproval. *Id*. at *1 n. 2 ("for the exact same reasons, those documents have no legal significance. Neither Administrator Gaynor nor Mr. Wolf currently possesses, nor have they ever possessed, the powers of the Acting Secretary of Homeland Security.").

REPLY IN SUPPORT OF SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
3     Case No.: 3:20-cv-01552-AJB-MSB

Equally compelling reasoning from *Nw. Immigrant Rights Project* defeats the Defendants' argument on two additional theories. First, "FVRA provides that '[a]n action taken by any person who is not acting' in compliance with the FVRA, 'in the performance of any function or duty of a vacant office to which' the FVRA applies, 'shall have no force or effect' and '**may not be ratified**.'" 5 U.S.C. § 3348(d). 2020 WL 5995206, at *15 (emphasis added). While this provision would not apply to officials serving pursuant to HSA, it applies to McAleenan and Wolf because they were not properly serving under the HSA. *Id*. Mr. Wolf's action in *Nw. Immigrant Rights Project* survived FVRA's ratification prohibition because it was not a "function or duty" of the Secretary. *Id*. "[F]unction or duty" includes only those functions or duties that are (1) "established by statute" and "required by statute to be performed by the applicable officer (and only that officer)." 5 U.S.C. § 3348(a)(2). Here, authority to install border barriers and roads and waive applicable laws is "required by statute to be performed by" the Secretary of Homeland Security. IIRIRA § 102(a) ("Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads"); *Id*. § 102(c)(1). Mr. Wolf's authorization of the Project and waivers "may not be ratified." 5 U.S.C. § 3348(d).

As an alternative basis to reject the Defendant's argument on ratification, the purported Acting Secretary Gaynor could not have designated Wolf to succeed him because "an Acting Secretary may not amend the Department's order of succession under § 113(g)(2)." 2020 WL 5995206, at *24. The FVRA states that its process to designate an order of succession is exclusive unless another statute "expressly" provides otherwise—and the system that 6 U.S.C. §113(g)(2) "expressly" provides is that the "Secretary" may designate an order of succession, not an "Acting Secretary." If "Secretary" actually meant "Acting Secretary," and the Acting Secretary could designate a new order of succession, then the Acting Secretary could pass off the powers of the Secretary "to lower-level 'officers' whom the President did not appoint and, perhaps, whom the President has never even heard of. ... [S]uch a reading would undermine the structure and purpose of the FVRA" as well as posing difficult constitutional questions about whether 6 U.S.C.

§113(g)(2) violates the Appointments Clause of the Constitution. *Nw. Immigrant Rights*, 2020 WL 5995206, at *18-20. This court should conclude the same and find that DHS's authorization of the Project and waivers of environmental laws are invalid.

### B. This court does not have discretion to make predictive judgments on questions of law.

Defendants assert, "this Court is tasked not with determining whether Plantiffs [sic] are likely to succeed on the merits of their claims in the Ninth Circuit, but whether Plaintiffs would ultimately likely succeed on the merits at the end of the litigation." Opposition at 23. Defendants cite no authority for this proposition. To the contrary, the likelihood of success on the merits analysis is meant to be done "under the existing law of the Circuit." *Purse Seine Vessel Owners Ass'n v. U. S. Dep't of State*, 584 F.2d 931, 934 (9th Cir. 1978); *see also Alley v. Little*, 181 F. App'x 509, 513 (6th Cir. 2006) (holding that "the prospect of a change in that feature of existing jurisprudence is as speculative as any other claim about possible future changes in governing law" and "does not impact our assessment as to the likelihood of [the plaintiff's] success on the merits under existing law"). The Ninth Circuit has already assessed relevant Supreme Court precedent, including the stay order, and decided that plaintiffs like the Tribe ultimately have a cause of action for the Defendants' unlawful funding scheme in this case. *See Sierra Club II*, 963 F.3d at 887. This court is bound by that analysis. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).

The Defendants rely on *Benisek v. Lamone*, 138 S. Ct. 1942 (2018) to suggest that this court can look to a case pending review by the Supreme Court to disregard binding analysis. That case did not endorse that approach. Instead, it affirmed a district court's denial of an injunction because the public interest would be served by waiting for a decision by the Supreme Court. *Id.* at 1945. While an injunction in this case serves the public interest, *see id.* ("the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."), the Court must address that factor separately from the success on the merits factor.

### II. Defendants cannot seriously challenge the harm to the Tribe.

The Court and the Defendants correctly point out that, as in *Lyng v. Nw. Indian Cemetery Protective Ass'n*, the "projects at issue in this case could have devastating effects on traditional Indian religious practices" and "virtually destroy the . . . Indians' ability to practice their religion." Dkt. 47 at 11 (quoting 485 U.S. 439, 451 (1988)). In fact, the defendant government agency in *Lyng* conceded that the project "would cause serious and irreparable damage to the sacred areas which are an integral and necessary part of the belief systems and lifeway of Northwest California Indian peoples." *Id*. at 442. But the question in that case was whether such irreparable harm amounted to a violation of the Free Exercise Clause. *Id*. That is not the question here.

The question here is whether an injunction against continued construction would prevent irreparable harm to the Tribe. Where the Government has no competing right to use the land for the Project in this case, *see* Section I, *supra*, the language about the Government's "right to use what is, after all, its land" has no bearing on the analysis. *Lyng*, 485 U.S. at 453.[3] That is why the plaintiff's interests in hiking and fishing in *Sierra Club II* were not diminished by the fact that they were on federal land. Defendants offer no reason to apply a stricter test when tribal interests are involved.

**A. Defendants fundamentally misunderstand the nature of the Tribe's injury.**

Defendants have not adequately surveyed the Project Area for cultural resources. *See* Declaration of Carmen Lucas ("Lucas Decl.") ¶¶ 15-16. As a result, tribal cultural resources will continue to be uncovered *during* Project construction. *Id*. The Defendants appear to be confused about why uncovering cultural items during construction is more harmful than discovering them through surveys before construction. *See* Opposition at 7.

---

[3] Most charitably, scholars have criticized this statement as ironic, but, more accurately, as racist. *See* Andrea Wallace, *Patriotic Racism: An Investigation into Judicial Rhetoric and the Continued Legal Divestiture of Native American Rights*, 8 DePaul J. for Soc. Just. 91, 130 (2014); Allison M. Dussias, *Ghost Dance and Holy Ghost: The Echoes of Nineteenth-Century Christianization Policy in Twentieth-Century Native American Free Exercise Cases*, 49 Stan. L. Rev. 773, 833 (1997).

The answer is simple. Many of the cultural artifacts that the Tribe is concerned about, like burials, lie beneath the surface. The Tribe has sought to have cultural sites and artifacts identified *prior* to construction, to no avail. For these items to now be "discovered" *during* construction requires that they have been excavated, or least disturbed, to be revealed. As Councilwoman Parada explained, "disturbance of a burial or cultural site is a deeply offensive injury to the Tribe's ancestors that echoes through the generations and causes harm to those of us living relatives who bear witness." Parada Decl. ¶ 9.[4] For this reason, repatriation and cultural monitoring cannot mitigate the harm already done upon discovery. *Id.*[5] The Tribe has consistently demanded that the Project be paused to allow *non-invasive* surveys of the Project Area, like soil sampling and cadaver dogs so that cultural items and sites can be avoided. *See* Dkt. 20-2 ¶ 33; Dkt. 40-1 at 21; Lucas Decl. ¶ 4.

**B. Construction activity will continue to disturb cultural resources.**

The Defendants argue that the Tribe is speculating when it cautions that construction activity will continue to disturb cultural sites. Opposition at 7. The Defendants have argued the same thing before. *See* Dkt. 20 at 10-11. Then, construction disturbed, by the Defendants' count, three tribal burial sites. *Id.* ("After 6 months of construction over nearly 18 miles involving the presence of tribal cultural monitors and CBP's own archeological monitors, no previously recorded or unrecorded burial sites have been revealed, <u>other than the three features discussed above</u>") (emphasis added). How many more sites must be disturbed before "speculation" turns into "likelihood"?

---

[4] This sentiment is not unique to the Tribe. *See* R.F. Martin, Annotation, Corpse Removal and Reinterment, 21 A.L.R.2d 472, 475-76 (1950) ("The normal treatment of a corpse, once it is decently buried, is to let it lie. This idea is so deeply woven into out legal and cultural fabric that it is commonplace to hear it spoken of as a "right" of the dead and a charge on the quick.")

[5] Even if the harm could be mitigated, Defendant's efforts are insufficient. A "Communication Plan" is not mitigation, and "capping" is not appropriate. *See* Lucas Decl. ¶ 14. Had Tribes been adequately consulted, this would have been addressed.

REPLY IN SUPPORT OF SECOND REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
7      Case No.: 3:20-cv-01552-AJB-MSB

"Likely" means "probable" or "reasonably expected." Black's Law Dictionary (11th ed. 2019). Based on the Defendants' evidence alone, if six months of construction disturbed three burial sites, the remaining six months of construction will likely disturb at least one more. In fact, the Tribe has demonstrated that construction has uncovered more than three sites in the past six months. The Defendants attempt to discredit the Tribe's accounts, but those attacks are misdirected.

Enriquez cites an unidentified Cogstone archaeologist calling into question whether the bones discovered in the cremation site were human bones. Dkt. 47-2 ¶ 74. The Tribe objects to this statement as hearsay. The Tribe offers the direct testimony of Dr. Madeleine Hinkes, the San Diego County Medical Examiner's and the Imperial County Coroner's forensic anthropologist that the bones were likely human. Declaration of Madeleine Hinkes ¶ 5; Lucas Decl. ¶ 13.

The Defendants also make a handful of misleading statements regarding the circle complex sites. Opposition at 4-5. While one of the larger circles was not visible from satellite images before 2016, this is likely due to poor resolution and vegetation. Third Decl. of Thomas Holm ("Holm Decl.") ¶ 3. The trail intersection marked by a rock cairn is, however, clearly visible going back as far as 2010, before which the resolution is very poor. *Id*. This trail intersection marks an important Kumeyaay cultural site within an area of known for a high density of cultural artifacts. Third Declaration of Cynthia "Parada Decl." ¶¶ 2-3. The Tribe objects to Mr. Enriquez's hearsay statements from unnamed "Kumeyaay representatives" calling into question the authenticity of the sites. Dkt. 47-2 ¶ 79. Dave Toler, a Kumeyaay elder present during the visit, identified the circle complex sites as Kumeyaay cultural sites and the surrounding circles as ancient "sleeping circles." Declaration of David Toler ¶ 7.

The Tribe also objects to Mr. Enriquez's hearsay statement from Mr. Billstrand regarding Carmen Lucas' comments. Dkt. 47-2 ¶ 81. Ms. Lucas did not dispute that the circle complex sites were cultural sites. Lucas Decl. ¶ 11. Ms. Lucas acknowledges that the sites are within a complex tribal cultural landscape, and the various features require more

study to determine the exact age and origin of the sites, which should have taken place prior to construction activity in the area, in consultation with tribes. *Id.*

Mr. Enriquez also states that the Kumeyaay Tribes never expressed concerns about the circle complex sites after the October 20, 2020 visit. That is false. Mr. Holm wrote to Mr. Enriquez on October 30, 2020, specifically expressing his concern about past and future harm to these important sites. Holm Decl. ¶ 5. Defendants cannot deny that project construction has disturbed numerous tribal cultural sites and will continue to disturb additional sites, causing irreparable harm to the Tribe.

### C. The Tribe faces particularized harm to its cultural practices in the area.

Claims of environmental harm are more than "general averments" and "conclusory allegations" when declarants "aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000). The Tribe's claims meet this standard.

Unlike the far-flung locales in *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992), tribal declarants attest to their specific use of the 20-mile stretch of Project Area that lies squarely within their traditional territory. *See* Dkt 40-2 ¶ 12. Specifically, tribal citizens engaged in bird dancing along the border before and during construction. Dkt 13-4 ¶ 12. CBP confirmed that tribal citizens engaged in this ritual in an area known as "Circle T" on July 17, 2020. Dkt. 20-3 ¶ 14. Construction activity disturbed the ritual on that occasion, Dkt 13-4 ¶ and will continue to interfere with tribal citizens' ability to bird dance. Parada Decl. ¶ 6. Trenching will also interfere with Kumeyaay ceremonial journeys on a specific north-south trail in the El Centro Project area and agave roasting in specific locations within the Project Area. *Id.* ¶¶ 7-8. Project lighting will interfere Kumeyaay stargazing on the solstices and equinoxes from specific locations within the Project Area. *Id*.

The Defendants respond that the Tribe can engage in its cultural activities in other areas. Opposition at 12 ("Plaintiffs provide no evidence to suggest that the narrow strip of land immediately adjacent to the proposed barriers is the only location across the entire

southern border where they can view the night stars."). The Ninth Circuit has squarely rejected this argument:

> Defendants submit that Sierra Club will not be irreparably harmed because its members have plenty of other space to enjoy. We have already rejected the essence of the Federal Defendants' argument. *See All. for the Wild Rockies*, 632 F.3d at 1135 (concluding that the Forest Service's argument that plaintiffs can "view, experience, and utilize other areas of the forest" "proves too much," because its logical extension is that a "plaintiff can never suffer irreparable injury resulting from environmental harm in a forest as long as there are other areas of the forest that are not harmed" (internal citations omitted)).

*Sierra Club II*, 963 F.3d 874, 895 (9th Cir. 2020). This court is bound to reject the argument as well. The Tribe faces serious and significant injury to its cultural practices within its historic territory.

### III. An injunction is necessary to preserve the status quo.

Defendants rely only on statistics of drug smuggling to argue that a border wall and security features are necessary to protect the public interest. Opposition at 24. The Tribe does not doubt the accuracy of these statistics, but as the Ninth Circuit explained, "Defendants cite drug trafficking statistics, but fail to address how the construction of additional physical barriers would further the interdiction of drugs." *Sierra Club II*, 963 F.3d at 897. The Tribe has offered evidence to support why an injunction would be consistent with congressional intent and to protect the status quo. On the other side of the scale, the Defendants come up short.

The Tribe requests a temporary restraining order to remain in place only until the Court can make a decision of the Tribe's request for preliminary injunction, which is scheduled to be heard on January 14, 2021. Such a temporary pause on construction to protect tribal cultural sites pending further review is surly justified here.

### CONCLUSION

For the foregoing reasons, the Tribe respectfully requests that this Court pause construction on the Project until it rules on the Tribe's motion for preliminary injunction, and after that, until it ultimately rules on the merits of the case.

1  Respectfully submitted.

2  December 9, 2020

4  */s/ Michelle LaPena*

5  Michelle LaPena (SBN 201018)
6  Simon W. Gertler (SBN 326613)
   ROSETTE, LLP
7  1415 L Street, Suite 450
   Sacramento, CA 95814
8  Telephone: (916) 353-1084
9  Facsimile: (916) 353-1085
   borderwalllitigation@rosettelaw.com

REPLY IN SUPPORT OF SECOND REQUEST FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION
11     Case No.: 3:20-cv-01552-AJB-MSB