1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LA POSTA BAND OF DIEGUEÑO MISSION INDIANS OF THE LA POSTA RESERVATION, ON BEHALF OF ITSELF AND ON BEHALF OF ITS MEMBERS AS PARENS PATRIAE,<br><br>　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, IN HIS OFFICIAL CAPACITY, et al.,<br><br>　　　　　　　　　　Defendants. | Case No.:  3:20-cv-01552-AJB-MSB<br><br>**ORDER:**<br><br>**(1) GRANTING PLAINTIFFS' MOTIONS TO SEAL, (Doc. Nos. 41, 49);**<br><br>**(2) DENYING DEFENDANTS' EX PARTE MOTION FOR LEAVE TO FILE A SUR-REPLY, (Doc. No. 57); AND**<br><br>**(3) DENYING PLAINTIFFS' SECOND MOTION FOR TEMPORARY RESTRAINING ORDER, (Doc. No. 40)** |

1

Presently before the Court are: (1) the La Posta Band of the Diegueño Mission Indians' ("La Posta" or "the Tribe") motions to seal, (Doc. Nos. 41, 49); (2) La Posta's second motion for a temporary restraining order ("TRO"), (Doc. No. 40); and (3) Defendants Donald J. Trump, Mark T. Esper, Chad F. Wolf, and Todd T. Semonite's ("Defendants" or "the Government") *ex parte* motion for leave to file a sur-reply, (Doc. No. 57). For the reasons set forth below, the Court (1) **GRANTS** La Posta's motions to seal, (Doc. Nos. 41, 49); (2) **DENIES** La Posta's second motion for TRO, (Doc. No. 40); and (3) **DENIES** Defendants' *ex parte* motion for leave to file a sur-reply, (Doc. No. 57).

# I.   FACTUAL BACKGROUND

The facts of this case were recounted at length in this Court's September 9, 2020 order. (Doc. No. 26.) As such, the Court will incorporate those facts into this order. For the purposes of this instant motion, La Posta presents the following additional facts to support their second request for a TRO and preliminary injunction:

La Posta's traditional territory, which encompasses the areas impacted by barrier construction within eastern San Diego and Imperial Counties ("Project Area"), is sacred to the Tribe. (*See* Second Declaration ("Decl.") of Cynthia Parada ("Second Parada Decl.") ¶ 11.) Thomas Holm, the director of the Kumeyaay Historic Preservation Council, "recently discovered that the El Centro section of the border wall cuts directly through a sacred site in Davies Valley." (Second Decl. of Thomas Holm ("Second Holm Decl.") ¶ 4.) The Davies Valley site features a "circle approximately 120 ft in diameter, marked clearly with a perimeter of stones and containing rock cairns." (*Id.* ¶¶ 3–4.) The circle is surrounded by smaller circle features and trails. (*Id.*) On November 10, 2020, a Kumeyaay group attempted to visit and pray at the site but Customs and Border Patrol ("CBP") officers did not allow access. (*Id.* ¶ 6.) The Tribe alleges other similar circle complexes have been identified in the Project Area. (*Id.*) Additionally, Mr. Holm "encountered a site about which contains a rock alignment that appears to be a Kumeyaay cultural site." (*Id.* ¶ 7.) The site allegedly contains numerous "ceramic sherds indicative of cremation vessels within the site." (*Id.*)

On November 17, 2020, CBP notified various Kumeyaay-affiliated tribes of an "unanticipated discovery" in the El Centro Project site when a tribal cultural monitor identified a Kumeyaay archaeological site adjacent to the newly constructed border wall in a "laydown yard." (*Id.* ¶ 8.) CBP identified three discoveries at this location: two "small fire pits or roasting features" and one "possible cremation site." (Second Decl. of Michelle LaPena ("Second LaPena Decl.") ¶ 5.) Tribal experts later visited the location and identified 18 separate fire features "approximately 100m north of the wall and extending south into the road adjacent to the border wall, indicating other features have already been destroyed and obscured by construction." (Second Holm Decl. ¶ 9; Second Parada Decl. ¶ 8.) A forensic anthropologist inspected the site and found "two small bone fragments, one 2 millimeters and one 6 millimeters, that could be human neck or face bones." (Second Holm Decl. ¶ 9, Ex. D.)

La Posta also maintains that the Project interferes with the Tribe's ability to stargaze. (Doc. No. 40-1 at 7.) The Tribe explains that astronomy is an integral part of Kumeyaay religion and cultural practice, with tribal citizens stargazing throughout the Project Area. (*See* Second Parada Decl. ¶¶ 13–14.) According to La Posta, the installation of lighting on the border wall will cause light pollution that will hinder the Tribe's ability to properly stargaze. (*Id.*)

Defendants maintain as of the date of the filing of their opposition brief, the bollards comprising the wall are completely installed for the El Centro A project (approximately 3.17 total miles), and approximately 14.3 of 15 miles are installed for the San Diego A project. (*See* Second Decl. of Antoinette Gant ("Second Gant Decl.") ¶ 8.) After the expected completion of the bollards on December 21, 2020, Defendants plan to begin construction of the "linear ground detection system" adjacent to the 20 miles of new barrier construction. (*Id.*) Defendants have also yet to install security features, such as lighting, cameras, and patrol roads in much of the Project Area. (*Id.*) Expected completion for the Project is late June 2021. (*Id.* ¶ 6.)

## II.   PROCEDURAL HISTORY

3

La Posta first commenced this action on August 11, 2020. (Doc. No. 1.) The action was accompanied by an *ex parte* motion for TRO and preliminary injunction. (Doc. Nos. 13–14.) The Court held a hearing on both motions and denied both motions on August 27, 2020. (Doc. No. 24.) La Posta subsequently appealed the Court's decision to deny the preliminary injunction to the Ninth Circuit. (Doc. No. 25.) On November 4, 2020, the Ninth Circuit affirmed this Court's denial of La Posta's first motion for a preliminary injunction. *See La Posta Band of Diegueno Mission Indians of La Posta Reservation v. Trump*, No. 20-55941, 2020 WL 6482173 (9th Cir. Nov. 4, 2020). Following the resolution of the appeal, the parties jointly moved for, and the Court approved, a briefing schedule for the filing of an Amended Complaint, as well as renewed motions for TRO and preliminary injunction. (Doc. Nos. 37–38.) On November 24, 2020, La Posta filed their second motion for TRO and preliminary injunction and accompanying motions to seal. (Doc. Nos. 40, 43.) Pursuant to the parties' joint briefing schedule, Defendants filed an opposition to both motions on December 4, 2020. (Doc. Nos. 47–48.) La Posta replied on December 9, 2020. (Doc. No. 55.) On December 11, 2020, Defendants filed an *ex parte* motion for leave to file a sur-reply, (Doc. No. 57), and La Posta opposed the motion, (Doc. No. 58). Currently, the hearing on La Posta's motion for preliminary injunction is set for January 14, 2021. (Doc. No. 45.) This order follows.

## III.   LA POSTA'S MOTIONS TO SEAL

The Court will first address La Posta's motions to seal the following declarations filed in connection with La Posta's second motion for TRO and preliminary injunction:

- The Second Declaration of Thomas Holm, (Doc. No. 42);
- The Third Declaration of Thomas Holm, (Doc. No. 50);
- The Declaration of Carmen Lucas, (Doc. No. 51);
- The Declaration of Madeleine Hinkes, (Doc. No. 52);
- The Declaration of David Toler, (Doc. No. 53);
- The Third Declaration of Cynthia Parada, (Doc. No. 54); and

4

- The Declaration of Paul Enriquez, (Doc. Nos. 47-2, 48-2).

La Posta urges the sealing of the foregoing declarations because they contain "confidential research" and exact locations of Kumeyaay sacred archaeological sites within the area of construction. (Doc. Nos. 41, 49.) Because the declarations include photographs and depictions of the locations of the sites, La Posta explains the public filing of these declarations could cause the location to be looted or damaged by unknown individuals. (*Id.*) The Tribe asks the Court to allow these declarations to be filed under seal to protect the integrity of the sites and the items contained therein.

## A.    Legal Standard for Motions to Seal

All documents filed with the Court are presumptively public. *See San Jose Mercury News, Inc. v. U.S. Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999) ("It is well-established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public."). "Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n.7 (1978)). Two standards generally govern requests to seal documents. *See Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677 (9th Cir. 2010):

> [J]udicial records attached to dispositive motions [are treated] differently from records attached to non-dispositive motions. Those who seek to maintain the secrecy of documents attached to dispositive motions must meet the high threshold of showing that "compelling reasons" support secrecy. A "good cause" showing under Rule 26(c) will suffice to keep sealed records attached to non-dispositive motions.

*Kamakana*, 447 F.3d at 1180 (citations omitted). The reason for the two different standards is that "[n]ondispositive motions are often unrelated, or only tangentially related, to the underlying cause of action, and, as a result, the public's interest in accessing dispositive

materials does not apply with equal force to non-dispositive materials." *Pintos*, 605 F.3d at 678 (quotations omitted).

A party seeking to seal materials related to non-dispositive motions must show good cause by making a "particularized showing" that "specific prejudice or harm will result" should the information be disclosed. Fed. R. Civ. P. 26(c). "[B]road, conclusory allegations of potential harm" will not suffice. *Foltz*, 331 F.3d at 1131. By contrast, under the "compelling reasons" standard applicable to dispositive motions, the Court must balance the competing interests of the public and the party who seeks to keep certain judicial records secret. After considering these interests, "if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Kamakana*, 447 F.3d at 1178–79 (internal quotation marks, omissions, and citations omitted). The party seeking to seal a judicial record bears the burden of meeting the "compelling reasons" standard. *Id.* at 1178; *Foltz*, 331 F.3d at 1135.

While La Posta moves to seal documents based on the "good cause" standard, the Court concludes the "compelling reasons" standard applies here. The Ninth Circuit has clarified that the "compelling reasons" standard applies whenever the motion at issue "is more than tangentially related to the merits of a case." *Center for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). In some instances, the proposed filing of documents under seal in connection with motions for preliminary injunction—though such motions are not dispositive—may be governed by the "compelling reasons" test. *Id.* at 1097–1101 (quoting *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 161 (3d Cir. 1993)). In keeping with this principle, requests to seal documents relating to motions for a preliminary injunction have been found by the Ninth Circuit to "more than tangentially relate[] to the merits" because success on the motion for a preliminary injunction could resolve a portion of the claims in the underlying complaint. *See Center for Auto Safety, LLC*, 809 F.3d at 1102. Here, La Posta's motion for TRO and preliminary injunction is certainly "more than tangentially related to the merits of the case" because La

6

Posta's Amended Complaint ultimately seeks injunctive relief that is not substantially different than the relief requested in this instant motion. As such, the "compelling reasons" standard governs the proposed sealing of the records.

### B.    Discussion

"In general, 'compelling reasons' sufficient to . . . justify sealing court records exist when such 'court files might . . . become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Kamakana*, 447 F.3d at 1179 (quoting *Nixon*, 435 U.S. at 598). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.* "The 'compelling reasons' standard is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order." *Id.* at 1178–79.

Two compelling reasons exist to justifying the sealing of the aforementioned declarations. First, the Court notes that locations of tribal cultural sites are kept confidential by Kumeyaay tribes and revealed only to qualified recipients. (*See* Second Parada Decl. ¶ 7.) La Posta explains the policy behind the confidentiality of archaeological and sacred sites is "to protect them from physical and spiritual vandalism and looting. If the confidential information in these declarations is publicly disclosed, it could be exploited, causing harm to the Tribe. . . ." (Doc. No. 49 at 4.)

Second, sealing of the declarations is appropriate because both California and federal public records law exempt the particular records from disclosure. Indeed, California public records law exempts from disclosure "[r]ecords of Native American graves, cemeteries, and sacred places and records of Native American places, features, and objects . . . maintained by, or in the possession of, the Native American Heritage Commission, another state agency, or a local agency." Cal. Gov't Code § 6254. Similarly, the federal Archaeological Resources Protection Act prevents from public disclosure information concerning the "nature and location" of archaeological resources. 16 U.S.C. § 470hh. Thus,

the sealing of the records is appropriate to protect the integrity of La Posta's cultural and sacred sites. Accordingly, the Court finds that compelling reasons justify sealing the declaration as "court files might . . . become a vehicle for improper purposes." The Court thus **GRANTS** La Posta's motions to seal. (Doc. Nos. 41, 49.)

## IV.   DEFENDANTS' *EX PARTE* MOTION FOR LEAVE TO FILE SUR-REPLY

Next, Defendants asks the Court for permission to file a sur-reply in connection with La Posta's motions for TRO and preliminary injunction. (Doc. No. 57.) The Government argues "Plaintiffs advance two new, affirmative arguments that Acting Secretary of Homeland Security Chad Wolf lacked authority to authorize the border barrier projects and waivers at issue in this case." (*Id.* at 2.) In response, La Posta asserts "[t]he arguments Defendants refer to are neither new nor affirmative, but rather are rebuttals to the Defendants' opposition arguments, which the Tribe referenced in its opening brief." (Doc. No. 58.)

The Court agrees with La Posta that a sur-reply is not warranted in this situation. Of course, a "district court need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007). However, the arguments Defendants challenge here are certainly related to the line of reasoning set forth in La Posta's opening brief. Furthermore, the points made by La Posta in their reply brief are in direct response to arguments advanced by Defendants in the opposition. Therefore, the Court **DENIES** Defendants' *ex parte* request.

## V.   LA POSTA'S SECOND MOTION FOR TEMPORARY RESTRAINING ORDER[1]

### A.   Legal Standard for TRO and Preliminary Injunction

The standard for issuing a TRO is the same as that for the issuance of a preliminary injunction. *See New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1347

---

[1] In support of their second motion for TRO, La Posta requests judicial notice of: (1) an excerpt of Delegation 00106, Rev. 08.5, signed by Kristjen Nielsen on April 10, 2019; (2) an amendment to

8

n.2 (1977). Thus, much like a preliminary injunction, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Whether to grant or deny a TRO or preliminary injunction is a matter within the Court's discretion. *See Miss Universe, Inc. v. Flesher*, 605 F.2d 1130, 1132–33 (9th Cir. 1979).

To obtain a TRO or preliminary injunction, "the moving party 'must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest.'" *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (quoting *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014)). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This articulation represents "one alternative on a continuum" under the "'sliding scale' approach to preliminary injunctions employed" by the Ninth Circuit. *Id.* at 1131–32. But "[t]he critical element in determining the test to be applied is the relative hardship to the parties." *Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978). "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Id.*

## B.   Discussion

Irreparable harm has always served as the "basis of injunctive relief in the federal

---

Delegation 00106 which was signed by Kevin McAleenan on November 8, 2019; and (3) an affidavit of Juliana Blackwell, which the Department of Homeland Security filed in proceedings in *Casa de Maryland, Inc. v. Wolf*, No. 8:20-cv-02118 (D. Md. Sept. 11, 2020). Because all these documents are either records signed by government officials or records filed in other court proceedings, the Court concludes that all three documents are appropriate subjects for judicial notice. *See* Fed. R. Civ. P. 201(b).

courts." *Sampson v. Murray*, 415 U.S. 61, 88 (1974). In their renewed motion for TRO, the Tribe asserts new allegations of harm associated with recent discoveries of cultural sites and items in the El Centro A Project Area. The Court will address each new allegation below. But upon close review of these new allegations, the Court concludes that La Posta has not met their high burden for the extraordinary relief of a TRO. Accordingly, the Court need not review the other three factors because the Tribe has not established irreparable harm in the absence of injunctive relief.

### 1.   Circle Rock Alignments

First, to demonstrate irreparable harm, La Posta contends that barrier construction will cut through various circular rock formations, indicative of tribal cultural sites. Specifically, the Tribe points out the El Centro section of the border wall intrudes upon a centuries-old sacred rock circle formation in Davies Valley. (*See* Second Holm Decl. ¶ 4.) The site features a circle approximately 120 feet in diameter, marked with a perimeter of stones and containing rock cairns. (*Id.* ¶¶ 3–4.) The circle is surrounded by smaller circle features and trails. (*Id.*) In opposition, Defendants respond that the circular feature is a modern construct, and that satellite imagery of the area shows no evidence of the circular feature before 2016. (*See* Third Decl. of Paul Enriquez ("Third Enriquez Decl.") ¶ 78.) In reply, La Posta states that "[w]hile one of the larger circles was not visible from satellite images before 2016, this is likely due to poor resolution and vegetation." (Doc. No. 55 at 9.) Regardless of whether the circle formation was visible by satellite prior to 2016, this factual dispute again undercuts La Posta's showing of a concrete, irreparable harm necessary for a TRO. Indeed, while La Posta claims the circle complexes as ancient Kumeyaay cultural sites, Defendants argue that other representatives of the Kumeyaay tribes examined the site in November 2020 and questioned whether the formations were the result of "ATV enthusiasts."[2] (Third Enriquez Decl. ¶ 79.) With directly competing

---

[2] La Posta objects to these statements in Mr. Enriquez's declaration as hearsay. (Doc. No. 55 at 9.) The Court, however, may consider inadmissible evidence, including hearsay evidence, in determining whether

evidence once again, the Court cannot simply conclude La Posta has established the necessary evidence for immediate relief based on this discovery.

La Posta next argues there is evidence of various other circular rock formations discovered by Mr. Holms, the director of the Kumeyaay Historic Preservation Council. (*See* Doc. No. 40-1 at 6–7; Second Holm Decl. ¶¶ 6–7.) However, these other locations cannot serve as the basis for irreparable injury because the "rock cairn and trail intersection that is referred to in Mr. Holm's declaration is approximately 700 feet north of the El Centro Project Area." (Third Enriquez Decl. ¶ 81.) To explain why this discovery was made, the Government adds that "Kumeyaay representatives were permitted to explore areas outside the El Centro Project Area, which is where Mr. Holm claims to have seen the trail intersection and rock cairn." (Third Enriquez Decl. ¶ 81.) As such, these circular rock formations will not be impacted by construction as they lay outside the El Centro A Project Area. (*See id.* ¶¶ 81–84.)

Additionally, La Posta highlights another rock alignment near the Skull Valley access road. (*See* Second Holm Decl. ¶ 6.) However, the road alignment for the Skull Valley access road was specifically shifted west to avoid the rock alignment identified by CBP during pre-construction surveys, thereby abating any irreparable injury that might occur to the Tribe in this area. (*See* Third Enriquez Decl. ¶ 83.) Therefore, these discoveries related to rock circle alignments may not serve as a basis for immediate injunctive relief as they are either factually disputed or fall outside of the area of construction.

## 2.    Fire Features and Bone Fragments

Second, to further establish irreparable damage, the Tribe asserts that "18 separate fire features" and two bone fragments were found by a tribal cultural monitor near the El

---

to issue a temporary restraining order or preliminary injunction. *See Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("[T]he district court did not abuse its discretion in considering hearsay and biased evidence of actual confusion because the rules of evidence do not strictly apply to preliminary injunction proceedings.").

Centro Project Area. (Doc. No. 40-1 at 20; Second Holm Decl. ¶¶ 8–9.) In opposition, Defendants argue that the number of features inside the Project Area are overstated. Instead, only three cultural fire features were discovered within the El Centro Project Area during the week of November 16, 2020. (*See* Third Enriquez Decl. ¶¶ 60–65.) The other fifteen fire features were found outside the Project Area. (*Id.*)

As to these three fire features, extensive mitigation efforts implemented by Defendants alleviate any imminent threat of irreparable harm. Upon discovery of the fire features, Defendants stated they "stopped construction in the area and immediately instituted mitigation measures to avoid any damage to the items, arranged for Plaintiffs to examine the features, and are working with Plaintiffs to implement a mutually-agreeable treatment plan." (*See* Third Enriquez Decl. ¶¶ 61–76.) In fact, after a tribal cultural monitor discovered the items, "CBP immediately created a 100-meter buffer zone around all three features and ceased all construction activity and vehicular traffic within that area." (*Id.* ¶ 65.) CBP then arranged for La Posta and other representatives from the Kumeyaay Tribes to conduct a site inspection of the area on November 19, 2020. (*Id.* ¶ 66–76.) As further evidence of the Government's cooperation to prevent irreparable harm, CBP circulated a "draft plan in early December that calls for capping—a means of protecting cultural resources in place—the cremation site and performing additional testing on the other two features." (*Id.* ¶ 76.) Pending implementation of this plan, CBP and the Kumeyaay tribes have agreed that "temporary concrete barriers would be placed around the features and no construction traffic or activity would be allowed within that buffer zone." (*Id.*)

As for the discovery of bone fragments near this site, even if mitigation procedures were not in place to prevent irreparable damage, factual disputes hinder La Posta's ability to obtain immediate injunctive relief. In particular, La Posta's medical examiner stated the bone fragments are likely human bones, (Doc. No. 40-1 at 20), whereas CBP's archeologist concluded that the bones are more likely to belong to an animal, (Doc. No. 48 at 12). Defendants also point out that determining whether the fragments are human, or animal would require laboratory testing, which would likely destroy the fragments given their

small size. (*Id.*) Thus, with these factual disputes and mitigation procedures, La Posta has fallen short of their burden of establishing irreparable harm based on these fire features and bone fragments.

### 3. Interference with Stargazing

La Posta next cites to interference with stargazing as another source of irreparable harm. (Doc. No. 40-1 at 7.) La Posta explains tribal citizens practice stargazing throughout the Project Area, and so, installation of lighting on the border wall will cause light pollution, obscuring the tribal citizens' view of the night sky. (*Id.*) As with the fire features discussed above, the Government has indicated it can take "steps to minimize light spillage, including through the installation of light shields that allow the light to spill downward, not upwards or horizontally." (*See* Third Enriquez Decl. ¶ 93.) With these mitigation measures, the Court cannot deem that the installation of lighting would cause irreparable harm sufficient for a TRO.

### 4. Inability to Survey Project Area

Lastly, La Posta appears to also characterize their irreparable harm as the inability to adequately survey the Project Area. But the mitigation efforts undertaken by the Government to date undermines this claim. Indeed, La Posta does not dispute that five tribal cultural monitors have been permitted on-site to observe construction activities in the Project Area, "in addition to the monitors CBP itself is providing." (*See* Third Enriquez Decl. ¶ 37.) CBP also has notified the Tribe that they are permitted to provide additional tribal cultural monitors at their own expense, but there is no evidence that La Posta has elected to do so. (Doc. No. 48 at 14). "To be sure, the Kumeyaay are under no legal obligation to provide monitors. Their decision not to do so, however, weakens their claim that they cannot oversee construction activities to mitigate potential damage." *Manzanita Band of Kumeyaay Nation v. Wolf*, No. 1:20-CV-02712 (TNM), 2020 WL 6118182, at *8 (D.D.C. Oct. 16, 2020).

In addition, CBP has reviewed prior survey data, conducted record searches of the

Project Area, and performed new surveys of the Project Areas specifically identified by La Posta as having a high likelihood of containing cultural artifacts. (*See* Third Enriquez Decl. ¶¶ 34, 40–43.) The record here also establishes that Defendants have immediately notified La Posta about newly discovered items, stopped construction upon detection of such items, implemented measures to create a buffer zone around the areas, and agreed to La Posta's recommended protection measures.

Whether these measures are in fact sufficient is not the question before the Court today. For today, the extensive mitigation efforts and protocols in place substantially undercut La Posta's ability to establish both irreparable and imminent harm. *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 454 (1988) ("It is worth emphasizing . . . that the Government has taken numerous steps in this very case to minimize the impact that construction of the [ ] road will have on the Indians' religious activities."); *see Quechan Tribe of the Ft. Yuma Indian Reservation v. U.S. Dep't of the Interior*, No. 12-CV-1167-WQH-MDD, 2012 WL 1857853, at *7 (S.D. Cal. May 22, 2012) (finding no likelihood of irreparable harm related to discovery of cultural and burial items where plaintiff failed to show that mitigation procedures were "not adequate to guard against irreparable injury to items discovered on public land"); *Manzanita Band of Kumeyaay Nation*, 2020 WL 6118182, at *5 ("For now, the mitigation efforts in place undermine the Kumeyaay's burden to establish both irreparable and imminent harm, especially given their own evidentiary shortcomings.").

## VI. CONCLUSION

Against the backdrop of this evidence and Defendants' mitigation procedures, the Tribe has not met their burden of establishing irreparable injury in the absence of an immediate injunction. Unable to meet this requirement, the Court need not address the

//
//
//
//

14

other three factors for a TRO. Based on all the reasons stated above, the Court (1) **GRANTS** La Posta's motions to seal, (Doc. Nos. 41, 49); (2) **DENIES** Defendants' *ex parte* motion for leave to file a sur-reply, (Doc. No.57); and (3) **DENIES** La Posta's second motion for TRO, (Doc. No. 40).

     **IT IS SO ORDERED**.

Dated:  December 16, 2020

Hon. Anthony J. Battaglia
United States District Judge